# APPENDIX D



# Davis Wright Tremaine LLP

ANCHORAGE    BELLEVUE    LOS ANGELES    NEW YORK    PORTLAND    SAN FRANCISCO    SEATTLE    SHANGHAI    WASHINGTON, D.C.

ROBERT CORN-REVERE              SUITE 450                    TEL (202) 508-6600
Direct (202) 508-6625           1500 K STREET NW             FAX (202) 508-6699
bobcornrevere@dwt.com           WASHINGTON, D.C. 20005-1272  www.dwt.com

December 22, 2005

Chairman, Appeals Review Panel
c/o Information and Privacy Coordinator/Appeals Officer
Assistant Secretary for Public Affairs
c/o The Appeals Officer
U.S. Department of State
515 22nd Street, N.W.
A/RPS/IPS/PP, SA-2
Washington, DC 20522-6001

> Re:    **FOIA Request 200504606**
> **Freedom of Information Act Appeal**

Dear Sir or Madam:

Pursuant to the Freedom of Information Act, 5 U.S.C. § 552, as amended ("FOIA"), your agency's implementing regulations and policies, including but not limited to 22 C.F.R. § 171.52, ICM Registry, LLC ("ICM Registry"), by counsel, hereby submits its appeal of agency inaction in response to the above-referenced FOIA request. A copy of the request and additional relevant materials are attached.

This appeal seeks administrative review with respect to the above-referenced FOIA request filed via fax by counsel for ICM Registry on October 18, 2005 (the "FOIA Request, copy attached as Exhibit 1). The FOIA Request asked that Department of State provide ICM Registry with copies of the following records:

All records, correspondence, memoranda, transcripts, notes, documents, reports, emails or audiovisual or other materials consisting of or reflecting, representing, recording or otherwise disclosing communications, written or oral, between March 1, 2005 and the present, regarding approval by the Internet Corporation for Assigned Names and Numbers ("ICANN"), and/or by its Board of Directors, of the new ".xxx" sponsored top-level domain ("sTLD"), and/or ICANN's or its Board's approval of ICM Registry's contract to operate the .xxx sTLD [other than] documents submitted to the agency by the general public as part of any mass mailing campaign(s) or similarly duplicative emails/documents.



> All records, correspondence, memoranda, transcripts, notes, documents, reports, emails or audiovisual or other materials consisting of or reflecting, representing, recording or otherwise disclosing communications, written or oral, between March 1, 2005 and the present, between any personnel at the Department of Commerce, or any Bureau or other component thereof, and the ICANN Board of Directors and its staff, ICANN's Governmental Advisory Committee ("GAC"), any GAC member country, or any individuals or agency in a GAC member country, regarding the .xxx sTLD.

*See* Exh. 1 at 1-2. The FOIA Request also asked that if any information was withheld, ICM Registry should receive copies of all non-exempt, reasonably segregable portions of the material, as well as a detailed statement of the statutory basis and reasons for each instance of withholding, and an index or similar statement of the nature of any withheld materials. *Id.* at 2. ICM Registry also expressed its willingness to discuss any questions in order to expedite processing of its request, including specific instances of potential deletion or claims of exemption from disclosure, and to pay search and duplication fees up to $5,000. Under 5 U.S.C. 552(a)(6)(A)(i) and 22 C.F.R. § 117.12(d), the time for the State Department to respond to the FOIA Request was November 15, 2005, or at the latest by November 30, 2005, if it exercised the ten-day extension permitted under 5 U.S.C. § 552(a)(6)(B) when unusual circumstances are present. [1]

Counsel for ICM Registry has spoken informally with staff within the Department of State regarding the outstanding FOIA Request. In initial conversations, the staff was unable to estimate when a response to the request might be forthcoming. However, the staff indicated that, based on preliminary review of the four corners of the request, its subject matter did not appear to fall within State Department responsibilities, and if that was the case, a response to that effect would issue. The staff also expressed doubt the State Department would have any documents responsive to the FOIA Request. Undersigned counsel agreed to provide – and subsequently furnished – additional information, as discussed further below, to assist in processing the FOIA Request and to help illustrate why it was properly directed to the Department of State. Nevertheless, the agency has not responded to the FOIA Request by the deadlines established by the FOIA provisions set out above.

Instead, by letter dated December 13, 2005 – two weeks after the deadline for action on the FOIA Request even allowing an unconfirmed and thus unjustified exercise of a ten-day "unusual circumstances" extension – the State Department indicated it would "begin processing"

---

[1] ICM Registry submits that a showing of unusual circumstances cannot be made in this case, and at the very least notes, as discussed above in the text to immediately follow, no showing was offered in any event since the agency has not responded to the FOIA Request. Moreover, once the initial twenty business days expired but before the ten-day extension period terminated, it was requested several times during discussions referenced in the text immediately to follow that the Department formalize its decision to exercise the ten-day extension by stating as much in writing. However, no such statement was provided.



ICM Registry's FOIA Request. [2]  The letter offered no explanation why the Department of State was only "beginning" to process the request some two months after it was filed, and two weeks *after* the longest period permitted by statute for a response. [3]  Nor did it give any indication when a response to the FOIA Request would be forthcoming.  Rather, it is clear the mailing is no more than a form letter sent out at the agency's commencement of processing a FOIA request.

The State Department's refusal to respond timely to ICM Registry's FOIA Request is unlawful, and the agency accordingly must grant this appeal, which is proper given its failure to respond.  *See* 5 U.S.C. 552(a)(6)(C) (administrative remedies are considered exhausted where there is no response by statutory deadlines).  There is no excuse for such utter failure to respond by administrative agencies charged with helping "promote [the] policy of broad disclosure of Government documents" necessary to "ensure an informed citizenry, vital to the functioning of a democratic society." *Center for Public Integrity v. Department of Energy*, 191 F.Supp.2d 187, 189 (D.D.C. 2002).  It is significant in this regard that, on the same day ICM Registry filed the instant FOIA Request with the Department of State, it filed a nearly identical request with the Department of Commerce (copy attached as Exhibit 3), and that agency expeditiously furnished a response on November 18, 2005, by providing records falling within ICM Registry's request. [4]  There is no reason why the State Department could not do the same.

It is no excuse that, as State Department staff intimated, the FOIA Request's subject matter may be unfamiliar to rank-and-file members of the agency and/or that they harbor doubt whether any responsive records are within the agency's possession.  In any event, to dispel such a notion, on November 29, 2005, undersigned counsel faxed to the State Department copies of documents ICM Registry received in response to its FOIA request to the Commerce Department, indicating a likelihood the State Department likewise possess responsive documents (copy of fax attached as Exhibit 6).  These included Commerce Department documents indicating coordination on the .xxx matter with an individual at State with the email address "shipmansa@state.gov" as well as with Michael Gross.  *See* Exh. 6, *passim.*  *See also* http://foia.state.gov/appeal.asp (an

---

[2]  A copy of the letter is attached as Exhibit 2.  It should be noted that, while the letter was dated December 13, 2005, it bore a post-mark of December 14, 2005, and did not arrive until December 19, 2005.

[3]  In this regard, and in the context of the discussion in note 1 *supra* regarding the exercise of ten-day extensions, the letter confirmed that no "unusual circumstances" that can justify non-compliance with statute's twenty-day deadline exist.  *See* Exh. 2 at 2 (indicating "unusual circumstances *may arise* for extending the limit," thereby confirming the agency makes no claim of "unusual circumstances" that presently exist) (emphasis added).

[4]  A copy of the Department of Commerce's response, exclusive of the responsive records, is attached as Exhibit 4.  Though the Commerce Department withheld and/or redacted a number of records responsive to ICM Registry's request, resulting in administrative appeal to the agency (a copy of which, exclusive of attachments, is attached as Exhibit 5), it is notable that Commerce provided approximately 1,600 pages of documents within the time allotted by the FOIA.

December 22, 2005
Page 4

"appeal letter should ... provide any additional supporting information [which] might include ... examples of material previously released by the State Department or another agency"). ICM Registry anticipates that additional records responsive to the FOIA Request are within the State Department's possession as well.

Moreover, while it is not necessary that an agency provide all records responsive to a request by the statutory deadline to meet its FOIA obligations, it must at least provide *something* that can be fairly characterized as a "response." *Pollack v. DOJ*, 49 F.3d 115, 118-19 (4th Cir. 1995). The December 13 form letter that the Department of State sent confirming receipt of the FOIA Request, and stating that processing of the request would "begin" thereafter, accordingly is not a "response" at all. [5] This is particularly true given that ICM Registry already had done some of the agency's work for it by providing copies of documents in State Department's possession that are responsive to the FOIA Request, and by providing additional leads on where additional responsive records might be found. There is no reason that your agency, in the ensuing two weeks between provision of that information and mailing the December 13 letter, could not have – at the very least – confirmed its possession of the records ICM Registry forwarded and any possession of similar documents the agency staff whose names appear on the records. Indeed, given the Department of Commerce's expeditious processing of an identical FOIA request, there is no reason the Department of State, armed with an additional month of working time, could not have produced something at least approximating a "response" under the FOIA.

