# ICM Registry, LLC v. U.S. Department of Commerce and U.S. Department of State
## Civil Action No. 06-0949

## Smith Declaration
## Exhibit 3



# Davis Wright Tremaine LLP

ROBERT CORN-REVERE
DIRECT (202) 508-6625
bobcornrevere@dwt.com

SUITE 450
1500 K STREET NW
WASHINGTON, D.C. 20005-1262

TEL (202) 508-6600
FAX (202) 508-6699
www.dwt.com

December 2, 2005

*VIA FACSIMILE* - (202) 482-2552
*and EMAIL* – FOIAAppeals@doc.gov

Assistant General Counsel for Administration
United States Department of Commerce
1401 Constitution Avenue, N.W., Room 5898-C
Washington, DC 20230

   **Re:   CRRIF 06-068**
   **Freedom of Information Act Appeal**

Dear Sir or Madam:

   Pursuant to the Freedom of Information Act, 5 U.S.C. § 552, as amended ("FOIA"), your agency's implementing regulations and policies, including but not limited to 15 C.F.R. § 4.10, and the National Telecommunications and Information Administration's ("NTIA") letter of November 18, 2005, responding to the above-referenced FOIA request, ICM Registry, LLC ("ICM Registry"), by counsel, hereby submits its appeal of agency action in response to its FOIA request. A copy of the FOIA request and the NTIA response are attached as Exhibits 1 and 2.

## Introduction

   ICM Registry filed FOIA request CRRIF 06-068 on October 18, 2005 (the "FOIA Request"), to ask the Department of Commerce ("DoC") or any Bureau or component thereof, including but not limited to NTIA, to provide ICM Registry with copies of the following records:

   All records, correspondence, memoranda, transcripts, notes, documents, reports, emails or audiovisual or other materials consisting of or reflecting, representing, recording or otherwise disclosing communications, written or oral, between March 1, 2005 and the present, regarding approval by the Internet Corporation for Assigned Names and Numbers ("ICANN"), and/or by its Board of Directors, of the new ".xxx" sponsored top-level domain ("sTLD"), and/or ICANN's or its Board's approval of ICM Registry's contract to operate the .xxx sTLD [other

December 2, 2005
Page 2



than] documents submitted to the agency by the general public as part of any mass mailing campaign(s) or similarly duplicative emails/documents.

All records, correspondence, memoranda, transcripts, notes, documents, reports, emails or audiovisual or other materials consisting of or reflecting, representing, recording or otherwise disclosing communications, written or oral, between March 1, 2005 and the present, between any personnel at the Department of Commerce, or any Bureau or other component thereof, and the ICANN Board of Directors and its staff, ICANN's Governmental Advisory Committee ("GAC"), any GAC member country, or any individuals or agency in a GAC member country, regarding the .xxx sTLD.

*See* Ex 1. The FOIA Request also asked that if any of the foregoing information was withheld, ICM Registry should receive copies of all non-exempt, reasonably segregable portions of such material, as well as a detailed statement of the statutory basis and reasons for each instance of withholding, and an index or similar statement of the nature of any withheld materials. *Id*. at 2.

NTIA responded to the FOIA Request by letter of November 18, 2004, by which it transmitted approximately 1,600 pages of documents and claimed an exemption to withhold "certain documents in whole or in part under 5 U.S.C. § 552(b)(5) as predecisional or privileged" (the "FOIA Response"). [1] Of those 1,600 pages, 120 contained redactions obscuring parts of the document with a notation to Section 552(b)(5), and 98 consisted solely of pages that were blank save for a reference to Section 552(b)(5), indicating that documents consisting of one or more pages had been withheld in full. Copies of the redacted and/or withheld documents are attached as Exhibit 3. [2]

Other than the statement in the FOIA Response and handwritten notations on the documents, NTIA provided no explanation of the statutory basis and reasons for redacting/withholding the documents, nor did it provide any index or other statement indicating the nature of the materials withheld. In virtually all cases of redaction, it is impossible to determine from con-

---

[1] *See* Ex. 2 at 1. The letter also indicated that NTIA identified additional documents from other agencies which may be responsive to the FOIA Request, that NTIA was in the process of coordinating with the other agencies "to accord them proper treatment under FOIA," and that NTIA would forward the documents upon completion of the inter-agency coordination effort. *Id*. ICM Registry has not received those documents, and hereby reserves all rights with respect to them pending their receipt.

