# Attachment 1

# REQUEST FOR RECONSIDERATION OF BOARD ACTION

ICM Registry, LLC ("ICM") submits this request for expedited reconsideration of the vote of the Board of Directors (the "Board") of the Internet Corporation for Assigned Names and Numbers ("ICANN") on 10 May 2006 regarding the .XXX sponsored top-level domain (the "sTLD"). This request is made pursuant to Article IV Section 2 of the ICANN bylaws effective 28 February 2006 ("Bylaws").

## Summary of Claim and Requested Action

ICM requests expedited reconsideration of the above-referenced vote on the grounds that, as evidenced herein:

1. Members of the Board voted against the ICM Agreement based on inaccurate information about the written statements of various governments concerning .XXX;

2. Members of the Board voted against the ICM Agreement based on an unfounded concern that it could put ICANN "in a difficult position of having to enforce all of the world's laws governing pornography, including ones that might require porn sites to use the domain;"

3. Members of the Board voted against the ICM Agreement without adequate information about the inappropriate involvement of the United States government in this process, or failing to appreciate the significance of that involvement;[1] and

4. Contrary to the direction of the Board on 15 September 2005 and 31 March 2006, the ICANN President and General Counsel did not engage in negotiations with ICM Registry regarding amendments to the proposed registry agreement, nor did they recommend changes to respond to concerns expressed by the Board and/or ICANN's Government Advisory Committee (the "GAC").

---

[1]      With respect to the inappropriate involvement of the United States government, ICM has also filed an action in the United States District Court for the District of Columbia against the United Stated Departments of Commerce and State for injunctive relief for violation of the Freedom of Information Act.

ICANN staff possessed critical information relevant to all of these claims well in advance of the Board call on 10 May 2006. Nonetheless, Board members rejected the proposed agreement with ICM Registry (the "ICM Agreement"), citing concerns that could and should have been dispelled by ICANN counsel, and information that was inadequate and/or incorrect.

As a result, the community of stakeholders identified in the application submitted by ICM (the "ICM Application"), along with Internet users globally have been denied the opportunity to work together to secure the benefits of a top-level domain for responsible adult web masters, as described in the Application.

ICM requests that the Committee recommend that the vote of the Board on 10 May 2006 be set aside, and that the Board approve the ICM Agreement.  In the alternative, ICM requests that the Committee recommend that the vote be set aside and that the Board:

1. Direct ICANN staff to negotiate a new contract for the registry on an expedited basis; and

2. Permit ICM to brief a joint meeting of the ICANN Board of Directors and any interested members of the GAC in Marrakech as to the substitute agreement's legal sufficiency and compliance with the communiqué issued by the GAC in Wellington, New Zealand (the "Communiqué"); and

3. Consider the adequacy of the substitute contract, applying standards of enforceability that are reasonably consistent with the standards contained in other registry agreements, including the agreement for .com;

4. Vote on the adequacy of the substitute contract at the Board meeting scheduled for 18 July 2006.

In light of the negative impact of continuing delay on ICM and the stakeholders community, ICM intends in the near future to submit a request for independent third-party review of the Board vote, as permitted under the Bylaws.  Further, ICM reserves the right to proceed in other fora based on the causes of action set forth in this petition, and on other causes of action.

The remainder of this document includes the detailed information and supporting documentation required by the Reconsideration Committee, as set forth in the Bylaws.

## Manner in which the Board's action affects ICM

With its vote on 10 May 2006 the Board effectively reversed its vote of 1 June 2005, when it directed ICANN staff to enter into commercial and business negotiations with ICM. The 1 June action reflected the Board's determination that the ICM Application met the Board-approved qualifications contained in the application criteria for new sTLDs issued 15 December 2003 (the "Criteria").[2] The Board repeated and elaborated on this instruction twice, on 15 September 2005[3] and on 31 March 2006.[4]

---

[2]      Staff has recently attempted to obscure the clear import of that vote, by referring to the Criteria as "minimum" criteria, but that description has no basis in any of the materials promulgated by ICANN in connection with the sTLD RFP, and is flatly inconsistent with statements made by Dr. Cerf (who told ICM principals that he viewed the next step as a vote "on the contract") as well as the repeated description of that action by ICANN itself. *See*, e.g., transcripts of staff reports on sTLD process:

> IF THE APPLICANT WERE FOUND TO MEET THOSE CRITERIA, THE BOARD WOULD THEN DIRECT ICANN TO INITIATE COMMERCIAL AND TECHNICAL NEGOTIATIONS WITH THOSE APPLICANTS. AND THAT WOULD RESULT IN A CONTRACT LEADING TO THE DESIGNATION OF THE STLD. (Vancouver, B.C.; 3 Dec 2005).

Likewise, in Luxembourg City, Mr. Pritz reported at the public forum that:

> THERE'S FOUR OTHER APPLICANTS THAT HAVE BEEN FOUND TO SATISFY THE BASELINE CRITERIA, AND THEY'RE PRESENTLY IN NEGOTIATION FOR THE DESIGNATION OF REGISTRIES, DOT CAT, DOT POST, TELNIC, AND XXX." (Luxembourg City, Luxembourg; 14 July 2005).

