## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

ICM REGISTRY, LLC,          )
                            )
             Plaintiff,      )
                            )
     v.                   )
                            )   Case No. 1:06CV00949 (JR)
UNITED STATES          )
DEPARTMENT OF COMMERCE and   )
DEPARTMENT OF STATE,     )
                            )
             Defendants.    )
_____)

## PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS'
## MOTION TO DISMISS AND FOR SUMMARY JUDGMENT, AND
## MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56 and Local Rules 7(a), 7(b), 7(h), & 56.1, Plaintiff ICM

Registry, LLC ("ICM"), by its attorneys, hereby submits its Memorandum in Support of ICM's

Motion for Summary Judgment and Opposition to Defendant's Motion to Dismiss and for Sum-

mary Judgment ("Def. Mot."). The Court should deny the government's Motion and grant Plain-

tiff summary judgment on its Complaint seeking access to records under the Freedom of Infor-

mation Act, 5 U.S.C. § 552 ("FOIA"), as there is no genuine issue of material fact and ICM is

entitled to judgment as a matter of law. *Bennett v. DEA*, 55 F.Supp.2d 36, 38-39 (D.D.C. 1999).

## PRELIMINARY STATEMENT

ICM filed the FOIA requests at issue in this case under the Act's "fundamental purpose"

of "assist[ing] citizens in discovering 'what their government is up to,'" [1] in hopes of

understanding what role the United States government played regarding ICM's pursuit of

approval from the Internet Corporation for Assigned Names and Numbers ("ICANN") to operate

a ".xxx" domain on the world-wide web.  Just as importantly, ICM seeks to understand what role the U.S. government believes it *can* play in domain-name approvals, which are vested with the international private sector via ICANN, so as to insulate the process from undue influence by any one country.  This international arrangement placed particular emphasis on insulating domain name approvals from governmental control, including that by the United States, which at the time had significant authority and to this day controls the authoritative root necessary to proper Internet functionality.  *See supra* at 4-5.  However, now that the Departments of State and Commerce have divulged that they possess well over two thousand pages of documents bearing on the proposed domain, of which they have redacted over 250 pages and withheld over 300 more pages in full, and have attempted to justify here their refusal to disclose the information predominantly as privileged "deliberative processes," the activities and role of the U.S. government with respect to domain-name governance have become evident, but no clearer.

In seeking to maintain secrecy with respect to the records, the government offers only vague allusions to .xxx, ICANN, and Internet governance generally, that not only fail to carry the burden of showing FOIA exemptions apply, but also raise more questions than they answer with respect to the U.S. role in domain approvals and Internet governance.  This is vital, as ICM has shown the records released thus far paint a picture of backstage activities at Commerce after the announcement of .xxx's initial approval that (1) suggest it focused on political reactions to the announcement, not regulatory activity, and (2) confirmed that Commerce lacks an official regulatory role in approving domains.[2]  The explanations relating to the documents not released now reinforce these points, particularly the latter to the extent both agencies fail to

---

[1] *Center for Int'l Envtl. Law v. OTR*, 237 F.Supp.2d 17, 22 (D.D.C. 2002) (quoting *DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989)).

pinpoint any specific aspect of their authority (or need to defend a lawsuit, or for legal advice) that relates to .xxx or ICANN in a way that reflects decision-making protectable under FOIA's exemptions.

For example, in describing the alleged deliberative processes that it claims support non-disclosure, Commerce repeatedly refers to matters such as "the Government's response if [ICANN] were to recommend the creation of the proposed new .xxx domain and/or enter [ ] a contract with ICM to operate [it]," and "the give and take of predecisional [ ] deliberations as ICANN considered ICM's application … and/or negotiated [the] draft contract."[3]   However, these assertions lack any explanation of how *ICANN's* consideration of .xxx or possible entry into a contract with ICM has a nexus to a legitimate exercise of *Commerce Department* policy-making.  Commerce's defense of it actions instead confirms that in many cases, it was involved not in policymaking or any other regulatory activity at all, but rather sought simply to manage domestic political pressure arising from the potential international availability of a .xxx domain. For example, much of the claimed "deliberation" involved matters such as "responses to indivi-duals who wrote to Commerce about .xxx," "how a news reporter interpreted a conversation with [a Commerce official] related to ICANN's decision," "public reaction to ICANN and .xxx," and inquiries from self-asserted "pro-family" special interest groups.[4]

---

[2]   *See* Compl. App. E.  The documents also indicated Commerce consulted with foreign governments officials to solicit intervention to achieve U.S. political goals relating to .xxx.  *Id.*

[3]   Def. Mot. Exh. B, Smith Declaration ("Smith Decl.") at 4, 7 & Vaughn Index at 1.

[4]   Smith Decl. at 5; Vaughn Index at 5, 9, 10, 13, 17.  *See also id.* at 15 (referencing with-held "USA Today Q&As").  Commerce also cites "contemplat[ed] litigation … against [it] by ICM in connection with the proposed creation of" a .xxx domain," but does not explain why such litigation would be proper, if ICANN's actions are independent of the U.S. government generally and the Commerce Department specifically.  *See infra* at 35-37.  The State Department similarly focuses on matters related to .xxx and ICANN without attempting to show a connection between those issues and the exercise of any specific agency policymaking activity.  *See infra* at 23-27.

As this Court has recognized, "difficulties arise" in FOIA cases where "the activities involved are not part of the normal and proper operations of the agency … but rather are connected with … abuses of an essentially political nature." *Tax Reform Research Group v. IRS*, 419 F.Supp. 415, 418 (D.D.C. 1976). In the end, the lack of nexus between a clear government role in ICANN's decisions whether to approve a new .xxx domain or a contract with ICM to operate it, or any other particular aspect of Internet governance, precludes it from meeting its burden under the FOIA exemptions it cites. This failure should compel the Court to grant summary judgment for ICM and order Defendants to release the records they have redacted and withheld.

## BACKGROUND

Since its inception, ICANN's *raison d'être* has been privatization of the Internet domain name system ("DNS") that controls the way each component of the Internet identifies itself and communicates with the rest of the network.[5] The core reason for ICANN's creation was to increase competition and international participation in DNS management and development, and to insulate those functions from U.S. government control. *Id.* This independence was a key aspect of the Department of Commerce's *White Paper* that ICANN was tailored to satisfy. ICANN thus evolved as an internationally organized, non-profit corporation that serves a variety of functions necessary to operating the Internet as a global network, including address space allocation,

---

[5]    *Management of Internet Names and Addresses,* 63 Fed. Reg. 31741 (1998) ("*White Paper*"); *Name.Space, Inc. v. Network Solutions, Inc.*, 202 F.3d 573, 578-79 (2d Cir. 2000). The DNS is necessary because every computer connected to the Internet relies on unique Internet Protocol numbers, *i.e.*, "IP addresses," consisting of numbers and periods (*e.g.*, 98.27.242.35) that, while useful to computers, are difficult for people to remember. The DNS overlays IP numbers with unique "domain names" consisting of alphanumeric fields or "domains" separated by periods, where for each domain name (*e.g.*, "icann.org"), the field to the far right (after the "dot") is a top level domain ("TLD"), *i.e.*, ".org" in the foregoing example.

protocol identifier assignment, and DNS management, as well as root server functions previously performed by the U.S. government and ICANN predecessors under government contracts. [6]

The relationship between ICANN and the Department of Commerce is defined by various contracts, as well as by a Memorandum of Understanding ("MoU") ICANN signed to transfer DNS management from the U.S. government to the global community. *Memorandum of Understanding Between the U.S. Department of Commerce and Internet Corporation for Assigned Names and Numbers*, www.icann.org/general/icann-mou-25nov98.htm. In the MoU, ICANN and the Commerce Department agreed, *inter alia*, to explore "procedures that should be in place, and the steps necessary to transition management responsibility for DNS functions now performed by, or on behalf of, the U.S. Government to a private-sector not-for-profit entity." *Id.* at II.B. Under the MoU, ICANN must send Commerce periodic status reports, but despite the contractual relationship, Commerce does not have regulatory authority over ICANN, which was intended to be free of government control and political influence. The MoU prohibits ICANN from acting arbitrarily or unjustifiably to injure any person or entity, or from "singl[ing] out any particular party for disparate treatment." *Id.* at V.A.2.

### ICM's Experience Before ICANN

ICM conceived of and began pursuing ICANN authority to operate a new .xxx TLD half a decade ago. Its first attempt followed the ICANN Board's adoption in July 2000 of a policy for introducing new TLDs, pursuant to which prospective TLD operators such as ICM could apply for either a "sponsored" TLD (*i.e.*, one with a sponsoring organization that would have responsibility for the TLD's policy formulation) or an unsponsored TLD (*i.e.*, for which ICANN

---

[6] ICANN's Board of Directors must be geographically diverse and includes fifteen voting members, and six non-voting liaisons, the latter of which includes those appointed by, *inter alia*, ICANN's Governmental Advisory Committee ("GAC"). *See generally* ICANN Bylaws. Art. VI, www.icann.org/general/archive-bylaws/bylaws-28feb06.htm#VI.

would have policy-formulating responsibility).  *See* Resolution of the ICANN Board on New TLDs, July 16, 2000, www.icann.org/tlds/new-tld-resolutions-16jul00.htm.  ICANN required applicants to submit detailed applications and a nonrefundable $50,000 application fee, and sTLDs applicants had to submit a proposal from a prospective sponsoring organization.  ICM's applications for new ".kids" and ".xxx" TLDs were among 47 announced in October 2000, but when ICANN selected 7 new TLDs (.aero, .biz, .coop, .info, .museum, .name, and .pro), ICM's were not among them.  *See* TLD Applications Lodged, www.icann.org/tlds/tld-applications-lodged-02oct00.htm; Press Release, "ICANN Announces Selections for New Top-Level Domains," Nov. 16, 2000, www.icann.org/announcements/icann-pr16nov00.htm.

Throughout 2001 and 2002, ICANN refined its process for considering new TLDs, [7] and in October 2003 launched an initiative to promote adoption of new TLDs that included an expedited process for a round of new sTLDs to serve specific communities of interest.  On March 16, 2004, ICM submitted a new proposal for a .xxx sTLD in response to ICANN's December 15, 2003 Request for Proposals ("RFP").  The RFP required a non-refundable $45,000 fee, and that each applicant show how its proposed sTLD would serve a clearly-defined Internet community, and that it had a sound business plan and a sufficient technical plan and expertise to ensure stable registry operation.  *See* New sTLD Application, Dec. 15, 2003, www.icann.org/tlds/new-stld-rfp/new-stld-application-parta-15dec03.htm.  ICM's .xxx application satisfied these criteria and all others for new sTLDs, and among other things described extensive outreach by ICM to identify for the responsible online adult entertainment community an sTLD that transcended geographic and language divides while maintaining high recognition and lasting value.  ICANN

---

[7]  This included chartering a New TLD Evaluation Process Planning Task Force, extended public discussions and public fora on new TLD proposals, and issuance of an action plan calling for a new round of sTLD applications.

opened a public comment period on the new applications, including .xxx, and twice extended it to permit additional comments.  Announcement, "Public Comment period for sTLD applications has been extended," Apr. 30, 2004, www.icann.org/announcements/announcement-30apr04.htm.

Beginning summer of 2004 and during the ensuing months, ICM's proposal underwent a thorough vetting process that included multiple meetings by ICANN, its Board, and the GAC, as well as extensive review by independent evaluators. [8]  On June 1, 2005, ICANN Board's voted that .xxx satisfied all eligibility criteria for new sTLDs, and it authorized ICANN's staff to move forward to technical and contractual negotiations with ICM. [9]  ICANN's counsel approved the final text of the agreement on August 1, 2005, and on August 9 ICANN issued an agenda for its monthly Board meeting, to be held August 16, indicating the Board would review and agree to the final .xxx sTLD agreement at the meeting.  *See* www.icann.org/minutes/index-2005.html. However, ICM's contract to operate the .xxx sTLD was derailed shortly before its scheduled final approval by ICANN's Board.

### Apparent U.S. Government Interference with ICANN sTLD Process

The .xxx sTLD appears to have fallen victim to U.S. government intervention into the ICANN process at the behest of a vocal minority opposed to the domain.  Specifically, although feedback during ICANN's comment period on the .xxx proposal was quite favorable, *see* Com-

---

[8]  In addition, in April 2005, in response to inquiries from ICANN's staff regarding ICM's willingness to address the ICANN Board directly, ICM representatives, including outside experts on legal and industry issues, met with the Board at ICANN's meeting in Argentina to discuss the .xxx proposal.  During the meeting, ICM answered in full all questions posed to it.

