# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ICM REGISTRY, LLC, | ) | |
| **Plaintiff,** | ) | Civil Action No. 06-0949 (JR) |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| COMMERCE and | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| STATE, | ) | |
| **Defendants.** | ) | |

## DEFENDANTS' REPLY TO PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND FOR SUMMARY JUDGMENT, AND CROSS-MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

Plaintiff concedes that a large majority of the documents processed by the defendants (the Department of Commerce ("DOC") and the Department of State ("DOS")) in response to plaintiff's Freedom of Information Act ("FOIA") request have been released in their entirety and without excision.[1]  See Plaintiff's Consolidated Opposition to Defendants' Motion to Dismiss and For Summary Judgment and Memorandum in Support of Cross-Motion for Summary Judgment ("Pl. Mem.") at p. 2.  In addition, plaintiff suggests that the documents released already have shed significant light on the subject of plaintiff's FOIA request - - plaintiff's attempt to secure approval from the Internet Corporation for Assigned Names and Numbers ("ICANN") to create a ".xxx" top-level Internet domain.  Id.  Nonetheless, plaintiff purports to challenge each and every document withheld by defendants, in whole or in part, under FOIA exemptions (b)4

_____

[1] Over 1,000 pages of materials have been released to plaintiff.

2

and (b)5.[2]  Specifically, plaintiff contends that the defendants have "fail[ed] to pinpoint any

specific aspect of their authority . . . that relates to .xxx or ICANN in a way that reflects decision-

making protectable under FOIA's exemptions."  Pl. Mem. at pp. 2-3.

As explained herein, to the extent that plaintiff suggests that the United States

government has no public policy role to play regarding ICANN, Internet governance, or

plaintiff's application with ICANN to establish a .xxx top-level domain, plaintiff is completely

wrong.  As detailed in the publicly available agreements with ICANN that are cited in plaintiff's

motion, DOC has always maintained consultative, advisory, and oversight functions vis-a-vis

ICANN, including the creation of top-level domains.  Moreover, ICANN actively encourages

international governmental involvement through its Governmental Advisory Committee

("GAC"), which permits the United States and other governments to provide advice to ICANN

on matters of public policy.  Additionally, DOS has the federal government's lead role in

implementing the foreign policy of the United States, and Internet governance is a subject of

United States government foreign policy.

However, none of this is more than marginally relevant to this FOIA lawsuit.  The FOIA

does not require agencies to identify "any specific aspect of their authority," id., that led to the

creation of a particular document, nor does it require agencies to identify "any specific aspect of

their authority" that would permit withholding responsive information.  Instead, the test under the

FOIA is whether information is properly withheld under one of the FOIA exemptions.  See 5

U.S.C. § 552(b).

_____

[2]  Plaintiff does not challenge the single document withheld in part by the DOC under
FOIA Exemption 6.  See Pl. Mem. at p. 15 n.19.

3

The DOC and DOS have withheld relatively limited amounts of information under FOIA Exemptions b(5), which protects information that would be subject to a discovery privilege in civil litigation, and Exemption b(4), which protects confidential business information.  An examination of plaintiff's motion makes it clear that plaintiff misconstrues Exemption (b)(5) by suggesting that an agency must identify a specific authority that led to the creation of the underlying record whenever it invokes the exemption.  In addition, plaintiff fails to explain why any of the government's withholdings fail to qualify under the proper criteria this exemption. Moreover, while plaintiff dismisses as "boilerplate" DOS's explanation of its withholdings under Exemption (b)(4), DOS's explanation clearly meets the D.C. Circuit's criteria for withholdings under this exemption.  Finally, plaintiff is incorrect in suggesting that the DOC improperly dismissed plaintiff's appeal of a second, related FOIA request because it is apparent that plaintiff failed to exhaust its administrative remedies.

## **ARGUMENT**

I.    THE GOVERNMENT PROPERLY WITHHELD MATERIAL PURSUANT TO FOIA EXEMPTION (b)(5).

As explained in the government's motion for summary judgment, DOC and DOS withheld information under three privileges recognized by FOIA Exemption (b)(5) - - the deliberative process privilege, the attorney-client privilege, and the attorney work product doctrine.  See Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss and For Summary Judgment ("D. Mem.") at pp. 17-41.  The deliberative process privilege applies to all of the documents withheld under Exemption (b)(5), although some of the documents withheld by DOC also trigger the attorney-client privilege or the attorney work

4

product doctrine.  D. Mem. at p. 22.

A.    THE DEPARTMENTS OF COMMERCE AND STATE PROPERLY
      WITHHELD DELIBERATIVE, PREDECISIONAL MATERIAL PURSUANT
      TO FOIA EXEMPTION (b)(5).

    1.    The deliberative process privilege does not require agencies to identify the
          source of their authority for deliberations.

Plaintiff's primary argument against the government's assertion of the deliberative

process privilege is not that the withholdings fail to satisfy the basic legal requirements for the

privilege, namely that the documents are "predecisional" and "deliberative," Vaughn v. Rosen,

523 F.2d 1136, 1143-44 (D.C. Cir. 1975), but rather that the DOC and DOS did not identify the

formulation of any legitimate agency policy to provide a basis for the privilege.  See Pl. Mem. at

pp. 23-35.  Plaintiff describes the "overarching problem" with the government's Exemption 5

withholdings as "the murkiness with which the agencies describe their activities," particularly in

reference to "decisions that ICANN must make, not those the government must – or even can –

make."  Pl. Mem. at pp. 22, 28.  Thus, plaintiff generally does not question that the material the

government seeks to protect precedes particular Government decisions and consists of opinions

and recommendations regarding those decisions.  Rather, plaintiff argues that the defendants'

decisions to withhold material are somehow outside of the scope of the defendants' authority.

