ICM Registry LLC

# QUESTIONS AND ANSWERS ON THE PROPOSED .XXX TOP-LEVEL DOMAIN

**MISIMPRESSION #1:** "THE .XXX DOMAIN WILL DO NOTHING TO GET PORNOGRAPHERS TO CLEAN UP THE INTERNET."

- *SOME OPPONENTS HAVE CLAIMED THAT CREATION OF .XXX COULD "DOUBLE THE NUMBER OF PORN SITES ON THE WORLD WIDE WEB."*

Not true. Those who have made this claim do not fully understand the nature of the online adult industry and/or the domain name system.

First, the number of adult Internet sites has increased each year in response to consumer demand – in the absence of an industry-specific top-level domain (TLD). For example, a recent *Third Way* report[1] estimates that the number of adult content web *pages* has grown from 14 million in 1998 to over 400 million in 2005. These 400 million pages are associated with approximately 3 million web sites/URLs. Keeping .xxx out of the Internet root will neither slow nor reverse this growth.

Second, while creation of an adult TLD may add a modest number of new sites/URLs that link to adult material, new registrations do not necessarily lead to additional content. Most adult webmasters are simply distributors of third-party content. These webmasters, referred to by the industry as "affiliates," generally operate multiple URLs. Each URL will be branded differently, but all link to the same, much smaller group of third-party content sites (see attached chart). Affiliates that register and host URLs under the .xxx domain will continue to point to the same universe of third-party content sites. Likewise, content producers who register a .xxx domain will not create new or separate content for that site. Rather, they will continue to maintain content on a single site and resolve all other domains they operate to that site. Thus, there is no reason to believe that creation of a TLD for adult material will increase the *amount* of sexually oriented material on the Internet in any significant way. The .xxx extension will, however, make it far easier for users and parents to avoid and block material they prefer not to see.

- *SOME ARGUE THAT "THE '.XXX' DOMAIN CLOAKS THE PORN INDUSTRY WITH LEGITIMACY," GIVING THEM A PLACE AT THE POLICY TABLE AND DISCOURAGING LAW ENFORCEMENT FROM BRINGING OBSCENITY CASES.*

Legality is determined in the U.S., and in most democracies, by application of the law. Creation of a TLD for adult material will not change, preclude, or undermine the

---

[1] http://www.third-way.com/products/THE_PORN_STANDARD.pdf

1

enforcement of existing laws, and registering a site in .xxx will not legalize any activity that would otherwise be illegal.  Ultimately, it will be the courts – not ICANN – that decide what material is illegal and what is not.  This outcome applies to all websites regardless of whether they are in .xxx, .com, .net, or some other top-level domain.

In the United States, it is a matter of settled law that the First Amendment protects publication of sexually explicit material that is not obscene, and courts traditionally have defined obscenity narrowly.  The Supreme Court, in opinions joined by some of its most conservative members, has repeatedly struck down blanket prohibitions on adult content.  Creation of a TLD for legal adult material may be said to *acknowledge* the existence of sexually oriented material on the Internet, but it makes little sense to think that "www.mypad.xxx" would be viewed as more legitimate than "www.mypad.com."  Registration in the .xxx domain would simply permit webmasters to provide *a more descriptive statement* about what the viewer will find should they visit their sites.

- CRITICS OF THE PROPOSAL COMPLAIN THAT EVEN IF A .XXX DOMAIN IS ESTABLISHED, PORNOGRAPHERS WILL KEEP THEIR EXISTING .COM URLS.

We agree.  It is unrealistic to expect webmasters to abandon their registrations in .com or other domains.  Fortunately, *the effectiveness of the .xxx domain as an additional tool to promote consumer choice does not depend on making .xxx the exclusive domain for sexually oriented content.*

First, we expect that in the relatively short term, most adult websites in existing domains will be linked by reference to a .xxx URL, enabling individuals who choose to do so to use filtering software to block the sites.  Over time, .xxx will likely become the adult industry's domain name of choice, and we expect that adult URLs on other domains will generally serve as pointers to .xxx-compliant sites.  Well before that transition is complete, however, the existence of a .xxx URL that resolves to a .com site will help make filtering tools more effective.