It is our hope this appeal can be resolved quickly and without the expenditure of substantial additional resources. However, it is imperative that ICM Registry receive all records sought in the FOIA Request to which it is entitled. If there are questions regarding this matter, or if there is information we can provide to bring it to an expeditious resolution, please contact us. We will look forward to your response to this appeal within the twenty working days specified by the FOIA and your agency's rules.

Very truly yours,

Davis Wright Tremaine LLP

Robert Corn-Revere
Counsel for ICM Registry

---

[5]  *See Pollack*, 49 F.3d at 118 ("While ... agency need not actually fulfill the request within that period of time, it is required to notify the requester of its decision whether and how it will comply, its reasons for that decision, and the requester's right to appeal any adverse determination to the agency head"). *See also Ruotolo v. DOJ*, 53 F.3d 4, 9 (2d Cir. 1995) ("time limit provision requires that a determination ... be made [by deadline] *and* that it include a notification of the requester's right to appeal," which December 13 letter here did not) (emphasis in original).

**EXHIBIT 1**

# Davis Wright Tremaine LLP



ANCHORAGE  BELLEVUE  LOS ANGELES  NEW YORK  PORTLAND  SAN FRANCISCO  SEATTLE  WASHINGTON, D.C.  SHANGHAI

SUITE 450
1500 K STREET NW
WASHINGTON, D.C.  20005-1262

TEL (202) 508-6600
FAX (202) 508-6699
www.dwt.com

## FAX COVER SHEET

**PLEASE DELIVER THE FOLLOWING MATERIAL AS SOON AS POSSIBLE.**
**PLEASE NOTIFY US IMMEDIATELY AT (202) 508-6600 IF NOT RECEIVED PROPERLY.**
**THANK YOU!**

THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE MAY BE PRIVILEGED AND CONFIDENTIAL INFORMATION INTENDED FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED BELOW.  IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE, (COLLECT IF NECESSARY) AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. MAIL.
THANK YOU!

| Date: October 18, 2005 | Time In: 4:09 PM | Total Pages To Be Sent:  3 (including cover page) |
|---|---|---|

FROM: Ronald G. London          TELEPHONE:  (202) 508-6635          FAX:  (202) 508-6699

SEND TO:

| NAME | COMPANY | FAX NUMBER |
|---|---|---|
| **Office of Information Programs and Services** | **U.S. Department of State** | **(202) 261-8579** |

COMMENTS/SPECIAL INSTRUCTIONS:



# Davis Wright Tremaine LLP

ANCHORAGE   BELLEVUE   LOS ANGELES   NEW YORK   PORTLAND   SAN FRANCISCO   SEATTLE   SHANGHAI   WASHINGTON, D.C.

RONALD G. LONDON                SUITE 450                    TEL (202) 508-6600
DIRECT (202) 508-6635           1500 K STREET NW             FAX (202) 508-6699
ronnielondon@dwt.com            WASHINGTON, D.C. 20005-1262  www.dwt.com

October 18, 2005

*VIA FACSIMILE* - (202) 261-8579

Office of Information Programs and Services
A/RPS/IPS/RL
U.S. Department of State, SA-2
Washington, DC 20522-1800

       **Re:    Freedom of Information Act Request**

Dear Sir or Madam:

      Pursuant to the Freedom of Information Act, 5 U.S.C. § 552, as amended ("FOIA"), and your agency's implementing regulations and policies, including but not limited to 22 C.F.R. Part 171, ICM Registry, LLC, by counsel, hereby requests that you provide us with copies of the following documents:

      All records, correspondence, memoranda, transcripts, notes, documents, reports, emails or audiovisual or other materials consisting of or reflecting, representing, recording or otherwise disclosing communications, written or oral, between March 1, 2005 and the present, regarding approval by the Internet Corporation for Assigned Names and Numbers ("ICANN"), and/or by its Board of Directors, of the new ".xxx" sponsored top-level domain ("sTLD"), and/or ICANN's or its Board's approval of ICM Registry's contract to operate the .xxx sTLD. This request does not encompass documents submitted to the agency by the general public as part of any mass mailing campaign(s) or similarly duplicative emails/documents.

      All records, correspondence, memoranda, transcripts, notes, documents, reports, emails or audiovisual or other materials consisting of or reflecting, representing, recording or otherwise disclosing communications, written or oral, between March 1, 2005 and the present, between any personnel at the State Department and the ICANN Board of Directors and its staff, ICANN's Governmental

October 18, 2005
Page 2

Advisory Committee ("GAC"), any GAC member country, or any individuals or agency in a GAC member country, regarding the .xxx sTLD.

If any information described above is withheld, ICM Registry requests copies of all non-exempt, reasonably segregable portions of such materials, as well as a detailed statement of the statutory basis and reasons for each instance of withholding, including specifically but not limited to the FOIA exemption relied upon for such withholding, and an index or similar statement of the nature of any materials withheld. If any of the requested documents require pre-release processing, we ask that the remaining documents be made available in advance of processing the entire request.

To expedite this request, ICM Registry is willing to discuss any questions you may have concerning this request and any specific instances of deletion or claims of exemption from disclosure in advance of a final determination on these issues. ICM Registry is prepared to pay all proper fees for document searching and duplication up to $5000.

We look forward to your response within twenty (20) working days from the date you receive this request, as required by 5 U.S.C. § 552(a)(6)(A)(i). Please call the undersigned if you have any questions concerning this request. Thank you for your attention in this matter

Very truly yours,

Davis Wright Tremaine LLP

Ronald G. London
Counsel for ICM Registry, LLC

**EXHIBIT 2**



**United States Department of State**

*Washington, D.C. 20520*

December 13, 2005
Case Number: 200504606

Ronald G. London
1500 K Street, Suite 450
Washington D.C. 20005-1272

Dear Mr. London:

This is in response to your Freedom of Information Act (FOIA) request, dated October 18, 2005, for copies of documents concerning approval by the internet corporation for assigned names and numbers (ICANN) of the new "XXX" sponsored top level domain (STLD) and/or it's approval of ICM registry's contract to operate the XXX STLD.

We will begin the processing of your request based upon the information provided in your communication. We will notify you as soon as responsive material has been retrieved and reviewed.

We wish to advise you that the cut-off date for retrieving records is either the date you have given the Department by specifying a particular time frame or the date the search is initiated.

**Fees:** The Freedom of Information Act requires agencies to assess fees to recover the direct costs of processing requests, unless a fee waiver has been granted.

---

*Office of Information Programs and Services*
*U.S. Department of State SA-2*
*Washington, DC 20522-8100*
    *Web site: foia.state.gov*

*Inquiries:*
*Phone: 1-202-261-8314*
*FAX: 1-202-261-8579*
*email: FOIAStatus@state.gov*

-2-

By making a FOIA request, you have agreed to pay all applicable fees up to $25.00 unless a fee waiver has been granted. You may specify a willingness to pay a greater or lesser amount. If the estimated fees exceed this limit, you will be notified.

Based upon the information that you have provided, we have placed you in the other requester category. This category requires us to assess search time after 2 hours/duplication costs after the first 100 pages.

You have stated your willingness to pay the fees incurred in the processing of this request up to $5,000.00.

We will notify you of the costs incurred in processing your request as soon as the search for and review of any responsive documents have been completed.

While we will make every effort to meet the time limits cited in the Freedom of Information Act (5 USC § 552), unusual circumstances may arise for extending the time limit (see enclosure). We appreciate your patience in this matter.

If you have any questions, please do not hesitate to contact us. We can provide faster service if you include the case number of your request in your communications with us.

*Office of Information Programs and Services*
*U.S. Department of State SA-2*
*Washington, DC 20522-8100*
*Web site: foia.state.gov*

*Inquiries:*
*Phone: 1-202-261-8314*
*FAX: 1-202-261-8579*
*email: FOIAStatus@state.gov*

-3-

We are pleased to be of service to you.

Sincerely,

CatletJR
Requester Communications Branch

Office of Information Programs and Services
U.S. Department of State  SA- 2
Washington, DC 20522-8100
        Web site: foia.state.gov

Inquiries:
Phone: 1- 202- 261- 8314
FAX: 1- 202- 261- 8579
email:  FOIAStatus@state.gov

**EXHIBIT 3**

# Davis Wright Tremaine LLP



ANCHORAGE  BELLEVUE  LOS ANGELES  NEW YORK  PORTLAND  SAN FRANCISCO  SEATTLE  WASHINGTON, D.C.  SHANGHAI

SUITE 450                           TEL (202) 508-6600
1500 K STREET NW                    FAX (202) 508-6699
WASHINGTON, D.C.  20005-1262        www.dwt.com

## FAX COVER SHEET

**PLEASE DELIVER THE FOLLOWING MATERIAL AS SOON AS POSSIBLE.**
**PLEASE NOTIFY US IMMEDIATELY AT (202) 508-6600 IF NOT RECEIVED PROPERLY.**
**THANK YOU!**

THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE MAY BE PRIVILEGED AND CONFIDENTIAL INFORMATION INTENDED FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED BELOW.  IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE, (COLLECT IF NECESSARY) AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. MAIL.
THANK YOU!

| Date: October 18, 2005 | Time In: 4:09 PM | Total Pages To Be Sent:  3 (including cover page) |
|---|---|---|

FROM: Ronald G. London          TELEPHONE:  (202) 508-6635          FAX:  (202) 508-6699

SEND TO:

| NAME | COMPANY | FAX NUMBER |
|---|---|---|
| **Brenda Dolan** **Departmental FOI Officer** | **U.S. Department of Commerce** | **(202) 219-8979** |

COMMENTS/SPECIAL INSTRUCTIONS:



# Davis Wright Tremaine LLP

ANCHORAGE   BELLEVUE   LOS ANGELES   NEW YORK   PORTLAND   SAN FRANCISCO   SEATTLE   SHANGHAI   WASHINGTON, D.C.