[2] For ease of reference, we have added consecutive page numbers to the records included at Exhibit 3. These did not appear on the documents as received with the FOIA Response. It should be noted that Exhibit 3 contains substantially more than 218 pages (the combined number of redacted and withheld pages referenced in the text), because in each case of a document that was redacted, Exhibit 3 contains the whole of the document and not just the redacted page(s).

December 2, 2005
Page 3



text the nature of the material withheld and, of course, in cases where a document was withheld in full, it is not possible to determine its nature or the specific reasons that might have lead to its nondisclosure. However, the nature of DoC's role in ICANN's process for approving new domains, and the content of the documents disclosed thus far, make application of any FOIA exemption highly doubtful.

## Background

Documents released thus far in response to the FOIA request, either in whole or in part, paint a picture of the nature of the activities that took place within DoC after the ICANN Board announced that it had approved ICM Registry's proposal for a sponsored .xxx domain. They suggest that DoC immediately focused on political reactions to ICANN's announcement – not on any regulatory activity – and confirmed DoC's view that it lacked any official decisional role in approving new domain names. Nevertheless, DoC decided to intervene in the ICANN process. The documents further indicate that the United States Government consulted with foreign representatives in an attempt to solicit foreign governmental intervention to achieve DoC's domestic political goals.

The leadership of NTIA began discussions of .xxx in response to news stories the day after ICANN's Board decision to commence negotiations with ICM Registry. Although the substance of various email exchanges was redacted under assertions of FOIA Exemption 5 relating to executive privilege for "predecisional" discussions (see discussion below), the documents that were released show that the correspondents (including DoC Assistant Secretary for Communications and Information Michael D. Gallagher) exchanged a news story on ICANN's decision. The only non-redacted text from the exchange says, "Mike, think this will cause us any problems?" Email from Meredith Attwell to Michael Gallagher, June 2, 2005; Email from John Kneuer to Michael Gallagher, June 2, 2005 (Exhibit 4, attached).

It is not evident that any policy decision was discussed in the ensuing email exchanges within NTIA, and in fact, some of the participants acknowledged the absence of a legitimate official role for the United States government in ICANN's decisionmaking process. This fact was underscored in an email sent two weeks after the initial exchange:

> The relationship between DoC and ICANN is defined by two separate agreements and is not one of regulator and regulated. One agreement is a joint partnership agreement in the form of a Memorandum of Understanding (MOU) which outlines a transition to private sector-led technical management of the Internet Domain Name System. The second agreement is the IANA functions contract which includes performance of the administrative functions associated with root management. Under the terms of the MOU, DoC reviews ICANN's performance to ensure the completion of tasks set forth by the MOU. *DoC does not exercise*

December 2, 2005
Page 4



> *oversight in the traditional context of regulation and plays no role in the*
> *internal governance or day-to-day operations of the organization.*

Email from Meredith Attwell to Cathy Handley, *et al.*, June 16, 2005 (emphasis added) (Exhibit 5, attached). Indeed, early discussions by at least some participants within DoC suggest that they supported the concept of a .xxx domain (notwithstanding the absence of a policy role for DoC). As one staff member wrote after DoC was asked to provide a briefing on the situation, "Can we please get some talking points on why this is a good thing and why we support it?" Email from Meredith Attwell to Jeffrey Joyner, *et al.*, June 14, 2005 (Exhibit 6, attached). *See also* Ex. 5 ("The ICM Registry application for .XXX has strong support from the child advocacy community because they feel that ICM's approach to the .xxx puts into place best practices that would not be achievable in the dot com space.").