And in Mar del Plata:

> AT THE END OF THAT, IF THERE WERE STILL CONTINGENCIES REMAINING IN THE APPLICATION, THE ICANN BOARD, WITH FULL INFORMATION, I.E.,WITH ACCESS TO THE ORIGINAL APPLICATION, THE QUESTIONS THAT WENT BACK AND FORTH, THE INDEPENDENT EVALUATORS' REPORT, AND SUBSEQUENT WRITINGS, TOOK ON TO CONFIRM WHETHER THE CONTINGENCIES IN THE APPLICATION HAD, IN FACT, BEEN REMOVED AND THE APPLICATION COULD GO ON TO THE NEGOTIATION PHASE, OR WHETHER ADDITIONAL INFORMATION WAS REQUIRED, OR, IN FACT, WHETHER THE APPLICATION WAS DEFICIENT AND SHOULD NOT BE GRANTED. (Mar del Plata, Argentina; 7 April 2005).

[3]      Resolved (05.__), that the ICANN President and General Counsel are directed to discuss possible additional contractual provisions or modifications for inclusion in the .XXX Registry Agreement, to ensure that there are effective provisions requiring development and implementation of policies consistent with the principles in the ICM application.  http://www.icann.org/minutes/resolutions-15sep05.htm

The voting transcript of the 10 May Board call and Dr. Twomey's press statements suggest that the vote actually reflects the Board's determination on the Application itself.[5]  If so, the Board has apparently decided not to recommend to the United States Department of Commerce (the "DoC") that the sTLD be added to the authoritative root for the domain name system, reversing its previous determination that the Application met the Criteria.  This action was taken without notice to ICM or the ICANN community, all of whom had been told that the Board's consideration would be limited to evaluating the adequacy of the contract.[6]

In addition, and even in the event that the question put to the Board was (as it should have been) simply whether to accept or reject the ICM Agreement, as Dr. Twomey has also suggested,[7] ICM has been harmed by ICANN's:

---

[4]       In Wellington in March, the Board directed staff "TO ANALYZE ALL PUBLICLY RECEIVED INPUTS, TO CONTINUE NEGOTIATIONS WITH ICM REGISTRY, AND TO RETURN TO THE BOARD WITH ANY RECOMMENDATIONS REGARDING AMENDMENTS TO THE PROPOSED STLD REGISTRY AGREEMENT, PARTICULARLY TO ENSURE THAT THE TLD SPONSOR WILL HAVE IN PLACE ADEQUATE MECHANISMS TO ADDRESS ANY POTENTIAL REGISTRANT VIOLATIONS OF THE SPONSOR'S POLICIES."  Motion of Veni Markovski, http://www.icann.org/meetings/wellington/captioning-board-31mar06.htm.

[5]       *See, e.g.,* Voting transcript statement of Dr. Cerf:  "We are going to be calling for placing a resolution on the table concerning the proposal by ICM for a top-level domain of .XXX."  Dr. Twomey told Australian press that the Application could be revived only "if a proposal were submitted to ICANN for its establishment under its regime for registering generic top-level-domains." Coonan Applauds .XXX Failurel.

         In a private press briefing conducted on Thursday, 11 May 2006, portions of which have been made publicly available by a participating reporter, Dr. Twomey once again reiterated that the application could be considered in a gTLD round, depending upon policy developed by the GNSO in that regard.  Press Conference MP3.  Under the circumstances, Dr. Twomey's suggestion that .XXX might be considered as a generic TLD is nothing short of bizarre.  Is the ICANN community supposed to believe that the GAC's so-called "public policy objections" disappear if there are no rules at all?

[6]       Dr. Twomey has suggested that this outcome is ICM's fault because, as on numerous other occasions, ICM asked for an "up or down vote."  Given the length of time in which the Application was pending, no one can be surprised that ICM was anxious for the Board to act.  And ICM did urge Dr. Cerf to bring the Agreement to the Board for a vote.  Nonetheless, all involved were clear that the subject of the Board's deliberation was to be the contract, and not the Application.

[7]       *e.g.*, in the press conference cited above.

- Failure to follow the rules it established in the sTLD RFP and applied to similarly situated applicants;

- Failure to act on the ICM Agreement for nearly a full year or enter into good faith negotiations on the terms of the Agreement or to resolve any deficiencies in the Agreement;

- Failure to limit its consideration on 10 May 2006 to a review of the contract terms;

- Repeated mischaracterization of the nature and import of the views expressed by various governments;

- Continuous ex parte communications among the government of the United States, the Chairman of the GAC, and senior ICANN management, which were not communicated to ICM, to the ICANN community, or to our knowledge, to members of the ICANN Board; and

- Failure to articulate and permit ICM to address any reasonable objections to the ICM Agreement, had they existed.

## Affect on the Stakeholder Community and Internet Users

The Board's action denies the stakeholder community, in particular advocates for children as well as responsible members of the adult online entertainment industry, the opportunity to work together to achieve the goals set forth in the charter of ICM and the Internet Foundation For Online Responsibility ("IFFOR"). The vote denies Internet users globally, in particular families, children, and adult consumers of legal adult material, the opportunity to benefit from the voluntary self-regulation by responsible members of the online adult entertainment industry.[8]

## Background

The following facts are not in dispute:

---

[8]    One year ago ICM surveyed the prevalence of 27 sexually explicit words in URLs in .com, .net, and .org. ICM repeated that survey last month and discovered that the number of sites with URLs containing one or more of those same 27 words had increased nearly 30% in one year, from 1.6 million sites to over 2 million sites. There is no reason to believe that trajectory is likely to level off anytime soon.