[9]  *See* sTLD Update: ICANN Moves Forward in First Phase Commercial & Technical Negotiations with an Additional sTLD Applicant, June 1, 2005, www.icann.org/announce-ments/announcement-01jun05.htm.  On June 12, 2005, ICM transmitted to ICANN a draft Registry Agreement, based on those ICANN previously approved for other domains.  During the latter half of July 2005, ICM and ICANN's staff resolved all open issues in the contract for operation of the .xxx sTLD.

ments Archive at http://forum.icann.org/lists/stld-rfp-xxx, a few U.S.-based activist groups had

initiated a negative lobbying campaign directed to the U.S. government in response to ICANN's

June 1 vote approving ICM's application.  One group provided a website to allow those so in-

clined to transmit to ICANN and the Commerce Department a form email stating:

Stop the Establishment of the .xxx Domain

> I oppose the establishment of the .xxx domain.  I do not want to
> give pornographers more opportunities to distribute smut on the
> Internet.  By establishing this new .xxx domain, you would be
> giving false hope to parents who want to protect their families
> from pornography.  You would also be lending legitimacy to the
> hardcore pornography industry.  Please stop this effort now.

*See* www.frc.org/get.cfm?i=AL05F04&track=0.  It appears this website and others like it

resulted in mass transmission of identical emails opposing the .xxx sTLD.  *See* www.conser-

vativepetitions.com/petitions.php?id=306.

Soon thereafter, on August 11, 2005 – just days before ICANN was to approve the .xxx

contract – Michael D. Gallagher, who was then Assistant Secretary for Communications and In-

formation at the Commerce Department, sent a letter to Dr. Vinton Cerf, a member of ICANN's

Board.  Compl. App. E, Ex. 21.  The letter urged the Board to ensure that purported "concerns of

the Internet community" were "adequately heard and resolved before the Board takes action on"

ICM's application.  *Id*.  Simply put, the U.S. government sought to delay .xxx's final approval.

Significantly, the letter did not take issue with any step ICANN took generally in evalu-

ating the new sTLD proposals, or in considering .xxx specifically, nor did it acknowledge that

whether to approve an adult domain had been before ICANN for five years and was actively and

publicly debated for 18 months before approval.  *Id*.  Nevertheless, the letter urged the Board to

delay finalizing the .xxx sTLD contract.  *Id*.  The next day, GAC Chairman Mohamed Sharil

Tarmizi also sent a letter to the ICANN Board regarding the .xxx sTLD in which, after months of

discussion on the new domain had passed with multiple opportunities for GAC to express concerns, he requested "further debate" and "time for additional governmental and public policy concerns to be expressed before reaching a final decision on this TLD." [10]  In the wake of the letters, ICANN did not approve the contract to operate the .xxx sTLD at the August 16, 2005 meeting, and ICM was forced to accept a one-month delay while it addressed these new missives.

### ICM's FOIA Requests and Agency Response

After the one-month delay to which ICM grudgingly consented came and went without ICANN action on the .xxx contract, ICM submitted FOIA requests on October 18, 2005 to the Commerce and State Departments (encompassing all their bureaus and components, including for Commerce the National Telecommunications and Information Administration ("NTIA")), in which ICM asked each agency to furnish copies of:

> All records, correspondence, memoranda, transcripts, notes, documents, reports, emails or audiovisual or other materials consisting of or reflecting, representing, recording or otherwise disclosing communications, written or oral, between March 1, 2005 and the present, regarding approval by [ICANN], and/or by its Board of Directors, of the new ".xxx" sponsored top-level domain ("sTLD"), and/or ICANN's or its Board's approval of ICM Registry's contract to operate the .xxx sTLD [other than] documents submitted to the agency by the general public as part of any mass mailing campaign(s) or similarly duplicative emails/documents.

> All records, correspondence, memoranda, transcripts, notes, documents, reports, emails or audiovisual or other materials consisting of or reflecting, representing, recording or otherwise disclosing communications, written or oral, between March 1, 2005 and the present, between any personnel at the Department [], or any

---

[10]  Compl. App. G.  The letter claimed additional time was necessary even though the .xxx sTLD already had been discussed "during the session between the GAC and the Board in Luxembourg" and "other GAC sessions."  *Id*.   In fact, according to minutes of the ICANN Board meetings while application was pending, Chairman Tarmizi participated in virtually all sessions at which the .xxx sTLD was discussed.  *See* ICANN Board Minutes, http://www.icann.org/minutes.

> Bureau or other component thereof, and the ICANN Board … and
> its staff, [the GAC], any GAC member country, or any individual
> or agency in a GAC member country, regarding the .xxx sTLD. [11]

ICM also asked that it receive, if any of the foregoing information was withheld, copies of all non-exempt, reasonably segregable portions of such material, as well as a detailed statement of statutory bases and reasons for each instance of withholding, and an index or similar statement of the nature of any withheld materials. *Id.*

The Commerce Department responded to ICM's above-quoted FOIA request by letter of November 18, 2004, which transmitted approximately 1,600 pages of documents and claimed an exemption to withhold "certain documents in whole or in part under 5 U.S.C. § 552(b)(5) as pre-decisional or privileged." Compl. App. E, Ex. 2. Of the 1,600 pages, 120 contained redactions obscuring parts of the document with a notation to Section 552(b)(5), *i.e.* FOIA "Exemption 5," and 98 consisted solely of pages left blank but for a reference to Section 552(b)(5) that indicated a record of one or more pages had been withheld in full. [12] Other than a statement in the cover letter and handwritten notations on the documents, NTIA offered no explanation of the statutory basis and reasons for redacting/withholding the records, nor an index or other statement indicating the nature of materials withheld. Because the U.S. government has no official role in the domain name approval process, in virtually all cases of redaction, it was impossible to tell from

---

[11] Compl. Apps. A & B. Commerce designated the FOIA request it received from ICM as CRRIF No. 06-068 (hereafter "DoC Request 06-608"), while ICM's request to State was designated as Request 200504606 (hereafter "State Request 04606").

[12] Copies of the redacted and withheld documents (with page numbers added post-receipt by ICM for ease of reference) are attached as Exhibit 3 to Appendix E of the Complaint. On December 19 and 21, 2005, ICM received from NTIA two supplemental FOIA responses to DoC Request 06-068 that provided additional responsive records as to which NTIA had claimed coordination with other agencies was necessary. *See* Compl. App. I. As with the initial response, the supplemental responses included documents with notations to Section 552(b)(5) that indicate records that were redacted and/or withheld in full.

context alone the nature of the material withheld, and where a record was withheld in full, it of course was not possible to determine its nature or the specific reasons for nondisclosure.

On December 2, 2005, ICM filed an administrative appeal of NTIA's response to DoC Request No. 06-068. [13] The appeal challenged NTIA's reliance on Exemption 5, especially in view of the extent to which records that were released indicated Commerce's focus with respect to .xxx was on political reactions to ICANN's announcement – not regulatory activity – and confirmed the agency's view that it lacked a role in the approval of domain names. Compl. Ex. E at 3-6, 7-9. The appeal also highlighted records indicating the U.S. government consulted with foreign representatives in an attempt to solicit international intervention to support Commerce's domestic political goals. *Id*. at 7. The appeal argued that reliance on Exemption 5 was procedurally deficient insofar as NTIA failed to offer an explanation of why the withheld information fell within the exemption, and that NTIA's Exemption 5 claim was substantively amiss due to failure to identify the agency action to which the redacted/withheld records pertain, and due to apparent dissemination of the redacted/withheld records outside the U.S. government, which defeats subsequent claims of Exemption 5 status. [14]

Also on December 2, 2005, ICM filed a follow-up FOIA request asking Commerce and its components, including but not limited to NTIA, to provide copies of records pertaining to Deputy Assistant Secretary for Communications and Information John Kneuer's plans to attend and/or participate in ICANN's meeting held November 30 through December 4, 2005 in Vancouver, Canada. Compl. App. C. As with its prior requests, ICM asked for all non-exempt

---

[13] *See* Compl. App. E. ICM later incorporated NTIA's supplemental FOIA responses into the appeal. *See* Compl. App. J & K.

[14] *Id*. at 7-11. ICM reiterated many of these points when it expanded its administrative appeal per letters exchanged with Commerce to encompass NTIA's supplements to its original response. *See supra* note 13 & Apps. cited therein. *See also* Compl. App. F.

reasonably segregable portions of withheld records, and a detailed justification and index. Commerce designated this request CRRIF No. 06-127 (hereafter "DoC Request 06-127").

NITA responded to that request by letter of January 19, 2006, by which it transmitted approximately 250 pages of records and claimed an exemption to withhold portions "in whole or in part under … 5 U.S.C. § 552(b)(5) as … contain[ing] predecisional, deliberative process, and/or attorney client privileged information." Compl. App. L. As with NTIA's response to ICM's first FOIA request, the records responsive to ICM's follow-up request included redactions obscuring parts of the documents with notations to Section 552(b)(5), and pages that were blank but for references to Section 552(b)(5) indicating where records were withheld in full. ICM filed an administrative appeal of this action on essentially the same grounds as its prior administrative appeal, which it incorporated by reference. Compl. App. F.

Meanwhile, prior to commencement of the instant litigation, the FOIA request ICM submitted to the State Department was never fulfilled or denied. Upon inquiry of ICM's counsel, State Department staff indicated that its preliminary review of the four corners of the request suggested its subject matter did not appear to fall within State Department responsibilities. *See* Compl. App. D at 2. However, by that time ICM already had received documents from Commerce, which even with redactions and withholdings indicated that records responsive to ICM's FOIA request also resided at the State Department, and ICM transmitted evidence to that effect to the State Department to aid its fulfillment of ICM's request. *Id*. at 3 & Ex. 6. Nonetheless, the State Department never responded substantively to the FOIA request prior to initiation of this action but rather, shortly after receiving evidence that it held records responsive to the request, issued a form letter on December 13, 2005, stating, notwithstanding the nearly two months that already had passed, that it would "begin processing" ICM's request. Compl. App. D, Ex. 2. The

State Department later confirmed its failure to act when it dismissed as premature ICM's administrative appeal of the agency's (in)action on grounds "no specific material has been denied" to ICM.  Compl. App. H.

The Commerce Department later joined State in this stonewalling tactic.  Specifically, it failed to decide ICM's administrative appeals relating to ICM's first FOIA request regarding .xxx generally.  *See supra* at 11 & nn.13-14 (citing Compl. Apps. E, F, J & K).  It also purported to dismiss ICM's administrative appeal relating to its second Commerce Department FOIA request on grounds the agency considered the appeal untimely, though it was filed on the last business day permissible under the FOIA and agency rules.  *See* Ans. & Aff. Def. at 1 & Exh. 1.

So, in sum, as of the time the Complaint was filed in this action, (i) although Section 552(a)(6)(A)(i) of the FOIA provides a twenty-working-day deadline for agencies to comply with or otherwise respond to a FOIA request, the State Department never substantively responded to a FOIA request ICM submitted 7 months prior; (ii) although Section 552(a)(6)(A)(ii) provides a twenty-working-day deadline for agencies to decide administrative appeals on FOIA requests, the Commerce Department did not resolve the appeal relating to DoC Request 06-068 that was then pending for nearly 6 months; and (iii) the Commerce Department dismissed as untimely, rather than addressing the substance of, ICM's administrative appeal relating to DoC Request 06-127, which was filed by the date permitted for such appeal under the agency's rules.

## Agency Response to Complaint for Judicial Review of FOIA Action

The State and Commerce Departments did not address ICM's FOIA request and FOIA appeal that, respectively, remained pending before those agencies at the time of ICM's Complaint here, until the government was forced to negotiate a deadline for doing so to secure

ICM's consent to a joint briefing schedule proposal.  Agreement on such a proposal was necessary to effectively forgive the government's failure to respond to ICM's Motion to Compel Preparation of a *Vaughn* index, and to place the Court's imprimatur on the deadlines for the outstanding agency FOIA actions. [15]

In finally responding to ICM's FOIA Request, on July 14, 2006, the State Department identified 74 responsive documents, [16] of which it released 6 with redactions and withheld 30 in full. [17]  It claimed the redactions and withholdings were justified under Exemption 5 on grounds the records included pre-decisional deliberative process material, and in a few cases, that material was nondisclosable under Exemption 4, which applies to trade secrets and privileged or confidential commercial or financial information. [18]  However, other than bare references to the Exemptions in the cover letter and handwritten notations on the documents, the State Department offered no explanation of the statutory bases and reasons for redacting/withholding the records, nor an index or other statement indicating the nature of materials withheld.  In virtually all cases

---

[15]  *See* Minute Order, June 23, 2006 (granting Proposed Briefing Schedule for Dispositive Motions that, *inter alia*, recited "[b]y July 14, 2006, the Department of State will release documents responsive to plaintiff's FOIA request, and the Department of Commerce will provide plaintiff with a decision on the administrative appeal").