Contrary to plaintiff's assertions, the deliberative process privilege does not turn on an

agency's ability to "pinpoint any specific aspect of their authority . . . that reflects decision-

making protectable under FOIA's exemptions."  Pl. Mem. at p. 3.  The "ultimate aim" of the

deliberative process privilege is simply to "prevent injury to the quality of agency decisions."

Petroleum Info. Corp. v. Dep't of Interior, 976 F.2d 1429, 1433-34 (D.C. Cir. 1992) (quoting

5

NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 151 (1975)).  The government is not aware of a

single case (cited by plaintiff or otherwise) requiring agencies to identify the "specific aspect of

their authority" that relates to the protected deliberations in order to invoke the privilege.[3]

Moreover, although courts may seek to identify "an agency decision or policy to which the

document contributed," e.g., Commonwealth of Puerto Rico v. Dep't of Justice, 823 F.2d 574,

585 (D.C. Cir. 1987), the Supreme Court has cautioned that the deliberative process privilege

does not necessarily require "an agency to identify a specific decision in connection with which a

memorandum is prepared.  Agencies are, and properly should be, engaged in a continuing

process of examining their policies; this process will generate memoranda containing

recommendations which do not ripen into agency decisions; and the lower courts should be wary

of interfering with this process."  Sears, 421 U.S. 132, 153 n.18.[4]  It is for this reason that the

_____

[3]  Rather, case law cited by plaintiff makes clear that courts expansively interpret
agencies' authority to conduct deliberations under the privilege:

> Along the way to formulating a policy that is within its power to implement, an agency
> might legitimately identify and consider a host of alternatives, some within the agency's
> power to effectuate and some without . . . Deeming internal discussions unprotected by
> the deliberative process privilege because, in retrospect, it appears that the agency was
> considering proposals that were beyond the scope of its authority to implement might
> well discourage the kind of frank and appropriate policymaking discussions that the
> privilege was meant to protect and promote.  Nonetheless, we may assume for the sake of
> argument that the scope of an agency's authority places some limits on the deliberate
> process privilege . . . Perhaps if . . . EPA staff members were to begin mapping out policy
> on something like school prayer, for example, then the privilege would not apply.  We
> may likewise assume, looking to another line of cases that . . . [plaintiff-appellant] cites to
> us, that internal discussions about a course of agency action that would be nefarious, if
> not illegal, likewise would not be protected by the deliberative process privilege.  Enviro
> Tech Int'l, Inc. v. U.S. Envtl. Protection Agency, 371 F.3d 370, 376 (7th Cir. 2004).

[4]  See also Balderrama v. Dep't of Homeland Security, 2006 U.S. Dist. LEXIS 19421, *
22 (March 30, 2006) (Robertson, J.) (citing Sears and noting that "[t]he existence of Exemption
5-protected documents does not depend on the agency's ability to identify a specific decision to

6

D.C. Circuit has held that "general guidelines are of limited utility" in defining the privilege, because "the deliberative process privilege is so dependent upon the individual document and the role it plays in the administrative process." Puerto Rico, 823 F.2d at 585.

        2.      The DOC properly invoked the deliberative process privilege.

            I.      The decision-making processes at issue relate to policy matters within the authority of DOC.

Plaintiff states that the DOC has withheld material that was not related to decisions properly made by the DOC. Pl. Mem. at pp. 3, 22. However, contrary to plaintiff's assertions, the DOC, through its National Telecommunications and Information Administration ("NTIA"), has official responsibilities with respect to ICANN and the creation of new domains such as .xxx. First, the United States government maintains policy control over and operational oversight responsibility for modifications to, and maintenance and dissemination of, the "authoritative root zone file."[5] The process for managing the authoritative root zone file is through two DOC legal agreements with outside parties: a contract and a cooperative agreement.[6] Before any new domain can be established, the ICANN Board must not only approve its creation, but also must submit an official recommendation to NTIA to add the new domain to the authoritative root zone

---

which the documents relate").

    [5] The authoritative root zone file is the highest level of the domain name system and contains the databases enabling an Internet address query to be routed to its proper destination. The authoritative root zone file is the master database from which copies are downloaded and disseminated through the Internet on a daily basis. A root zone file directs an address query to the proper top level domain zone file, which contains the location and other information about the numerous generic top level domains and country code top level domains. See Name.Space, Inc., v. Network Solutions, Inc., 202 F.3d 573 (2nd Cir. 2000).

    [6] These agreements are described in footnotes 7 and 8.

7

file.[7]  After the ICANN Board makes an official recommendation, NTIA must approve the

recommendation and provide written direction to VeriSign, Inc. to modify the authoritative root

zone file before the domain is live within the Internet domain name system.[8]

Second, the DOC has official responsibilities with respect to ICANN and its creation of

new domains under a 1998 Memorandum of Understanding ("MOU") with ICANN.[9]  NTIA is

responsible for ensuring that ICANN fulfills its obligations under the MOU which, in part,

consists of ensuring that the **process** for creating new domains is open and transparent, and

accessible to the global internet community.  For example, when ICANN was considering

approval of the .xxx domain, ICANN's obligations included, under MOU, Section V.C.8:

> consideration and evaluation of . . . b. [t]he creation and implementation of selection
> criteria for new and existing TLD registries [.xxx would be such a registry], **including
> public explanation of the process, selection criteria, and the rationale for selection**

---

[7]  ICANN submits its recommendations with respect to modifications to the authoritative root zone file as one of its responsibilities under the Internet Assigned Numbers Authority (IANA) functions contract with the DOC.  The terms of the contract make it clear that ICANN does not have the authority to authorize the changes.  A copy of the IANA functions contract in effect at the time of the initiation of this litigation as well as the current contract are available on NTIA's website at http://www.ntia.doc.gov/ntiahome/domainname/iana.htm.