Second, responsible adult webmasters will have strong incentives to register .xxx domains.  They believe that voluntary self-regulation is in their industry's best interest, and for that reason will agree to follow "best practice" codes.  Such measures would include prohibitions on illegal content; unfair or deceptive marketing practices; practices designed to attract children or suggest the presence of child pornography; use of credit card sales without the authenticated consent of the card holder; sending unsolicited promotional email; or misusing personal data.  Compliance with best practices designed to prevent fraud and authenticate card users will address concerns of responsible webmasters, consumers of adult material, credit card companies, data protection authorities, advocates for children, and others.

As an example, the questionable business practices of a few unscrupulous webmasters are responsible in part for the high charge-back rate associated with credit card purchases of online adult material.  As a result of this charge-back rate, credit card companies currently charge adult-content webmasters commissions in the range of 15-20

2

percent per transaction.  Voluntary industry self-regulation through enforcement of best practices will reduce consumer complaints and credit card charge backs, and improve the reputation of participating businesses.  Similarly, participation in voluntary self-regulation efforts may help webmasters enforce their anti-spam policies more effectively, which in turn may reduce their *CAN-SPAM Act* compliance costs.  And finally, under some statutory schemes, including the *Truth in Domain Names Act* (sponsored by Representative Mike Pence (R-IN) and Senator Orrin Hatch R-T), and signed into law by President Bush in 2003), registration in a clearly labeled domain such as .xxx would preclude any claim that a sexually-oriented website was somehow mislabeled or misleading.  Such considerations are likely to encourage many webmasters to make use of .xxx domains once they are available.

- *CRITICS CHARGE THAT .XXX WILL NOT MAKE THE INTERNET MORE FAMILY FRIENDLY OR SAFER FOR CHILDREN.*

These critics are simply ignoring the substantive commitments made by ICM to empower parents and to promote best practices by webmasters.

First, participating adult online entertainment providers will adhere to best practices (as described above) to be developed by the adult industry and leading child-safety experts from around the globe.  In addition, registrants will participate in various programs to prevent unauthorized use of their sites by purveyors of child pornography.  By working together, webmasters may be better able to enforce their own anti-spam policies, and promote compliance with CAN SPAM among their affiliates.

Second, the **International Foundation for Online Responsibility (IFFOR)** will bring leading children's advocates and leaders of the online adult industry together to identify and proactively address emerging policy and technology issues.  ICM has consulted with globally respected members of the child advocacy community, among others, in developing this foundation proposal, and IFFOR and ICM are committed to use the proposed sTLD to:

- Develop, implement, and enforce responsible business practices developed through industry self regulation, community, including practices to safeguard children, combat child pornography online, and empower user choice;

- Foster communication and joint decision making between the responsible online adult-entertainment community and the broader community of Internet stakeholders, in an environment reflecting the functional, geographic, and cultural diversity of these communities; and

- Promote the principles set forth in the United Nations Declaration of Human Rights related to free expression, as well as protect the privacy and security of consenting adult consumers of online adult-entertainment goods and services.

Individuals and organizations supporting the proposal for a TLD for adult entertainment include Homayra Sellier (president and founder of UNESCO's worldwide

3

online child protection program), John Carr (Children's Charities UK), Dr. Janet Stanley (National Child Protection Clearinghouse, Australia), Robin Raskin (Family PC Magazine), Parry Aftab (WiredSafety.org), Jean Armour Polly (netmom.com), and Steve Balkam (Internet Content Rating Association).  Their support indicates that they believe that the .xxx TLD can enhance parents' ability to control and enhance their children's online experience.

Third, creation and operation of the adult TLD will provide significant financial support for the efforts of groups working to protect children online.  ICM Registry will donate $10.00 USD of every .xxx registration to support IFFOR, with a substantial proportion to be earmarked for distribution to support the work of the global child advocacy community.  Examples of the kinds of programs IFFOR will support include:

- ASACP:  The Association of Sites Advocating Child Support, created by the adult content industry in 1996, operates a child pornography hotline.  ASACP investigates and reports validated child pornography sites to the appropriate government agencies (FBI) and related associations (NCMEC, Protegeles and other relevant European hotlines).

- ICRA: The Internet Content Rating Association is an international, independent organization promoting parental control of child Internet use through content labeling—without undermining free expression, human rights, or civil liberties values.  ICM will, for example, encourage the use of ICRA's newest labeling software by adult websites.