RONALD G. LONDON            SUITE 450                    TEL (202) 508-6600
DIRECT (202) 508-6635        1500 K STREET NW            FAX (202) 508-6699
ronnielondon@dwt.com         WASHINGTON, D.C. 20005-1262  www.dwt.com

October18, 2005

*VIA FACSIMILE* - (202) 219-8979

Brenda Dolan
Departmental Freedom of Information Officer
Office of Management and Organization
U.S. Department of Commerce
Room H5327
Washington, D.C. 20230

   Re: **Freedom of Information Act Request**

Dear Sir or Madam:

   Pursuant to the Freedom of Information Act, 5 U.S.C. § 552, as amended ("FOIA"), and your agency's implementing regulations and policies, including but not limited to 15 C.F.R. Part 4, ICM Registry, LLC, by counsel, hereby requests that you provide us with copies of the following documents held by any Bureau or component of your agency, including but not limited to your office and the National Telecommunications & Information Administration:

   All records, correspondence, memoranda, transcripts, notes, documents, reports, emails or audiovisual or other materials consisting of or reflecting, representing, recording or otherwise disclosing communications, written or oral, between March 1, 2005 and the present, regarding approval by the Internet Corporation for Assigned Names and Numbers ("ICANN"), and/or by its Board of Directors, of the new ".xxx" sponsored top-level domain ("sTLD"), and/or ICANN's or its Board's approval of ICM Registry's contract to operate the .xxx sTLD. This request does not encompass documents submitted to the agency by the general public as part of any mass mailing campaign(s) or similarly duplicative emails/documents.

   All records, correspondence, memoranda, transcripts, notes, documents, reports, emails or audiovisual or other materials consisting of or reflecting, representing,

October 18, 2005
Page 2

recording or otherwise disclosing communications, written or oral, between March 1, 2005 and the present, between any personnel at the Department of Commerce, or any Bureau or other component thereof, and the ICANN Board of Directors and its staff, ICANN's Governmental Advisory Committee ("GAC"), any GAC member country, or any individuals or agency in a GAC member country, regarding the .xxx sTLD.

If any information described above is withheld, ICM Registry requests copies of all non-exempt, reasonably segregable portions of such materials, as well as a detailed statement of the statutory basis and reasons for each instance of withholding, including specifically but not limited to the FOIA exemption relied upon for such withholding, and an index or similar statement of the nature of any materials withheld. If any of the requested documents require pre-release processing, we ask that the remaining documents be made available in advance of processing the entire request.

To expedite this request, ICM Registry is willing to discuss any questions you may have concerning this request and any specific instances of deletion or claims of exemption from disclosure in advance of a final determination on these issues. ICM Registry is prepared to pay all proper fees for document searching and duplication up to $5000.

We look forward to your response within twenty (20) working days from the date you receive this request, as required by 5 U.S.C. § 552(a)(6)(A)(i). Please call the undersigned if you have any questions concerning this request. Thank you for your attention in this matter

Very truly yours,

Davis Wright Tremaine LLP

Ronald G. London
Counsel for ICM Registry, LLC.

**EXHIBIT 4**



**UNITED STATES DEPARTMENT OF COMMERCE**
National Telecommunications and
Information Administration
Washington, D.C. 20230

November 18, 2005

Ronald G. London
Davis Wright Tremaine LLP
Suite 450
1500 K Street, N.W.
Washington, DC 20005

       RE:    Freedom of Information Act Request (CRRIF 06-068)

Dear Mr. London:

    On October 20, 2005, the National Telecommunications and Information Administration (NTIA) received your request under the Freedom of Information Act (FOIA), as amended, 5 U.S.C. § 552. You requested documents from the Department of Commerce, including documents from March 1, 2005 regarding approval by the Internet Corporation for Assigned Names and Numbers (ICANN) and/or its Board of Directors of a .xxx sponsored top level domain or of ICM Registry's contract to operate the .xxx domain. You also requested documents from the Department of Commerce, including documents from March 1, 2005 between Departmental personnel and the ICANN Board, its staff, its Governmental Advisory Committee (GAC), any GAC member country, or individual or agency of a GAC member country regarding the .xxx domain. Your request excluded documents submitted to the Department by the general public as part of any mass mailing campaign or similarly duplicative emails or documents.

    Documents responsive to your request are enclosed. NTIA has withheld certain documents in whole or in part under 5 U.S.C. § 552(b)(5) as predecisional or privileged. NTIA also identified certain documents from other agencies which may be responsive to your request and is in the process of coordinating with those agencies to accord them proper treatment under FOIA. We will forward those documents to you upon successful completion of that coordination.

    In accordance with the Department of Commerce's FOIA regulations, fees associated with the processing of your request are $ 4,956.51.00, which includes the cost of the agency's search and review ($2,481.51.00) and duplication ($ 2,475.00). Please make your check payable to the U.S. Treasury and forward it to our office at the U.S. Department of Commerce, National Telecommunications and Information Administration, Office of the Chief Counsel, 1401 Constitution Avenue, N.W., Room 4713, Washington, DC 20230. See 15 C.F.R. § 4.9.

    This concludes the initial determination by the Department. You have the right to administratively appeal this decision within 30 calendar days of the date of this letter. The appeal must include a copy of your request, this letter, a statement of the reasons why the records

requested should be made available, and why the initial denial was in error. This appeal must be addressed to the Assistant General Counsel for Administration, U.S. Department of Commerce, 1401 Constitution Avenue, N.W., Room 5898-C, Washington, DC 20230. Both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal." 15 C.F.R. § 4.9. Your appeal may also be sent by electronic mail to FOIAAppeals@doc.gov or by facsimile to (202) 482-2552.

If you have any questions regarding the processing of your request, please contact Denise Marshall at (202) 482-1030.

Sincerely,

Kathy D. Smith
Chief Counsel

Enclosures

2

**EXHIBIT 5**



# Davis Wright Tremaine LLP

ROBERT CORN-REVERE
DIRECT (202) 508-6625
bobcornrevere@dwt.com

SUITE 450
1500 K STREET NW
WASHINGTON, D.C. 20005-1262

TBL (202) 508-6600
FAX (202) 508-6699
www.dwt.com

December 2, 2005

*VIA FACSIMILE* - (202) 482-2552
*and EMAIL* – FOIAAppeals@doc.gov

Assistant General Counsel for Administration
United States Department of Commerce
1401 Constitution Avenue, N.W., Room 5898-C
Washington, DC 20230

> **Re:  CRRIF 06-068**
> **Freedom of Information Act Appeal**

Dear Sir or Madam:

Pursuant to the Freedom of Information Act, 5 U.S.C. § 552, as amended ("FOIA"), your agency's implementing regulations and policies, including but not limited to 15 C.F.R. § 4.10, and the National Telecommunications and Information Administration's ("NTIA") letter of November 18, 2005, responding to the above-referenced FOIA request, ICM Registry, LLC ("ICM Registry"), by counsel, hereby submits its appeal of agency action in response to its FOIA request. A copy of the FOIA request and the NTIA response are attached as Exhibits 1 and 2.

## Introduction

ICM Registry filed FOIA request CRRIF 06-068 on October 18, 2005 (the "FOIA Request"), to ask the Department of Commerce ("DoC") or any Bureau or component thereof, including but not limited to NTIA, to provide ICM Registry with copies of the following records:

> All records, correspondence, memoranda, transcripts, notes, documents, reports, emails or audiovisual or other materials consisting of or reflecting, representing, recording or otherwise disclosing communications, written or oral, between March 1, 2005 and the present, regarding approval by the Internet Corporation for Assigned Names and Numbers ("ICANN"), and/or by its Board of Directors, of the new ".xxx" sponsored top-level domain ("sTLD"), and/or ICANN's or its Board's approval of ICM Registry's contract to operate the .xxx sTLD [other

December 2, 2005
Page 2

than] documents submitted to the agency by the general public as part of any mass mailing campaign(s) or similarly duplicative emails/documents.