The documents indicate that DoC's position began to change not because of any management concerns related to the United States government role under the MOU, but for domestic political reasons coming from outside DoC. A number of politically active domestic special-interest groups, that had declined for reasons of their own to participate in ICANN's public comment process, began to seek U.S. government intervention in the weeks following ICANN's decision that ICM Registry's .xxx application met ICANN's published eligibility criteria. They also contacted key legislators to seek briefings from DoC on the .xxx issue. Email from Mike Hurst, Office of Rep. Chip Pickering, to Jim Wasilewski, June 14, 2005; Email from Meredith Attwell to Jim Wasilewski, *et al.*, June 14, 2005 (Exhibit 7, attached). DoC staff members informed congressional staff that "DoC does not exercise oversight in the traditional context of regulation and plays no role in the internal governance or day-to-day operations of the organization." These briefing points were forwarded directly to the political advocacy groups. Email from Mike Hurst to Patrick Trueman, Family Research Council; Donald Wildmon, American Family Association; Janet M. LaRue, Concerned Women for America; and Donna Rice Hughes, Enough is Enough, June 16, 2005 (Exhibit 8, attached). At about this time, DoC's staff began to compile background information on legislators who appeared to favor creation of a .xxx domain and those who likely opposed it, based on questions related exclusively to domestic political agendas. Email from Meredith Attwell to Cathy Handley, *et al.*, June 16, 2005 (Exhibit 9, attached).

The pressure groups also focused their attentions on DoC and arranged meetings with top-level staff members. Email from Clyde Ensslin to Janet LaRue and Patrick Trueman, June 20, 2005 (Exhibit 10, attached) They additionally devised email campaigns to flood DoC with identical emails calling for U.S. government intervention in the ICANN process. By mid-June, DoC established a system to maintain a running tally of the emails on .xxx. In an email titled "Update on public reaction to ICANN and .xxx." staff members noted that "[m]ost have an identical text and came in from an 'Alert' on the Family Research Council home page." They also became aware that "[t]wo other conservative Web sites have stories that suggest people should contact Commerce in opposition to .xxx." Email from Clyde Ensslin to Michael Gallag-

December 2, 2005
Page 5



her, June 20, 2005 (Exhibit 11, attached).  Such external campaigns increasingly appeared to drive political discussions within DoC.  As DoC's Executive Secretary wrote on June 16, 2005:

> Who really matters in this mess is Jim Dobson.  What he says on his radio program in the morning will determine how ugly this really gets -- if he jumps on the bandwagon our mail server may crash.  My suggestion is that someone from the White House ought to call him ASAP and explain the situation, including that the White House doesn't support the porn industry in any way, shape, or form, including giving them their own domain.

Email from Fred Schwien to C. Gunderson, *et al.*, June 16, 2005 (Exhibit 12, attached).  All the while, NTIA staff kept close tabs on the number of emails pouring in because the activist groups they met with "were very interested in these numbers."  Email from Clyde Ensslin to Meredith Attwell, June 22, 2005 (Exhibit 13, attached).

Although the staff attempted to direct the political focus away from DoC because the "decision to move forward on this was made by ICANN and ... DoC does not participate in the selection process for creating new domains," it was not successful.  *Id.*  DoC staff members promised the Family Research Council that they would facilitate a meeting between the conservative group and ICANN, and they compiled names and contact information of ICANN staff and North American Board members to be provided to the outside group.  Email from Suzanne Sene to Meredith Attwell, June 24, 2005; Email from Kathy Smith the John Kneuer, *et al.*, July 11, 2005  (Exhibit 14, attached).

The documents produced thus far indicate that much of DoC's attention was devoted to devising a response to the organized email campaigns, initially to deflect criticism of a proposed .xxx sTLD and, in fact, to develop background material to justify DoC support for the proposal.  Attention was devoted to word-smithing proposed responses to email based on the views of the commenter rather than on any actual administrative decisions.  For example, the form letter prepared by the staff differed depending on whether incoming correspondence supported or opposed the .xxx proposal.  For the identical form letters asking the United States government to block ICANN's approval of the new domain, responses included the line "I share your concern about the proliferation of pornography."  For those who wrote to support .xxx, the DoC response deleted that line.  Memo from Maureen Lewis to Michael Gallagher (undated) (Exhibit 15, attached).  Responses also were prioritized based on the perceived political importance of the correspondent.  Writers on an "A" list would get a response signed by the Secretary of Commerce, while those on the "B" list would get a letter from the Assistant Secretary.  Email from Geraldine Moody to Suzanne Sene, Sept. 29, 2005 (Exhibit 16, attached).