ICM Registry LLC
Request for Reconsideration (19 May 2006)

1. ICM Registry submitted its Application in response to the sTLD RFP in March of 2004.

2. The ICM Application was the subject of a public comment prior commencing on 2 April 2004 and ending on 17 May 2004.

3. 63 comments were received, the vast majority of which supported the creation of a sponsored top-level domain for adult webmasters.  <u>In fact, the ICM Application received more positive comments than any other sTLD application, and a far higher percentage of positive comments than most other applications</u>.

4. No government submitted comments on the ICM Application.

5. On 1 December 2004, Dr. Twomey wrote to GAC Chairman Tarmizi, and requested the GAC's advice on the public policy issues arising in connection with the new sTLD applications.  http://www.icann.org/correspondence/twomey-to-tarmizi-01dec04.pdf.

6. Chairman Tarmizi responded to Dr. Twomey on 3 April 2005:[9]

> No GAC members have expressed specific reservations or comments, in the GAC, about the applications for sTLDs in the current round.  However should sTLDs use ENUM, that should not interfere with established international policies for the E164 numbering system. ˝ Letter from Tarmizi to Twomey 3apr05.pdf.

7. As set forth by ICANN in greater detail in its Status Report on the sTLD Evaluation Process dated 3 December 2005, the ICANN Board of Directors discussed the completed ICM Application, as supplemented at the Board's invitation, on at least three separate occasions prior to its meeting of 1 June 2005. The record reflects that Chairman Tarmizi participated in all but one of those discussions.

8. At that meeting, having determined that the Application met the Criteria, the Board directed staff to enter into commercial negotiations with ICM.

9. On 11 July 2005, members of the ICANN Board met with the GAC in open session.  In that meeting, in response to questions from representatives from Brazil, Chile, Spain, and Denmark, Dr. Cerf and Dr. Twomey reminded the GAC that ICM's Application had been on the public record since March of 2004, and stated that ICANN had considered the Application in accordance with the established policies and procedures.

---

[9]        Only one day before Chairman Tarmizi wrote this letter, ICM representatives met with the ICANN Board to answer the Board's questions regarding the ICM Application.  Chairman Tarmizi was present for at least part of this meeting and unquestionably knew that the Board was giving serious consideration to the ICM Application.

10. On 9 August 2005, ICANN posted a proposed contract with ICM, and announced its intention to review the agreement at its next meeting, scheduled for 16 August 2005. http://www.icann.org/tlds/agreements/XXX/proposed-XXX-agmt-09aug05.pdfhttp://www.icann.org/minutes/index-2005.html

11. On 12 August 2005, ICANN staff informed ICM counsel that ICANN was in receipt of a letter from Michael Gallagher, Assistant Secretary for Communications and Information of the United States Department of Commerce ("DoC") requesting that ICANN "ensure that the concerns of all members of the Internet community on [the ICM proposal] have been adequately heard and resolved" before voting on the contract."

12. On 12 August 2005, ICANN posted a letter, dated the same date, from Chairman Tarmizi noting that "apart from the advice given in relation to the creation of new gTLDs in the Luxembourg Communiqué that implicitly refers to the proposed TLD, sovereign governments are also free to write directly to ICANN about their specific concerns," which he thought "several" governments might do. http://www.icann.org/correspondence/tarmizi-to-board-12aug05.htm

13. On 15 August 2005, ICANN posted the letter (dated 11 August 2005 but stamped "received" on 15 August) from Michael Gallagher. http://www.icann.org/correspondence/gallagher-to-cerf-15aug05.pdf

14. Following discussions with Dr. Twomey and ICM staff, ICM sent a letter, dated and posted 15 August 2005, asking the Board to postpone contract consideration for thirty days. http://www.icann.org/correspondence/lawley-to-twomey-15aug05.pdf

15. The ICANN Board considered the ICM contract on 15 September 2005, and asked staff to consider additional assurances regarding policy development and change of control. http://www.icann.org/minutes/resolutions-15sep05.htm

16. ICM provided responsive contract language to ICANN staff on 27 September 2005.

17. ICANN counsel was not able to discuss the responsive language provided by ICM until 17 March 2006, at which point outside counsel for ICM and ICANN promptly reached agreement on the language, to be sent to Mr. Jeffrey.

18. In Wellington, ICM proposed additional language to respond to concerns expressed in the GAC's communiqué (the "Wellington Communiqué"). http://gac.icann.org/web/communiques/gac24com.pdf

19. The Board considered the substance of the ICM Agreement on 18 April 2006, http://www.icann.org/minutes/minutes-18apr06.htm, after which ICANN posted the ICM Agreement as a "proposal" from ICM rather than a negotiated text.

7

20. The Board rejected the ICM Agreement, and perhaps the Application (as discussed above) on 10 May 2006. http://www.icann.org/minutes/voting-transcript-10may06.htm

21. Between July of 2004 and the present time, the ICANN Board approved contracts with registry operators for 5 of the other 7 applications determined by the Board to meet the Criteria. The Board is expected to approve similar agreements for .asia and .post. While several applications raise "public policy issues" about which governments have expressed concern, none of the corresponding agreements are materially different from the agreement posted by ICANN in August of 2005. None of those agreements provide compliance assurances of the sort demanded of ICM in September and again in March.[10]

## Material information not considered by the Board

## A. Governmental Input

Prior to and following the Board's vote, ICANN staff stated that ICANN had received communications from the European Commission, and the governments of Australia, Brazil, Denmark, Sweden, and the United Kingdom opposing the ICM Application. While at least some of those governments have communicated with ICANN, the publicly available documents do not demonstrate opposition to the substance of the ICM Application.[11] ICANN received the following communications from governments:

August 11, 2005, posted August 15: The U.S. government requested a delay in Board consideration of the ICM agreement.