[16]  This was in addition to 1,155 pages of records released on July 5, 2006, as potentially responsive to ICM's request but which State did not review for responsiveness nor redact for nondisclosable material, in order to expedite their release and minimize the costs related thereto.

[17]  Def. Mot. Grafeld Declaration ("Grafeld Decl.") at Exh. 7.  The State Department later re-reviewed *sua sponte* the documents it redacted and/or withheld and released one additional document in full and five in part.  *Id*. Exh. 8.  In addition, in its FOIA response on July 14, State referred five documents to the Department of Defense for inter-agency coordination.  On August 15, 2006, the Defense Information Systems Agency ("DISA") within the Department of Defense issued a letter indicating the five documents were emails forwarding press clippings mentioning .xxx or ICANN and, notwithstanding DISA's position that the emails were not "agency records" under the FOIA, provided the URLs and a brief description of the clippings.  *Id*. Exh. 9.  This comports with the approach State took with regard to press clippings (other than disclaiming they constitute agency records), *see supra* note 16, and the DISA records are not in dispute here.

of redaction, it was impossible to tell from context alone the nature of the material withheld, and where a record was withheld in full, it of course is not possible to determine its nature or the specific reasons for nondisclosure.  The State Department's claims are all the more mysterious in light of its lack of involvement in ICANN's approval process for domain names and its initial reaction to the FOIA request that the subject matter did not appear to fall within its responsibilities.  *See supra* at 12.

On July 17, 2006, ICM received a letter dated July 13 wherein the Commerce Department granted in part and denied in part ICM's administrative appeal.  Smith Decl. Exh. 8.  Specifically, the Commerce Department released 55 documents in part, and 10 in full (though it already had released some of these initially in response to the FOIA request), while withholding 183 documents in part and 60 in full under Exemption 5's deliberative process privilege. [19]  While the Commerce Department's decision on administrative appeal was somewhat more expansive than the terse, one line-references and handwritten citations to Exemption 5 in its initial FOIA determination, it still offered only the most general defense of the withholdings.

While acknowledging Exemption 5's deliberative process privilege requires an agency to establish what deliberative process is at stake and the role the records played therein, the decision offered only opaque, generic references to NTIA's "role" in ICANN's processes relating to the .xxx proposal and the "roles of NTIA with respect to ICANN."  *Id*. at 2.  Beyond

---

[18]  Grafeld Decl. Exh. 7 at 1-2.  For the additional documents later released in full or in part, *see supra* note 17, the agency relied exclusively on FOIA Exemption 5.  *See id*. Exh. 9.

[19]  *Id*. at 1.  Commerce also claimed attorney-client privilege under Exemption 5 for 23 of 183 documents withheld in part, and 7 of 60 documents withheld in full.  *Id*.  It also withheld part of one document (an individual's personal cell phone number) under FOIA Exemption 6, which protects information about individuals that if disclosed would cause a clearly unwarranted invasion of personal privacy.  *Id*. at 1, 4.  The Commerce Department's invocation of Exemption 6 and withholding of information under it is not in dispute.  *But see* Def. Mot. at 41-43.

this, the decision afforded no insight into what agency decisions are relevant to NTIA fulfilling such a "role" or how such activity comports with its statutory authority. Id. at 2-3. The decision on administrative appeal however did admit – not surprisingly given its lack of specificity – that "there is no one Government decision to which the protectable documents pertain." *Id*. at 2. The decision also suggested some records were nondisclosable solely because they were drafts rather than final documents. *Id*. at 2-3. The Commerce Department similarly made only the most generic of cases that some of its withholdings are sustainable as privileged attorney-client communications, using justifications that consisted of little more than restating the legal requirements for whether the privilege applies.[20] The decision on administrative appeal made no effort at any kind of specificity, however, or to demonstrate that at the time the information was conveyed public disclosure or use of it was not anticipated or intended.

### Status of ICM's .xxx Proposal

After the August 16, 2005, meeting at which ICANN's Board was to approve the contract with ICM for the .xxx sTLD, and during the months ICM's FOIA requests to the Commerce and State Departments were pending, ICANN's Board held eight meetings for which approval of the .xxx sTLD agreement initially appeared on the agenda but was deleted before the meeting, and/or in which the Board discussed the contract but failed to vote on it. On May 10, 2006, the Board brought up the .xxx agreement for ICANN action, but a 9-5 majority voted against approving it. However, the process has not yet reached finality, as ICANN's determination remains subject to reconsideration, and ICM filed a request (copy appended as Attachment 1) that urges reversal on grounds of, among other things, the impropriety of U.S. government in-

---

[20] *See id*. at 3-4 ("portions of the documents consist of request for advice from clients in NTIA to their attorneys, or of facts presented by clients to their attorneys … with the expectation of obtaining legal advice … , or of advice from an attorney to his or her client, or of questions from an attorney to his or her client to elicit facts [in order] to provide legal advice").

fluence over ICANN's decision-making relating to the .xxx domain. ICM initially requested that ICANN decide the reconsideration request at its Board meeting scheduled for July 18, 2006, but the process has been extended through September 30, 2006. ICANN's bylaws also afford ICM the right to request formation of an independent panel to review, via an arbitration process, ICANN's actions with respect to the .xxx sTLD and the proposed contract for ICM to operate the domain.

## ARGUMENT

The extent to which the U.S. government appears to have inserted itself into ICANN's decision-making process relating to .xxx and pursued a political agenda underscores the importance of ensuring ICM's statutory right under the FOIA to "discover[ ] 'what the[ ] government is up to,'" *Center for Int'l Envtl. Law*, 237 F.Supp.2d at 22, and of granting, therefore, ICM's instant summary judgment motion. At minimum the Court must effectuate "the strong policy … that the public is entitled to know what its government is doing and why." *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 868 (D.C. Cir. 1980). There is no dispute that "providing information material for monitoring [such] Government's activities is a core purpose of FOIA." *Southern Utah Wilderness Alliance, Inc. v. Hodel*, 680 F.Supp. 37 (D.D.C. 1988). Here, unlawful reliance on FOIA Exemptions 4 and 5 to withhold information has denied ICM access to records to which it is entitled. The Court accordingly should order the agencies to disclose those materials.

Federal agencies bear the burden of justifying any exemptions under the FOIA,[21] but the Commerce Department's administrative appeal decision contained only the most general of explanations for its withholdings, and ICM received nothing more than bare assertions and handwritten citations to FOIA exemptions in conjunction with State Department processing of ICM's FOIA request.  As discussed in greater detail below, Defendants' Motion here and the accompanying Vaughn Index and declarations "elaborate" on the agency's theories of withholding in only the most superficial way, and accordingly constitute the kind of "[c]onclusory and generalized" defenses that are "unacceptable as a means of sustaining the burden of nondisclosure."  *National Parks and Conserv. Ass'n v. Klepper*, 547 F.2d 673, 680 (D.C. Cir. 1976).  The requirement that agencies provide meaningful explanations for withheld records – which it has been held are presumed disclosable unless fitting within a specific FOIA exemption – is a critical one given that "Congress enacted FOIA to promote a policy of broad disclosure of Government documents" and to "ensure an informed citizenry, vital to the functioning of a democratic society."  *Center for Public Integrity v. Department of Energy*, 191 F.Supp.2d 187, 189 (D.D.C. 2002).  In this regard, the "limited exceptions" in § 552(b) "do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of" the FOIA.  *Department of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001)  The agencies here cannot be permitted to undermine that objective.

---

[21]  *Campbell v. DOJ*, 164 F.3d 20, 31 (D.C. Cir. 1999).  Indeed, "Congress has encouraged the agencies to disclose" even "*exempt* material for which there is no compelling reason for withholding, and an agency's own balancing of the resource costs of justifying nondisclosure against the value of secrecy may provide a rough estimate of how compelling is its reason for withholding."  *Coastal States Gas*, 617 F.2d at 861.

I.    **STATE DEPARTMENT INVOCATION OF EXEMPTION 4 VIOLATES ITS OBLIGATIONS UNDER THE FOIA**

The State Department's non-specific claims of right to withhold documents under FOIA Exemption 4 that simply reiterates the legal standard as *ipse dixit* attempts to satisfy the rule of law, *see* Def. Mot. at 16-17; Grafeld Decl. at 17-19, "fail to supply … even the minimal information necessary to make a determination," *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 150 (D.C. Cir. 2006) (quoting *Coastal States Gas*, 617 F.2d at 861), and thus cannot carry the government's burden.   While Exemption 4 allows agencies to withhold "trade secrets and commercial or financial information obtained from a person and privileged or confidential," 5 U.S.C. § 552(b)(4), the FOIA not only places the burden of proving the exemption squarely on the shoulders of the government, *Judicial Watch*, 449 F.3d at 146, it also requires that it "provide a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply."  *Id*.  *Mead Data Cent., Inc. v. Department of the Air Force*, 566 F.2d 242, 259 (D.C. Cir. 1977).

Consequently, in this case it is incumbent upon the State Department to provide more than "conclusory and generalized allegations of exemptions."  *Nat'l Parks & Conservation Assoc.*, 547 F.2d at 680 (citation and internal quote omitted).  Yet the State Department refuses to disclose two documents and portions of a third without offering any serious explanation why they contain trade secrets or commercial or financial information.  *See* Grafeld Decl. 17-19.  The closest the agency comes is the vague and unsupported statement in the Grafeld Declaration that "[i]nformation is withheld from [the] three documents … because [it is] information concerning *commercial aspects of the  ICANN process*."  *Id*. at 10 (emphasis added).  This fails to afford even the slightest hint as to the subject matter of the documents.  In refusing to explain itself, the

State Department instead presents justifications and records descriptions so vague and generic as to be meaningless. Such platitudes "impede judicial review" as "[b]road, sweeping claims of privilege without reference to the withheld documents." *Judicial Watch*, 449 F.3d at 147.

To cite one example that typifies the justifications for invoking Exemption 4, Document No. E71 was withheld in its entirety, but instead of providing any information on the document's subject matter, the State Department merely states that it "deal[s] with ICANN, the GAC, and the WSIS." *See* Grafeld Decl. at 18. This description is hopelessly generic and it wholly precludes the Court from "tying" the merits of the exemption to the documents the government seeks to withhold. *Judicial Watch*, 449 F.3d at 150. Moreover, from the lone document State produced in part but redacted under Exemption 4 (No. E2), there is nothing in the material surrounding the redaction to suggest the missing verbiage necessarily involves *any* trade secret or commercial or financial information, and neither the government's brief nor the Grafeld Declaration offer further insight. *See id*. at 149 (Exemption 4 claim fails if "document descriptions themselves shed little light individually, and surrounding entries do not help").

The State Department thus essentially seeks to justify nondisclosure with an entirely conclusory recitation of legal principle: "The information in this message was provided with the expectation that it would be held in confidence, and release could impair the future ability of U.S. officials to obtain information from these sources." Grafeld Decl. at 19. This statement is pure boilerplate – it contains no factual information whatsoever, and merely parrots a legal test, and thus cannot carry the government's burden under FOIA Exemption 4. *See In Defense of Animals v. HHS*, No. 99-3024, 2001 U.S. Dist. Lexis 24975, at *37 (D.D.C. Sept. 1, 2001). Instead, by refusing to explain its decision, the State Department erects "a nearly impregnable defensive position," where it has a monopoly on "all the evidence," all knowledge of the basis

for nondisclosure, and all information about the subject matter of the records. *See Judicial Watch*, 449 F.3d at 146. To refute boilerplate assertions that information was provided to State with the expectation it be held in confidence and that disclosure would harm future information gathering, ICM – and the Court – can only guess at possible bases for nondisclosure.

Accordingly, because the State Department fails to carry its burden to withhold these documents under Exemption 4, the Court should order their release. *In Defense of Animals*, 2001 U.S. Dist. Lexis 24975, at *37. Alternatively, ICM respectfully requests that the Court conduct *in camera* review of the documents to determine if they support the conclusory assertions both that they contain trade secret or commercial or financial information, and that disclosure would impair future information gathering. If the documents do not support this conclusion, the Court should order the documents disclosed. *See Public Citizen Health Research Group v. FDA*, 964 F.Supp 413, 415-16 (D.D.C. 1997). At minimum, the agency must provide a more detailed explanation for its nondisclosure and redactions as to these records before denying ICM access. *Pacific Architects and Eng'rs, Inc. v. Renegotiation Bd.*, 505 F.2d 383, 384-85 (D.C. Cir. 1974).