[8] DOC authorizes VeriSign to make changes to the authoritative root zone file pursuant to Amendment 11 to Cooperative Agreement NCR 92-18742.  Amendment 11 is available on NTIA's website at http://www.ntia.doc.gov/ntiahome/domainname/agreements/Amend11_052206.pdf.  The Second Circuit has already found that the requirement in Amendment 11 that DOC provide written approval before any changes are made to the authoritative root zone file is not a prior restraint on free speech, and that any restrictions it imposes relate only to the time, place or manner of speech.  See Name.Space, Inc., v. Network Solutions, Inc., 202 F.3d at 573.

[9]  On September 29, 2006, DOC and ICANN announced a three-year extension and amendment of the MOU.  Under the terms of the amended MOU, ICANN remains committed to continue to build on existing processes for the introduction of new top level domains as well as improved transparency and accountability.  The text of the extended agreement is available on NTIA's website at http://www.ntia.doc.gov/ntiahome/domainname/agreements/jpa/signedmou290906.pdf.

8

**decisions** . . . . (emphasis added).

Under Section V.C.8., ICANN was obligated to "[d]efine and implement a predictable strategy

for selecting new TLDs **using straightforward, transparent, and objective procedures** . . . ."

Pursuant to Section V.C.9, ICANN was obligated to "[c]ontinue to develop, to test, and **to**

**implement appropriate mechanisms that foster informed participation in ICANN by the**

**global Internet community** . . . ." (emphasis added). The foregoing obligations are reflected in

the following language from an August 11, 2005 letter from Assistant Secretary Michael

Gallagher to Dr. Vinton Cerf, a member of the ICANN Board:

> I am writing to urge the Board **to ensure that the concerns of all members of the**
> **Internet community on this issue have been adequately heard** and resolved before the
> Board takes action on this application . . . **I request that the Board will provide a**
> **proper process** and adequate additional time for these concerns to be voiced and
> addressed before any additional action takes place on this issue (emphasis added).

Third, the DOC plays an official role with respect to ICANN's creation of new domains

because the DOC accepted ICANN's open invitation to national governments to serve on its

Governmental Advisory Committee. The GAC is comprised of government representatives from

around the world and "provide[s] advice to ICANN on issues of public policy."[10] Based on this

advisory role, the DOC, in exercising its legitimate policymaking authority, is fully justified in

deliberating on possible recommendations to the GAC related to ICANN's creation of an .xxx

domain, particularly as the recommendations concern the *process* for creating new domains.

Based on these three DOC roles with respect to ICANN, contrary to plaintiff's assertions, the

DOC has ample authority to deliberate on possible courses of action to take if ICANN were to

recommend the creation of the new .xxx domain and/or enter into a contract with ICM to operate

---

[10] From ICANN's website: www.icann.org/committees/gac/outreach-en-01oct01.htm.

9

the domain.

Plaintiff also suggests that the DOC's deliberations on how to respond to inquiries it received from members of the public and the press are not protected under the deliberative process privilege.  Specifically, plaintiff states:

> Nowhere . . . does the government explain how Commerce Department responses to such political concerns involve agency policy- or decision-making within the meaning of the deliberative process privilege.  Pl. Mem. at p. 32.

However, in light of the broad scope of policy-making subject to protection under the deliberative process privilege,[11] the suggestion that the predecisional, deliberative communications made in the process of formulating DOC positions would not be protected is preposterous.  Plaintiff fails to cite any case law support for this position, and defendants know of none.  Indeed, the DOC and other Government agencies have Offices of Public Affairs which have the responsibility of responding to inquiries from the press and the public.  To suggest that their predecisional, deliberative communications in formulating responses to such inquiries, even if they are "political" in nature, would not be protectable under the deliberative process privilege lacks any support in the case law.

ii.     The DOC did not waive the deliberative process privilege by disclosing documents to third parties.

Plaintiff states that it made an "extensive showing" in its administrative appeal that the DOC "appeared to have shared with outside parties - including ICANN and/or representatives of foreign governments - either information withheld from ICM, or enough information involving the subject matter thereof that might be sufficient to waive the deliberative process privilege."

---

[11]  See supra n.3 (discussing Enviro-Tech Int's Inc., 371 F.3d at 370).

10

Pl. Mem. at p. 34.  However, the DOC's July 13, 2006, decision on the administrative appeal

states:

> [a]lthough the documents you cite include references to countries, individuals, or entities
> outside the U.S. Government, none of the documents, including those portions we are
> withholding, were shared with such outside parties.  Any e-mail addresses on the
> documents you reference that reveal the individuals who sent or received any of the
> withheld material are addresses of U.S. Government employees.

See Smith Dec., Exhibit 8, at p. 3.

In an attempt to support its argument, plaintiff points out that the DOC omitted from its

Vaughn Index the names of individuals designated to receive only a "cc" of an e-mail.  Plaintiff

implies that the "cc" recipients might include parties outside the United States government.

However, the "cc" addresses were omitted from the Smith Declaration and Vaughn index in the

interest of economy and because they have not been withheld.  In fact, defendants have released

to plaintiff the e-mail addresses of all senders and recipients, including "cc" recipients of e-mails

that have been withheld (in full or in part) solely under the deliberative process privilege.  The

senders and recipients of six e-mails withheld in their entirety under the attorney-client and

deliberative process privileges (ACW2-ACW7) have not been released.  See Smith Dec. at pp.