- InHope:  The Association of Internet Hotline Providers facilitates and coordinates the work of local Internet hotlines responding to use of illegal content on the Internet.  Membership includes hotline operators from Australia, Austria, Belgium, Canada, Denmark, Finland, France, Germany, Greece, Hungary, Iceland, Ireland, Italy, Netherlands, Poland, South Korea, Spain, Sweden, Taiwan, the UK, and the US, and its members received and acted on nearly 100,000 reported cases of online child pornography in 2003.  The organization facilitates the exchange of expertise among hotline operators, training on technical, psychological, legal, and managerial aspects of operating hotlines, provides financial support and mentoring to newly established hotline initiatives, and develops best practices.

- Internet Watch Foundation:  IWF serves as an independent intermediary providing an online mechanism for reporting the posting or hosting of illegal images of child abuse in the UK.

- NCMEC:  The National Center for Missing and Exploited Children was established in 1984 to serve as a clearinghouse for information about missing and exploited children.  It operates a "CyberTipline" that is used by the public to report Internet-related child sexual exploitation.  It also provides technical assistance to individuals and law-enforcement agencies in the prevention,

   investigation, prosecution, and treatment of cases involving missing and exploited children.

- WiredSafety:  WiredSafety.org and its affiliated sites provide information and education to Internet and mobile device users of all ages.  Affiliated sites include, for example, Teenangels, a specially trained group of 13-18 year-old volunteers who run programs in schools to spread the word about responsible and safe surfing to kids and adults.

<u>MISIMPRESSION #2</u>:  "THE .XXX DOMAIN PROPOSAL OFFERS FALSE HOPE TO PARENTS AND OTHERS WHO WANT TO PROTECT THEIR CHILDREN FROM PORNOGRAPHY."

- *CRITICS CLAIM THAT CREATION OF THE DOMAIN WOULD "COMPLICATE RATHER THAN SIMPLIFY THE JOB OF FILTERING COMPANIES BECAUSE, IN ADDITION TO BLOCKING SITES IN THE .XXX DOMAIN, THEY WILL HAVE TO BLOCK THE NUMERIC IP AS WELL."*

This critique makes no sense.  At present, filtering companies must identify adult sites in .com, .net and other TLDs by viewing the site manually or through some technological means.  The manual approach requires a significant, ongoing resource commitment.  Technological approaches, which use algorithms to examine the words used or aspects of the images, are less expensive but also far less accurate.  Depending on the approach used, such content filtering is often over-inclusive (i.e., it filters out general audience content) or under-inclusive (i.e., it fails to filter adult content).

Once identified, these sites must be tracked and filtered based on their IP addresses.  This is how filtering technology works now.

In contrast, sites voluntarily designated as .xxx are already self-selected as containing sexually oriented content.  Those who prefer to avoid such material may simply set their browsers to do so, and filtering companies can adjust their algorithms to filter sites using the three-letter adult TLD identifier.  Moreover, creation of a TLD for adult entertainment will help Internet users identify content they might prefer to avoid, even if they are <u>not</u> using a filter.  Users can visually check the domain name of any site that appears in their search results and can decide on that basis not to visit a site that is marked with the .xxx extension.  Once the .xxx domain is operational, it is likely that search engines themselves will develop user-friendly functionality that permits users to indicate that they prefer not to see adult content.

And even if creation of .xxx does not eliminate <u>all</u> of the current deficiencies in filtering technology, adding an adult TLD cannot possibly undermine the effectiveness of filtering technology, and will likely help considerably.  Every existing adult site that migrates to .xxx or redirects its existing .com address to a .xxx URL is one less site that must be manually located and programmed into filtering software.  As *USA Today* noted in a September 15 editorial urging ICANN to approve the .xxx contract, "Its value is as an experiment, particularly for protecting children.  Why not?"

5

**MISIMPRESSION #3:  CREATION OF A .XXX DOMAIN REWARDS PURVEYORS OF OBSCENE PORNOGRAPHY IN VIOLATION OF US LAW.**

The .xxx TLD is not a regulatory or legal designation – it only indicates that the websites using the TLD are likely to contain sexually oriented content.  This critique is thus flawed in two ways:  First, the fact is that most adult content on the Internet is legal in the United States, and even the most dramatic shift in the Supreme Court is unlikely to change that.  Moreover, .xxx registrants will be bound by the terms of their registration contracts to avoid hosting illegal content.  Second, though an .xxx address may enhance branding efforts, the principal "rewards" of a .xxx registration are twofold:  (1) It makes it more likely that site visitors will be willing customers; and (2) It makes it less likely that site visitors will be offended or surprised.  In addition, compliance with the code of conduct will preserve the good reputation of responsible adult webmasters amongst their customers, law enforcement, regulators, and business partners.  These "rewards" are enjoyed by the entire Internet community.