All records, correspondence, memoranda, transcripts, notes, documents, reports, emails or audiovisual or other materials consisting of or reflecting, representing, recording or otherwise disclosing communications, written or oral, between March 1, 2005 and the present, between any personnel at the Department of Commerce, or any Bureau or other component thereof, and the ICANN Board of Directors and its staff, ICANN's Governmental Advisory Committee ("GAC"), any GAC member country, or any individuals or agency in a GAC member country, regarding the .xxx sTLD.

*See* Ex 1. The FOIA Request also asked that if any of the foregoing information was withheld, ICM Registry should receive copies of all non-exempt, reasonably segregable portions of such material, as well as a detailed statement of the statutory basis and reasons for each instance of withholding, and an index or similar statement of the nature of any withheld materials. *Id.* at 2.

NTIA responded to the FOIA Request by letter of November 18, 2004, by which it transmitted approximately 1,600 pages of documents and claimed an exemption to withhold "certain documents in whole or in part under 5 U.S.C. § 552(b)(5) as predecisional or privileged" (the "FOIA Response"). [1] Of those 1,600 pages, 120 contained redactions obscuring parts of the document with a notation to Section 552(b)(5), and 98 consisted solely of pages that were blank save for a reference to Section 552(b)(5), indicating that documents consisting of one or more pages had been withheld in full. Copies of the redacted and/or withheld documents are attached as Exhibit 3. [2]

Other than the statement in the FOIA Response and handwritten notations on the documents, NTIA provided no explanation of the statutory basis and reasons for redacting/withholding the documents, nor did it provide any index or other statement indicating the nature of the materials withheld. In virtually all cases of redaction, it is impossible to determine from con-

---

[1] *See* Ex. 2 at 1. The letter also indicated that NTIA identified additional documents from other agencies which may be responsive to the FOIA Request, that NTIA was in the process of coordinating with the other agencies "to accord them proper treatment under FOIA," and that NTIA would forward the documents upon completion of the inter-agency coordination effort. *Id.* ICM Registry has not received those documents, and hereby reserves all rights with respect to them pending their receipt.

[2] For ease of reference, we have added consecutive page numbers to the records included at Exhibit 3. These did not appear on the documents as received with the FOIA Response. It should be noted that Exhibit 3 contains substantially more than 218 pages (the combined number of redacted and withheld pages referenced in the text), because in each case of a document that was redacted, Exhibit 3 contains the whole of the document and not just the redacted page(s).

December 2, 2005
Page 3



text the nature of the material withheld and, of course, in cases where a document was withheld in full, it is not possible to determine its nature or the specific reasons that might have lead to its nondisclosure. However, the nature of DoC's role in ICANN's process for approving new domains, and the content of the documents disclosed thus far, make application of any FOIA exemption highly doubtful.

### Background

Documents released thus far in response to the FOIA request, either in whole or in part, paint a picture of the nature of the activities that took place within DoC after the ICANN Board announced that it had approved ICM Registry's proposal for a sponsored .xxx domain. They suggest that DoC immediately focused on political reactions to ICANN's announcement – not on any regulatory activity – and confirmed DoC's view that it lacked any official decisional role in approving new domain names. Nevertheless, DoC decided to intervene in the ICANN process. The documents further indicate that the United States Government consulted with foreign representatives in an attempt to solicit foreign governmental intervention to achieve DoC's domestic political goals.

The leadership of NTIA began discussions of .xxx in response to news stories the day after ICANN's Board decision to commence negotiations with ICM Registry. Although the substance of various email exchanges was redacted under assertions of FOIA Exemption 5 relating to executive privilege for "predecisional" discussions (see discussion below), the documents that were released show that the correspondents (including DoC Assistant Secretary for Communications and Information Michael D. Gallagher) exchanged a news story on ICANN's decision. The only non-redacted text from the exchange says, "Mike, think this will cause us any problems?" Email from Meredith Attwell to Michael Gallagher, June 2, 2005; Email from John Kneuer to Michael Gallagher, June 2, 2005 (Exhibit 4, attached).

It is not evident that any policy decision was discussed in the ensuing email exchanges within NTIA, and in fact, some of the participants acknowledged the absence of a legitimate official role for the United States government in ICANN's decisionmaking process. This fact was underscored in an email sent two weeks after the initial exchange:

> The relationship between DoC and ICANN is defined by two separate agreements and is not one of regulator and regulated. One agreement is a joint partnership agreement in the form of a Memorandum of Understanding (MOU) which outlines a transition to private sector-led technical management of the Internet Domain Name System. The second agreement is the IANA functions contract which includes performance of the administrative functions associated with root management. Under the terms of the MOU, DoC reviews ICANN's performance to ensure the completion of tasks set forth by the MOU. *DoC does not exercise*

December 2, 2005
Page 4



> *oversight in the traditional context of regulation and plays no role in the*
> *internal governance or day-to-day operations of the organization.*

Email from Meredith Attwell to Cathy Handley, *et al.*, June 16, 2005 (emphasis added) (Exhibit 5, attached). Indeed, early discussions by at least some participants within DoC suggest that they supported the concept of a .xxx domain (notwithstanding the absence of a policy role for DoC). As one staff member wrote after DoC was asked to provide a briefing on the situation, "Can we please get some talking points on why this is a good thing and why we support it?" Email from Meredith Attwell to Jeffrey Joyner, *et al.*, June 14, 2005 (Exhibit 6, attached). *See also* Ex. 5 ("The ICM Registry application for .XXX has strong support from the child advocacy community because they feel that ICM's approach to the .xxx puts into place best practices that would not be achievable in the dot com space.").

The documents indicate that DoC's position began to change not because of any management concerns related to the United States government role under the MOU, but for domestic political reasons coming from outside DoC. A number of politically active domestic special-interest groups, that had declined for reasons of their own to participate in ICANN's public comment process, began to seek U.S. government intervention in the weeks following ICANN's decision that ICM Registry's .xxx application met ICANN's published eligibility criteria. They also contacted key legislators to seek briefings from DoC on the .xxx issue. Email from Mike Hurst, Office of Rep. Chip Pickering, to Jim Wasilewski, June 14, 2005; Email from Meredith Attwell to Jim Wasilewski, *et al.*, June 14, 2005 (Exhibit 7, attached). DoC staff members informed congressional staff that "DoC does not exercise oversight in the traditional context of regulation and plays no role in the internal governance or day-to-day operations of the organization." These briefing points were forwarded directly to the political advocacy groups. Email from Mike Hurst to Patrick Trueman, Family Research Council; Donald Wildmon, American Family Association; Janet M. LaRue, Concerned Women for America; and Donna Rice Hughes, Enough is Enough, June 16, 2005 (Exhibit 8, attached). At about this time, DoC's staff began to compile background information on legislators who appeared to favor creation of a .xxx domain and those who likely opposed it, based on questions related exclusively to domestic political agendas. Email from Meredith Attwell to Cathy Handley, *et al.*, June 16, 2005 (Exhibit 9, attached).

The pressure groups also focused their attentions on DoC and arranged meetings with top-level staff members. Email from Clyde Ensslin to Janet LaRue and Patrick Trueman, June 20, 2005 (Exhibit 10, attached) They additionally devised email campaigns to flood DoC with identical emails calling for U.S. government intervention in the ICANN process. By mid-June, DoC established a system to maintain a running tally of the emails on .xxx. In an email titled "Update on public reaction to ICANN and .xxx." staff members noted that "[m]ost have an identical text and came in from an 'Alert' on the Family Research Council home page." They also became aware that "[t]wo other conservative Web sites have stories that suggest people should contact Commerce in opposition to .xxx." Email from Clyde Ensslin to Michael Gallag-

December 2, 2005
Page 5



her, June 20, 2005 (Exhibit 11, attached). Such external campaigns increasingly appeared to drive political discussions within DoC. As DoC's Executive Secretary wrote on June 16, 2005:

> Who really matters in this mess is Jim Dobson. What he says on his radio program in the morning will determine how ugly this really gets -- if he jumps on the bandwagon our mail server may crash. My suggestion is that someone from the White House ought to call him ASAP and explain the situation, including that the White House doesn't support the porn industry in any way, shape, or form, including giving them their own domain.

Email from Fred Schwien to C. Gunderson, *et al.*, June 16, 2005 (Exhibit 12, attached). All the while, NTIA staff kept close tabs on the number of emails pouring in because the activist groups they met with "were very interested in these numbers." Email from Clyde Ensslin to Meredith Attwell, June 22, 2005 (Exhibit 13, attached).

Although the staff attempted to direct the political focus away from DoC because the "decision to move forward on this was made by ICANN and … DoC does not participate in the selection process for creating new domains," it was not successful. *Id.* DoC staff members promised the Family Research Council that they would facilitate a meeting between the conservative group and ICANN, and they compiled names and contact information of ICANN staff and North American Board members to be provided to the outside group. Email from Suzanne Sene to Meredith Attwell, June 24, 2005; Email from Kathy Smith the John Kneuer, *et al.*, July 11, 2005 (Exhibit 14, attached).