Throughout these developments, the DoC's staff closely monitored press coverage of the ICANN process, and classified stories as "pro" and "con" the .xxx proposal.  Editorials and Opinions re Internet Governance as of 10-19-05 (Exhibit 17, attached).  *See also* Ex. 11.  In response to one article circulated among NTIA staff, one participant wrote, "that language is

December 2, 2005
Page 6



really awful. [H]opefully today we can come up with something better we can use." Email from
~~C. Gunderson to Clyde Ensslin, June 17, 2005 (Exhibit 18, attached). In at least two instances,~~
NTIA staff contacted news organizations (CNN and the Washington Post) in an effort to revise
stories after they were published. Email from Clyde Ensslin to C. Fuqua, June 17, 2005; Email
from Clyde Ensslin to Robert MacMillan, June 17, 2005 (Exhibit 19, attached). The documents
suggest that many of the staff interactions focused on how DoC was portrayed in press reports,
not on deliberations relating to any agency decision.

In the last two weeks of June, DoC received nearly 4,000 pieces of correspondence on the
ICANN Board's decision to move into contract negotiations with ICM Registry. Nonetheless,
DoC participants in the mid-July ICANN meeting in Luxembourg City reported "happily" that
the GAC communiqué contained no mention of .xxx. Email from Suzanne Sene to Meredith
Attwell, July 13, 2005 (Exhibit 20, attached). In addition, DOC staff in Luxembourg reported
that some GAC members held a view – "not shared by the U.S." – that ICANN did not adequate-
ly consult before directing the staff to enter into negotiations with ICM Registry. *Id.* At some
point in the following weeks, however, NTIA reversed itself completely and decided to intervene
in the ICANN process to delay its Board's final consideration of the ICM Registry contract.

On August 11, 2005, DoC's Assistant Secretary for Communications and Information,
Michael D. Gallagher, sent a letter to the Chairman of ICANN's Board of Directors, Dr. Vinton
Cerf, asking ICANN's Board not to act on ICM Registry's contract until after "all members of
the Internet community on this issue have been adequately heard." (Exhibit 21, attached). With-
out mentioning DoC's limited role under the MOU or ICANN's lengthy evaluation process over
a period of 18 months, the letter said DoC had received "nearly 6,000 letters and emails from
individuals expressing concern about the impact of pornography" and urged ICANN's Board to
"provide a proper process and adequate additional time for these concerns to be voiced and
addressed." In fact, however, the documents released thus far demonstrate conclusively that
DoC had received a vast majority of those letters and emails before the meeting in July, where
DoC participants "happily" reported that the GAC communiqué did not mention the .xxx sTLD.

Assistant Secretary Gallagher's letter also suggested that "other countries have significant
reservations" about the .xxx proposal. Contrary to that assertion, however, documents suggest
the United States government embarked on a campaign after the fact to persuade other govern-
ments to contact ICANN about .xxx. Email from Suzanne Sene to Fiona Alexander, *et al.*,
August 10, 2005; Email from Kathy Smith to Fiona Alexander, *et al.*, August 11, 2005 (Exhibit
22, attached). For example, in briefing papers prepared in advance of a meeting with a
representative of the Canadian government, NTIA staff suggested that U.S. Officials take advan-
tage of the meeting as an opportunity to "encourage" Canada to send a letter. Memo by Fiona
Alexander, August 22, 2005 (Exhibit 23, attached). NTIA staff members were in contact with
various members of the GAC in an effort to develop a coordinated response, including Japan, the
European Commission, and others. Email from Suzanne Sene to Meredith Attwell, Sept. 16,
2005 (Exhibit 24, attached). These emails demonstrate that NTIA actively orchestrated a GAC
reaction to the ICANN Board decision regarding .xxx. For example, one email from August 16,

December 2, 2005
Page 7



2005, written by GAC Chairman Mohamed Sharil Tarmizi and forwarded by NTIA staff con-
tains the following discussion:

> I am just wondering if you could share with me how far the USG is going
> to take this issue. For example, if the Board decides to go ahead in
> October or November before the Vancouver meeting, what would be
> USG's reaction?
>
> Is the concern over the content side or the process/procedure side? For
> example, would governments (and I do not mean just the USG) want to go
> down the path of "auditing" the contract and make sure that the contract
> has followed the appropriate process and procedures?
>
> You can well imagine that there are those on the Board not very happy
> with this. *I need to know what the acceptable future course of action
> might be so that we can do some strategizing.*

Email from Fiona Alexander to Clyde Ensslin, *et al.*, June 16, 2005 (emphasis added) (Exhibit
25, attached).