August 12, 2005, posted August 12: Chairman Tarmizi informed Dr. Twomey that "several" governments might write to express their concerns about .XXX.

---

[10]     .jobs and .travel: http://www.icann.org/minutes/minutes-08apr05.htm
.mobi:  http://www.icann.org/minutes/minutes-28jun05.htm
.cat:  http://www.icann.org/tlds/agreements/cat/proposed-cat-agmt-09aug05.pdf
.tel: http://www.icann.org/tlds/agreements/tel/

[11]     "Mr. Twomey said that in addition to the US, the UK, Denmark, Sweden, Brazil and Australia had lodged their own complaint their own complaints against the pornography plan." FT.com May 12 2006.

September 6, 2005:  Citing the earlier introduction of .travel and .XXX without adequate consultation (*e.g.*, treating .XXX as a done deal), the Brazilian government asked Chairman Tarmizi to ensure that new TLDs would be considered only after full consultation.  http://www.icann.org/correspondence/lopez-to-tarmizi-06sep05.pdf

September 13, 2005:  The Swedish government expressed its view that pornography is not compatible with gender equality goals, and asked the Board to delay consideration of the ICM contract until after the Vancouver meeting.  ICANN has not posted this letter. (Exhibit A).

September 16, 2005:  Deputy Director General Peter Zangl, European Commission, asked Dr. Cerf to delay consideration of the contract to give the GAC an opportunity to review the evaluation reports.  http://www.icann.org/correspondence/zangl-to-cerf-16sep05.pdf

September 30, 2005:  Taiwan's GAC representative informed the Board that his government thought the .XXX sTLD would be helpful, but suggested that in the future ICANN should provide more time for GAC comment.  ICANN has never posted this letter. (Exhibit B).

May 9, 2006:  The UK's GAC representative wrote to Dr. Cerf noting ICANN's authority in this matter, and recommending that ICANN have a workable means of making ICM live up to its commitments.  http://www.icann.org/correspondence/boyle-to-cerf-09may06.htm

**The actual letters simply do not evidence the opposition cited by Dr. Twomey.  Only the Wellington Communiqué even references governmental opposition - saying "some" members are strongly opposed.  Otherwise, not a single one of the letters that that ICANN made available expresses a substantive objection to the ICM proposal.**[12]

---

[12]     The Swedish letter does express a position on pornography - that it is not compatible with gender equality goals.  It is likely that some of ICM's strongest supporters would agree with that view.  It is not, however, a view on the ICM Application, and notwithstanding the view of the Swedish minister, pornography remains legal in Sweden.

ICM Registry LLC
Request for Reconsideration (19 May 2006)

To ICM's knowledge, ICANN has not made any communications from the Australian government or the Danish government public.  With respect to the Danish position, however, ICM received an email (Exhibit C) from Denmark's GAC representative, Sidse Ægidius, which flatly contradicts Dr. Twomey's description:

> I would however like to clarify the Danish position.  The remarks I have made have solely addressed the fact that ICANN board has not followed the procedures that it - according to the bylaws - must follow when taking decisions.  In other words my remarks could have concerned any other TLD with possible public policy implications, and <u>DK has not taken any position on triple x as such</u>. (emphasis added).

ICM provided ICANN staff with a copy of this email upon receipt.

## B.  Responsibility for Enforcing sTLD Rules

Some members of the ICANN Board appear to have erroneously believed that the ICM Agreement could put "in a difficult position of having to enforce all of the world's laws governing pornography, including ones that might require porn sites to use the domain."

In response to specific requests for contractual language from the ICANN Board and the GAC, ICM Registry sought to draft provisions (not required of other applicants) that contained the following obligations:

1.  Registry Operator will directly or, as appropriate and as set forth in the Application, in conjunction with IFFOR:

    a.  Establish policies and procedures for the sTLD, including specifically but without limitation: policies for the use of automated tools to monitor proactively registrant compliance with registry policies related to labeling and the prohibition of child pornography; mechanisms for user reporting of registrant non-compliance with registry policy; procedures for providing notice to non-compliant registrants and an opportunity to cure that is reasonable in light of the nature of such non-compliance; and the circumstances under which Registry Operator will terminate the registration of a non-compliant registrant;

b. Establish registration requirements for the sTLD, which shall, <u>in addition to the obligation to comply with all applicable law and regulation,</u> and without limitation, include obligations related to verification of registrant eligibility, willingness to adhere to best practice guidelines containing prohibitions on: illegal content; unfair, deceptive, or fraudulent marketing practices; the use of malware, malicious code, spoofing, pfishing; practices designed to attract children or suggest the presence of child pornography; unauthenticated use of credit cards; violations of law regarding the sending of unsolicited promotional email; or misuse of personal data, and other policies and procedures (the "Policy Commitments") for the sTLD including, without limitation, Registry Operator's policy commitments contained in [listed] documents submitted to ICANN by the Registry Operator.