## II.    THE GOVERNMENT'S INVOCATION OF EXEMPTION 5 VIOLATES ITS OBLIGATIONS UNDER THE FOIA

The government's reliance on boilerplate recitation of legal standards and general lack of specificity is even more pronounced with respect to its Exemption 5 claims and precludes the agencies from satisfying their burden here as well. With respect to Exemption 5 particularly, the D.C. Circuit has held that "Congress intended to confine exemption (b)(5) 'as narrowly as is consistent with efficient Government operation,'" *Senate of the Commonwealth of Puerto Rico v. DOJ*, 823 F.2d 574, 584 (D.C. Cir. 1987) (quoting *Coastal States Gas*, 617 F.2d at 868)); *see also Petroleum Info. Corp. v. Department of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992), and

the Supreme Court has held that it protects from disclosure "those documents, and only those documents, normally privileged in the civil discovery context." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975). *See also Klamath Water Users*, 532 U.S. at 9 ( "The point of Exemption 5 is not to protect Government secrecy pure and simple …."). This means for present purposes that, to invoke Exemption 5, the government bears the burden of identifying specifically the deliberative process, work-product or attorney client privileges that apply to each record redacted or withheld. [22] The overarching problem with each of these, however, is the murkiness with which the agencies describe their activities, particularly with respect to what policymaking activities they purport to have engaged in under the deliberative process exemption, which both agencies rely upon most heavily to defend most of their withholdings. They generally refer to decisions that *ICANN* must make, not those the government must – or even can – make.

It is a particular weakness of the government's Exemption 5 claims that it fails to offer any explanation whatsoever regarding the respective agencies' powers or roles as they relate to Internet governance, or the relationship between ICANN and the Commerce Department, which once carried out DNS responsibilities now ceded to the international Internet community. *See White Paper*, 63 Fed. Reg. at 31742-43. Indeed, it is contradictory to at once credit Commerce's intent that "neither national governments acting as sovereigns nor intergovernmental organizations acting as [their] representatives … should participate in management of Internet names and addresses," *id*. at 31745, and claims here that, for example, Commerce engaged in a "deliberative process" involving some "response" if ICANN "were to recommend the creation of [a] .xxx domain and/or enter into a contract" for its operation, or that "litigation brought against Commerce by ICM" would somehow *a fortiori* arise from *ICANN* decisions. *E.g.*, Def. Mot. at 22-

---

[22]  5 U.S.C. § 552(a)(4)(B) ("burden is on the agency to sustain its action"); *Delaney, Migdail & Young, Chartered v. IRS*, 826 F.2d 124, 128 (D.C. Cir. 1987).

23, 29; Smith Decl. at 4, 8. Lacking greater specificity from the agencies, there can be no course but that the Court enter summary judgment for ICM and order release of the withheld material.[23]

### A.    The State Department Did Not Identify the Formulation of Any Agency Policy to Legitimately Provide a Basis for the Deliberative Process Privilege

All agency records the State Department redacted or declined to release, with the exception of the three documents discussed in Section I above, were improperly withheld under FOIA Exemption 5 based on claims the deliberative process privilege applies. In order for the privilege to apply, an agency must have created the records or information redacted or withheld during its consideration of proposed action as part of the decision-making process. *Coastal States Gas*, 617 F.2d at 866 (agency record is "deliberative" if it weighs "pros and cons of agency adoption of one viewpoint or another"). Such nondisclosure is justified only if the records are both predecisional, *i.e.*, "antecedent to the adoption of agency policy," and deliberative, *i.e.*, "actually … related to the process by which policies are formulated." *Jordan v. DOJ*, 591 F.2d 753, 773 (D.C. Cir. 1978); *Formaldehyde Inst. v. HHS*, 889 F.2d 1118, 1121 (D.C. Cir. 1989). It is not enough that a record was prepared as part of agency consideration of some matter − it also must "bear on the formulation or exercise of policy-oriented judgment." *Ethyl Corp. v. EPA*, 25 F.3d 1241, 1248 (4th Cir. 1994) (quoting *Petroleum Info. Corp.*, 976 F.2d at 1435). *See also National Inst. of Military Justice v. DOD*, 404 F.Supp.2d 325, 347 (D.D.C. 2005) ("document must reflect the 'give-and-take' of the consultative process").

---

[23]    The same is true with respect to many of the government's non-segregability claims under Exemption 5, which requires the release of factual information that is segregable from privileged statements. The types of repeated "blanket declarations" offered here that "all facts are so intertwined to prevent disclosure," *see, e.g.*, Vaughn Index at 1, 12, 13, 16, 17, 20, 21, 22, 24, 27, 28, "do[ ] not constitute a sufficient explanation." *The Wilderness Soc'y v. Department of the Interior*, 344 F.Supp.2d 1, 19 (D.D.C. 2004). "Rather, for *each* entry the defendant is required to specify *in detail* which parts of the document are disclosable," *id.* (emphasis added), and the government should be required to do so here.

It is incumbent on agencies making an Exemption 5 deliberative process claim to specify the action(s) to which the redacted/withheld predecisional records relate in order to sustain non-disclosure. *Senate of Puerto Rico*, 823 F.2d at 585. In so doing, the records must relate to the "process of working out … policy and determining what [the] law shall be," *Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 257 (D.C. Cir. 1982), or the "formulation" of a "position or policy." *Schell v. HHS*, 843 F.2d 933, 936 (6th Cir. 1988). In short, the records must relate to the creation of "governmental decisions and policies." *Playboy Enters., Inc. v. DOJ*, 677 F.2d 931, 935 (D.C. Cir. 1982); *Southam News v. INS*, 674 F.Supp. 881, 886 (D.D.C. 1987)). To be sure, "the privilege does not 'turn on the ability of an agency to identify a specific decision in connection with'" the material withheld, Def. Mot. at 21 (quoting *Sears, Roebuck*, 421 U.S. at 151 n.18), but as even the government admits here, an agency must at least "establish 'what deliberative process is involved and the role played by the documents in issue in the course of the process.'" *Id*. (quoting *Coastal States Gas*, 617 F.2d at 868 (discussing, *inter alia*, *Sears Roebuck*).

Here, the State Department offers only a litany of vague references to agency activity that in all cases fail both to "establish what deliberative process is involved" and to tie the records to the purported decision-making at issue. *See* Grafeld Decl. at 12-24. In some instances, even the agency's own counsel is unclear on not only what deliberative process is involved, but even what the records comprise. For example, for Document No. L5, which was denied in full (and which ICM thus has not seen and thus cannot shed additional light upon), the best the government can do is state it consists of notes that "*appear* to reflect discussion of possible changes in the U.S. Government's relationship with the GAC." *Id*. at 12 (emphasis added). If the government does not even know what a document purports to be, withholding cannot be justified under an exemp-

tion that requires "specifying" a relevant deliberative process. *Senate of Puerto Rico*, 823 F.2d at 585. Moreover, even if the above description is accurate, an unadorned reference to "possible changes in … relationship with the GAC" does not suffice as identifying a deliberative process and the role the document played in it. *See Wilderness Soc'y*, 344 F.Supp.2d at 11 (crediting claim that "defendants have failed to identify a particular decision to which the documents relate, but rather, *inter alia*, vaguely suggest … they relate to 'wilderness issues,' 'wilderness review,' 'wilderness policy,' and 'wilderness matters'"). For the same reason, it is improper for State to withhold Document No. L6A solely because "the author … states he is offering his views on 'the ICANN question.'" Grafeld Decl. at 12. *See Wilderness Soc'y*, 344 F.Supp.2d at 11; *Coastal States Gas*, 617 F.2d at 868 ("Characterizing [ ] documents as 'predecisional' simply because they play into an ongoing [ ] process would be a serious warping of the meaning of the word.").

In other cases, the State Department all but admits there is no deliberative process in play, but rather cites commentary on agency activity generally, or even activity by non-government actors. The former occurs where the government attempts to justify withholding Document Nos. E52, E57 and E62 based in part on "reference in [a] memorandum to 'the .xxx issue,' not related to approval … but rather commenting on the number of FOIA requests related to .xxx and a correspondingly increased scrutiny of ICANN." Grafeld Decl. at 16. *Compare National Council of La Raza v. DOJ*, 339 F.Supp.2d 572, 583-84 (S.D.N.Y. 2004) ("an inquiry about a policy is not the same as a step in the formulation about that policy"). An example of the latter arises with respect to Document No. E54, a "draft memo[ ] commenting on a press article, which discusses threats to the Internet and proposed alternatives to the DNS" and that "notes the increased attention to ICANN and briefly cites several factors, including … .xxx." Grafeld Decl. at 16-17. These statements have nothing to do with formulation of agency policy, but rather

involve public commentary on Internet governance.  In still other cases, the State Department does not reference policy-making at all – by the government or third parties – or even any agency activity, but simply describes the material withheld, as in the case of Document No. L6A, Nos. E52, E57, E58 and E62, Nos. E14, E20, E31 and E32, No. E59, No. E24 and Nos. E36, E68, E69 and E70.  Grafeld Decl. at 12, 15, 19, 22, 23.  Such recitations, of course, also fail both to establish the deliberative process involved and to tie the records to any process.  *Nat'l Parks & Conservation Assoc.*, 547 F.2d at 680 ("conclusory and generalized allegations" are insufficient).

In addition, the lack of specificity regarding what policy-formulation was involved in the claims of exemption preclude the Court from making the requisite findings in favor of the State Department – or at all – to support nondisclosure under the deliberative process privilege.  First, because no policy-making activity is specified, there is no way the Court can place the records in a temporal framework to identify them as "antecedent to the adoption of agency policy," which is a prerequisite to finding them "*pre*decisional."  *Jordan*, 591 F.2d at 773  (emphasis added).  The ambiguity also precludes a finding the records were "deliberative" because without identification of the "process by which policies are formulated," there is no way to ascertain the documents' relation to the process alleged to be relevant.  *Id*.

Finally, while obfuscation regarding the U.S. government's role in the ICANN process and Internet governance generally is a problem that plagues Commerce Department Exemption 5 claims more so than the State Department and thus is discussed in greater detail *infra*, it exists here as well.  For example, the government justifies withholding Document Nos. L8A, E50 and E51 in part because they purportedly involve "the future relationship of the U.S. Government to ICANN," including questions "relat[ing] to the principles that ICANN must apply to approval of

a new sTLD such as .xxx." Grafeld Decl. at 13-14. At most this explanation hints at a future time where ICANN's independence from the U.S. government might change, but more importantly any discussion of "principles that *ICANN* must apply" as an independent body has no bearing, of course, on *State Department* policy-making. *Id*. at 14 (emphasis added). *See also id*. at 15, 21 (regarding, respectively, "memorandum [that] addresses *ICANN's* pending decision to consider a new .xxx TLD" and "message [that] reports on a meeting at which issues *in ICANN* and possible solutions are discussed") (emphases added). Agencies cannot justify withholding documents under the FOIA based on descriptions of policymaking by other, non-governmental bodies. *See Guckian v. GSA*, No. 75-2156, 1976 U.S. Dist. LEXIS 15489, at *9-*10 (D.D.C. April 20, 1976). The opaque explanations also should be considered in the specific context here – where documents already released reveal that the government was seeking to accommodate the demands of politically-connected interest groups, as discussed below. *See infra* at 31-32.

**B.    The Commerce Department Did Not Identify the Formulation of Any Agency Policy to Legitimately Provide a Basis for the Deliberative Process Privilege**

The Commerce Department fares no better than the State Department in invoking the deliberative process privilege, because it, too, does not identify any "process of working out … policy," *Arthur Andersen*, 679 F.2d at 257, or "formulation" of a "position," *Schell*, 843 F.2d at 936, that suffices to establish "what deliberative process is involved and the role played by the documents … in the course" thereof. *Coastal States Gas*, 617 F.2d at 868. The government broadly describes the withheld material as implicating "internal Government recommendations and opinions to the Government's response if … ICANN were to recommend the creation of the proposed new .xxx domain and/or enter into a contract with ICM." Smith Decl. at 4. It also cites "deliberations relating to ICANN's consideration of the ICM application" and of a "draft

contract with ICM."  *Id*. at 4, 7.  These descriptions are entirely opaque with respect to what *Commerce Department* policy-making was in play, but rather cite only decisions that confronted *ICANN* as to which Commerce has not articulated that it plays any role.

The deliberative process privilege under Exemption 5 cannot be used to protect such records bearing on decision-making by entities outside the government that consequently "appear to have nothing to do with the deliberative processes of the agency itself."  *Judicial Watch, Inc. v. Department of Energy*, 310 F.Supp.2d 271, 317 (D.D.C. 2004).  "Unless a defendant agency – whose burden it is – can demonstrate how any given communication contributed to the *agency's* own deliberative process, the records must be released."  *Id.* (emphasis original); *Guckian v. GSA*, *supra*; *Center for Int'l Envtl. Law*, 237 F.Supp.2d at 24-28. In this regard, it is notable the government's brief seeks to satisfy the deliberative process privilege's "predecisional" criterion by claiming "*ICANN* has not approved ICM's application for a new .xxx domain and has not entered into a contract … to operate the .xxx domain."  Def. Mot. at 23 (emphasis added) (internal quotes and editing omitted).