27-28.  But the Vaughn Index description of these documents states: "The documents describe

confidential communications among DOC lawyers and their DOC clients, which have not been

disclosed outside of the attorney-client relationship."  See id. at p. 26.  The Supplemental

Declaration of Kathy Smith ("Smith Supp. Dec."), which is attached hereto as Exhibit 1,

confirms that none of the material at issue in the documents in this case has been disclosed to

parties outside of the United States government.  Smith Supp. Dec. ¶ 4.

11

3.    The DOS properly invoked the deliberative process privilege.

Plaintiff dismisses the DOS deliberative process claims as "a litany of vague references to agency activity that fail to establish what deliberative process is involved and to tie the records to the purported decision-making at issue." Pl. Mem. at p. 24.  Further, plaintiff states that "obfuscation regarding the U.S. government's role in the ICANN process" is a problem with the State Department's withholdings, although it is "a problem that plagues [DOC's] Exemption 5 claims more so than the State Department."  Pl. Mem. at p. 26.  However, plaintiff's arguments do not take into account DOS's role in formulating foreign policy, nor do they rebut the document-by-document explanations for withholdings that DOS included in the Declaration of Margaret Grafeld.  See D. Mem., Exhibit C: Grafeld Declaration ("Grafeld Dec.").

i.    The decision-making processes at issue in the documents withheld by DOS relate to policy matters within the authority of DOS.

The documents withheld by DOS under Exemption 5 in this case were generated in the course of DOS decision-making and policy-making activities.  DOS is the agency primarily responsible for overseeing the foreign affairs and implementing the foreign policy of the United States.[12]  It has statutory responsibility for "formulation, coordination, and oversight of foreign policy related to international communications and information policy," including "primary authority for the conduct of foreign policy with respect to such telecommunications functions, including the determination of United States positions and the conduct of United States participation in negotiations with foreign governments and international bodies."  22 U.S.C. § 2707.  ICANN's role in Internet management issues has been the subject of intense international

---

[12]  See, e.g., 22 U.S.C. § 2656.

12

debate in the second half of 2005 and continuing into 2006.  Although the United States

government has advocated that ICANN continue in its role as technical manager of the Internet

domain-name system ("DNS"), the European Union and others in the international community

have suggested that ICANN is too closely connected to the United States government and have

lobbied for ICANN's Internet management responsibilities to be turned over to a United Nations

body or other multinational organization.[13]  ICANN's future role as DNS manager was a major

agenda item at the United Nations World Summit on the Information Society ("WSIS") in Tunis,

Tunisia, in November 2005 (where the Department of State led the United States delegation).[14]

The WSIS, in turn, spawned the creation of the "Internet Governance Forum" for

multistakeholder dialogue on Internet public policy issues that will be convened by the United

Nations Secretary General (in which the DOS will play a major part), and in which ICANN's

proper role may again serve as a major source of discussion.[15]  Accordingly, ICANN's future role

as a manager of Internet domain names and addresses, and the United States government's

support of, and relationship with, ICANN continues to be the subject of Internet-related foreign

policy discussions.

---

[13]  See, e.g., International Herald-Tribune, "Agreement allows U.S. to control Web names," (Nov. 17, 2005); Matt Moore, Associated Press, "Deal Reached on Managing the Internet" (Nov. 16, 2005); John Markoff, "Control the Internet?  A Futile Pursuit, Some Say," The New York Times (Nov. 14, 2005); Mark Shiffrin and Avi Silberschatz, "Web of the Free," The New York Times (Oct. 23, 2005); The Department of State, U.S. Principles on the Internet's Domain Name and Addressing System (June 30, 2005), available at http://www.state.gov/e/eb/rls/othr/2005/57995.htm.

[14]  See, e.g., articles cited supra n.13.

[15]  See, e.g., http://www.itu.int/wsis/implementation/igf/index.html.

13

>    ii.    DOS's responsive records are only peripherally related to
>           plaintiff's FOIA request.

Had plaintiff's FOIA request truly been limited to documents identifying "what role

[DOS] played, or could play, regarding ICM's pursuit of approval from [ICANN] to operate an

'.xxx' domain on the world-wide web," Pl. Mem. at pp. 1-2, the DOS's search would have

yielded few, if any, responsive documents.  However, plaintiff's request was more broad - -  it

sought any records relating to ICANN's approval of the new .xxx sponsored top-level domain.

See D. Mem. at p. 5.  The vast majority of DOS records responsive to this request are press

articles and other records related to ICANN compiled by DOS in support of its foreign policy

responsibilities, described supra.  In virtually all of these records, the .xxx domain-name issue

appears in passing or as part of a larger discussion related to United States foreign policy with

respect to ICANN.  DOS released the vast majority of its records - -  well over 1,000 pages of

material - - without making any excisions or withholdings in order to facilitate the production of

documents to plaintiff.  See Grafeld Dec. ¶¶ 11, 31.  DOS withheld 34 documents in part or in

full under Exemption (b)(5) (the deliberative process privilege) and three documents in part

under Exemption (b)(4).  Grafeld Decl. ¶¶ 16, 18.[16]  As indicated in the Grafeld Declaration,

DOS has withheld very little information relating to .xxx.  In some of the documents excised by

DOS, all information relating to .xxx has been released.  Where information about .xxx has been

withheld, it usually consists of a small section of a larger document reflecting deliberations on

the appropriate foreign policy position that DOS should take regarding ICANN's role in Internet

---

[16]  DOS also referred five documents to the Department of Defense for that agency's
direct reply to plaintiff, but those documents are not at issue here.  See Pl. Mem. at 14 n.17.  DOS
referred a sixth document to the Department of Commerce, and that sixth document was covered
by the Department of Commerce's Vaughn materials.  See, e.g., Grafeld Decl. ¶ 13.