**MISIMPRESSION #4:  THE OPPOSITION TO THIS TLD PROPOSAL IS "UNPRECEDENTED."**

The letter from NTIA Administrator Michael Gallagher asserts that the 6,000 letters and emails sent to the Department of Commerce prior to August 11, 2005 on this topic reflect "unprecedented" opposition to the creation of a TLD.  We understand that the Commerce Department received those 6,000 letters and emails in the weeks following ICANN's decision on June 1, 2005 to move into contract negotiations with ICM.  We further understand that in the wake of Assistant Secretary Gallagher's letter to ICANN on August 11, 2005, both the Commerce Department and ICANN received many additional emails, postcards, and letters.

No one should be surprised that creation of a new TLD for adult entertainment would be more controversial than creation of a TLD for museums, the travel industry, or licensed professionals.  We are cognizant that many people hold strong personal and religious convictions about adult entertainment.

What is surprising, however, is the government's direct intervention in ICANN's process asking the ICANN Board not to ratify the ICM agreement on August 16, 2005 as scheduled, and calling on ICANN to allow additional time for a "proper process" to consider these eleventh-hour complaints.  The Department of Commerce was well aware of the process ICANN had implemented for the 2003-2004 sTLD round, and had more than ample opportunity prior to August 11, 2005 to form a view as to whether or not the process was "proper."

In Amendment 6 to the Memorandum of Understanding (MOU), dated September 16, 2003, and now in effect, the Commerce Department called upon ICANN to:

> *Define and implement a predictable strategy for selecting new*
> *TLDs using straightforward, transparent, and objective*

6

>       *procedures that preserve the stability of the Internet (strategy*
>       *development to be completed by September 30, 2004 and*
>       *implementation to commence by December 31, 2004).*

ICANN's request for proposals (RFP) for new sponsored top-level domains, issued in December 2003, laid out the criteria by which applications would be judged, and specified in detail both the process that ICANN would follow, and the time-line for that process.  Presumably, the Commerce Department was aware of both the selection criteria and the process by which applications would be considered, inasmuch as this RFP was issued in furtherance of ICANN's obligations under the MOU.

As explained below, the Department of Commerce intervention may have significant implications for ICANN's status as an independent, private-sector institution. And, of course, where the U.S. government does step in to promote domestic policy goals, its actions must be consistent with constitutional protections for freedom of expression and association.

Moreover, the correspondence that NTIA received was generated by advocacy groups, including the Family Research Council, American Family Association, Concerned Women for America, Focus on the Family, and others that have previously demonstrated the ability to generate mass emails.  For example, the efforts of such groups produced 1.4 million complaints to the Federal Communication Commission after Janet Jackson's infamous "wardrobe malfunction" during the half-time entertainment at the 2004 Super Bowl.  Although such campaigns may get attention, they do not reflect broad public sentiment.  An Associated Press poll conducted shortly after the Super Bowl found that over 80 percent of Americans believed it was a waste of tax dollars for the FCC to investigate the event.  It is probably fair to say that worldwide opinion would be even more skeptical.

These organizations claim to represent approximately 4 million American conservatives who apparently believe that <u>all</u> adult material on the Internet should be treated as illegal obscenity, a position not reflected in U.S. law.  A far larger percentage of Americans have demonstrated, through their use of the Internet, that they want legal adult material to be available.  According to statistics gathered by Mediapost Online, the annual revenue of Internet adult industry is $2.5 billion—virtually the same as the revenue from adult material on cable and pay-per-view television.  Mediapost estimates that in a recent twelve-month period, 72 million people worldwide (40 million in the United States) viewed adult sites.  Over 25% of US Internet users view adult sites on a regular basis.  Online users conduct sixty-eight million searches each year—constituting 25% of all search engine requests—to find adult material (Internet Filter Review).  In July 2004 alone, "XXX" was searched more than 709,553 times, making it one of the Internet's most popular search terms (Overture).

In addition, ICM has garnered significant support for the creation of a .xxx TLD from organizations wholly unaligned with the adult content industry or its consumers. Organizations and individuals that have been briefed and consulted in connection with the application include:

7

- The leading child advocate protection advocates in the United Kingdom, Australia, New Zealand, India, Europe, Canada, Hong Kong and Singapore.