The documents produced thus far indicate that much of DoC's attention was devoted to devising a response to the organized email campaigns, initially to deflect criticism of a proposed .xxx sTLD and, in fact, to develop background material to justify DoC support for the proposal. Attention was devoted to word-smithing proposed responses to email based on the views of the commenter rather than on any actual administrative decisions. For example, the form letter prepared by the staff differed depending on whether incoming correspondence supported or opposed the .xxx proposal. For the identical form letters asking the United States government to block ICANN's approval of the new domain, responses included the line "I share your concern about the proliferation of pornography." For those who wrote to support .xxx, the DoC response deleted that line. Memo from Maureen Lewis to Michael Gallagher (undated) (Exhibit 15, attached). Responses also were prioritized based on the perceived political importance of the correspondent. Writers on an "A" list would get a response signed by the Secretary of Commerce, while those on the "B" list would get a letter from the Assistant Secretary. Email from Geraldine Moody to Suzanne Sene, Sept. 29, 2005 (Exhibit 16, attached).

Throughout these developments, the DoC's staff closely monitored press coverage of the ICANN process, and classified stories as "pro" and "con" the .xxx proposal. Editorials and Opinions re Internet Governance as of 10-19-05 (Exhibit 17, attached). *See also* Ex. 11. In response to one article circulated among NTIA staff, one participant wrote, "that language is

DTI

December 2, 2005
Page 6

really awful. [H]opefully today we can come up with something better we can use." Email from
C. Gunderson to Clyde Ensslin, June 17, 2005 (Exhibit 18, attached). In at least two instances,
NTIA staff contacted news organizations (CNN and the Washington Post) in an effort to revise
stories after they were published. Email from Clyde Ensslin to C. Fuqua, June 17, 2005; Email
from Clyde Ensslin to Robert MacMillan, June 17, 2005 (Exhibit 19, attached). The documents
suggest that many of the staff interactions focused on how DoC was portrayed in press reports,
not on deliberations relating to any agency decision.

   In the last two weeks of June, DoC received nearly 4,000 pieces of correspondence on the
ICANN Board's decision to move into contract negotiations with ICM Registry. Nonetheless,
DoC participants in the mid-July ICANN meeting in Luxembourg City reported "happily" that
the GAC communiqué contained no mention of .xxx. Email from Suzanne Sene to Meredith
Attwell, July 13, 2005 (Exhibit 20, attached). In addition, DOC staff in Luxembourg reported
that some GAC members held a view – "not shared by the U.S." – that ICANN did not adequate-
ly consult before directing the staff to enter into negotiations with ICM Registry. *Id.* At some
point in the following weeks, however, NTIA reversed itself completely and decided to intervene
in the ICANN process to delay its Board's final consideration of the ICM Registry contract.

   On August 11, 2005, DoC's Assistant Secretary for Communications and Information,
Michael D. Gallagher, sent a letter to the Chairman of ICANN's Board of Directors, Dr. Vinton
Cerf, asking ICANN's Board not to act on ICM Registry's contract until after "all members of
the Internet community on this issue have been adequately heard." (Exhibit 21, attached). With-
out mentioning DoC's limited role under the MOU or ICANN's lengthy evaluation process over
a period of 18 months, the letter said DoC had received "nearly 6,000 letters and emails from
individuals expressing concern about the impact of pornography" and urged ICANN's Board to
"provide a proper process and adequate additional time for these concerns to be voiced and
addressed." In fact, however, the documents released thus far demonstrate conclusively that
DoC had received a vast majority of those letters and emails before the meeting in July, where
DoC participants "happily" reported that the GAC communiqué did not mention the .xxx sTLD.

   Assistant Secretary Gallagher's letter also suggested that "other countries have significant
reservations" about the .xxx proposal. Contrary to that assertion, however, documents suggest
the United States government embarked on a campaign after the fact to persuade other govern-
ments to contact ICANN about .xxx. Email from Suzanne Sene to Fiona Alexander, *et al.*,
August 10, 2005; Email from Kathy Smith to Fiona Alexander, *et al.*, August 11, 2005 (Exhibit
22, attached). For example, in briefing papers prepared in advance of a meeting with a
representative of the Canadian government, NTIA staff suggested that U.S. Officials take advan-
tage of the meeting as an opportunity to "encourage" Canada to send a letter. Memo by Fiona
Alexander, August 22, 2005 (Exhibit 23, attached). NTIA staff members were in contact with
various members of the GAC in an effort to develop a coordinated response, including Japan, the
European Commission, and others. Email from Suzanne Sene to Meredith Attwell, Sept. 16,
2005 (Exhibit 24, attached). These emails demonstrate that NTIA actively orchestrated a GAC
reaction to the ICANN Board decision regarding .xxx. For example, one email from August 16,

December 2, 2005
Page 7

2005, written by GAC Chairman Mohamed Sharil Tarmizi and forwarded by NTIA staff contains the following discussion:

> I am just wondering if you could share with me how far the USG is going to take this issue. For example, if the Board decides to go ahead in October or November before the Vancouver meeting, what would be USG's reaction?
>
> Is the concern over the content side or the process/procedure side? For example, would governments (and I do not mean just the USG) want to go down the path of "auditing" the contract and make sure that the contract has followed the appropriate process and procedures?
>
> You can well imagine that there are those on the Board not very happy with this. *I need to know what the acceptable future course of action might be so that we can do some strategizing.*

Email from Fiona Alexander to Clyde Ensslin, *et al.*, June 16, 2005 (emphasis added) (Exhibit 25, attached).

The DoC actions in this regard clearly raise the question whether the U.S. government intends to exert regulatory control over the domain name system, thus contradicting its official position that the domain name system is a private system not under control of any government. Clarification of this point is necessary to determine whether the DoC was deliberating on some policy on which it exerts decisionmaking authority. As one document released by NTIA noted:

> Because ICANN's role is dependent upon its contract with Commerce, the Department maintains the ultimate control of the IANA. This gives the U.S. the ability to implement any decision made by the international community regarding the internet. For example, if the international community decides to develop an .XXX domain [*sic*] for adult material, it will not go on the Top Level Domain (TLD) registry if the U.S. does not wish for that to happen.

United States Control of the Domain Name System, attached to Email from Meredith Attwell to Robin Layton, August 5, 2005 (Exhibit 26, attached). Absent some clarification, it is difficult to evaluate NTIA's assertion that any FOIA exemption applies.

### Analysis

The redactions and withheld documents contained in NTIA's FOIA Response are inconsistent with the law. As noted, in each case where NTIA withheld all or part of a document, it provided nothing more than handwritten citations to 5 U.S.C. § 552(b)(5), *i.e.*, FOIA Exemption 5, which exempts from disclosure records that are "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an

agency in litigation with the agency." However, federal administrative agencies bear the burden of justifying any exemptions under the FOIA, *Campbell v. DOJ*, 164 F.3d 20, 31 (D.C. Cir. 1999), and "[c]onclusory and generalized" explanations are "unacceptable as a means of sustaining the burden of nondisclosure." *National Parks and Conserv. Ass'n v. Klepper*, 547 F.2d 673, 680 (D.C. Cir. 1976). The requirement that agencies provide meaningful explanation for withholding records that are presumed disclosable unless fitting within a specific FOIA exemption is critical, since "Congress enacted FOIA to promote a policy of broad disclosure of Government documents" and to "ensure an informed citizenry, vital to the functioning of a democratic society." *Center for Public Integrity v. Department of Energy*, 191 F.Supp.2d 187, 189 (D.D.C. 2002). In this regard, the "limited exceptions" in § 552(b) "do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of" the FOIA. *Department of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). The FOIA Response neither satisfies NTIA's burden of providing a meaningful explanation for its withholdings, nor adheres to FOIA's spirit of openness and disclosure.

With respect to Exemption 5, the Supreme Court has held that the exemption protects from disclosure "those documents, and only those documents, normally privileged in the civil discovery context." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975). This includes records created during agency consideration of proposed action as part of the decision-making process, *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980) (agency record is "deliberative" if it weighs "pros and cons of agency adoption of one viewpoint or another"), or, as NTIA put it, agency records that are "predecisional." However, to withhold intra- or inter-agency records, they must be both predecisional, *i.e.*, "antecedent to the adoption of agency policy," <u>and</u> deliberative, *i.e.*, "actually ... related to the process by which policies are formulated." *Jordan v. DOJ*, 591 F.2d 753, 773 (D.C. Cir. 1978); *Formaldehyde Inst. v. HHS*, 889 F.2d 1118, 1121 (D.C. Cir. 1989). It is not enough that a document simply is prepared as part of agency consideration of some matter – it also must "bear on the formulation or exercise of policy-oriented judgment." *Ethyl Corp. v. EPA*, 25 F.3d 1241, 1248 (4th Cir. 1994) (quoting *Petroleum Info. Corp. v. Department of Interior*, 976 F.2d 1429, 1435 (D.C. Cir. 1992)).