The DoC actions in this regard clearly raise the question whether the U.S. government
intends to exert regulatory control over the domain name system, thus contradicting its official
position that the domain name system is a private system not under control of any government.
Clarification of this point is necessary to determine whether the DoC was deliberating on some
policy on which it exerts decisionmaking authority. As one document released by NTIA noted:

> Because ICANN's role is dependent upon its contract with Commerce,
> the Department maintains the ultimate control of the IANA. This
> gives the U.S. the ability to implement any decision made by the inter-
> national community regarding the internet. For example, if the inter-
> national community decides to develop an .XXX domain [*sic*] for
> adult material, it will not go on the Top Level Domain (TLD) registry
> if the U.S. does not wish for that to happen.

United States Control of the Domain Name System, attached to Email from Meredith Attwell to
Robin Layton, August 5, 2005 (Exhibit 26, attached). Absent some clarification, it is difficult to
evaluate NTIA's assertion that any FOIA exemption applies.

**Analysis**

The redactions and withheld documents contained in NTIA's FOIA Response are
inconsistent with the law. As noted, in each case where NTIA withheld all or part of a
document, it provided nothing more than handwritten citations to 5 U.S.C. § 552(b)(5), *i.e.*,
FOIA Exemption 5, which exempts from disclosure records that are "inter-agency or intra-
agency memorandums or letters that would not be available by law to a party other than an

December 2, 2005
Page 8



agency in litigation with the agency." However, federal administrative agencies bear the burden of justifying any exemptions under the FOIA, *Campbell v. DOJ*, 164 F.3d 20, 31 (D.C. Cir. 1999), and "[c]onclusory and generalized" explanations are "unacceptable as a means of sustaining the burden of nondisclosure." *National Parks and Conserv. Ass'n v. Klepper*, 547 F.2d 673, 680 (D.C. Cir. 1976). The requirement that agencies provide meaningful explanation for withholding records that are presumed disclosable unless fitting within a specific FOIA exemption is critical, since "Congress enacted FOIA to promote a policy of broad disclosure of Government documents" and to "ensure an informed citizenry, vital to the functioning of a democratic society." *Center for Public Integrity v. Department of Energy*, 191 F.Supp.2d 187, 189 (D.D.C. 2002). In this regard, the "limited exceptions" in § 552(b) "do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of" the FOIA. *Department of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). The FOIA Response neither satisfies NTIA's burden of providing a meaningful explanation for its withholdings, nor adheres to FOIA's spirit of openness and disclosure.

With respect to Exemption 5, the Supreme Court has held that the exemption protects from disclosure "those documents, and only those documents, normally privileged in the civil discovery context." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975). This includes records created during agency consideration of proposed action as part of the decision-making process, *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980) (agency record is "deliberative" if it weighs "pros and cons of agency adoption of one viewpoint or another"), or, as NTIA put it, agency records that are "predecisional." However, to withhold intra- or inter-agency records, they must be both predecisional, *i.e.*, "antecedent to the adoption of agency policy," <u>and</u> deliberative, *i.e.*, "actually … related to the process by which policies are formulated." *Jordan v. DOJ*, 591 F.2d 753, 773 (D.C. Cir. 1978); *Formaldehyde Inst. v. HHS*, 889 F.2d 1118, 1121 (D.C. Cir. 1989). It is not enough that a document simply is prepared as part of agency consideration of some matter – it also must "bear on the formulation or exercise of policy-oriented judgment." *Ethyl Corp. v. EPA*, 25 F.3d 1241, 1248 (4th Cir. 1994) (quoting *Petroleum Info. Corp. v. Department of Interior*, 976 F.2d 1429, 1435 (D.C. Cir. 1992)).

As a threshold matter, because NTIA has not provided any detailed explanation of how the records it redacted and withheld satisfy Exemption 5, or any insight into the nature of those documents, it is impossible to assess the validity of its claims of exemption. *See National Parks and Conserv. Ass'n, supra* (conclusory and generalized explanations are unacceptable). In this regard, it is incumbent upon an agency making an Exemption 5 claim to specify the agency action to which redacted/withheld predecisional records relate in order to sustain nondisclosure. *Senate of the Commonwealth of Puerto Rico v. DOJ*, 823 F.2d 574, 585 (D.C. Cir. 1987). In so doing, the action must represent the agency's "final decisions or final actions," *Vaughn v. Rosen*, 523 F.2d 1136, 1145 (D.C. Cir. 1975), and the documents must relate to the "process of working out … policy and determining what [the] law shall be," *Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 257 (D.C. Cir. 1982), or the "formulation" of a "position or policy." *Schell v. HHS*, 843 F.2d 933, 936 (6th Cir. 1988). In short, the records must relate to the creation of "governmental

December 2, 2005
Page 9



decisions and policies." *Playboy Enters., Inc. v. DOJ*, 677 F.2d 931, 935 (D.C. Cir. 1982); *Southam News v. INS*, 674 F.Supp. 881, 886 (D.D.C. 1987)).