It appears from the Voting Transcript and Dr. Twomey's public statements that the proposal to obligate registrants to comply "with all applicable law and regulation" and prohibit "illegal content" in particular raised concerns for some Board members about the enforceability of the contract. This concern was, according to Dr. Twomey, reinforced by the letter from Martin Boyle, UK representative to the GAC, dated 9 May 2006. In that letter, Mr. Boyle said:

Furthermore, it will be important for the integrity of ICANN's position as final approving authority for the dot.XXX domain name, to be seen as able to intervene promptly and effectively if for any reason failure on the part of ICM in any of these fundamental safeguards becomes apparent.

Dr. Twomey has repeatedly stated in the days since the Board vote that the decision largely came down to 'whether the creation of "XXX" might put ICANN in a difficult position of having to enforce all of the world's laws governing pornography, including ones that might require porn sites to use the domain.'[13] Moreover, according to Twomey:

some of ICANN's directors read from this that if ICM could not be relied upon to police the content under .XXX, as its contract would have required, then ICANN would be called upon to police it instead, something the organization is ill-equipped for. Computer Business Review, 12th May 2006.
http://www.cbronline.com/article_news.asp?guid=20324D32-0376-4062-BCEF-E89D077570AF

---

[13]      *See, e.g.,*http://www.cnn.com/2006/TECH/internet/05/11/xxx.domain.ap/

ICM Registry LLC
Request for Reconsideration (19 May 2006)

First, Dr. Twomey's characterization of Mr. Boyle's letter is baseless. The only reasonable interpretation of Mr. Boyle's admonition is that the UK government would expect ICANN to enforce its agreement with ICM. There is no suggestion of any kind that the British government would expect ICANN to enforce ICM's contract with registrants in the sTLD. It should be a matter of grave concern to the Board that ICANN staff failed to clarify this point for Board members, most of whom are neither lawyers nor native English speakers. As a result, Board members voting against the ICM Agreement appear to have done so based on an inaccurate reading of Mr. Boyle's letter. At the very least, staff might have clarified the matter directly with Mr. Boyle.[14]

Second, Dr. Twomey's assertion that the contract as drafted constitutes a promise to enforce pornography laws across jurisdictional boundaries is similarly without foundation. ICM made clear to the Board in its Application and in its presentation to the Board in Argentina that the registry was expressly non-regulatory and would not undertake to "enforce" the many different national laws that exists. All businesses, however, are required to obey the law in the jurisdictions in which they operate. In this regard, the phrase "applicable law" in the ICM Agreement is a well-understood concept under governing U.S. and state law, and simply means the law in a country that has jurisdiction - *i.e.,* the ability to enforce a court order - over an individual or entity that is a party to the agreement.

If ICM were to receive service of a legally valid court order from a federal or state court with jurisdiction, it would be obligated - with or without the phrase that apparently confused Board members - to comply with that order. If a court in another jurisdiction ordered ICM to take some particular action, ICM would be obligated to comply to the extent that the issuing court had jurisdiction over ICM - with or without the contractual language. Where a court seeking to enforce that order requires the application of law by

---

[14]    ICM did. Mr. Boyle seemed surprised by this interpretation of his letter.

a United States court, however, the "applicable law" must be consistent with public policy, including the United States Constitution.[15]

Of course, any operator of a website, or the operator of a server on which that site is hosted, must comply with the laws of the jurisdiction in which it resides, regardless of the domain in which it is registered or the provisions of any registry agreement. Nothing in the proposed ICM Registry agreement affects this principle in any way. Nor does a decision by a national government to enforce domestic laws against those within its jurisdiction involve ICM or ICANN in any way.

.

Quite apart from the proposed contractual language, the same analysis would apply to a judicial attempt to order ICANN to remove content from a website. Unless the court in question has jurisdiction over ICANN, ICANN could not be obligated to comply without an order from a U.S. court, which would determine whether or not the order is compatible with U.S. law. Even if the court actually had jurisdiction over ICANN, the court could not order ICANN to remove the content. Though a court might order ICANN to enforce its contract with ICM, ICANN has no mechanism and no ability to enforce the registrant agreement. In this situation, ICANN would be no more liable for content in .XXX than it is now for the same content in .com. And, to the extent that ICANN incurs any costs defending this proposition, the ICM Agreement, like all other registry agreements, contains an indemnification clause for just this situation.

The reference to "illegal content" was added in response to Board and GAC demands (and ICM would certainly agree to delete it). ICANN and members of the GAC know quite well that neither ICM nor IFFOR is in a position to determine whether or not

---

[15]     *See, e.g., Ackermann v. Levine*, 788 F.2d 830, 837 (2d Cir. 1986); *Laker Airways Ltd v. Sabena, Belgian World Airlines*, 73 F.2d 909, 929, 931, 937, 943 (D.C. Cir. 1984); *Yuen v. U.S. Stock Transfer Co.*, 966 F. Supp. 944, 948 (C.D. Cal. 1997); *see Hilton v. Guyot*, 159 U.S. 113 (1895) (outlining fundamental principles of comity); Cal. Civ. Proc. Code § 1713.4(b)(3) (court need not recognize foreign money judgment based on cause of action repugnant to public policy of state). *See also Matusevitch v. Telnikoff*, 877 F. Supp. 1 (D.D.C. 1995), *aff'd on other grounds*, 159 F.3d 636 (D.C. Cir. (1998) (Table); *Bachchan v. India Abroad Publ'ns. Inc.*, 585 N.Y.S.2d 661 (N.Y. Sup. Ct. 1992).

content is legal - in the United States, or anywhere else.[16]  That determination must be left to government.  Enforcement in this case would proceed in the same manner described above.  Here, the prohibition on illegal content is the same as an obligation to comply with applicable law, which is the only reasonable interpretation of the Wellington Communiqué.