Review of Commerce's Vaughn Index, where one would expect to see the deliberative process justification set forth in greater detail, provides no elaboration sufficient to satisfy the government's burden.  In some cases, the Vaughn Index simply repeats the above general state-ments then describes the material withheld, [24] but provides no further description of the alleged

---

[24]  The Vaughn index deals only in generalities in other areas as well.  For example one set of emails, documents EP133-138 and EP148, were redacted on the vague basis that the withheld material involved an "opinion on the objective of an upcoming meeting" from "DOC employee John Kneuer."  Vaughn Index at 6-7.  As "the Vaughn index and the agency affidavits must disclose as much information as possible without thwarting the exemption's purpose," *Animal Legal Defense Fund v. Dep't of the Air Force*, 44 F.Supp.2d 295, 298 (D.D.C. 1999) (internal editing and quote omitted), simply stating that redacted material discusses some hazy "objective" of a "meeting" the government does not describe in even the most general way, or indicate in any manner the subject matter thereof, does not give the Court enough to go on to rule in favor of a deliberative process privilege claim.  *See, e.g., Judicial Watch*, 449 F.3d at 152 (citing

deliberative process in which the documents allegedly played a role. Vaughn Index at 1-2, 4. *Compare Wilderness Soc'y*, 344 F.Supp.2d at 12 ("entries, which" provide only "the briefest of references to its subject matter – will not do"). In other cases, such as for documents EP59-69 and EP109-115, the only "insight" the government offers into the deliberative process allegedly in play is where it refers to "opinions" related to, regarding, or about a variety of *ICANN* functions. *E.g.*, *id.* at 3, 5. But there is no explanation on how opinions on "*ICANN's decision about the .xxx domain*" or "*ICANN's decision* to negotiate a contract" factor into particular Commerce Department policy-making. *Id.* at 3 (emphases added). The closest the government comes to offering any insight whatsoever in this regard is where it cites "opinions on the DOC's role with respect to certain functions of ICANN." *Id.* at 5. But even here the government only alludes to "DOC's role" without offering any explanation what that role is, how the agency carries it out, and what decisions or policies are made along the way to which a protectable "deliberative process" contributes. Such generalized invocations of what may represent any number of different agency activities are insufficient.[25]

The "missing link" in these claims of privilege regarding "DOC's role" and its "opinions" relating to ICANN decisions is what, precisely, the Commerce Department intended to do, if anything, as part of or in response to action on the .xxx sTLD. Absent such specific

---

entries that "suffer from vagueness defects" because they do not "describe the withheld information, where one "tells the court little about the deliberative nature of the information" and another "says nothing about the information conveyed").

[25] *Compare Wilderness Soc'y*, 344 F.Supp.2d at 12 (rejecting deliberative process claim where "defendants' own definition … does not specify any one agency decision but rather three (and possibly more) different agency decisions"), *with* Smith Decl. Exh. 8 at 1 ("there is no one Government decision to which the protectable documents pertain"). *Compare also* Vaughn Index at 16 ("withheld [materials] consist of recommendations and opinions relating to planning for NTIA's future course"), *with Coastal States*, 617 F.2d at 868 ("Characterizing [ ] documents as 'predecisional' simply because they play into an ongoing [ ] process" is inadequate).

action by the agency, or at least consideration and rejection of such action, explained in sufficient detail for the Court to identify the administrative process at work, there can be no claim of privilege. *See Enviro Tech Int'l, Inc. v. EPA*, 371 F.3d 370, 376 (7th Cir. 2004). Yet on this point, the government is completely silent with respect to the material it has withheld. This is not altogether surprising, however, as any claim that there is in ICANN's decision-making on new domains a Commerce Department role that constitutes a "deliberative processes" under Exemption 5, would be completely at odds with Commerce's statement, in documents it has disclosed, that it "plays no role in the internal governance or day-to-day operations of" ICANN, Compl. App. E, Exh. 5, and its admission in this case that "[t]he Department of Commerce … has no regulatory authority over ICANN." Ans. ¶ 10. This hands-off approach, rather than murky allusions that Commerce had some role to play in .xxx approval or start-up, corresponds much more closely to Commerce's ceding of DNS and other functions to ICANN. *See generally White Paper*, *supra*.

Even were Court to attempt to divine some protectable deliberative process(es) from the government's generalized statements, [26] nothing readily offers itself as a viable candidate. To be sure, there are decisive actions the government could take that directly relate to or arise out of ICANN's approval of a .xxx sTLD or the contract to operate it. For example, Commerce conceivably could try to somehow force ICANN not to approve the domain or the contract, or alternatively might refuse to effectuate a favorable ICANN decision by, for example, refusing to add the domain to the root. But such acts were not likely subjects of the material withheld, as they would be inconsistent with the *White Paper*, the MoU and other contractual and legal

---

[26] *But see Judicial Watch, Inc. v. Department of the Army*, 435 F.Supp.2d 81, 92 (D.D.C. 2006) ("FOIA places the burden of justifying nondisclosure on the agency" and this "cannot be shifted to the courts by … generalized claims of exemption"); *Arthur Andersen*, 679 F.2d at 258 (citing "concern…that unassisted court examination might be prohibitively burdensome").

constraints, and in any event do not support withholding materials under Exemption 5's deliberative process privilege. *See Tax Reform Research Group v. IRS*, 419 F.Supp. 415 (actions that lie well beyond outer limits of agency's authority cannot "be construed as being part of any proper governmental process" under Exemption 5). *See also id.* at 418.

This is not to suggest agencies can *never* assert Exemption 5 to protect deliberations that contemplate prospective actions falling outside their authority, but even courts that apply a lenient standard in this regard recognize that "the scope of an agency's authority places some limits on the deliberate process privilege, and internal communications about something not even arguably within the agency's domain … might not be privileged." *Enviro Tech*, 371 F.3d at 376.

To the extent the Court attempts to identify viable candidates of protectable deliberative processes among Commerce Department activities to which the government *does* allude more specifically, the choices get no better. For example, several instances of withholding involve the August 11, 2005 letter from then-Assistant Secretary Gallagher to ICANN, Compl. App. E, Ex. 21, but whatever merit there is in protecting drafts thereof, *see* Vaughn Index at 7-8, transmitting a letter from NTIA to ICANN cannot transform all "opinions" and "recommendations" on such nebulously described matters as "ICANN's consideration of" a .xxx sTLD and contract, into the type of specific "agency decision or policy" necessary to support Exemption 5 withholding. [27]

Similarly, in many instances, such as for documents DT6, EP19-28, EP30-32, EP37, EP90-93, EP102, EP105, EP107-08, EP127 EP143-46, and HW9, the government claims the

---

[27] *Senate of Puerto Rico*, 823 F.2d at 585. In this regard, because Commerce fails, as did the State Department, to specifically identify *any* agency decision or policy to which withheld materials relate, it suffers the same problem of providing neither temporal nor contextual frameworks essential for the Court to decide whether, respectively, the records are "predecisional" and "deliberative." *See supra* at 26 (citing *Jordan*, 591 F.2d at 773). In this regard, the Commerce Department makes no showing on these points other than to talismanically reiterate the buzz words "predecisional" and "deliberative." *See* Smith Decl. & Vaughn Index, *passim*.

deliberative process privilege to justify withholding records reflecting Commerce Department

reaction to inquiries from the press and public in response to news that ICANN had approved the

.xxx sTLD or was on the verge of entering a contract with ICM to operate the domain. [28]

Specifically, the government seeks to withhold information pertaining to:

- an "opinion relating to how a news reporter interpreted a conversation" with Commerce Department personnel;

- the "use" and "content" of a "letter to individuals who wrote to the DOC on .xxx;"

- an "opinion on an issue related to .xxx" in an email entitled "Update on public reaction to ICANN and .xxx;"

- "Talking Points/Questions & Answers" that "[i]nclude in the subject line 'USA Today Q&As;'" and

- "draft letters," "draft email responses" and "draft form responses" from Michael Gallagher "to Rick Schatz, President and CEO of National Coalition for the Protection of Children and Families, concerning [his] letter to the DOC conveying his views," "to Wanda Adair concerning her letter to the DOC conveying her concerns," and generally "to members of the public regarding their e-mails to the DOC on .xxx."

*Id.* Nowhere, however, does the government explain how Commerce Department responses to

such political concerns involve agency policy- or decision-making within the meaning of the

deliberative process privilege.

Indeed, the privilege does not apply if the government fails to show that communications

"displayed any 'deliberative' characteristics, where "there is no indication that any policy

options were even considered in connection" with the statements, and where statements merely

"explain" agency activity or policies but does "not modify[ ] it in any way." *National Sec. Ar-

chive v. FBI*, 759 F.Supp. 872, 880 (D.D.C. 1991). It is incumbent upon the government in the

first instance to explain why these materials do not comprise simply "documents that comment

---

[28]  Smith Decl. at 5 (claiming protection for "draft responses to individuals who wrote to Commerce about .xxx"); Vaughn Index at 5, 8, 9, 13, 17, 23.

upon" agency activity, the disclosure of which does not "unduly impinge on agency decision making." *Id*. In this regard, just as an intra-agency "inquiry about a policy is not the same thing as a step in the formulation of that policy," *La Raza v. DOJ*, 339 F.Supp. at 583-84, an agency's responses to such inquiries from outside the agency do not necessarily represent formulation of agency policy protectable under the deliberative process privilege. Moreover, the mere fact that some of the materials listed above exist in draft form is not alone sufficient to meet the agency's burden. [29]

Finally, as with most of its deliberative process defense, the government gives short shrift to the additional important matter of whether the material it claims is privileged was shared with outside parties, which would result in waiver of the privilege. *Radiation Sterilizers, Inc. v. Department of Energy*, 1991 U.S. Dist. LEXIS 4669 at *16 (D.D.C. Apr. 9, 1991) ("Even after an agency has shown that an Exemption 5 privilege protects documents from disclosure, that privilege can be waived through … release to private parties or nonfederal agencies."). In most cases, the government "addresses" this point only implicitly by listing for each record senders and recipients that are limited to personnel within U.S. government bodies. In this regard, "while an agency's affidavits are presumed to be in good faith" and may be taken at face value, "a plaintiff can rebut this presumption." *National Inst. of Military Justice*, 404 F.Supp.2d at 332.

---

[29] *Center for Biological Diversity v. Gutierrez*, 2006 U.S. Dist. LEXIS 55437 at *29 (D.D.C. Aug. 10, 2006) ("that the Index refers to these documents as drafts solves little, for although the deliberative process privilege surely extends to drafts, they are not per se exempt"). Indeed, in one case the government claims "release of the draft letters would disclose information that may not have been grounds for Commerce's ultimate response," Def. Mot. at 26, but again, since it is unclear what policy-making activity was underway, this only begs the question: what response? To the extent it can be gleaned that the "response" included answering "individuals who wrote about .xxx," for example, *id*. at 24-25, or similar activity, the government has not explained how this constitutes policy-making under the deliberative process privilege.

Here, the government has omitted the names of "individuals designated to receive only a 'cc' of an e-mail," Vaughn Index at 1 n.1.  In addition, ICM made an extensive showing in its administrative appeal that Commerce appeared to have shared with outside parties – including ICANN and/or representatives of foreign governments – either information withheld from ICM, or enough information involving the subject matter thereof that might be sufficient to waive the deliberative process privilege. [30]  Also, "it is reasonable to infer that [where] defendants only describe[ ] information in some of the documents as 'confidential,' those entries that [do not] do not merit non-disclosure." *Wilderness Soc'y*, 344 F.Supp. at 17.  Accordingly, it is significant the government's brief recites that some materials for which it claims deliberative process privilege were not shared with outside parties (specifically, "handwritten notes") but omits such a statement for the rest.  *Compare* Def. Mot. at 28 *with id*. at 23-27, 30-34.  Taking all these factors into consideration, it is incumbent upon the agencies to affirmatively show the material withheld was not disclosed to non-U.S. government recipients, and/or that the Court conduct an *in camera* review to ensure the privilege was not waived.  *Carter v. Department of Commerce*, 830 F.2d 388, 392-93 (D.C. Cir. 1987) (court should conduct *in camera* review if, *inter alia*, "there is evidence … for example, [that] information contained in agency affidavits is contradicted by other evidence in the record").

The government's failure in the first instance to carry its burden of identifying Commerce Department policy- or decision-making activity to which records it redacted or withheld relate is fatal to a deliberative process privilege claim under Exemption 5 of the FOIA.  *See*, *e.g.*, *Coastal*

---

[30]  *See* Compl. App. E, Exh. 5 at 10-11.  *See also id*. at 7 (quoting August 16, 2005 email from GAC Chairman Tarmizi that asked whether Commerce "could share … how far the USG is going to take this issue.  For example, if the Board decides to go ahead in October or November before the Vancouver meeting, what would be USG's reaction?" and stating "I need to know what the acceptable future course of action might be so that we can do some strategizing.").