14

management.

      iii.    <u>None of plaintiff's arguments regarding the individual documents withheld by DOS have merit.</u>

      Although plaintiff's complaints regarding DOS's exemption (b)(5) withholdings are, for the most part, generalized, plaintiff singles out several DOS documents as examples of defective withholdings.  <u>See</u> Pl. Mem. at pp. 24-27.  The Declaration of Margaret Grafeld includes a document-by-document explanation of the Department's rationale for invoking exemption (b)(5).  <u>See</u> Grafeld Dec.  As explained <u>infra</u>, the Grafeld Declaration provides a ready explanation as to why the information withheld from each document identified by plaintiff is predecisional and deliberative.

      <u>Document L5</u>:  Because of the conditional nature of the document's description in the Grafeld Declaration, plaintiff argues that "the government does not even know what [the] document purports to be."  Pl. Mem. at p. 24.  However, Document L5 was described conditionally because, although those notes that are legible "reflect discussion of possible changes in the U.S. Government's relationship with the GAC," Grafeld Dec. ¶ 19, many of the notes in this document are "illegible."[17]  Document L-5 is clearly predecisional -  - the decision being contemplated is a change to the United States government's relationship with the GAC.  It is also deliberative because it consists of notes from a DOC-DOS meeting to discuss possible GAC changes.  Due to their abbreviated and indistinct nature, the notes could be "subject to differing interpretations and therefore potentially misleading."  <u>Id.</u>; <u>see</u> <u>Jordan v. Dep't of Justice,</u>

---

    [17]  The GAC is an ICANN committee whose membership is "open to all national governments."  It is the mechanism by which governments can "consider and provide advice on the activities of [ICANN] as they relate to the governments' concerns."  <u>See</u> ICANN Bylaws, Article VII, Section 3(b), available at <u>http://www.icann.org/committees/gac.</u>

15

591 F.2d 753, 772-73 (D.C. Cir. 1978) (en banc) (deliberative process "protects the public from confusion that would result from premature exposure to discussions").

Document L6A is a five-page internal DOS memorandum dated December 5, 2005, providing the author's in-depth views on "the ICANN question." See Grafeld Dec. ¶ 20. This document is prototypical "deliberative process" because it consists, in its entirety, of "suggestions or recommendations as to what agency policy should be" by analyzing foreign policy and other issues implicated by the U.S. Government's relationship with ICANN. See Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 868 (D.C. Cir. 1980).

Documents E52, E57, E58, and E62 are various versions of a December 2005 memorandum to Deputy Secretary of State Robert Zoellick from the Assistant Secretary for Economic and Business Affairs entitled "ICANN/Internet Governance: Policy Challenges for 2006." Grafeld Dec. ¶ 23.[18]  In an attempt to be forthcoming and to narrow the issues under dispute, the Grafeld Declaration described this multi-paged memorandum's one reference to .xxx to show plaintiff that this document is only marginally related to plaintiff's FOIA request.[19]

---

[18]  Documents L8A, E50, and E51 are drafts of another December 2005 memorandum between the same officials, this one titled "Policy Considerations for the Management of the Internet," which was written "in response to six questions from the Deputy Secretary of State concerning the future relationship of the U.S. Government to ICANN." Grafeld Dec. ¶ 21.  Only one of the six questions discussed in this memorandum is responsive to plaintiff's request.  Id. Plaintiff asserts without discussion that "the principles that ICANN must apply" to approval of xxx. cannot be the subject of DOS "policy-making." Pl. Mem. at p. 27.  But the topic arose in the context of DOS deliberations on "the future relationship of the U.S. Government to ICANN," which is indisputably a matter for DOS policy-making.  Grafeld Dec. ¶ 21.

[19]  The memorandum includes but a single reference to "the .xxx issue," and that single reference is "not related to approval of a .xxx TLD but rather commenting on the number of FOIA requests related to .xxx and a correspondingly increased scrutiny of ICANN." Grafeld Dec. ¶ 23.

16

Leaving no good deed unpunished, plaintiff instead uses the .xxx reference to suggest, falsely, that the DOS has "all but admit[ted] that there is no deliberative process in play." Pl. Mem. at p. 25. Instead, this memorandum is another example of a prototypical deliberative process - - it is an information memorandum between high-level officials at DOS describing "issues and policy decisions with respect to ICANN that are likely to arise in 2006." Grafeld Dec. ¶ 23.[20]

Similarly, Document E54 is a draft memorandum to the Assistant Secretary for Economic and Business Affairs commenting on a January 19, 2006 Wall Street Journal article on international attempts to build alternatives to the Internet.[21] The memorandum was drafted in the context of the DOS's ongoing role in managing the foreign policy aspects of the United States' relationship with ICANN.[22] Plaintiff is simply off the mark by suggesting (without citing any authority) that agency deliberations triggered by "public commentary on Internet governance" cannot qualify for the deliberative process privilege. Pl. Mem. at p. 26.

Documents E14, E20, E24, E31, and E32 are chains of e-mails which were released in large part to plaintiffs. Grafeld Dec. ¶¶ 26, 29. The context of the deliberations in these documents is clear from the portions of the documents released to plaintiff. Document E14 is a

---

[20] Plaintiff's assertion that the Grafeld Declaration "does not reference policy-making at all" with respect to these documents is simply wrong. See Pl. Mem. at p. 26. The Grafeld Declaration identifies the title of the memorandum as "ICANN/Internet Governance: Policy Challenges for 2006" and it explains that the memorandum "endeavors to alert the Deputy Secretary to issues and policy decisions with respect to ICANN that are likely to arise in 2006." Grafeld Dec. ¶ 23.

[21] See Christopher Rhodes, "In Threat to Internet Clout, Some Are Starting Alternatives," Wall St. Journal (Jan. 19. 2006) at A1.