- UNESCO's Innocence in Danger Program;

- Government representatives in the United States, Europe and the Far East;

- Leading Free Expression organizations;

- Privacy watchdog groups; and

- United States and European law enforcement agencies.

For over five years, ICM worked diligently to hone its proposal in consultation with the broadest range of potential stakeholders. As a result of their input, the .xxx proposal will enable more efficient filtering of sexually-oriented content, encourage adult-oriented webmasters to improve age-verification and abandon intrusive marketing practices, and support efforts to curb child pornography. While some of these groups were initially wary of cooperation with the adult-content industry, they have come to understand that a cooperative, self-regulatory system like this one can best advance the goals of their organizations. Many of these and other organizations signed on to the best practices concept in a White Paper submitted to ICANN (and attached to this letter), which mirrors the approach embodied in the ICM Registry proposal.

Finally, .xxx has garnered direct public support, as well. ICM has received more than 1,000 *unsolicited* emails in support of the domain; postings to the ICANN comment forum on the .xxx proposal were overwhelmingly positive; and numerous organizations and well-respected individuals and entities from across the political spectrum have voiced their support of .xxx and/or their concern about the ramifications of the DOC intervention.

<u>MISIMPRESSION #5</u>:  OTHER COUNTRIES HAVE SIGNIFICANT RESERVATIONS REGARDING THE CREATION OF A .XXX DOMAIN.

We are aware that a handful of countries have commented negatively on ICANN's decision to move into contract negotiations with ICM. These comments almost all appear to us to be motivated either by concerns about the exclusive role of the U.S. government vis-à-vis ICANN or by a desire (not shared by the US) to see stronger governmental control over DNS management. In some cases, the comments have issued from governments who are known to exercise a tight grip on the Internet content their citizens are permitted to see.

For example, throughout the multi-lateral World Summit on the Information Society (WSIS) process and the efforts of the Working Group on Internet Governance (WGIG), Brazil (supported, *inter alia*, by Pakistan, China, Algeria, and Saudi Arabia) has consistently condemned ICANN as the vehicle through which the United States government unilaterally imposes its DNS policy on the rest of the world. Quite recently,

the Brazilian government officially proposed the creation of "A Global Internet Governance Coordination Forum." According to the position paper, Brazil's proposed forum would be "autonomous and independent," UN-affiliated, and "based on an international treaty" aimed at sharing authority among representatives of a multitude of countries (Proposal dated June 3, 2005, translated from Portuguese and posted on ICANN Watch by Milton Mueller). The concerns expressed by these governments have very little to do with the substance of the .xxx proposal. Rather, the proposal is cited to support their arguments, either (i) that governments, and not ICANN, should control central DNS policy, or (ii) that the US is improperly exercising exclusive authority over the Internet root server system.

We are also aware that in Luxembourg this summer, France and Denmark in particular took ICANN Board members to task over its decision to negotiate a contract with ICM. Notwithstanding the concerns expressed by a small number of GAC participants, the GAC communiqué issued in Luxembourg simply did not address the creation of an adult TLD.

Finally, we understand that the EU recently questioned ICANN's compliance with a provision of the Bylaws that requires the Board to "notify the Chair of the Governmental Advisory Committee in a timely manner of any proposal raising public policy issues on which it or any of ICANN's supporting organizations or advisory committees seeks public comment." The Bylaws require the Board to take into account any "timely response" to that notification prior to taking action. This question is, frankly, astonishing.

According to ICANN Board minutes, the GAC chair participated in several board meetings where the proposal was discussed. ICANN staff regularly briefs the GAC on ICANN's activities, and ICM formally and repeatedly offered to meet with the GAC or any of its members to discuss the domain. What's more, in December of 2004, CEO Paul Twomey wrote to Chairman Tarmizi to request input on the "public policy elements of a number of issues before [ICANN]." The third item in Mr. Twomey's list of "issues with public policy aspects for GAC consideration" specifically references the 10 applications for new sTLDs. In his March 2005 response to Paul Twomey's letter, GAC Chair Sharil Tarmizi said: "**No GAC members have expressed specific reservations or comments, in the GAC, about the applications for sTLDs in the current round**" *(emph. added)*. Chairman Tarmizi went on to say that ICANN should ensure that any sTLD proposing to use ENUM did not interfere with established policies for the E164 numbering system. In short, ICANN notified the GAC Chair of its deliberations on .xxx and received a "timely response" to the effect that the GAC was not concerned. If the GAC had any remaining doubts about the seriousness of this proposal, they should have been dispelled by ICM's repeated offers to meet with the GAC and/or any GAC participant on numerous occasions.