As a threshold matter, because NTIA has not provided any detailed explanation of how the records it redacted and withheld satisfy Exemption 5, or any insight into the nature of those documents, it is impossible to assess the validity of its claims of exemption. *See National Parks and Conserv. Ass'n*, *supra* (conclusory and generalized explanations are unacceptable). In this regard, it is incumbent upon an agency making an Exemption 5 claim to specify the agency action to which redacted/withheld predecisional records relate in order to sustain nondisclosure. *Senate of the Commonwealth of Puerto Rico v. DOJ*, 823 F.2d 574, 585 (D.C. Cir. 1987). In so doing, the action must represent the agency's "final decisions or final actions," *Vaughn v. Rosen*, 523 F.2d 1136, 1145 (D.C. Cir. 1975), and the documents must relate to the "process of working out ... policy and determining what [the] law shall be," *Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 257 (D.C. Cir. 1982), or the "formulation" of a "position or policy." *Schell v. HHS*, 843 F.2d 933, 936 (6th Cir. 1988). In short, the records must relate to the creation of "governmental

December 2, 2005
Page 9



decisions and policies." *Playboy Enters., Inc. v. DOJ*, 677 F.2d 931, 935 (D.C. Cir. 1982); *Southam News v. INS*, 674 F.Supp. 881, 886 (D.D.C. 1987)).

Here, not only did NTIA not indicate to what agency action the redacted/withheld records pertain, there are no plausible governmental "decisions" that would suffice for Exemption 5 purposes. The FOIA Request has its origins in the August 11, 2005, letter from DoC Assistant Secretary Gallagher to Dr. Cerf, urging the ICANN Board to allow additional time before taking further action on the .xxx sTLD. For a variety of reasons, this does not qualify as a final agency action sufficient to support an Exemption 5 claim.

First, the letter does not – on its face – appear to represent a governmental position, policy, or statement of law or regulation as contemplated by Exemption 5 precedent such as that cited above. Indeed, DoC has reiterated several times that the letter was merely a request for further "process." More importantly, by its own terms and as asserted by DoC, the letter from Assistant Secretary Gallagher to Dr. Cerf pertains not to any *Commerce Department* action, but rather action to be taken by *ICANN*. *Unless NTIA seeks to claim that ICANN is an administrative agency of the federal government and/or is under DoC control to bring it within the bodies to which Exemption 5 applies, the letter cannot represent agency action.* Even if the letter were a manifestation of DoC "action" of some kind, it clearly is not a "final" action or policy, or the formulation of anything tangible. Rather, it is an intermediary step seeking additional time in anticipation of future action by ICANN. The only way the letter might be a predecisional action of any sort is if NTIA's position rests on DoC intentions to take further action with respect to the .xxx sTLD. But if so, the agency must declare as much <u>now</u> and identify the action to be taken, or at the very least describe the nature of action under deliberation. *Wilderness Society v. Department of the Interior*, 344 F.Supp.2d 1, 12 (D.D.C. 2004). *See also Ethyl Corp., supra.*

Even if the August 11, 2005, letter to ICANN's Board were agency action sufficient to support NTIA's claim of Exemption 5 nondisclosure, that explanation would not justify much of the redaction and withholding that occurred here. As the FOIA Response recites, Exemption 5 applies to *predecisional* agency records, and many of the records redacted or withheld here postdate Assistant Secretary Gallagher's letter to Dr. Cerf. In addition to being well-established that agency records are "predecisional" only if a specific decision to which they relate can be identified, *see, e.g., Senate of Puerto Rico v. DOJ, supra*, it is well-settled that a distinction exists between predecisional records that assist an agency in arriving at decision, which are exempt from disclosure, and post-decisional records, which are not. *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184 (1975); *Bristol-Myers Co. v. FTC*, 598 F.2d 18, 23 (D.C. Cir. 1978). *Cf. Ryan v. DOJ*, 617 F.2d 781, 791 (D.C. Cir. 1980). As even a cursory review of Exhibit 3 reveals, among the records for which NTIA claims an Exemption 5 privilege (among those for which a date can be discerned – in some cases whole documents were redacted, including their dates), many were created *after* August 11, 2005. Again, unless NTIA and/or other DoC components anticipate additional activity with respect to the .xxx sTLD that will comprise final agency action – which activity must be identified, as noted above, to support the Exemption 5 claim – the redaction and withholding of records post-dating August 11, 2005, is unlawful.

For example, NTIA redacted information from the August 16, 2005, email chain discussing GAC Chairman Tarmizi's inquiry into "how far" the U.S. government "is going to take this issue." Ex. 25. It also redacted information from email chains dated September 9 and 12, 2005, discussing the subject "pto needs background/talking points re wsis and .xxx." Ex. 3 at 65-71, 107-112, 129, 146, 161-164. And it redacted as somehow "non-responsive" information from a September 16, 2005, email chain discussing "phonecons and email exchanges with the eu commission, japan and canada" [sic] regarding potential letters from those countries to ICANN's Board of Directors. Ex. 24. NTIA also redacted material from an August 22, 2005, briefing outline for an upcoming August 25, 2005, meeting with Mike Binder of Industry Canada. Ex. 23. These are but several of many examples.

There is yet another reason why many of the records that were redacted or withheld are not subject to Exemption 5, regardless of whether they pertain to relevant agency "action" and/or post-date such action. Specifically, it appears that many of the documents that were withheld have been shared with parties outside DoC. As a general matter, the protection of FOIA Exemption 5 is waived if an agency has disclosed the records to third parties or non-federal agencies. *Chilivis v. SEC*, 673 F.2d 1205, 1212 (11th Cir. 1982). While this principle may not apply to disclosures to Congress, other federal agencies, and/or in court proceedings, the records produced in response to the FOIA Request indicate that this exception does not apply here.

For example, the August 16, 2005, email referenced above regarding Chairman Tarmizi's inquiry into "how far" the U.S. government "is going to take this issue" is one of many indicating a significant level of communication between DoC and foreign governments regarding the .xxx sTLD, yet these documents contain redactions of information that likely traveled outside not only the agency, but across U.S. borders. Ex. 25. The September 16, 2005, email cited above about letters from other countries to ICANN's Board, which appears to have had significant material redacted as "non-responsive," discusses "phone cons and email exchanges with" individuals in those countries. Ex. 24. Another example is the email chain suggesting contact with Brazil, Denmark and South Africa to encourage them to "speak up" about .xxx. *See* Email from Suzanne Sene to Fiona Alexander, *et al.*, August 10, 2005 (Exhibit 27, attached). An August 11, 2005, email similarly discusses prospective "contacts with the GAC and other international contacts" with whom discussion of the information redacted from the documents here removes them from the purview of Exemption 5. Email from Fiona Alexander to Katy Smith, *et al.*, August 11, 2005 (Exhibit 28, attached).

Information also was redacted from the "likely topics" section of the above-cited backgrounder entitled "Meeting with Michael Binder, Industry Canada on WSIS and Internet Governance." Ex. 23. Not only does this reveal DoC coordination with foreign governments on initiation of the .xxx sTLD, which communiqués do not fall within any exception to Exemption 5 waiver, it indicates NTIA withheld information it specifically targeted for sharing with such foreign nationals, who by definition are parties outside the agency. In addition, the documents

December 2, 2005
Page 11



reveal that NTIA briefing papers prepared for congressional staff members were disseminated to outside activist groups who are leading the campaign against the .xxx proposal. *See* Ex. 8.

One email that was redacted as "non-responsive" refers to discussions between DoC personnel and Dr. Cerf which, again, unless NTIA claims ICANN as a federal agency, suggests regular communication of the matters redacted with persons outside DoC. Email from Cathy Handley to Meredith Attwell, July 22, 2005 (Exhibit 29, attached). A June 16, 2005, email purports to have "attached … a document that incorporates … comments of "Members [of Congress] who have spoken publicly about the .xxx," yet withholds the attachment (and redacts material in the email). Ex. 9  This begs the question of how an agency record that contains information discussed openly by Members of Congress can be withheld as non-publicly disclosed information for which confidentiality may be sustained under Exemption 5. Similarly, another email chain indicates NTIA personnel coordinated with the non-governmental Internet Caucus Advisory Committee regarding remarks to be made by DoC and State Department personnel, yet information pertaining to these prospective *public* comments was redacted. Email from Fiona Alexander to S. Shipman, August 30 and 31, 2005 (Exhibit 30, attached).

### Conclusion

ICM Registry appreciates the effort NTIA put into responding to the FOIA Request, compiling the responsive records and processing the documents for disclosure. It is our hope this appeal can be resolved quickly and without the expenditure of substantial additional resources. However, it is imperative that ICM Registry receive all the documents – and parts of them – that it sought in its FOIA Request and to which it is entitled. If there are any questions regarding this matter, or there is any information we can provide to bring it to an expeditious resolution, please do not hesitate to contact me. We will look forward to your response within the twenty working days specified by the FOIA and your agency's rules.