Here, not only did NTIA not indicate to what agency action the redacted/withheld records pertain, there are no plausible governmental "decisions" that would suffice for Exemption 5 purposes. The FOIA Request has its origins in the August 11, 2005, letter from DoC Assistant Secretary Gallagher to Dr. Cerf, urging the ICANN Board to allow additional time before taking further action on the .xxx sTLD. For a variety of reasons, this does not qualify as a final agency action sufficient to support an Exemption 5 claim.

First, the letter does not – on its face – appear to represent a governmental position, policy, or statement of law or regulation as contemplated by Exemption 5 precedent such as that cited above. Indeed, DoC has reiterated several times that the letter was merely a request for further "process." More importantly, by its own terms and as asserted by DoC, the letter from Assistant Secretary Gallagher to Dr. Cerf pertains not to any *Commerce Department* action, but rather action to be taken by *ICANN*. *Unless NTIA seeks to claim that ICANN is an administrative agency of the federal government and/or is under DoC control to bring it within the bodies to which Exemption 5 applies, the letter cannot represent agency action.* Even if the letter were a manifestation of DoC "action" of some kind, it clearly is not a "final" action or policy, or the formulation of anything tangible. Rather, it is an intermediary step seeking additional time in anticipation of future action by ICANN. The only way the letter might be a predecisional action of any sort is if NTIA's position rests on DoC intentions to take further action with respect to the .xxx sTLD. But if so, the agency must declare as much now and identify the action to be taken, or at the very least describe the nature of action under deliberation. *Wilderness Society v. Department of the Interior*, 344 F.Supp.2d 1, 12 (D.D.C. 2004). *See also Ethyl Corp., supra.*

Even if the August 11, 2005, letter to ICANN's Board were agency action sufficient to support NTIA's claim of Exemption 5 nondisclosure, that explanation would not justify much of the redaction and withholding that occurred here. As the FOIA Response recites, Exemption 5 applies to *predecisional* agency records, and many of the records redacted or withheld here postdate Assistant Secretary Gallagher's letter to Dr. Cerf. In addition to being well-established that agency records are "predecisional" only if a specific decision to which they relate can be identified, *see, e.g., Senate of Puerto Rico v. DOJ, supra*, it is well-settled that a distinction exists between predecisional records that assist an agency in arriving at decision, which are exempt from disclosure, and post-decisional records, which are not. *Renegotiation Bd. v. Grunman Aircraft Eng'g Corp.*, 421 U.S. 168, 184 (1975); *Bristol-Myers Co. v. FTC*, 598 F.2d 18, 23 (D.C. Cir. 1978). *Cf. Ryan v. DOJ*, 617 F.2d 781, 791 (D.C. Cir. 1980). As even a cursory review of Exhibit 3 reveals, among the records for which NTIA claims an Exemption 5 privilege (among those for which a date can be discerned – in some cases whole documents were redacted, including their dates), many were created *after* August 11, 2005. Again, unless NTIA and/or other DoC components anticipate additional activity with respect to the .xxx sTLD that will comprise final agency action – which activity must be identified, as noted above, to support the Exemption 5 claim – the redaction and withholding of records post-dating August 11, 2005, is unlawful.

December 2, 2005
Page 10



For example, NTIA redacted information from the August 16, 2005, email chain discussing GAC Chairman Tarmizi's inquiry into "how far" the U.S. government "is going to take this issue." Ex. 25. It also redacted information from email chains dated September 9 and 12, 2005, discussing the subject "pto needs background/talking points re wsis and .xxx." Ex. 3 at 65-71, 107-112, 129, 146, 161-164. And it redacted as somehow "non-responsive" information from a September 16, 2005, email chain discussing "phonecons and email exchanges with the eu commission, japan and canada" [sic] regarding potential letters from those countries to ICANN's Board of Directors. Ex. 24. NTIA also redacted material from an August 22, 2005, briefing outline for an upcoming August 25, 2005, meeting with Mike Binder of Industry Canada. Ex. 23. These are but several of many examples.