Third, the ICM Agreement gives ICANN the right to terminate the agreement, to impose sanctions, to arbitrate, and to take a number of other steps to enforce compliance.  ICANN also has considerable "soft" leverage, for example, in the new registry services approval process - and ICANN has not shied from using this soft leverage in the past.

To the extent the ICM Agreement is "not enforceable" as a practical matter, the same can and must be said of every other agreement ICANN has signed with registries.  The only possible difference is that in this case ICM has given ICANN no reason whatsoever to believe that it will behave irresponsibly.  Quite to the contrary, as members of the Board and staff have publicly noted, ICM has consistently been a constructive and responsible participant in the ICANN process.

Moreover, even if disparate treatment is justified in this case, it is only justified to the extent necessary to address legitimate concerns.  ICANN could have sought additional enforcement mechanisms, but elected not to do so.  Many such mechanisms exist and are commonly used in commercial agreements.  For example, ICANN could have required ICM to post a bond to ensure performance.  Inasmuch as the principals of ICM told Dr. Cerf and Dr. Twomey in Wellington that they intended to agree to any reasonable contract terms ICANN put to them, it was incumbent upon ICANN to at least consider the possibility that other approaches might suffice.

---

[16]      Note, however, that the prohibition on child pornography - which is illegal in many, but not all countries, will not depend on governmental action in the first instance.  Rather, ICM and IFFOR will contract with an existing organization - such as ASACP - that has the ability to monitor for possible child pornography and uses established relationships to report child pornography to the proper authorities.  As ICM is not a hosting service, take-down issues must be addressed elsewhere.

ICM Registry LLC
Request for Reconsideration (19 May 2006)

14

<u>Fourth</u>, in the United States, a contract is generally assumed to require parties to the agreement to comply with applicable law.[17]  The phrase merely articulates that standard obligation.  To the extent that this obligation raises concerns with some Board members, they should be aware that it attaches to every single registry agreement that ICANN signs, whether or not the agreements include the phrase.

## C.  Inappropriate Involvement of the U.S. Government

**The Board did not consider material information provided by ICM Registry to ICANN staff that demonstrated that the U.S. government was attempting to manipulate the ICANN process in furtherance of its domestic political agenda.**

Following the unexpected intervention of the DoC in ICANN's deliberations last summer, ICM submitted a request for information under the United States' Freedom of Information Act ("FOIA") to the DoC and the Department of State.  The submissions, dated 18 October 2005 requested all records related to ICANN's consideration of the ICM Application, and all records reflecting the government's communications with the ICANN Board, staff, or the GAC regarding the ICM Application.

The DoC responded on 18 November 2005, turning over more than 1600 pages of documents.[18]  The DoC withheld certain information, claiming a statutory exemption for documents that were "pre-decisional or privileged."  On 2 December 2005, ICM filed an administrative challenge to the DoC's decision to withhold documents.  ICM forwarded a copy of that document to John Jeffrey and Paul Twomey on 5 December 2005.  (Exhibit D).  As described in the administrative challenge, the documents provide undisputable evidence of the material intervention by the government of the United States in the internal deliberations of ICANN.  The following disturbing facts emerge from those documents:

---

[17]        *See, e.g., Relational Investors LLC v. Sovereign Bancorp, Inc.,* 417 F. Supp. 2d 438 (S.D.N.Y. 2006) (Contractual language must be interpreted in light of existing law, the provisions of which are regarded as implied terms of the contract.); *Ellington v. State, Dept. of Natural Resources*, 979 P.2d 1000 (Alaska 1999); *Double H Housing Corp. v. Big Wash, Inc.,* 799 A.2d 1195 (D.C. 2002); *Zattiero v. Homedale School Dist No. 370,* 137 Idaho 568, 51 P.3d 382, 167 Ed. Law Reporter 946(2002).

[18]        Available on the ICM website.  http://www.icmregistry.com/

ICM Registry LLC
Request for Reconsideration (19 May 2006)

Shortly following the Board vote on 1 June 2005, the Commerce Department began to monitor responses. The DoC became aware of objections from a socially conservative special interest group. According to one Commerce Department official:

> Who really matters in this mess is Jim Dobson. . . . . someone from the White House ought to call him ASAP and explain … that the White House doesn't support the porn industry in any way, shape or for, including giving them their own domain."

Before the end of June the DoC received more than 4000 letters and emails - at least two-thirds of the comments later cited by the DoC as a reason for putting off the 16 August discussion. Nonetheless, at that time and <u>until at least mid-July following the Luxembourg meeting, the DoC supported the ICM Application</u>.

- o For example, on 16 June 2005, one senior official at DoC asked staff to provide "talking points on why this is a good thing and why we support it." On that same date, internal email demonstrates that the DoC position was that it had no role in the "internal governance or day-to-day operations of the organization."