*States Gas*, 617 F.2d at 868.   Such failure compels the denial of Defendants' motion for summary judgment, and grant of summary judgment to ICM requiring the government to release the documents unless it can properly substantiate non-disclosure.   *Wilderness Soc'y*, 344 F.Supp.2d at 13.

### C.    The Commerce Department Improperly Relies Upon Work-Product and Attorney-Client Privileges

In withholding certain documents, the Commerce Department improperly asserts not only the deliberative process privilege, but also the work-produce and attorney-client privileges that, like the deliberative process privilege, are encompassed by Exemption 5.  5 U.S.C. § 552(b)(5); *Animal Legal Defense Fund*, 44 F.Supp.2d at 302.   However, the government has not met its burden under either of these privileges.   Accordingly, summary judgment should be granted for ICM on these claims of exemption.

### 1.    The Government Failed to Show the Withheld Documents Were Prepared in Anticipation of Litigation Under the Work Product Privilege

The Commerce Department cannot satisfy its burden regarding claims of Exemption 5 status under the work-product privilege because it has neither specified any litigation the agency expected to ensue, nor a reasonable basis that such a claim – or any claim – was foreseeable. *Hertzberg v. Veneman*, 273 F.Supp.2d 67, 75 (D.D.C. 2003) ("this circuit has held that at the very least some articulable claim, likely to lead to litigation, must have arisen" that "was fairly foreseeable at the time") (citation and internal quote omitted).   While a "document need not be created when litigation was a certainty so long as it was created 'with an eye toward litigation,'" *Hornbeck Offshore Transp., LLC v. Coast Guard*, 2006 WL 696053 *14 (D.D.C. March 20, 2006) (quoting *Hickman v. Taylor*, 329 U.S. 495, 511 (1947)), it "must at least have been

prepared with a specific claim supported by concrete facts which would likely lead to litigation." *Coastal States Gas*, 617 F.2d at 865. *See also Wilderness Soc'y*, 344 F.Supp. 2d at 17 (same).

Here, the government does not even come close to identifying a potential claim based on concrete facts. Instead, it merely incants that the "documents were prepared in contemplation of litigation, and are clearly protected under the attorney work-product privilege." Def. Mot. at 31. Likewise, the Smith Declaration is utterly devoid of detail or fact: "Two documents are withheld in part under this category, which consists of information prepared by Commerce attorneys in contemplation of litigation brought against Commerce by ICM." Smith Decl. at 8. Similarly, the *Vaughn* index mentions only that the withheld records were created in anticipation of litigation brought by ICM involving "creation of a new .xxx [TLD]." *Id*. at 28. These conclusory statements do not identify any claim the Commerce Department believed ICM would pursue against the agency, or establish a basis for believing such litigation was likely. Moreover, given Commerce's intent explained above that ICANN's domain-approval process remain independent from any governmental control, the government offers no reason why ICM would bring litigation against the *Commerce Department* for actions (or omissions) on *ICANN's* part. The only way the work-product claim makes sense would be if Commerce somehow impermissibly commandeered the ICANN process, or there otherwise was a basis for treating ICANN as an alter ego of Commerce or ICANN took impermissible steps at the Commerce Department's direction. *See Judicial Watch, Inc. v. DOJ*, 432 F.3d 366, 369 (D.C. Cir. 2005) (quoting Fed. R. Civ. P. 26(b)(3))). *See also Klamath Water Users*, 532 U.S. at 10-11.

In any event, the conclusory statements offered by the government in asserting the work-product privilege stand in stark contrast to what precedent requires. This case closely resembles *Senate of Puerto Rico*, in which the D.C. Circuit held an affidavit that simply stated records

withheld by DOJ "were prepared by [its] Civil Rights Division Attorneys in anticipation of litigation" was insufficient to demonstrate that the work-product privilege applied. 823 F.2d at 587. The Court held the government could not properly invoke the work-product privilege on the basis of "conclusory assertions," defined as statements containing "no factual support … for an *essential* element of the claimed privilege." *Id.* at 585.

Even if the government had managed to identify the prospective litigation with sufficient particularity, its claim of work-product privilege still would fail because it has not carried its burden of showing the litigation was likely to occur. As in *Coastal States Gas*, the government "neglected to supply the court with sufficient facts, either in its [*Vaughn*] index or its submitted affidavits, to permit a conclusion that in fact specific claims had arisen and were *likely to be pursued to the point of litigation*." 617 F.2d at 866 (emphasis added). After all, the "mere possibility" of litigation is "hardly tangible enough" to trigger the work-product privilege. *Id.* at 865. Thus, the government's attempt to assert the work-product privilege is thus doubly flawed, and the Court should reject the claim of privilege and order the withheld material released.

**2.    The Government Failed to Show that Documents Contained Client Confidences or Legal Advice Under the Attorney-Client Privilege**

The government's claim of right to withhold records pursuant to the attorney-client privilege under Exemption 5 is far too slight and conclusory to satisfy its burden of justifying non-disclosure. The argument in the government's brief on this point, which comprises but a portion of a single paragraph, consists solely of one factual sentence quantifying what was withheld, two sentences that "simply paraphrase[] in conclusory terms the formal legal requirements," *Animal Legal Defense Fund*, 44 F.Supp.2d at 302, and a third sentence that describes the documents in the context of the relevant legal standard without explaining how it is satisfied. Def. Mot. at 30

(citing *Mead Data*, 566 F.2d 252; *Schiller v. NLRB*, 964 F.2d 1205, 1208 (D.C. Cir. 1992)).

Similarly, the Smith declaration combines these statements into a single paragraph that claims

the standard is met simply by restating the components thereof and inserting the word "Com-

merce" where appropriate. [31]  The Vaughn index uses much the same language, with descriptions

of the specific categories of allegedly privileged documents that are only slightly more revealing.

Even taken together, this showing, perhaps more here than on any other aspect of the govern-

ment's claims, reveals that with regard to its invocation of Exemption 5, "much of it consists of

boilerplate" that once stripped to its essence, "like a Persian cat with its fur shaved, is alarmingly

pale and thin."  *Schurz Communications, Inc. v. FCC*, 982 F.2d 1043, 1050 (7th Cir. 1992).

        While agencies may invoke attorney-client privilege under FOIA Exemption 5 by show-

ing the withheld record involves confidential communications between an attorney and his client

and relates to a matter for which the client seeks legal advice, "the attorney client privilege does

not give the agency the ability to withhold a document merely because it is between the agency

and its lawyers."  *Wilderness Soc'y*, 344 F.Supp.2d at 16.  What is "conspicuously absent" here,

are "facts to substantiate the … claim of privilege."  *Animal Legal Defense Fund*, 44 F.Supp.2d

at 301.  While "the explanation of the exemption claim and the descriptions of withheld material

need not be so detailed as to reveal that which the agency wishes to conceal, … they must be

sufficiently specific to permit a reasoned judgment as to whether the material is actually

exempt."  *Founding Church of Scientology v. Bell*, 603 F.2d 945, 949 (D.C. Cir. 1979).

        The government's claim of attorney-client privilege suffers the same failing that plagues

its claim of deliberative process privilege.  Specifically, the justification ties back to matters

---

[31]  Smith Decl. at 8.  The remaining verbiage under headings in the government's brief and declaration pertaining to attorney-client privilege is dedicated to explaining why the material also allegedly qualifies for the deliberative process privilege, which we address above.

"concerning .xxx," its "possible approval of .xxx," or matters such as a ".xxx discussion paper," Vaughn Index at 24-25, without offering any insight into how work on whether to effectuate a potential new sTLD, which falls to ICANN, can be the subject matter of "professional advice" between Commerce's personnel and its attorneys. While one might imagine how the subject matter might give rise to the need for legal advice in a variety of ways, none are offered, or even suggested here. The document-specific listings themselves typically shed no further light, as in most cases they provide only the date, number of pages, and sender and recipient. [32]

    In addition, the government dutifully recites the documents were not disclosed outside the attorney-client relationship, *see*, *e.g.*, Vaughn Index at 24, in an attempt to make the requisite showing on confidentiality. [33] But given ICM's showing discussed above that the subject matter of the redacted and withheld records was discussed outside the agency and some of the records may have been so shared as well, *see supra* at [_], the government must do more than offer facile assertions about confidentiality.

    All told, given the lack of factual substantiation for its attorney-client privilege claims and explanation for how its activities relating to .xxx gave rise to any need for legal advice, as well its minimalist showing on confidentiality, the government has not carried its burden under

---

[32] Vaughn Index at 25. Indeed, in only one place does the government offer an appropriate document-specific indication how a redacted communication comprises legal advice, *see id.* at 26 (describing "advice of DOC attorney … on interpreting legal agreements"), but this serves only to underscore the insufficiency of the government's showing for the balance of the documents, which in most listings is silent beyond date, length and parties, and in others contains *ipse dixit* statements such as "[i]ncludes protected legal advice from Mr. Joyner to Ms. Layton." *Id.* at 25.

[33] *See*, *e.g.*, *Hornbeck Offshore*, 2006 WL 696053 at *15 (holding that "[i]f it is demonstrated that the information shared between the attorney … and the agency client … is confidential, the attorney-client privilege applies" but "the Court cannot assume confidentiality," so if an attorney-client privilege claim "gives no indication as to … confidentiality," it is "impossible to determine if confidential information was supplied … that was not … disclosed to a third party").

FOIA Exemption 5 to justify nondisclosure.  Accordingly, the Court should order Commerce to release the withheld documents and unexpurgated versions of those it redacted.  *See Coastal States*, 617 F.2d at 863.  At minimum, the Court should conduct an *in camera* review to ensure, given the paucity of the government's showing, that the documents themselves support the conclusory assertions regarding satisfaction of the criteria for claiming attorney-client privilege, *see Judicial Watch, Inc. v. Department of Commerce*, 83 F.Supp.2d 105, 112 (D.D.C. 1999), and if that review is unavailing, require a more substantive explanation from the government if immediate release of the withheld material is not ordered.  *Wilderness Soc'y*, 344 F.Supp. at 17.

## III.    COMMERCE IMPROPERLY DISMISSED ICM'S ADMINISTRATIVE FOIA APPEAL FOR DoC REQUEST 06-127

The Commerce Department summarily dismissed ICM's administrative FOIA appeal with respect to DoC Request No. 06-127 in order to withhold documents from ICM, and supports that action here solely by raising an affirmative defense that ICM failed to exhaust its administrative remedies.   Def. Mot. at 6-8; Def. Mot. Exh. B, McCready Declaration ("McCready Decl.") at 2.  Specifically, the government urges the Court to dismiss ICM's complaint with respect to DoC Request 06-127, because the Commerce Department issued a decision on the request January 19, 2006, and ICM filed its administrative appeal on February 21, 2006. *Id.*  However, since the doctrine of administrative exhaustion is prudential, not jurisdictional, *see Wilbur v. CIA*, 355 F.3d 675, 677 (D.C. Cir. 2004) (*per curiam*), given that prudential considerations warrant adjudicating ICM's claim and that exhaustion is not required if pursuit of administrative remedies would have been futile, *DL v. District of Columbia*, 2006 U.S. Dist. LEXIS 59945, at *12 (D.D.C. Aug. 25, 2006), the Court should deny the motion to dismiss and proceed to the merits of Commerce's withholding of documents responsive to ICM's request.

As a threshold matter, the government mischaracterizes ICM's appeal as having been received "four days after the expiration of the appeal deadline." Def. Mot. at 8. The date by which an appeal of a decision rendered January 19, 2006, was required to be filed was, in fact, February 21, 2006 – the day ICM filed: the thirtieth day was Saturday February 18, the next was Sunday, and Monday February 20 was a federal holiday (Presidents' Day), making the first business day Tuesday February 21, 2006. *See*, *e.g.*, 15C.F.R. § 4.6(b). Commerce's "four days late" claim accordingly rests on its refusal to credit ICM with having appealed by February 21 on grounds the appeal was filed by email at 5:41 p.m.. and by fax at 5:52 p.m., McCready Decl. at 2, then counting back from the next day, February 22, to the thirtieth day, February 18, which was a Saturday on which ICM could not have filed. In any case, even if treating the appeal as having been filed February 22 was permissible, it only means ICM was at most late by one day – or, more accurately 41 minutes – not "four days."