[22] Like many of the other documents retrieved by the DOS, Document E54 is only marginally related to plaintiff's FOIA request and it contains only one brief reference to .xxx. See Grafeld Dec. ¶ 24.

17

series of e-mails dated October 21, 2005 which reports from a conference held in Brussels,

Belgium, entitled "ICANN, WSIS, WGIG [the U.N. Working Group on Internet Governance]:

Internet Governance at its Crossroads."  The meeting involved discussions with European Union

representatives regarding their proposal to change ICANN's role in Internet governance.  The

limited redacted elements of this e-mail, none of which are responsive to plaintiff's FOIA

request, see Grafeld Decl. ¶ 26, protect internal United States government deliberations regarding

the foreign policy implications of the ICANN-related positions advanced at this international

meeting.  Document E20 consists of a November 2005 New York Times article (released to

plaintiff) discussing ICANN and entitled "Internet Governance."  One sentence, reflecting

internal DOS deliberations on responding to the article, has been redacted.   Document E24 is a

series of e-mails from November 2005 related to an Organization for Economic Cooperation and

Development conference call on "some of the decisions made in Tunis [at the WSIS]."  The only

part of this e-mail chain that has been redacted is a single preparational e-mail between DOC and

DOS officials who were participating in the call.  See Grafeld Dec. ¶ 29.  Documents E31 and

E32 consists of a December 2005 Agence France-Presse report on the new ".eu" domain name.

Two brief comments reflecting deliberations on the new .eu domain, .xxx, and ICANN have been

excised.  See Grafeld Dec. ¶ 26.

Document E59 is a two-page document draft memorandum on a meeting between DOS

officials and a Japanese official.  Grafeld Dec. ¶ 28.  The only portion of the document

responsive to plaintiff's request is a brief comment about the implications of the issue of .xxx in

Japan.  Id.  The document is a draft memorandum, which by itself "goes to the merits of

Exemption 5's predecisional and deliberative elements."  Judicial Watch, Inc. v. FDA, 449 F.3d

141, 152 (D.C. Cir. 2006); <u>see also</u> <u>Kidd v. Dep't of Justice</u>, 362 F.Supp.2d 291, 295 (D.D.C.

2005) ("Draft documents, by their very nature, are typically predecisional and deliberative.")

(quoting <u>Exxon Corp. v. Dep't of Energy</u>, 585 F. Supp. 690, 698 (D.D.C. 1983)).  Accordingly,

the document has been withheld because "[r]elease of the document, to the extent the draft may

be inaccurate or incomplete, could be misleading about what transpired at the meeting."  Grafeld

Dec. ¶ 28.

　　　　Documents E36, E68, E69, and E70 are summaries of or commentaries on "White House

high tech conference calls." Grafeld Dec. ¶ 30.  As is evident from the portions of the documents

provided to plaintiff, these conference calls served as interagency fora for discussing and

deliberating on current high tech policy issues.  Each of these documents was carefully redacted

to provide any reasonably segregable factual information to plaintiff .  <u>Id</u>.

   B. <u>THE DEPARTMENT OF COMMERCE PROPERLY WITHHELD ATTORNEY
WORK-PRODUCT MATERIAL PURSUANT TO EXEMPTION (b)(5).</u>

　　　　Plaintiff asserts that the DOC failed to justify its assertion of the attorney work-product

privilege because it neither specified any claim(s) it expected to be brought nor showed that

litigation was foreseeable.  Pl. Mem. at pp. 35-37.

   1.  <u>Claims Anticipated by the DOC</u>

　　　　ICM itself provided a roadmap to possible claims it would bring against the DOC in an

October 7, 2005 letter and 14-page attachment entitled "Questions and Answers on the Proposed

.XXX Top-Level Domain." <u>See</u> Smith Supp. Dec., Exhibits A and B.  The letter and attachment

were sent as a follow-up to a meeting held at the DOC, among representatives of the DOC and

ICM.  <u>See</u> Smith Supp. Dec. ¶ 5.  The attachment includes a section entitled "Misimpression #7:"

19

**EVERYBODY KNOWS THAT THE DEPARTMENT OF COMMERCE HAS THE AUTHORITY TO INTERVENE IN THE ICANN PROCESS, INFLUENCE THE BOARD TO DELAY OR REJECT THE ICM CONTRACT, OR REFUSE TO DIRECT VERISIGN TO ADD .XXX TO THE AUTHORITATIVE ROOT.**
(capitals and bold in original).

See id., Exhibit B at p. 11. ICM asserts that the intervention referenced in the heading could

serve as the basis for a claim under the Administrative Procedure Act.  Specifically, ICM

indicated that:

> This intervention . . . has significant implications for the Department of Commerce and ICANN under U.S. law, potentially subjecting both to the strictures of constitutional and statutory mandates, including those of the Administrative Procedure Act ("APA").

Id.  ICM also specified possible First Amendment grounds for an action against the DOC.[23]

Specifically, ICM indicated:

> U.S. government intervention that affects ICANN's consideration of the .xxx domain proposal also raises important First Amendment questions . . . Here, there is no question but that the potentially expressive nature of TLDs would apply to the .xxx domain, but the First Amendment issue raised by U.S. Government intervention is even more fundamental.  Creation of the .xxx domain directly implicates the constitutionally protected right of free association.

Id. at p. 13.  Therefore, DOC properly anticipated Administrative Procedure Act and First

Amendment claims.

      2.  Foreseeablity of Litigation

In the Section of plaintiff's motion entitled, "Apparent U.S. Government Interference

---

[23] The attachment includes other statements that indicate ICM's potential willingness to challenge the legality of DOC's actions, without mentioning specific claims:

> A government decision <u>not</u> to direct Verisign to add a new domain approved by ICANN to the authoritative root unquestionably would constitute governmental action that would be subject to legal review.  Id. at p. 12.