The only conclusion that can be drawn is that the governments that are now complaining about the ICANN process have, in fact, elected not to participate in that process. This is quite troubling, given the U.S. position on private sector management of the DNS. While the advisory role of governments in the ICANN process may be new or

uncomfortable, responding to their concerns by interfering in the ICANN process rewards their unwillingness to play by the rules, which, inevitably, undermines ICANN's authority and the legitimacy of its operations.

**MISIMPRESSION #6:** ICANN HAS NOT HEARD THE VOICES OF THOSE CONCERNED THAT CREATION OF .XXX WILL HAVE A NEGATIVE IMPACT ON FAMILIES AND CHILDREN.

- *ASSISTANT SECRETARY GALLAGHER HAS CALLED UPON ICANN TO HAVE A "PROPER PROCESS" AND PROVIDE "ADEQUATE ADDITIONAL TIME" FOR THESE CONCERNS TO BE VOICED AND ADDRESSED.*

ICANN's impending vote on the final registry contract for the .xxx domain is the culmination of more than five years of a process that has been exhaustive, careful, open, deliberate, and expensive. The process has included a variety of public discussions and numerous public comment periods in which a myriad of voices participated. Far from being the product of insular ICANN processes, the .xxx TLD proposal was created in consultation with many of the largest and most active Internet child-advocacy organizations in the world. The proposal process itself generated significant public comment and input—all of which has been thoroughly addressed.

The ICM proposal, as well as ICANN's consideration of it, has been debated on national television in the US and elsewhere – including on NBC's *Today* program, which has an audience of over seven million U.S. viewers. It was reported in national and international publications such as the *Financial Times*, the *Chicago Tribune*, the *Washington Post*, and *USA Today*. The arguments now being made by U.S. organizations, such as the Family Research Council and Focus on the Family, neither represent new points of view nor do they articulate new or different substantive policy arguments. These questions have been asked and answered repeatedly throughout this process.

The lengthy ICANN approval process has generated comments from an even wider range of voices. As the voluminous commentary posted on the ICANN forum regarding .xxx indicates, ICANN heard from many regarding the impact of the proposal on children and families – both in favor of and opposing the proposed TLD. Moreover, the worldwide news coverage of the .xxx proposal spurred involvement from parties that had never before shown interest in ICANN. With discussions of the proposal and its potential featured by major print and television media outlets, it is unlikely that any concerns remain unvoiced.

ICANN has taken ample time to consider all points of view and possible concerns. More importantly, interested parties have had more than sufficient notice, time, and opportunity to voice an opinion. The debate has been public, and national media coverage extended awareness of the project far beyond the ordinary ICANN community to those who might not follow the ICANN process on a regular basis. Finally, the ICANN Board itself is a diverse group, and we understand that more than one Board member expressed the kinds of concerns that appear to have motivated the Commerce Department letter. After a full debate, the Board decided that concerns about

10

protecting children from exploitation and abuse and families from unwanted sexual content are best served by moving forward with .xxx.

**MISIMPRESSION #7:** **EVERYBODY KNOWS THAT THE DEPARTMENT OF COMMERCE HAS THE AUTHORITY TO INTERVENE IN THE ICANN PROCESS, INFLUENCE THE BOARD TO DELAY OR REJECT THE ICM CONTRACT, OR REFUSE TO DIRECT VERISIGN TO ADD .XXX TO THE AUTHORITATIVE ROOT.**

The write-in campaign that prompted the Commerce Department's August 11 letter was sponsored by U.S. special interest groups that objected to approval of ICM Registry's proposal for domestic policy reasons. As explained above, this type of action is the very paradigm of U.S. government intervention in the ICANN process that has spawned international doubts about ICANN's independence and the future of private control over the Internet domain name system.

This intervention also has significant implications for the Department of Commerce and ICANN under U.S. law, potentially subjecting both to the strictures of constitutional and statutory mandates, including those of the Administrative Procedure Act ("APA"). To be sure, the actions of both DOC and private organizations involved in management of the DNS have been unsuccessfully challenged in the past.