Very truly yours,

Davis Wright Tremaine LLP

Robert Corn-Revere
Counsel for ICM Registry

**EXHIBIT 6**

# Davis Wright Tremaine LLP

ANCHORAGE   BELLEVUE   LOS ANGELES   NEW YORK · PORTLAND   SAN FRANCISCO   SEATTLE   SHANGHAI   WASHINGTON, D.C.

|  |  |
|---|---|
| SUITE 450 | TEL (202) 508-6600 |
| 1500 K STREET NW | FAX (202) 508-6699 |
| WASHINGTON, D.C. 20005-1272 | www.dwt.com |

## FACSIMILE TRANSMITTAL

Date: November 29, 2005

Client No.: 65751-1

SEND TO:

| NAME | FIRM/COMPANY/CONFIRMATION NO. | FAX NUMBER |
|---|---|---|
| Eva Tyler | State Department | (202) 261-8586 |

FROM:

Ronald G. London          Telephone: (202) 508-6635     Fax: (202) 508-6699

### NUMBER OF PAGES (including cover page): 2

COMMENTS:

    Thank you for speaking with me yesterday regarding FOIA Request 200504606. I apologize that I was delayed in faxing you a copy of the Commerce Department response to an identical FOIA request that, as we discussed, may provide some guidance for the State Department and avoid your sending a form response that the subject matter of our request falls outside the State Department's purview.

    To further assist you, I am also forwarding a few documents we received in response to the Commerce FOIA Request, which indicate coordination on the .xxx matter with an individual at State with the email address "shipmansa@state.gov" as well as with Michael Gross of your agency. Hopefully this will allow you to more effectively direct your internal inquiries in formulating a response to our request.

    As I noted in my voicemails, it is apparent the State Department has exercised the ten-business-day extension under Section 552(a)(6)(B)(i) of the FOIA. We are hopeful that with this additional information you will be able to provide a response within the statutory deadline, which is fast approaching. If I can provide further information that will speed your response, please do not hesitate to contact me. Thank you.

---

**IF YOU DO NOT RECEIVE ALL PAGES OF THIS TRANSMISSION,
PLEASE CALL (202) 508-6600 AS SOON AS POSSIBLE**

**From:**       Clyde Ensslin
**To:**         Michael Gallagher
**Date:**       8/11/2005 5:37:14 PM
**Subject:**    .XXX messaging

Mike: My guidance from fifth floor OPA is not to publicize the letter but we may fax it to people who request it.

With your approval, I will distribute the following talking points to OPA and State Dept.

Draft talking points on .XXX letter Aug 11

5 U.S.C. § 552(b)(5)

A/S Gallagher's request is wholly consistent with announced U.S. principles on the Internet's Domain Name and Addressing System:

Principle 3: The United States continues to support the ongoing work of ICANN as the technical manager of the DNS and related technical operations.

Principle 4: We encourage an ongoing dialogue with all stakeholders around the world in the various fora as a way to facilitate discussion and to advance our shared interest in the ongoing robustness and dynamism of the Internet.

# # #


CC:            John Kneuer;  Ranjit deSilva

**From:**     Fiona Alexander
**To:**         shipmansa@state.gov
**Date:**      8/31/05 1:35:38 PM
**Subject:**   Fwd: Draft WSIS Briefing Invite

Sally

5 USC §552(b)(5)

Tim - in terms of the event, my understanding is that David will want to do the usual tag team of the issue that he and Mike having been doing. Mike explaining the principles, why we issued them, then David going into WSIS specific. Can you check with David and let me know so I can pull together the necessary briefing material for Mike. Hope you had a good vacation.

Fiona

>>> "Tracey Rhoades" <trhoades@ntia.doc.gov> 08/31/05 8:13 AM >>>
Hello -- Internet Caucus lunch w/ Mike and Amb. Gross has been confirmed for 9/12. Please review the attached draft invite and let me know if you recommend any edits. I will forward your comments or approval back to Tim Finton and request further information regarding the format for remarks. I will forward that info to you when I receive it -- Please coordinate w/ Tim Finton on development of Mike's talking points/remarks. thanks!

>>> Tim Lordan <tim@netcaucus.org> 8/30/2005 2:46 PM >>>
Tim/Tracey:

I have attached a draft invitation to the briefing by Ambassador Gross and Assistant-Secretary Gallagher schedule for September 12. This is just a draft and we welcome your comments, edits and suggestions. We have reserved Rayburn B339 at noon on September 12. We had hoped for a Capitol Building room but they seem to be all booked on that day. If nothing develops on that front we'll go with B339 over lunch.

So, please take a look at the attached draft invite (I have pasted it below for those of you on Blackberry).

- Tim Lordan
--
Tim Lordan
Executive Director
Internet Caucus Advisory Committee
c/o Internet Education Foundation
202-638-4370
tim@netcaucus.org
http://www.netcaucus.org

Draft Invite, August 30, 2005

You are cordially invited to attend a briefing by ...

Ambassador David Gross and Assistant Secretary Michael Gallagher on ...

Negotiating Control Of the Internet With the U.N.: Keeping Security,

Stability and .XXX In Focus.

Monday, September 12, 2005, Noon
Rayburn HOB, Room B339

U.N. Secretary-General Kofi Annan's Working Group on Internet Governance (WGIG) has recommended four new models for governing the Internet - any of which strip the U.S. government of its historic role in controlling fundamental Internet operations. The recent request by U.S. Assistant Secretary Michael Gallagher to hold off on activating the pornographic .XXX domain has illuminated the important intersection between technical management and policy. In a meeting planned for September 19 in Geneva, U.S. Ambassador Gross will implore the WGIG to allow the U.S. to "maintain its historic role in authorizing changes or modifications to the authoritative root zone file." Absent any changes, the U.N.'s World Summit on the Information Society (WSIS) will approve one of the four models at its meeting in Tunis in November.

Ambassador Gross and Assistant Secretary Gallagher have agreed to brief congressional staff on this timely and important issue as they prepare for their negotiations. The ambassador will lead the delegation to the Geneva meeting and to the culminating Summit in Tunis. Mr. Gallagher is the Assistant Secretary of Commerce for Communications and Information and through the Secretary of Commerce he is the President's principal adviser on telecommunications policy.

Please join the ambassador and the assistant secretary for this briefing on control of the Internet on Monday, September 12, at noon. A boxed lunch will be served.

Location:   Rayburn House Office Building, Room B339
RSVPs:   Required, please send e-mail to rsvp@netcaucus.org or via phone at 202.638.4370 to attend the event.

This event is hosted in conjunction with the Internet Caucus and its Co-chairs - Senators Burns and Leahy, and Congressmen Goodlatte and Boucher.

Boxed lunch will be served. For more information, please visit www.netcaucus.org.


CC:              fintontc@state.gov;  Tracey Rhoades

## MEETING WITH MIKE BINDER, INDUSTRY CANADA ON WSIS AND INTERNET GOVERNANCE, STATE RM. 4826, 3:00-4:00 PM, AUGUST 25, 2005

### PURPOSE
Mike Binder, Assistant Deputy Minister, Spectrum, Information Technologies and Telecommunications from Industry Canada is coming to Washington to strategize with USG on WSIS/Internet governance and meet with other DOC officials on the Security Prosperity and Partnership (SPP) Initiative. As David Gross is friendly with Mike Binder, he is likely to use the meeting as a brainstorming exercise on positioning in the WSIS negotiations.

### BACKGROUND/LIKELY TOPICS
Bill Graham from Binder's staff has been a staunch ally in the WSIS process. *It is critical for you to thank them for their support.* Unlike most meetings where Canada silently agrees with USG, in the WSIS process they have very vocal in their agreement with our position and a key collaborator in the negotiation process

5 USC § 552(b)(5)

5 USC § 552(b)(5)

- **SPP:** Binder will be meeting with Michelle O'Neill to discuss continued cooperation under the SPP and how to achieve the already agreed to deliverables. It is expected their meeting will focus on agreeing to the dates of the next Senior officials meeting of the ICT Working Group (you participated in the previous one that Phil Bond hosted). That meting is likely to be in October in Ottawa.

- **Speaking Invitation:** A member of Binder's staff contacted Sheila on 8/17 seeking your participation in a Canadian Spectrum Summit on 12/1. They have invited you to participate in a panel of various international participants focused on regulating spectrum to serve the public interest. No commitment had been made at this time.

Prepared By: Fiona Alexander/OIA/X1890

## PARTICIPANTS
- NTIA: You, Cathy Handley, Suzanne Sene
- State: David Gross, Sally Shipman
- Industry Canada: Mike Binder, Bill Graham (WSIS Rep.), Malcolm Andrew (GAC Rep.)

## ATTACHMENTS
- Mike Binder Bio
- Canadian Comments on the WGIG Report
- Details of a Canadian Invite for Oct. Spectrum Symposium

Prepared By: Fiona Alexander/OIA/X1890

NTIA Use Only

# MICHAEL BINDER

Assistant Deputy Minister, Spectrum, Information Technologies and Telecommunications
<u>Industry Canada</u>

Michael Binder is the Assistant Deputy Minister of Spectrum, Information Technologies and
Telecommunications, Industry Canada. He is responsible for overseeing the implementation of
the Federal Government's "Connectedness Agenda" that commits to connecting all Canadians to
an accessible and affordable high speed information highway (Broadband).