There is yet another reason why many of the records that were redacted or withheld are not subject to Exemption 5, regardless of whether they pertain to relevant agency "action" and/or post-date such action.     Specifically, it appears that many of the documents that were withheld have been shared with parties outside DoC. As a general matter, the protection of FOIA Exemption 5 is waived if an agency has disclosed the records to third parties or non-federal agencies. *Chilivis v. SEC*, 673 F.2d 1205, 1212 (11th Cir. 1982). While this principle may not apply to disclosures to Congress, other federal agencies, and/or in court proceedings, the records produced in response to the FOIA Request indicate that this exception does not apply here.

For example, the August 16, 2005, email referenced above regarding Chairman Tarmizi's inquiry into "how far" the U.S. government "is going to take this issue" is one of many indicating a significant level of communication between DoC and foreign governments regarding the .xxx sTLD, yet these documents contain redactions of information that likely traveled outside not only the agency, but across U.S. borders. Ex. 25. The September 16, 2005, email cited above about letters from other countries to ICANN's Board, which appears to have had significant material redacted as "non-responsive," discusses "phone cons and email exchanges with" individuals in those countries. Ex. 24. Another example is the email chain suggesting contact with Brazil, Denmark and South Africa to encourage them to "speak up" about .xxx. *See* Email from Suzanne Sene to Fiona Alexander, *et al.*, August 10, 2005 (Exhibit 27, attached). An August 11, 2005, email similarly discusses prospective "contacts with the GAC and other international contacts" with whom discussion of the information redacted from the documents here removes them from the purview of Exemption 5. Email from Fiona Alexander to Katy Smith, *et al.*, August 11, 2005 (Exhibit 28, attached).

Information also was redacted from the "likely topics" section of the above-cited backgrounder entitled "Meeting with Michael Binder, Industry Canada on WSIS and Internet Governance." Ex. 23. Not only does this reveal DoC coordination with foreign governments on initiation of the .xxx sTLD, which communiqués do not fall within any exception to Exemption 5 waiver, it indicates NTIA withheld information it specifically targeted for sharing with such foreign nationals, who by definition are parties outside the agency. In addition, the documents

December 2, 2005
Page 11



reveal that NTIA briefing papers prepared for congressional staff members were disseminated to outside activist groups who are leading the campaign against the .xxx proposal. *See* Ex. 8.

One email that was redacted as "non-responsive" refers to discussions between DoC personnel and Dr. Cerf which, again, unless NTIA claims ICANN as a federal agency, suggests regular communication of the matters redacted with persons outside DoC. Email from Cathy Handley to Meredith Attwell, July 22, 2005 (Exhibit 29, attached). A June 16, 2005, email purports to have "attached … a document that incorporates … comments of "Members [of Congress] who have spoken publicly about the .xxx," yet withholds the attachment (and redacts material in the email). Ex. 9 This begs the question of how an agency record that contains information discussed openly by Members of Congress can be withheld as non-publicly disclosed information for which confidentiality may be sustained under Exemption 5. Similarly, another email chain indicates NTIA personnel coordinated with the non-governmental Internet Caucus Advisory Committee regarding remarks to be made by DoC and State Department personnel, yet information pertaining to these prospective *public* comments was redacted. Email from Fiona Alexander to S. Shipman, August 30 and 31, 2005 (Exhibit 30, attached).

### Conclusion

ICM Registry appreciates the effort NTIA put into responding to the FOIA Request, compiling the responsive records and processing the documents for disclosure. It is our hope this appeal can be resolved quickly and without the expenditure of substantial additional resources. However, it is imperative that ICM Registry receive all the documents – and parts of them – that it sought in its FOIA Request and to which it is entitled. If there are any questions regarding this matter, or there is any information we can provide to bring it to an expeditious resolution, please do not hesitate to contact me. We will look forward to your response within the twenty working days specified by the FOIA and your agency's rules.

Very truly yours,

Davis Wright Tremaine LLP

Robert Corn-Revere
Counsel for ICM Registry