- o Following the Luxembourg meeting, in an email dated 13 July 2005, the US representative to the GAC reported "happily" that the GAC communiqué contained no mention of .XXX. She also reported on the view of some GAC members - which was "not shared by the U.S." - that ICANN did not adequately consult before approving the ICM Application for contract negotiations on 1 June 2005.

At some point after 13 July and before 11 August 2005, the United States government reversed its position on the ICM Application, and Michael Gallagher wrote to Dr. Cerf requesting a delay to "provide a proper process and adequate additional time" for concerns to be expressed. Mr. Gallagher reference to the "unprecedented" amount of comments received is pretense because, as noted above, the <u>DoC received the vast majority of these comments before the end of June - while it was still supporting the ICM Application</u>.

Despite Chairman Tarmizi's letter, and Secretary Gallagher's assertions, we know, as discussed above, that other governmental concerns were limited to procedural questions.

16

The documents show that the United States government attempted to instigate and orchestrate governmental reactions, which was necessary to obscure the fact that it was unilaterally intervening in the ICANN process to derail ICM, which would have been embarrassing in the run-up to the final WSIS meeting, and created serious risks for ICANN.[19]  Chairman Tarmizi's email of 16 August to Suzanne Sene clearly demonstrates this point.[20]  In that email Chairman Tarmizi asks Ms. Sene to share with him:

> how far the USG is going to take this issue?  For example, if the board decides to go ahead in October or November … what  would be the USG's reaction? . . . I need to know what the acceptable future course of action might be so that we can do some strategizing." (emphasis added).[21]

While the documents provided to date do not contain Ms. Sene's response to Chairman Tarmizi, they clearly indicate that by August of 2005 the U.S. government had adopted the view that the .XXX domain would not go in the root "if the U.S. does not wish for that to happen."

The role of the U.S. Department of Commerce in ICANN's deliberative process calls into question the fundament integrity of the ICANN process.  Before reversing itself with respect to the creation of a top level domain for responsible adult webmasters, the ICANN Board - and indeed the ICANN community - should have been told, as the

---

[19]    For example, proof that ICANN was working in tandem with DoC to implement U.S. policy would subject ICANN to potential liability under U.S. statutory and constitutional law, and make its position in WSIS even more precarious.

[20]    Given the posting sequence, one must wonder whether the letter from Chairman Tarmizi was solicited to preserve the appearance of an independent ICANN.  As discussed above, ICANN has posted a total of three letters from governments on this issue: (1) a letter from the Government of Brazil (dated 6 September); (2) a letter from a senior official at the European Commission (dated 16 September); and (3) a letter from the UK government that has been consistently misrepresented in the week since the Board voted.  ICANN has received, but not posted, letters from the Governments of Taiwan and Sweden.  Finally, we understand that ICANN has received a letter from the Australian government, which has not been posted.

[21]    Under the circumstances, the 12 August letter from Chairman Tarmizi to the Board seems quite odd indeed.  For example, Secretary Gallagher's letter is dated August 11, but not posted until August 15 (although ICANN staff undeniably had a copy of the letter no later than August 12.  Chairman Tarmizi's letter, on the other hand, was dated and posted on August 12.  Nonetheless, as Chairman Tarmizi's email of 16 August demonstrates, he clearly viewed this as a USG concern - not a GAC concern.

ICM Registry LLC
Request for Reconsideration (19 May 2006)

documents turned over by the U.S. government and in the possession of ICANN staff demonstrate:

- That the U.S. government was intent on preventing the addition of .XXX to the authoritative root; and

- That the procedural concerns cited by Secretary Gallagher were <u>nothing more than a facade to legitimize the actions of the U.S. government in response to purely domestic, political concerns</u>.

In short, the members of the ICANN Board of Directors who voted to enter into commercial negotiations with ICM on 1 June 2005, and who - <u>but for the 11th hour intervention of the DoC, and its campaign to kill the ICM Application</u> - might have voted in favor of the ICM Agreement on 16 August or 15 September, should have had this information before being asked to vote on 10 May 2006.  ICM and members of the ICANN community are entitled to understand the scope of the DoC intervention, the extent of any concerns about the impending expiration of the MOU and the IANA functions contract, and the manner in which the DoC's change of heart in pursuit of a domestic, partisan political agenda affected its handling of the ICM Application.

## D.  ICANN Staff Did Not Negotiate with ICM As Directed and Violated Established ICANN Policies and Procedures.

On 15 September 2005, as discussed above, the Board instructed the President and General Counsel to "discuss possible additional contractual provisions or modifications for inclusion in the .XXX Registry Agreement, to ensure that there are effective provisions requiring development and implementation of policies consistent with the principles in the ICM application."  <u>http://www.icann.org/minutes/resolutions-15sep05.htm</u>.  After speaking with ICANN staff to clarify the Board's concerns, ICM Registry forwarded responsive language to the General Counsel on 27 September 2005.

ICANN staff was not available to discuss the language with ICM for six months - that is, until 17 March, 2006, when Mr. Jeffrey referred the matter to outside counsel.  Two days

later, outside counsel for both sides reached agreement on the language, which ICANN's counsel indicated she would transmit to Mr. Jeffrey.