Moreover, even if this 41-minute delay in filing supports finding that ICM missed the February 21 deadline, that does not *a fortiori* require dismissal on failure-to-exhaust grounds. As the D.C. Circuit recently held, exhaustion is prudential, not jurisdictional.[34] In *Wilbur*, the Court explained that the exhaustion doctrine is not to be applied mechanically, but rather based on the "the purposes and policies underlying the … requirement, namely, to prevent premature interference with agency processes, to give the parties and the courts benefit of the agency's experience and expertise and to compile an adequate record." *Wilbur* 355 F.3d at 677. Accordingly, *Wilbur* held exhaustion did not prevent the court from exercising jurisdiction, even though the FOIA requestor's administrative appeal was *four years* late. *Id*. at 676-77.

---

[34] *Wilbur* 355 F.3d at 677. *See also Alaska Excursion Cruises, Inc. v. United States*, 603 F.Supp 541, 547 (D.D.C. 1984).

The Court should exercise its prudential powers to consider ICM's appeal here because there is no merit to the government's claims that ICM "attempted to circumvent the administrative process" or "to seek judicial review before the agency [ ] had an opportunity to exercise its discretion and expertise … and make a factual record."  Def. Mot. at 7-8.  In this regard, Commerce had every opportunity to exercise "discretion and expertise," in that the appeal on DoC Request 06-127 raised issues identical to those in the agency appeal on DoC Request 06-068, which had been on file nearly three months – or twice as long as the FOIA gives agencies to decide appeals, *see* 5 U.S.C. § 552(a)(6)(A)(ii) – by the time ICM filed the appeal for DoC Request 06-127. [35]  In fact, ICM asked the agency to consider the appeals together, and it incorporated by reference the first appeal into the second.  *See* Compl. App. F at 2.  Accordingly, it cannot be said Commerce had "no occasion to consider the very issue … raise[d]" in ICM's agency appeal for DoC Request 06-127, *Biological Diversity*, 2006 U.S. Dist. LEXIS 55437 at *23, especially given its ruling on the agency appeal on DoC Request 06-068 after the filing of the complaint here, five months *after* ICM filed an appeal for DoC Request 06-127.  *See* Smith Decl. Exh. 8.

The Commerce Department's treatment of the agency appeal for DoC Request 06-068 not only shows the agency had an opportunity to pass on issues relevant to DoC Request 06-127, it supports proceeding to the merits of ICM's complaint on DoC Request 06-127 as a prudential matter.  In particular, it is clear ICM's pursuit of administrative remedies as to the latter request

---

[35]  Of course, Commerce also had the "discretion" to decide the merits of ICM's appeal despite the 41-minute tardiness but declined to do so.  In this regard, it bears noting that the 5:00 p.m. cut-off relied upon to support exhaustion-based-dismissal was an agency rule as to which Commerce could have granted leniency, whereas the statutory deadlines the agency violated was not within its power to waive.  *See, e.g., Safety-Kleen Corp. v. Dresser Indus., Inc.*, 518 F.2d 1399, 1403 (C.C.P.A. 1975).  *See also Omnipoint Corp. v. FCC*, 78 F.3d 620, 631 (D.C. Cir. 1996); *Fisons Corp. v. Shalala*, 860 F.Supp. 859, 863-66 (D.D.C. 1994).

would have been futile. [36]  First, the Commerce Department's dismissal of the agency appeal with respect to DoC Request 06-127, at the first possible opportunity, on a hyper-technical application of agency deadlines, even though it already had a timely-filed appeal by ICM pending (indeed, overdue) that raised the same issues, reveals its obvious interest in avoiding the merits of the appeal for DoC Request 06-127.  More importantly, the fact that Commerce did not rule on ICM's agency appeal of DoC Request 06-068 filed December 2, 2005 until over seven months later, *after* the instant lawsuit commenced, fully undermines any claim that it would have ruled on ICM's appeal on DoC Request 06-127 before ICM filed a Complaint here.  This clearly is a case where "administrative delay" triggers the futility exception because "agency inaction is in reality a statement by the agency of its unwillingness to consider the issue." *Randolph-Sheppard Vendors v. Weinberger*, 795 F.2d 90, 106 (D.C. Cir. 1986).

Moreover, the Commerce Department's willingness to play fast-and-loose with *statutory* and other deadlines is another prudential factor that supports denying the motion to dismiss.  As noted, Commerce failed to comply with the statutory FOIA mandate to decide agency appeals within twenty working days.  *See supra* at 13, 15.  It consequently also violated the very same rules (by months) that it now alleges ICM violated (by minutes) in seeking to have the Court dismiss ICM's complaint. [37]  Further, its refusal to honor deadlines has persisted before this Court.  As the Court is aware, Commerce failed to transfer to the Justice Department in a timely manner documents relevant to this case, thus delaying the summary judgment schedule the Court approved and to which the parties agreed.  *See* Def. Mot. for Enlargement of Time to File Dis-

---

[36]  *See DL v. District of Columbia*, 2006 U.S. Dist. LEXIS 59945 at *12 ("exhaustion is not required when … continuing through the administrative process would be futile or inadequate").

[37]  *See* 15 C.F.R. § 4.6(b); 4.10(a).  In addition, along with missing the agency appeal deadline by more than six months, Commerce did not comply with required procedures for extending

positive Motion (Doc. No. 7) at 1.  All told, prudential considerations preclude the Commerce Department from blatantly violating statutory and other deadlines and procedures itself, then seeking to have the Court honor a hyper-technical reading of agency rules – which Commerce itself violated – for purposes of dismissing ICM's Complaint.  *See, e.g., United States v. One White 1987 Tempest Sport Boat*, 726 F.Supp. 7, 10 (D. Mass. 1989) ("If non-governmental claimants are held to a high standard of forgiveness for their failure to act within … deadlines, fundamental fairness requires that the government be held to the same high standard.").

One final prudential consideration – judicial economy – also supports denying the motion to dismiss and instead addressing ICM's claims regarding Doc Request No. 06-127.  *See Alaska Excursion Cruises*, 603 F.Supp at 547.  If ICM's claim regarding DoC Request 06-127 were dismissed for failure to exhaust administrative remedies, ICM would file a nearly identical FOIA request, and the Commerce Department would again grant it in part and deny it in part.  ICM would file an administrative appeal, followed by an action in this Court.  From the standpoint of judicial economy, it is far more logical for this Court to decide the issues in Request No. 06-127 now, especially since it must decide identical issues with respect to DoC Request 06-068, which decision would control any future litigation.  *See Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1313 (D.C. Cir. 1991) ("promoting judicial economy by reducing duplication" is a prudential factor militating against mechanical application of exhaustion doctrine).

As all relevant factors tip decidedly in ICM's favor, the Court should deny the government's motion to dismiss.  Moreover, as the government has placed all its eggs in this procedural basket and neglected to address the substance of ICM's Complaint with respect to DoC Request 06-127, the Court should order the Commerce Department to release the redacted and withheld

---

the ordinary deadline due to "unusual circumstances."  *See* 5 U.S.C. § 552(a)(6)(B)(i).  *See also* 15 C.F.R. 4.6(c).

records to which it has denied ICM access. [38]  At minimum, the Court should require the government to submit a Vaughn index and/or other supporting material to justify its redactions and withholdings in responding to DoC Request 06-127, and order that that task be expedited and carried out in manner consistent with the Court's ruling on the merits of ICM's Complaint regarding DoC Request 06-068.  *See Boggs v. Secret Serv.*, 987 F.Supp. 11, 31 (D.D.C. 1997).

## CONCLUSION

For the foregoing reasons, Plaintiff ICM respectfully requests that the Court grant Plaintiff summary judgment on its Complaint in this matter.

Dated this 21st day of September, 2006.

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

_____/s/ Robert Corn-Revere_____
Robert Corn-Revere – Bar No. 375415
Ronald G. London – Bar No. 456284
Amber L. Husbands – Bar No. 481565
Davis Wright Tremaine LLP
1500 K Street, N.W., Suite 450
Washington, D.C.  20005
(202) 508-6600

ATTORNEYS FOR PLAINTIFF

---

[38]  *Alexander v. Unlimited Progress Corp.*, 2004 U.S. Dist. LEXIS 21013, at *11 (N.D. Ill. Oct. 20, 2004) (defendant moving for summary judgment waived substantive arguments by asserting a "procedural argument, without making any substantive argument in its brief"); *Curcio v. FBI*, No. 89-0941, 1990 U.S. Dist. LEXIS 14738, at *9-*15  (D.D.C. Nov. 2, 1990).

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

ICM REGISTRY, LLC,                                    )
                                                      )
                          Plaintiff,                  )
                                                      )
          v.                                          )
                                                      )      Case No. 1:06CV00949 (JR)
UNITED STATES                                         )
DEPARTMENT OF COMMERCE and                            )
DEPARTMENT OF STATE,                                  )
                                                      )
                          Defendants.                 )
_____)

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE**

Pursuant to Local Rule 7(h), Plaintiff ICM Registry, LLC ("ICM"), submits this State-
ment of Material Facts Not in Genuine Dispute.

1.       ICM is an applicant to the Internet Corporation for Assigned Names and Numbers
("ICANN") for authority to operate a new ".xxx" sponsored top-level domain ("sTLD") on the
Internet. *See*, *e.g.*, Compl. App. E, Ex. 21.

2.       On June 1, 2005, ICANN found that ICM's .xxx sTLD application met all eligi-
bility criteria and voted to negotiate with ICM a contract to operate the domain, the approval of
which ICANN's Board of Directors later scheduled to consider at its August 16, 2005, meeting.
*Id.*

3.       On August 11, 2005, the Commerce Department's Assistant Secretary for Com-
munications and Information, Michael D. Gallagher, sent a letter  to Dr. Vinton Cerf, a member
of ICANN's Board, to "urge the Board to ensure" that purported "concerns of the Internet
community" were "adequately heard and resolved before the Board takes action on" ICM's
application. *Id.*

4.     The letter did not take issue with any specific step ICANN took in evaluating proposals for new "sponsored" top level domains ("sTLDs") generally or .xxx specifically.  *Id.*

5.     On August 12, 2005, the Chairman of ICANN's Government Advisory Committee ("GAC"), Mohamed Sharil Tarmizi, sent a letter to the ICANN Board regarding the .xxx sTLD, in which he requested "further debate" and "time for additional governmental and public policy concerns to be expressed before reaching a final decision on this TLD."  Compl. App. G.

6.     ICANN did not approve the contract to operate the .xxx sTLD at the August 16, 2005 meeting.  Answer ¶ 19.

7.     On October 18, 2005, ICM submitted requests under the federal Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), to the Commerce Department (and to all its bureaus and components, including NTIA) and to the State Department, asking the agencies to provide ICM with copies of the following records:

> All records, correspondence, memoranda, transcripts, notes, documents, reports, emails or audiovisual or other materials consisting of or reflecting, representing, recording or otherwise disclosing communications, written or oral, between March 1, 2005 and the present, regarding approval by [ICANN], and/or by its Board of Directors, of the new ".xxx" sponsored top-level domain ("sTLD"), and/or ICANN's or its Board's approval of ICM Registry's contract to operate the .xxx sTLD [other than] documents submitted to the agency by the general public as part of any mass mailing campaign(s) or similarly duplicative emails/documents.

> All records, correspondence, memoranda, transcripts, notes, documents, reports, emails or audiovisual or other materials consisting of or reflecting, representing, recording or otherwise disclosing communications, written or oral, between March 1, 2005 and the present, between any personnel at the [agency], or any Bureau or other component thereof, and the ICANN Board of Directors and its staff, [the GAC], any GAC member country, or any individuals or agency in a GAC member country, regarding the .xxx sTLD.

Compl. Apps. A & B.

8.     ICM's October 18, 2005 FOIA requests also asked that it receive, if any of the foregoing information was withheld, copies of all non-exempt, reasonably segregable portions of such material, as well as a detailed statement of the statutory basis and reasons for each instance of withholding, and an index or similar statement of the nature of any withheld materials. *Id.*

9.     The Commerce Department designated the FOIA request it received from ICM as CRRIF No. 06-068 (hereafter "DoC Request 06-068"). Compl. App. E, Ex. 2.

10.     The State Department designated the FOIA request it received from ICM as Request 200504606 (hereafter "State Request 04606"). Compl. App. D, Ex. 2.

11.     The statutory deadline for the Commerce Department to respond to DoC Request 06-068 was November 16, 2005, or at the latest, if the Commerce Department exercised an extension available in "unusual circumstances," December 1, 2005. 5 U.S.C. § 552(a)(6)(A)(i).

12.     The statutory deadline for the State Department to respond to State Request 04606 was November 16, 2005, or at the latest, if the State Department exercised an extension available in "unusual circumstances," December 1, 2005. 5 U.S.C. § 552(a)(6)(A)(i).