20

with ICANN's TLD Process," plaintiff appears to assert that the Government interfered with

ICANN's TLD process when NTIA Assistant Secretary Gallagher sent an August 11, 2005 letter

to Dr. Cerf, asking the ICANN Board to allow additional time before taking further action on the

proposed .xxx TLD.[24]  Pl. Mem. at pp. 7-9.  Based upon the October 7, 2005 letter, this could be

a possible trigger for First Amendment claims.  Moreover, the Smith Supplemental Declaration

indicates that after reviewing the letter, the declarant "believed it represented a threat of litigation

against the DOC if ICM Registry were to be unsuccessful in obtaining the .xxx contract with

ICANN."  Smith Supp. Dec. ¶ 9.  As of the date of filing of this Reply, ICM has been

unsuccessful in obtaining the .xxx contract with ICANN.[25]  Therefore, it is clear that litigation

was forseeable.

C.    THE DEPARTMENT OF COMMERCE PROPERLY WITHHELD
      ATTORNEY-CLIENT MATERIAL PURSUANT TO EXEMPTION (b)(5).

Plaintiff makes essentially the same arguments against the DOC's assertion of the

attorney-client privilege that it did against the DOC's assertion of the deliberative process

privilege.  In particular, plaintiff's fundamental objection to the DOC's assertion of the attorney-

client privilege is that the matters as to which the DOC clients were seeking legal advice were

not within DOC's authority, and thus not legitimate subjects about which DOC clients could ask

DOC attorneys to provide legal advice.  See Pl. Mem. at pp. 38-39.  The fundamental flaw in this

argument was demonstrated herein, in Section  I(A)(2)(I), which explains that the DOC has

---

[24]However, this letter was sent and made public *before* ICM sent the October 7, 2005
letter and attachment to the DOC.  Thus, it is clear that the August 11, 2005 letter did not
constitute interference in the ICANN process.

[25] See Pl. Mem. at pp. 5-9, 16-17.

21

official responsibilities related to ICANN and its creation of new domains.  Therefore, the DOC

is amply justified in deliberating on, and raising legal issues concerning, these matters.

Moreover, the argument in Section  I(A)(2)(I) that the DOC did not waive the deliberative

process privilege by disclosing any material to third parties is equally applicable to waiver of the

attorney-client privilege.  See Smith Supp. Dec. ¶ 4.

## II.    THE DEPARTMENT OF STATE PROPERLY WITHHELD MATERIAL PURSUANT TO FOIA EXEMPTION (b)(4).

DOS withheld Documents E8 and E71 in full and Document E2 in part under Exemption

b(4), which protects information that is (a) commercial or financial, (b) obtained from a person,[26]

and (c) privileged or confidential.  See Public Citizen Health Research Group v. U.S. Food and

Drug Admin., 704 F.2d 1280, 1290 (D.C. Cir. 1983); D. Mem. at pp. 15-17 and Grafeld Dec. ¶¶

16, 25.   Plaintiff disputes DOS's withholdings from all three documents.  See Pl. Mem. at pp.

19-21.

However, plaintiff cannot seriously dispute that the information in question is

"commercial" which, based on its "ordinary meaning," has been broadly interpreted to include

any record in which the submitter has a "commercial interest."[27]  In each case, the submitter had

an obvious commercial interest in the information transmitted to DOS.  The portions of

---

[26]  Plaintiff apparently does not dispute that DOS obtained the information from "a person."

[27]  Public Citizen Health Research Group v. U.S. Food and Drug Admin., 704 F.2d at 1290; see also Am. Airlines v. Nat'l Mediation Bd., 588 F.2d 863, 870 (2d Cir. 1978) (commercial information means "anything pertaining or relating to or dealing with commerce"); Critical Mass Energy Project v. NRC, 830 F.2d 278, 281 (D.C. Cir. 1987) (holding that "information may qualify as 'commercial' even if the provider's . . . interest in gathering, processing, and reporting the information is noncommercial").

22

Document E2 released to plaintiff indicate that the redacted information reflects the professional insights of the author, a consultant in the telecommunications industry, on ICANN and the WSIS.[28]  Grafeld Dec. ¶ 25.  Document E18 consists of information provided to WSIS and Internet governance provided by a source in a Washington, D.C. business organization.  Id. Finally, Document E71, e-mail chains from two different ICANN personnel, consists of information related to ICANN, the GAC, and WSIS.  Id.

Further, the information withheld is "confidential."  Under Exemption (b)(4), information "voluntarily" submitted to the government is considered "confidential" if it is not "customarily" disclosed to the public by the person from whom the information was obtained.  Critical Mass Energy Project v. NRC, 975 F.2d at 878-79.  Information "required" to be submitted to the government is considered "confidential" if its disclosure would be likely either "(1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained."  Id. Here, although the information withheld was provided voluntarily to DOS, it would qualify for withholding under even the more stringent test for "required" submissions because, in each case, the DOS has concluded that release of the information "could impair the future ability of U.S. officials to obtain information" from the particular source.  Id.  This statement is not "an entirely conclusory recitation of legal principle," see Pl. Mem. at p. 20, it is a factual statement that reflects the sensitive nature of the information withheld.

---

[28]  Moreover, all information responsive to plaintiff's FOIA request from Document E2 (i.e., "all material related to .xxx") was released to plaintiff.  See Grafeld Decl. ¶ 25.

23

### III.  THE DEPARTMENT OF COMMERCE PROPERLY DISMISSED PLAINTIFF'S FOIA APPEAL DESIGNATED CRRIF 06-127.

Plaintiff concedes that its administrative appeal was filed late, but disputes that it was four days late as the Government argued in its Motion.  Plaintiff argues that, in any case, the doctrine of exhaustion of administrative remedies does not preclude judicial review of the appeal. See P. Mem. at p. 41.