*However, the element that was missing in those cases is the very thing that is troubling here: governmental intervention in ICANN decisions on the DNS for domestic policy purposes unrelated to the stability and security of the Internet.*

The major reasons why DOC should not further intervene in ICANN's decisions regarding the DNS are summarized below.

**APPLICATION OF LAW TO DOC'S ACTIONS.**

There have been only a handful of cases involving DNS governance that challenged actions by the Commerce Department and/or ICANN and/or Network Solutions, Inc. (subsequently acquired by Verisign, and operator of the .com TLD ("NSI")). *E.g.*, *McNeil v. Verisign, Inc.*, 127 Fed. Appx. 913 (9th Cir. April 1, 2005); *Bord v. Banco de Chile*, 205 F.Supp.2d 521 (E.D. Va. 2002); *Island Online v. NSI*, 119 F.Supp.2d 289; *National A-1 Adver., Inc. v. Network Solutions, Inc.*, 121 F.Supp.2d 156 (D. N.H. 2000).

Although the plaintiffs did not prevail in those cases, <u>each case turned on the absence of significant government involvement with the DNS functions at issue</u>. In each case, the courts declined to take action because it was "fairly apparent that the government's policy and actions [sought] to *extricate* itself from involvement in the Internet's operations." *National A-1 Advertising*, 121 F.Supp.2d at 169 *(emphasis added)*.

Consider, for example, *Island Online v. NSI*, 119 F.Supp.2d at 307. In this case the court found that "the challenged action [was] in no way undertaken at the behest of, under the influence of or for the financial benefit of the [government]." Likewise, and

11

exactly on point, in *Bord v. Banco de Chile*, 205 F.Supp.2d at 524, the court dismissed the Commerce Department from that case because the government's "only involvement in the implementation of [a] dispute resolution policy adopted by ICANN" arose "from the Memorandum of Understanding … between the [Department] and ICANN and a Statement of Policy [on] Management of Internet Names and Addresses," neither of which "required a specific dispute resolution policy [to] be adopted by ICANN" nor "bind ICANN in any way to commit to" a specific course of action regarding dispute resolution. Here, by sharp contrast, the actions at issue include DOC's intervention to influence or delay ICANN's approval of the .xxx TLD in response to domestic political pressure, backed by the possible denial of access to the root server for a new domain.

A government decision <u>not</u> to direct Verisign to add a new domain approved by ICANN to the authoritative root unquestionably would constitute governmental action that would be subject to legal review. But even actions that fall short of an official "rejection" can implicate both statutory and constitutional rights. Indeed, "the Constitution's protection is not limited to direct interference with fundamental rights." *Healey v. James*, 408 U.S. 169, 183 (1972). First Amendment and other freedoms "are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." In this regard, courts "are not free to disregard the practical realities" of agency actions. *Id*. Thus, governmental efforts to "exhort" or otherwise induce ICANN not to act or to take specific action should suffice as an "informal sanction" that would "amply demonstrate[ ]" an objective to "deliberately set about to achieve the suppression" of disfavored speech. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963).

Here, a DOC decision to withhold direction to Verisign to include a new TLD in the authoritative root would likely provoke a serious crisis. For obvious reasons, ICANN might be quite reluctant to provoke this crisis, and might prefer to put final board consideration off in order to avoid doing so. In one relevant example, the United States District Court for the District of Columbia issued a preliminary injunction when the Meese Commission on Pornography did nothing more than send a letter to certain businesses that, according to one witness,[2] were engaged in distributing pornography. *Playboy Enterprises, Inc. v. Meese*, 639 F. Supp. 581 (D.D.C. 1986). As a result of the letter, certain recipients stopped selling magazines such as *Playboy* and *Penthouse*. Quoting *Bantam Books*, the court said "it would be naïve" to accept the government's assertion that the letter was "mere legal advice," but that it "plainly serve[d] as [an] instrument[] of regulation independent of the law." *Id*. at 585.

### APPLICABLE LAW.

Any action by the U.S. government affecting ICANN's consideration of the .TLD of a .xxx TLD must meet certain due process requirements. At a minimum, due process requires an impartial tribunal. *Ward v. Monroeville*, 409 U.S. 57, 60 (1972); *Tumey v.*

---

[2] The witness in that case was the Reverend Donald Wildmon, current head of the American Family Association ("AFA").