He is also in charge of telecommunications and electronic commerce policies; the allocation of
spectrum, licensing of the wireless industries; and the promotion of growth & international
competitiveness of the Information and Communication Technologies industries.

Mr. Binder holds a Ph.D. in Physics from the University of Alberta.



**world summit
on the information society**
Geneva 2003 - Tunis 2005



August 22, 2005

---

Document WSIS-II/PC-3/CONTR/042-E
17 August 2005
Original: English

# CANADA

## COMMENTS ON THE REPORT OF THE WGIG

### CANADIAN SUBMISSION ON INTERNET GOVERNANCE

**Introduction**

Canada is pleased to submit the following paper outlining its position on the report of the United Nations Working Group on Internet Governance (WGIG), in preparation for discussions at the third meeting of the Preparatory Committee for the World Summit on the Information Society (WSIS).

Canada has been a strong supporter of the WSIS from its inception. Canada's original vision statement for this UN initiative was that the "WSIS is about development". Our support has been based on our belief in the importance of information and communications technologies as a tool for creating the information society. Central to this belief is our understanding that all the peoples of the world must truly have the opportunity to participate in the information society, if we are to achieve the maximum benefits for mankind. For that reason, we continue to believe that the WSIS must strive to raise awareness of the potential of information and communication technologies for development at the highest political levels. Canada reaffirms its support for UNGA Resolution 56/183 on the WSIS which recognizes "… the urgent need to harness the potential of knowledge and technology … and to find effective … ways to put this potential at the service of development for all". Canada's contribution to the discussion of Internet governance in the WSIS context is conditioned by this development perspective.

The Internet is a central element of the emerging global information society. Thus, its security, stability, reliability and sustainability as a global network are of paramount importance for Canada in all discussions of Internet governance. To make governance effective however, we must also put capacity building at the centre of our efforts, so that all countries and all stakeholders are able to play their respective roles in an effective and responsible manner. These principles underlie the Canadian position on Internet governance.

Canada agrees with the WGIG that consideration of Internet governance in the WSIS context will benefit by separating the discussion of the broad policy issues categorized by the WGIG

Case 1:06-cv-00949-JR     Document 1-5     Filed 05/19/2006     Page 42 of 45

from discussion of the management of critical Internet resources. This paper considers each in its turn.

## Addressing Policy Issues Broader than the Internet

Turning first to broad policy issues, including those related to the use of the Internet, issues whose impact is broader than the Internet, and issues related to development and capacity building:

- In principle, Canada supports the idea of creating a multi-stakeholder forum to discuss a broad range of public policy issues related to the Internet. We believe it is desirable to build upon the dialogue established by the WGIG and its public consultations.

- We agree with the WGIG Report that the forum for dialogue should not be a continuation of the WGIG itself. As well, the forum should not be a permanent institution. It should be established for not more than five years, and its operation should make maximum use of ICTs to operate in a cost-effective and inclusive fashion.

- The forum should focus on capacity building, particularly to develop the knowledge and experience necessary for developing countries to be able to participate effectively in the discussion of Internet issues. The forum could encourage examination of a range of public policy options which may be useful for interested countries.

- The forum should not be involved in day-to-day operations of the Internet, nor distract from discussions taking place in existing organizations.

- Adequate resources must be identified to ensure that all stakeholders (including developing countries, SMEs and civil society) are able to participate. The forum should be supported by a very light organization, with a focus on development.

- Canada does not support the creation of a new treaty organization for the purposes of Internet governance.

- Canada notes that many of the broad policy issues raised in the WGIG discussions have been, or are being addressed, by existing government-funded international and multilateral organizations, including those of the UN system. These organizations bring to bear considerable experience and research capacity for international policy development, and have established public processes and consultation mechanisms capable of canvassing a broad spectrum of facts and opinion. We believe that each can make informed contributions to the discussion of broad policy issues related to the Internet, and to the need for capacity building identified in the Report. Given the significant global public investment already made in these agencies, this international resource should be fully engaged by member states in the continuing public discussion of policy issues related to the Internet, whether or not a forum is established, if only to conserve resources. Their engagement should also serve to avoid duplication of efforts.

## Addressing Issues Related to Core Internet Technical Resources

Second, concerning issues of critical Internet resources: in this paper, primarily those dealt with by the Internet Corporation for Assigned Names and Numbers (ICANN):

- Canada wishes to underscore the technical nature of ICANN as a body responsible for the administration of Internet names and IP addresses.

- While recognizing that these technical issues give rise, from time to time, to policy considerations, Canada is of the view that the short history of ICANN has seen a tendency by many stakeholders to seek to have ICANN address policy issues which are not dependent on its core technical responsibilities. This has led to confusion about ICANN's role and sometimes distracted the organization from its core mandate. By helping to disaggregate broader policy issues from those specifically arising from ICANN's primary technical functions, the WGIG has made an important contribution to delineating those matters for which ICANN should be held responsible and those which should be addressed elsewhere. Canada is of the view that, going forward, ICANN and its stakeholders should be scrupulous in taking a very narrow view of ICANN's policy functions, ensuring that any policy issues dealt with arise directly from and/or are inextricably linked to its core technical functions. Any other policy issues should be referred to other more appropriate bodies, or to the forum suggested by the WGIG, should it be created.

- Canada has been a long-time and strong supporter of the ICANN model, as a private, not-for-profit, bottom-up entity. This support is fully consistent with the views expressed above. Indeed, it is because of the primarily technical nature of ICANN's mandate that Canada has long supported this approach.

- Canada supports the continuing evolution and reform of ICANN in the post-2006 environment.

- Canada acknowledges the vital role that the United States government has played in the development of the Internet itself and, through the establishment of ICANN, in initiating a process aimed at increasing competition, privatization, and enabling international participation in the management of the Internet's technical functions. We also applaud the arm's length, light-touch approach which the United States government has adopted in its oversight of ICANN itself. Like the vast majority of participants in the WGIG, Canada agrees that the path of increasing competition, privatization and internationalization should be pursued.

- Canada supports the continued participation of governments in ICANN through the Governmental Advisory Committee (GAC). Outside the WSIS context, it may be worth exploring the establishment of mechanisms to help focus the GAC's agenda, and governments' relationship with ICANN, in a manner consistent with the narrow policy role foreseen for ICANN itself, and supportive of the goals of increasing competition, privatization and internationalization.

- The GAC's effectiveness could be enhanced by the establishment of a permanent GAC Secretariat which would focus on providing necessary logistical support to the GAC, and contribute to capacity development aimed at improving GAC participation by developing countries. A secure funding mechanism would have to be found, perhaps via an untied contribution from ICANN itself. Canada does not believe there is a need for such a secretariat to provide policy research capability. Instead, the GAC should draw on the expertise of its membership, including that of other international organizations.

## Conclusion

Finally, Canada would like to congratulate and thank the Chairman and members of the WGIG, as well as the Executive Director and members of the Secretariat, for their work and the Working Group report. The WGIG process has provided an example of how a diverse multi-stakeholder group can work together to dramatically elevate the level of discussion of an important issue, and to produce a valuable outcome.

## Canadian Invite for December Spectrum Symposium

SENT 8/17/05

Dear Ms. Williams:

It was a pleasure to speak to you today. As I mentioned on the telephone, I spoke to Mr. Gallagher during the ITU-R TG1-8 meeting held in San Diego last May. At that time, I mentioned that we were holding a one-day symposium in Ottawa on December 1st and he seemed interested in attending as a speaker.

The purpose of this E-mail is to invite Mr. Gallagher to participate in the symposium called Spectrum 20/20. It is co-hosted by Industry Canada, the national spectrum regulatory authority, specifically the Spectrum Engineering branch and the Radio Advisory Board of Canada, our principle national, non-government advisory group.

Each year we invite experts from academe, government and industry, from around the world to discuss issues of importance in a panel format which, we hope, provokes both immediate discussion and longer term thought.

We would like to invite him to participate in a session called "Fooling Mother Nature in 2020 - Making More/New Spectrum Available" where we will be asking regulatory people from Asia-Pacific, Europe, the USA and Canada to discuss how they are trying to make regulation serve the public interest.

You can find out a bit more about Spectrum 20/20 on the RABC web site at: < http://www.rabc.ottawa.on.ca/e/spectrum2020_program.cfm > but the basics are:

*When: Thursday, 1 December 2005 - Session 3 is from 14:05 to 15:25

*Where: Ottawa, at the Ottawa Congress Centre

*What: Panel discussion - with a fairly large (150+/-), fairly technical (most are RABC members) audience

Please let me know if Mr. Gallagher will be able to participate. We can provide more information on the format of this symposium upon request. Please feel free to contact me at anytime should you require further information.

Yours truly,

Marc Dupuis
Director, New Wireless Services and Technology
Spectrum Engineering Branch
Industry Canada