As demonstrated in the memorandum provided to ICANN on 8 April 2006 (Exhibit E), despite the long delay, before the Wellington meeting started, ICM had placed contract changes on the table, and ICANN's outside counsel had reviewed those changes, which addressed many of the concerns cited by Acting Assistant Secretary John Kneuer in his letter to Chairman Tarmizi dated 20 March 2006. http://www.icann.org/correspondence/kneuerto-tarmizi-20mar06.pdf. Although ICM communicated this to Chairman Tarmizi promptly, and offered further revisions (Exhibit F), the GAC was unwilling to consider the revised text because it had not been posted by ICANN.

At the conclusion of the ICANN Board meeting on 31 March 2006, ICM's counsel forwarded a further draft of the ICM Agreement. As demonstrated in the memorandum referenced above, ICM's draft responded to every reasonable concern and suggestion expressed by the GAC in its Wellington Communiqué. ICM counsel pointed out the very small number of issues that were not handled in accordance with the Communiqué (*e.g.*, the ICM Agreement did not include a ban on "offensive" content precisely because no such standard exists).

ICANN staff did not express concerns about the new revisions, or suggest additional language. In fact, ICM's counsel spoke with Mr. Jeffrey several times, and Dr. Twomey as well, in the days before ICANN posted the ICM Agreement on 18 April 2006. Staff did not request or suggest changes to the contract language. Nonetheless, the ICM Agreement was posted as ICM's "revised, proposed" contract - *i.e.,* not blessed by staff.

When ICANN posted the minutes of the 18 April Board call, unfortunately only after the vote on 10 May, ICM learned for the first time that some Board members remained concerned about the manner in which sTLD agreements (in general):

> guaranteed compliance by the registry operator with the terms, and whether the right level of policy enforcement processes are currently in place within the sTLD agreements to cover communities as complex as the adult entertainment community. Concerns were also expressed about how policy processes would be

set up and whether an ICANN-like policy process was quick enough for the community in the .XXX application.  http://www.icann.org/minutes/minutes-18apr06.htm

Had ICANN staff at any time communicated these lingering concerns, ICM would have endeavored to address them - as its principals told Dr. Cerf in Wellington they would do. In response to the rather odd statement in the minutes about the adequacy of its policy development processes, ICM would have explained that because the major policies would be in place by the time registration commenced, as the Start-Up Plan clearly demonstrates, the policy development process could be deliberate and careful.  ICM would have reminded the Board that the Business evaluators had specifically described the ICM policy process as well thought through.  But ICM was not given an opportunity to respond to these concerns - notwithstanding the Board's instruction to "discuss" and "negotiate."

ICM, in its request for independent review, will detail the numerous ways in which its application was singled out from other sTLD applications for disparate treatment not justified by substantial and reasonable cause.  In addition to constituting violations of the ICANN Bylaws, however, staff handling of the ICM Application repeatedly violated established ICANN policies.  While those actions and inactions are too numerous to list, ICM would like to bring to the attention of the Reconsideration Committee the decision to post the evaluation reports in December, notwithstanding the existence of a complaint pending before the ICANN Ombudsman and over the objections of the Ombudsman, and despite ICANN's repeated statements - in public and in private - that the evaluations would be posted only when the process was complete.[22]  (Exhibit G)


## Why The Board Did Not Have This Information Earlier

The Reconsideration Policy requires ICM to explain the reasons it did not submit the information referenced herein to the Board prior to 10 May 2006.

---

[22]      Was Dr. Cerf appropriately briefed, for example, before castigating ICM for impeding the process and unilaterally pulling the ICM Agreement off the agenda in Vancouver?

First, as detailed above, in each instance where ICANN staff did not possess the referenced information, ICM provided it to staff in a timely manner, reasonably expecting staff to use and share it with the Board as appropriate.

Second, throughout this long and expensive process, ICM has endeavored to interact with ICANN's Board and staff respectfully and constructively. We believed, until last week, that ICANN would consider the ICM Application in accord with ICANN's policies, procedures, and Bylaws. We believed that staff members were being candid with us, and that the outcome would not be determined by the inappropriate intervention of a single government.

ICM believed that it was neither necessary nor constructive to disseminate this information more widely, knowing that it would likely embarrass some people and create fodder for others wishing to end private sector management of the DNS.

It would be unfortunate, indeed, for the Committee to conclude that ICM's reliance on staff to bring this information to the Board constitutes a waiver of its reconsideration rights. Such a conclusion is untenable, for a multitude of reasons, not the least of which is level of acrimony that would create in the community and the volume of paper Board members would then receive.

## Specific Steps Requested by ICM

In light of the foregoing, ICM Registry requests that the Committee recommend that the vote of the Board on 10 May 2006 be set aside, and that the Board approve the proposed contract. In the alternative, the ICM Registry requests that the vote be set aside and that the Board:

5.  Direct ICANN staff to negotiate a new contract for the registry on an expedited basis; and

6.  Permit ICM to brief a joint meeting of the ICANN Board of Directors and any interested members of the ICANN Government Advisory Committee ("GAC") in Marrakech as to the substitute agreement's legal sufficiency and compliance with

21

the communiqué issued by the GAC in Wellington, New Zealand (the "Communiqué"); <u>and</u>

7. Consider the adequacy of the substitute contract, applying standards of enforceability that are reasonably consistent with the standards contained in other registry agreements, including the agreement for .com;

8. Vote on the adequacy of the substitute contract at the Board meeting scheduled for 18 July 2006.

Respectfully Submitted,

Stuart Lawley
President and CEO
19 May 2006