13.     On December 2, 2005, ICM submitted a FOIA request asking that the Department of Commerce and any bureau or component thereof, including but not limited to NTIA, provide ICM with copies of records "pertaining to Deputy Assistant Secretary for Communications and Information John Kneuer's plans to attend, and/or his participation in," an ICANN meeting held November 30 through December 4, 2005, in Vancouver, Canada. Compl. App. C.

14.     ICM's December 2, 2005 FOIA request asked for all non-exempt reasonably segregable portions of any records withheld, and a detailed justification and index for the withholding. *Id.*

15.     The Commerce Department designated the December 2, 2005 FOIA request involving Deputy Assistant Secretary Kneuer's trip as CRRIF No. 06-127 (hereafter "DoC Request 06-127").  Compl. App. F, Ex. 2.

16.     The statutory deadline for the Commerce Department to respond to DoC Request 06-127 was January 3, 2006, or at the latest, if the Commerce Department exercised an extension available in "unusual circumstances," January 18, 2006.  5 U.S.C. § 552(a)(6)(A)(i).

17.     On December 13, 2005, the State Department sent a letter stating it would "begin processing [the FOIA] request" it received from ICM.  Compl. App. D, Ex. 2.

18.     ICM provided the State Department evidence by fax showing that the agency possessed records responsive to State Request 04606.  Compl. App. D., Ex. 6.

19.     On November 18, 2005, NTIA initially responded to DoC Request 06-068 by transmitting approximately 1,600 pages of documents.  Compl. App. E, Ex. 2.

20.     The letter responding to DoC Request 06-068 claimed an exemption to withhold "documents in whole or in part under 5 U.S.C. § 552(b)(5) as predecisional or privileged."  *Id.*

21.     Of the 1,600 pages, NTIA produced in response to DoC Request 06-068, 120 contained redactions obscuring parts of the document with a notation to Section 552(b)(5), and 98 consisted solely of pages that were blank except for a reference to Section 552(b)(5), indicating records consisting of one or more pages were withheld in full.  Compl. App E, Ex. 3.

22.     Other than the statement in its FOIA response to DoC Request 06-068 and the handwritten notations on documents, NTIA provided no explanation of the statutory basis and reasons for redacting/withholding the documents, or any index or other statement indicating the nature of the materials withheld.  *Id.*

23. On December 19 and 21, 2005, ICM received from NTIA supplemental FOIA responses to DoC Request 06-068 consisting of additional records responsive to the request for which NTIA claimed coordination with other agencies was necessary before releasing them. Compl. App. I.

24. As with the initial response, the supplemental responses to DoC Request 06-068 included documents with notations to Section 552(b)(5) that indicate records that were redacted and/or withheld in full.  *Id.*

25. On December 2, 2005, ICM timely filed an administrative appeal with Commerce of NTIA's November 18 initial response to DoC Request No. 06-068.  Compl. App. E.

26. ICM later incorporated into its appeal relating to DoC Request 06-068 NTIA's supplemental FOIA responses as well.  Compl. Apps. J & K.

27. ICM's appeal with respect to DoC Request No. 06-068 noted the records released to that point suggested that after the ICANN Board announced it had approved the proposal for a sponsored .xxx domain, the Commerce Department immediately focused on political reactions to ICANN's announcement – not on any regulatory activity – and confirmed that, while in the agency's view it lacked an official decisional role in approving new domain names, it intervened in the ICANN process.  Compl. App. E.

28. ICM's administrative appeal relating to DoC Request No. 06-068 disputed on both procedural and substantive grounds NTIA's redaction and withholding of records respon-sive to DoC Request 06-068 under FOIA Exemption 5, including, among other shortcomings, that (a) because NTIA failed to provide a detailed explanation of how the records it redacted and withheld satisfy Exemption 5, or any insight into the nature of those documents, it is impossible to assess the validity of its claims; (b) NTIA's invocation of Exemption 5 was impermissible

because it applies only to records relating to creation of governmental decisions and policies, yet NTIA failed to indicate to what agency policy- or decision-making the redacted/withheld records pertain, nor is there any plausible governmental activity that would suffice; and (c) it was not evident any policy decision was discussed within NTIA, and some records in fact reflect the absence of a legitimate U.S. government role in ICANN's processes. *Id.*

29.    ICM reiterated many of the points described in the immediately preceding paragraph when ICM expanded its administrative appeal to encompass NTIA's supplements to its original response to DoC Request 06-168.  Compl. App. J.

30.    The statutory deadline for the Commerce Department to respond to ICM's appeal relating to DoC Request 06-068 was January 3, 2006, or at the latest, if the Commerce Department exercised an extension available in "unusual circumstances," January 18, 2006.  5 U.S.C. § 552(a)(6)(A)(ii).

31.    On January 19, 2006, NTIA initially responded to DoC Request 06-127 by transmitting approximately 250 pages of documents.  Compl. App. L.

32.    The letter responding to DoC Request 06-127 claimed an exemption to withhold "documents in whole or in part under 5 U.S.C. § 552(b)(5) as predecisional or privileged." *Id.*

33.    ICM filed an administrative appeal dated February 21, 2006, with Commerce by fax and email transmitted February 21, 2006, to challenge NTIA's January 19 response to DoC Request No. 06-127 on essentially the same grounds cited in ICM's prior administrative appeal regarding DoC Request 06-068.  Compl. App. F.

34.    On March 2, 2006, the Department of Commerce issued a letter refusing to consider ICM's administrative appeal relating to DoC Request 06-127, on grounds that Commerce was treating the appeal as received the next business day.

35.     On May 10, 2006, ICANN's Board voted 9-5 against approving ICM's contract to operate the .xxx sTLD.  Answer ¶ 19.

36.     ICM has filed a reconsideration request with ICANN regarding its action on the proposal for the .xxx sTLD.  ICM Memorandum in Support of Motion for Summary Judgment, Attachment 1.

37.     On May 19, 2006, ICM filed a complaint in United States District Court for the District of Columbia seeking judicial review of the Commerce Department's and the State Department's responses, or lack thereof, to DoC Request 06-068, DoC Request 06-127, and State Request 04606, and to the administrative appeals of agency action associated with those requests.

38.     On May 22, 2006, ICM filed a Motion to Compel Preparation of a *Vaughn* Index seeking a Court order requiring the Commerce and State Departments to provide within 30 days after service of the complaint referenced in the immediately foregoing paragraph, an itemized, indexed inventory of every record or portion thereof responsive to DoC Request 06-068, DoC Request 06-127, and State Request 04606 that the agencies assert to be exempt from disclosure, accompanied by a detailed justification statement covering each refusal to release the records in accordance with *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973).

39.     The deadline for the agencies to respond to the Motion to Compel referenced in the immediately foregoing paragraph was June 7, 2006.  LCvR 7(b).

40.     On June 14, 2006, Defendants moved for an extension of time to answer, move or otherwise respond to the Motion to Compel.

41.     During the week of June 12, 2006, Plaintiff and Defendants negotiated, and on June 16, 2006, they jointly filed, a Proposed Briefing Schedule for Dispositive Motions that

established a briefing schedule for the parties to file cross motions for summary judgment, and which required that, by July 14, 2006, the Commerce Department to decide the administrative appeal relating to DoC Request 06-068, and the State Department to release documents or otherwise make a determination with respect to State Request 04606.

42.    On June 19, 2006, the government filed an Answer and Affirmative Defenses of the Department of Commerce and the Department of State.

43.    On July 5, 2006, the State Department released 1,155 pages of records that were potentially responsive to ICM's request, but which State did not review for responsiveness or redact for nondisclosable material.  Defendant's Motion to Dismiss and for Summary Judgment ("Def. Mot."), Grafeld Declaration, Exh. 6.

44.    On July 14, 2006, the State Department released its response to State Request 04606 originally due by December 1, 2005, pursuant to the statutory deadline, by reporting that it had identified 74 documents responsive to the request.  *Id.*, Exh. 7.

45.    The letter responding to State Request 04606 claimed an exemption to withhold documents in whole or in part under 5 U.S.C. §§ 552(b)(5) as "inter-agency or intra-agency communications containing deliberative process, attorney-client, or attorney work product information," and, in a limited number of cases, under 5 U.S.C. § 552(b)(4) for material alleged to constitute privileged or confidential trade secrets or commercial or financial information.  *Id.*

46.    Of the 74 documents the State Department identified as responsive to State Request 04606, it released 30 in full and 6 with redactions, comprising 109 pages in all, but withheld 33 in full and referred an additional 5 to the Department of Defense for interagency coordination.  *Id.*

47.     Of the 109 pages released in response to State Request 04606, 14 included white blocks representing text that had been redacted, with notations to "B5" or "B4" alongside.  *Id.*

48.     Other than the statement in its FOIA response to State Request 04606 and the "B5" and "B4" notations on documents, the State Department provided no explanation of the statutory basis and reasons for redacting/withholding the documents, or any index or other statement indicating the nature of the materials withheld.  *Id.*

49.     On July 13, 2006, the Commerce Department mailed its "final response" to ICM's administrative appeal relating to DoC Request 06-068 ("DoC Appeal Decision").  Def. Mot. Exh. B, Smith Declaration, Exh. 8.

50.     The DoC Appeal Decision granted ICM's administrative appeal in part and denied it in part by releasing 55 documents in part, and 10 in full (some of which it had already released in its initial response to DoC Request 06-068), while withholding 183 documents in part and 60 in full.  *Id.* at 1.

51.     The DoC Appeal Decision justified the withholding under 5 U.S.C. § 552(b)(5) under the deliberative process privilege and, with respect to 23 of 183 documents withheld in part and 7 of 60 documents withheld in full, attorney-client privilege.  *Id.*

52.     The DoC Appeal Decision's invocation of the deliberative process privilege under Exemption 5 admitted "there is no one Government decision to which the protectable documents pertain," but asserted that the deliberative process(es) at issue involve NTIA's role in ICANN's approval of the proposed .xxx domain and/or ICM's contract to operate it.  *Id.* at 2

53.     The DoC Appeal Decision's claim of attorney-client privilege assertedly was based on "requests for advice from clients in NTIA to their attorneys, or of facts presented by clients to their attorneys in NTIA or another Federal agency with the expectation of obtaining

legal advice in the future, or of advice from an attorney to his or her client, or of questions from an attorney to his or her client to elicit facts to enable him or her to provide legal advice." *Id*. at 2-3.

Dated this 21st day of September, 2006.

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP


_____/s/ Robert Corn-Revere_____
Robert Corn-Revere – Bar No. 375415
Ronald G. London – Bar No. 456284
Amber L. Husbands – Bar No. 481565
Davis Wright Tremaine LLP
1500 K Street, N.W., Suite 450
Washington, D.C.  20005
(202) 508-6600

ATTORNEYS FOR PLAINTIFF

10

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

—————————————————————
ICM REGISTRY, LLC,                        )
                                          )
                    Plaintiff,            )
                                          )
        v.                                )
                                          )        Case No. 1:06CV00949 (JR)
UNITED STATES                             )
DEPARTMENT OF COMMERCE and                )
DEPARTMENT OF STATE,                      )
                                          )
                    Defendants.           )
—————————————————————)

**PLAINTIFF'S RESPONSE TO DEFENDANTS'
STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE**

Pursuant to Local Rule 7(h), Plaintiff ICM Registry, LLC ("ICM"), submits this Response to Defendants' Statement of Material Facts Not in Genuine Dispute. There is no dispute between the parties with respect to the material aspects of the treatment by the Departments of Commerce and State with respect to ICM's request for agency records involving the government activities related to Internet Corporation for Assigned Names and Numbers' consideration of ICM's application and contract to operate a .xxx Internet domain. Some assertions, however, in Defendants' Statements of Material Facts Not in Dispute are actually not statements of fact, but rather legal arguments or conclusory statements Plaintiff does not admit. These are listed below:

I.    Department of Commerce – Freedom of Information Act Request CRRIF No. 06-127

4.    Plaintiff submitted its administrative appeal of the Commerce Department's initial determination regarding CRRIF 06-127 on February 21, 2006, after the thirtieth day following the determination fell on Saturday, February 18, 2006, a weekend day the Department was closed, and the two subsequent days, Sunday, February 19, and Monday, February 20, 2006,

were, respectively, a weekend day and a holiday (President's Day) that the Department also was closed. Accordingly, February 21, 2006, was the thirty-_third_ day after the initial determination, not the thirty-_fourth_ day, and was the first business day after the thirtieth day on which the Department's rules require that requestors to file administrative FOIA appeals. McCready Dec. Exh. 3.

Dated this 21st day of September, 2006.

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP


_____/s/ Robert Corn-Revere_____
Robert Corn-Revere – Bar No. 375415
Ronald G. London – Bar No. 456284
Amber L. Husbands – Bar No. 481565
Davis Wright Tremaine LLP
1500 K Street, N.W., Suite 450
Washington, D.C.  20005
(202) 508-6600

ATTORNEYS FOR PLAINTIFF