By letter dated January 19, 2006, plaintiff was informed that an appeal must be received within thirty calendar days of the denial letter.  See Defendant's Statement of Material Facts Not in Genuine Dispute ¶ 2.  Specifically, the DOC's FOIA regulations at 15 C.F.R. § 4.10(a) state:

> a written appeal or an electronic appeal . . . must be received by the Office of General Counsel during normal business hours (8:30 a.m. to 5 p.m., Eastern Time, Monday through Friday), within thirty *calendar* days of the date of the written denial . . . Written or electronic appeals arriving after normal business hours will be deemed received on the next normal business day. (emphasis added).

By letter dated February 21, 2006, transmitted by e-mail and facsimile, through counsel, ICM appealed the initial determination.  The letter arrived on February 21, 2006, by e-mail at 5:41 p.m., and by fax at 5:52 p.m.  Therefore, it was deemed received on the next business day, February 22, 2006.  However, the appeal was due on February 18, 2006, thirty calendar days from the January 19, 2006 letter.  The appeal was received on February 22, 2006, thirty-four days from the date of the letter which, contrary to plaintiff's assertions, is *four* calendar days past the thirty-day limit established by 15 C.F.R. § 4.10(a).

These facts are quite similar to those in a recent case in which it was held that a FOIA appeal received by e-mail at 5:12 p.m., twelve minutes after the filing deadline, was late and that accordingly plaintiff had failed to exhaust administrative remedies.  See Center for Biological

24

<u>Diversity v. Gutierrez</u>, No. Civ. A. 05-1045, 2006 WL 2329330 (D.D.C. August 10, 2006).  The

court in <u>Center for Biological Diversity</u>, cited two factors to consider in determining whether

failure to exhaust precludes judicial review:

> Although exhaustion of a FOIA request is not jurisdictional because the FOIA does not
> unequivocally make it so, still as a jurisprudential doctrine, failure to exhaust precludes
> judicial review if [1] the purposes of exhaustion and [2] the particular administrative
> scheme support such a bar.

<u>Id</u>., 2006 WL 2329330, at *8 (quoting <u>Wilbur v. CIA</u>,  355 F.3d 675, 677 (D.C. Cir. 2004)).

With regard to first factor, in <u>Center for Biological Diversity</u>, the Federal agency at issue

(the DOC's National Marine Fisheries Service, or NFS),:

> did not accept the tardy appeal; thus it has had no occasion to consider the very issue that
> the Center raises here: whether NFS properly invoked FOIA Exemption 6 to redact
> materials it released . . . *The exhaustion requirement exists to provide the agency 'an
> opportunity to exercise its discretion and expertise on the matter and to make a factual
> record to support its decision. . . To ignore that requirement here would frustrate this
> policy by 'cut[ting] off the agency's power to correct or rethink initial judgments or
> errors.'* (emphasis added) (internal quotations omitted).

<u>Id</u>. at *14.  The court concluded:

> that NFS set a legitimate deadline, the Center failed to meet that deadline, and NFS
> simply respected its regulations and declined to review the appeal.  To now ignore that
> deadline would frustrate the purposes of exhaustion.

<u>Id</u>. at *9.  The facts of this case compel the same conclusion - -  granting plaintiff judicial review

would frustrate the purposes of exhaustion.

With respect to the second factor, the Court stated that it is settled that "FOIA's

administrative scheme 'favors treating failure to exhaust as a bar to judicial review."  <u>Id</u>. *13 n.9

(citing <u>Hidalgo</u>, 344 F.3d 1256, 1259 (D.C. Cir. 2003).  Moreover, many agencies require that an

administrative appeal be filed within the time limit specified in the agency's regulations in order

to satisfy the FOIA exhaustion requirement.  <u>Id</u>. at *8 (citing <u>Wilbur</u>, 355 F.3d at 675).

Accordingly, the administrative scheme of the FOIA favors considering ICM's failure to exhaust

by filing a timely appeal as a bar to judicial review.

ICM argues that <u>Wilbur</u> supports its assertion that filing a FOIA appeal late does not

preclude judicial review of the appeal.  However, the court in <u>Center  for Biological Diversity</u>,

distinguished <u>Wilbur</u>, observing that in the latter, the CIA accepted the late appeal, processed it,

and issued a final decision upholding the agency's initial determination.  In <u>Center  for Biological

Diversity</u>, as in the instant case, the agency did not accept the late appeal, much less process it

and uphold the agency's initial determination.  <u>Center  for Biological Diversity</u>, at *14.  Thus

<u>Wilbur</u> fails to support ICM's assertion that filing a FOIA appeal late does not preclude judicial

review of the appeal.  Rather, both factors identified in <u>Wilbur</u> favor denying judicial review to

ICM in CRRIF 06-127.

## **CONCLUSION**

For the reasons explained herein, defendants respectfully request that the Court grant the

government's Motion to Dismiss and for Summary Judgment and deny plaintiff's Cross-Motion

for Summary Judgment.

26

Respectfully submitted,


/s/
JEFFREY A. TAYLOR, D.C.. Bar # 498610
United States Attorney


/s/
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney


/s/
MARIAN L. BORUM, D.C. Bar # 435409
Assistant United States Attorney
501 3rd Street, N.W., 4th Floor
Washington, D.C.  20530
(202) 514-6531
Counsel for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of October, 2006, the foregoing was served upon counsel for plaintiff via the Court's ECF e-mail.  I further certify that the signed original of this Reply shall be retained in the official case file.


/s/_____
MARIAN L. BORUM
ASSISTANT UNITED STATES ATTORNEY