12

*Ohio*, 273 U.S. 510, 523 (1927). But certain procedural requirements must be met as well. For purposes of the Commerce Department, basic due process requirements are codified in the Administrative Procedure Act. Among the more significant constraints on government action under the APA is the prohibition on arbitrary and capricious agency action, and the provision of judicial review to overturn such actions. *See* 5 U.S.C. § 706. This requirement implicates other legal duties, notably the government's obligation to make a record sufficient to allow a court to conduct meaningful review. *See*, *e.g.*, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971). This necessitates in most cases a written statement of reasons for the government's actions. *See*, *e.g.*, 5 U.S.C. §§ 553(d), 555(e)(, 557(3)(A). In addition, both rulemaking proceedings and adjudications under the APA require the agency to explain the legal authority pursuant to which it proposes or purports to act. *See*, *e.g.*, *id*. §§ 553(b)(2), 554(b)(2). In all cases, the APA requires an opportunity to be heard (though the precise means, and whether an oral hearing is required, vary based on the specific agency action at issue), *see* 5 U.S.C. § 553-557, and restrictions may apply to *ex parte* communications with agency decision makers. *See*, *e.g.*, *id*. § 557(d)(1).

U.S. government intervention that affects ICANN's consideration of the .xxx domain proposal also raises important First Amendment questions. Although the Second Circuit once rejected a First Amendment claim in a case involving the DNS because the generic TLDs at issue were only "three-letter afterthoughts . . . lacking in expressive content," it stressed that "more contentful gTLDs … may constitute expressive speech" and that "[t]here is nothing inherent in the architecture of the Internet that prevents new gTLDs from constituting expressive speech." *See Name.Space, Inc. v. Network Solutions, Inc.*, 202 F.3d 573, 585 (2d Cir. 2000). The court explained that "certain domain names and new gTLDs … could indeed amount to protected speech," particularly if used "to influence the public's decision to visit [a] website." *Id*. at 586. Here, there is no question but that the potentially expressive nature of TLDs would apply to the .xxx domain, but the First Amendment issue raised by U.S. government intervention is even more fundamental. Creation of the .xxx domain directly implicates the constitutionally protected right of free association. The central purpose of the ICM Registry proposal to create a sponsored domain was to create a structure through which members of the adult online community and other stakeholders could organize for the purpose of agreeing on certain business practices. Such associational activities have "long been held to be implicit in the freedoms of speech, assembly, and petition." *Healey v. James*, 408 U.S. at 181.

The Supreme Court has recognized "[g]overnment actions that may unconstitutionally burden this freedom may take many forms, one of which is intrusion into the internal structure or affairs of an association." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647-48 (2000) (internal quotations and citations omitted). In this regard, the Court's *Healey* decision is particularly relevant to the facts here. It involved a state college denial of official recognition to a group who sought to form a controversial student organization. *Id*. at 171. In the same way as U.S. intervention affected ICANN's consideration of the .xxx TLD, denial of official recognition by the college in *Healey* "posed serious problems for the organization's existence and growth," especially in that "nonrecognition barred [it] from using … facilities" necessary to "pursue its stated

13

purpose," such as holding on-campus meetings, use of campus bulletin boards, and "denial of access to the customary media for communicating." *Id*. at 177, 181. The Court held that "denial of official recognition, without justification … burdens or abridges [the] associational right" held under the First Amendment and that "the effect of the College's denial of recognition was a form of prior restraint." *Id*. at 181, 184. Accordingly, "once [the group] had filed an application in conformity with the requirements [of the school], the burden was upon the College administration to justify its decision or rejection." *Id*. In this regard, *Healey* also acknowledged that basing decisions regarding official recognition on conclusions about the group that were outside the official record constitutes a denial of procedural due process rights protected by the Constitution. *Id*. at 177, 186.

Up to this point, DOC has consistently refrained from intervening in the ICANN policy process, consistent with its private character and international mandate. The U.S. has characterized its residual authority over the Internet's authoritative root purely to ensure the security and stability of the Internet, and has publicly stated that it has and will continue to defer to ICANN on new TLDs. There are many good reasons for the current approach, not the least of which is the U.S. policy supporting private solutions to Internet governance. But an equally compelling reason is the need of the U.S. government to remain free from the legal entanglements that are associated with intervention in the ICANN process.

It is our hope that the questions you have raised and the answers and perspective we have provided will assist you. If you have any further questions, please do not hesitate to contact us.