## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

ICM REGISTRY, LLC,                        )
                                          )
                 Plaintiff,               )
                                          )
        v.                                )
                                          )    Case No. 1:06CV00949 (JR)
UNITED STATES DEPARTMENTS                 )
OF COMMERCE and STATE,                    )
                                          )
                 Defendants.              )
_____)

### PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS' SECOND MOTION FOR SUMMARY JUDGMENT, AND MEMORANDUM IN SUPPORT OF RENEWED MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56 and Local Rules 7(a), 7(b), 7(h), & 56.1, and the Court's Order (Doc. No. 17) and Memorandum & Opinion (Doc. No. 16) on summary judgment, *ICM Registry, LLC v. Department of Commerce*, 2007 WL 1020748 (D.D.C. March 29, 2007) ("*SJ Order*"), Plaintiff ICM Registry, LLC ("ICM"), by its attorneys, hereby submits its Memorandum in Support of ICM's Renewed Motion for Summary Judgment and Opposition to Defendants' Second Motion for Summary Judgment ("Def. Sec. Mot."). The Court should deny Defendants' Motion and grant Plaintiff summary judgment on its Complaint seeking access to records that remain contested under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), as there is no genuine issue of material fact and ICM is entitled to judgment as a matter of law. *Bennett v. DEA*, 55 F.Supp.2d 36, 38-39 (D.D.C. 1999).

### PRELIMINARY STATEMENT

This Court's initial ruling denied the government's decision to withhold documents in whole or in part where, among other things, the agencies "neither identified the deliberative pro-

cess to which the document[s] contributed nor explained how the materials are pre-decisional." *SJ Order* at *8. The Departments of Commerce and State in their Second Motion for Summary Judgment now renew their request that the Court approve withholding or redacting 35 documents under Exemptions (b)(5) (deliberative process) and (b)(4) (private information) for which they failed to meet their burden previously, and newly request the Court to sanction their withholding or redacting an additional 36 documents under these and other FOIA exemptions. The agencies seek to withhold most of the documents − over 60 in all − based on claims under the deliberative process privilege, and submitted supplemental Vaughn Indexes in an attempt to support their assertions. Although ICM does not dispute the government's claims with respect to some of the documents,[1] the agencies in most cases have failed to justify withholding or redacting them.[2]

Overall, the government's new submissions fail to meet the elemental threshold for Exemption (b)(5) claims in that they still do not identify the necessary deliberative process or explain how the documents were pre-decisional.[3] The government's central claim is that most documents could be withheld or redacted because they related to the adoption and promulgation of agency policy and were prepared "by government employees for . . . decision makers and they reflected the opinions, advice, recommendations, and proposed responses of those employees." Def. Sec. Mot. at 39. According to this argument, the "agency policy" at issue is that "certain

---

[1]    ICM does not dispute withholdings with respect to documents 000011-000015, 000017, 000022-000024 and 000027, 000034-000037, and some material redacted from EP60. *See infra* at 29, 35-36, & nn.32, 49, 53.

[2]    The documents remaining in dispute are E2-E3, E36, E54, E59, E68-E71, EP7, EP33-34, EP46, EP59-69, EP90-92, EP98, EP102, EP116-17, EP125-26, MPW3, MPW14, 000001-10, 000016, 000018-000021, 000025, and 000028-33.

[3]    As explained below, the government similarly fails to justify withholding or redacting 2 documents under Exemption (b)(4).

matters … would have to be addressed if an [*sic*] .xxx domain were created" and the government would have to develop "a position on how to respond if ICANN were to recommend the creation of a proposed new .xxx domain." *Id*. at 22. The government argues that certain documents "were relevant to the development of final Government positions" and can be withheld because the individuals involved "held jobs with responsibilities related to telecommunications policy-making." *Id*. It asserts that the materials were "predecisional" because "ICANN did not approve ICM's application for a proposed new .xxx domain[,] and did not enter into a contract with ICM to operate the .xxx domain" [4]

These arguments generally confuse the nature of the contractual relationship between ICANN and the Commerce Department. The sketchy descriptions in the supplemental Vaughn index of the government's role in the domain name process make it sound like approval of the .xxx domain is a matter of government policy, as if the domain would be a program run by the Commerce Department, not a matter to be approved by a private corporation chartered to remove the government from Internet management. However, nothing could be further from the truth. Implementation of the contractual obligations between ICANN and Commerce is not a question of "telecommunications policymaking."

---

[4] Def. Sec. Mot. at 23. Although there is no dispute that the Commerce Department succeeded in blocking a final contract between ICM and ICANN, the government contradicts itself repeatedly on whether ICANN had approved the ICM application, which is a prerequisite to entering contract negotiations. *See, e.g*., *id*. at 24 ("redacted paragraph 'consists of Ms. Attwell's opinions … regarding ICANN's decision to negotiate a contract for the xxx domain'"); 27 ("information redacted from these e-mails consists of 'Ms. Attwell's opinions on ICANN's decision to enter into negotiations on an [*sic*] .xxx contract'"); 30 ("lines were redacted which consist of Ms. Domenici's questions and opinion regarding the approval of the .xxx domain"). But as the Court acknowledged in the *SJ Order*, there is no dispute that "the ICANN Board determined that the .xxx application met all eligibility criteria for sponsored domains," *SJ Order* at *1, and it is only the contract for ICM to operate the domain that was ever at issue thereafter.

This is not to suggest that the government has no role in the process. Obviously, it does. But the fact that Commerce oversees its contract with ICANN does not necessarily make any information generated in reaction to ICANN's actions part of a "deliberative process" that is protected by Exemption (b)(5). By way of analogy, the government is not required to disclose records "related solely to the internal personnel rules and practices of an agency," 5 U.S.C. § 552(b)(2), but it could not legitimately use this exemption to shield politicized decisions to hire or fire government workers. *See*, *e.g*., Dan Eggen and Paul Kane, *Goodling Says She 'Crossed the Line,'* WASH. POST, May 4, 2007 at A1; Dan Eggen and Paul Kane, *Ex-Aide Contradicts Gonzales on Firings*, WASH. POST, March 30, 2007 at A1; Dan Froomkin, *E-Mail Saga Gets Fishier*, WASH. POST, April 13, 2007.

Here, documents released thus far show that Commerce Department officials initially expressed support for the ICM Registry proposal for a .xxx domain after the ICANN Board voted to accept the application, and looked for ways to explain its benefits.[5] This position changed, however, but only after organized email campaigns from well-connected socially conservative groups and White House intervention altered the political landscape.[6] As a consequence, the Commerce Department worked behind the scenes – and not through any official deliberative process – to pressure ICANN into rejecting the ICM Registry contract.[7] However, as this Court has made clear, where "activities … are not part of the normal and proper operations of the agency" but "are connected with … abuses of an essentially political nature,

---

[5] Compl. App. E at 3-4 & Exhs. 5-6. *See also infra* at 7, 8-9, 17.

[6] Compl. App. E at 4-5 & Exhs. 8, 12, 14. *See also infra* at 9.

[7] Opposition and Cross-Motion for Summary Judgment ("Pl. SJ Opp.") at 7-9; Compl. App. E, Exh. 21; *id*. App. G.

they are not entitled to nondisclosure under FOIA exemptions." *Tax Reform Research Group v. IRS*, 419 F. Supp. 415, 41 (D.D.C. 1976).

## POLICY BACKGROUND

To evaluate the government's claims of deliberative process privilege it is necessary to understand the policy environment in which decisions regarding the domain name system ("DNS") are made. The DNS is managed by ICANN, a private corporation that came into being after the U.S. government adopted an express policy eschewing government control over the Internet. ICANN operates and conducts its DNS management activities under a Memorandum of Understanding (the "MOU") with the United States Department of Commerce. Additionally, ICANN carries out some of its more technical duties under a sole-source contract also with the Commerce Department (the "IANA Functions Contract"). [8] These contractual functions are carried out pursuant to an express policy of the United States government adopted in a 1998 "*White Paper*" to leave DNS management to the private sector. [9]

The official policy of the United States, as articulated in the *White Paper*, committed the government to a process to "allow the private sector to take leadership for DNS management." [10] In particular, the *White Paper* took the position that "deciding policy for the addition of new

---

[8] IANA is an acronym for the "Internet Assigned Names Authority." IANA publishes the Top Level Domain ("TLD") information, including Whois and name server data, all of which is referred to as "root zone management." Root zone management includes keeping the root zone up to date and maintaining the authoritative "Whois" database for top-level domains. IANA also oversees registration for various Internet Protocol parameters, such as port numbers, protocol and enterprise numbers, options, codes, and types.

[9] *Management of Internet Names and Addresses,* 63 Fed. Reg. 31741 (1998) ("*White Paper*"); *Name.Space, Inc. v. Network Solutions, Inc.*, 202 F.3d 573, 578-79 (2d Cir. 2000).

[10] 63 Fed. Reg. at 31744. The *White Paper* "provides the U.S. Government's policy regarding the privatization of the domain name system in a manner that allows for the development of robust competition and that facilitates global participation in the management of Internet names and addresses." *Id*. at 31749.

domains" would be a private sector function and "the new corporation would be the most appropriate body to make these decisions." *Id*. at 31646. Under this policy, "the new corporation would undertake various responsibilities for the administration of the domain name system now performed by or on behalf of the U.S. Government by third parties under arrangements or agreements with the U.S. Government. The U.S. Government also ensures that the new corporation has appropriate access to needed databases and software developed under those agreements." *Id*. at 31749. According to the *White Paper*, "overall policy guidance and control of the TLDs and the Internet root server system should be vested in a single organization that is representative of Internet users around the globe," and this private entity would, *inter alia*, "oversee policy for determining the circumstances under which new TLDs are added to the root system." *Id*.

Upon ICANN's creation, the relationship between it and the U.S. Commerce Department was set forth in the MoU, with the goal of privatizing the DNS under the principles of stability, competition, private, bottom-up coordination, and representation. *Memorandum of Understanding Between the U.S. Department of Commerce and Internet Corporation for Assigned Names and Numbers*, www.icann.org/general/icann-mou-25nov98.htm. Although ICANN must send Commerce periodic status reports under the MoU, Commerce does not have regulatory authority over ICANN, which was intended to be free of government control and political influence. *Id*. The MoU requires the parties "to manage the functions delineated in the Statement of Policy in a transparent, non-arbitrary, and reasonable manner," and seeks to ensure that "technical management of the DNS shall not apply standards, policies, procedures or practices inequitably or single out any particular party for disparate treatment." *Id*. at V.A.2. ICANN, and not the Commerce Department, is tasked with "[t]he creation and implementation of minimum criteria for new and existing gTLD registries." *Id*. at V.C.9.b. By contrast, Commerce's responsibilities focus on

"oversight of the technical management of DNS functions" and development of "operational procedures for the root server system." *Id*. at V.B.5, 8.  In short, ICANN has the policymaking role while the U.S. government's function in this scheme is ministerial and unrelated to DNS approval policy. [11]

This relationship between the U.S. government and ICANN was summed up in a nutshell by a senior Commerce official in a document that was partially released earlier in this case:

> The relationship between DoC and ICANN is defined by two separate agreements and is not one of regulator and regulated.  One agreement is a joint partnership agreement in the form of a Memorandum of Understanding (MOU) which outlines a transition to private sector-led technical management of the Internet Domain Name System.  The second agreement is the IANA functions contract which includes performance of the administrative functions associated with root management.  Under the terms of the MOU, DoC reviews ICANN's performance to ensure the completion of tasks set forth by the MOU. *DoC does not exercise oversight in the traditional context of regulation and plays no role in the internal governance or day-to-day operations of the organization.*

Compl. App. E, Exh. 5.

## PROCEDURAL BACKGROUND

ICM incorporates by reference the Background factual discussion from its original Opposition and Cross-Motion for Summary Judgment.  ICM established as the basic context for this litigation ICANN's role in approving new sponsored TLD ("sTLDs") and ICM's application to operate a .xxx domain pending before ICANN when ICM filed the Commerce and State Depart-

---

[11]  The same technical relationship is spelled out in ICANN's contract with Commerce for the IANA functions.  Although it notes that changes in the root zone file currently require Commerce Department approval, this is articulated in the section of the agreement entitled "Administrative Functions Associated With Root Management" that are in place to "maintain[ ] the stable operation of the DNS." *Contract Between ICANN and the United States Government for Performance of the IANA Functions* at Section E.2.  Commerce has reaffirmed that its role in this regard is intended to ensure the stability and security of the DNS, not to supplant ICANN's policy functions.  U.S. Principles on the Internet's Domain Name and Addressing System, June 30, 2005 (www.ntia.doc.gov/ntiahome/domainname/USDNSprinciples_06302005.htm).

ment FOIA requests that gave rise to this suit. Pl. SJ Opp. at 4-17. Among other things, ICM described how an eleventh-hour letter from Commerce Department Assistant Secretary for Communications and Information Michael Gallagher to a leading member of ICANN's Board succeeded in blocking the last step toward .xxx's inauguration, despite the fact that ICANN's Board had determined that .xxx satisfied all criteria for new sTLDs and announced its intent to enter a contract with ICM to operate the domain. Pl. SJ Opp. at 7-9. *See also* Compl. App. E, Ex. 21. The Gallagher letter neither took issue with any step ICANN took in evaluating new sTLDs or .xxx specifically, nor acknowledged the .xxx proposal had been actively and publicly debated at length before ICANN's approval of the ICM application. Instead, Gallagher's inter- vention in ICANN's domain name approval process appeared to be a sop to the demands of politically-connected socially conservative groups who opposed generally all adult content on the Internet. Pl. SJ Opp. at 7-8, 27. ICM filed Commerce and State Department FOIA requests to "discover[ ] what the[ ] government [was] up to" [12] when it decided to insert itself at the last minute into ICANN's sTLD approval process.

While the agencies withheld or redacted quite a number of potentially critical records, documents they released indicated Commerce was engaged not in policy-making, but responding to political pressures and seeking cover for what until then had been non-involvement in, and perhaps even support for, ICANN's pending approval of the contract for the .xxx domain. One document from June 14, 2005 showed Commerce staff seeking "talking points on why [.xxx] is a good thing and why we support it," Compl. App. E, Exh. 6, while another two days later explained the "application for .XXX has strong support from the child advocacy community because they feel that ICM's approach … puts into place best practices [not] achievable in the

---

[12]  *Center for Int'l Envtl. Law v. OTR*, 237 F.Supp.2d 17, 22 (D.D.C. 2002) (quoting *DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989)).

dot com space." *Id.* Exh. 5. At the same time, Commerce was disclaiming it had any policy or regulatory role to play in ICANN's approval of sTLDs. *See supra* at 7 (quoting Compl. App. E, Exh. 5).

This all changed after ICANN's announcement that it would negotiate a contract with ICM to operate the .xxx domain. Press accounts and agency records received in response to ICM's FOIA requests showed mass transmissions of identical emails opposing .xxx engineered by special interest groups, and a scramble at Commerce to respond to them. [13] According to one email disclosed under ICM's FOIA request, "[w]ho really matters in this mess is [Focus on the Family founder and Chairman] Jim Dobson" to whom it was suggested "someone from the White House ought to call [to] explain … that [it] doesn't support the porn industry in any way, shape, or form, including giving them their own domain." [14] Ultimately, the Commerce Department's National Telecommunications and Information Administration ("NTIA") sent the Gallagher letter to ICANN on August 11, 2005, seeking delay in its final approval of the contract for the .xxx domain. Pl. SJ Opp. at 8.

Notwithstanding ICANN's August 9, 2005 posting of the fully negotiated contract for ICM's operation of the domain and scheduling it for approval at ICANN's August 16, 2005 Board meeting, the NTIA letter succeeded in persuading ICANN to delay doing so. *SJ Order* at

---

[13] *See* Compl. App. E, Exh. 5 at 5-6. *See also*, *e.g.*, Pl. Opp. at 31-31 (discussing records reflecting Commerce reaction to press and public inquiries following ICANN announcements, including development of form response to individuals who participated in mass email campaign, and personalized reply to National Coalition for the Protection of Children and Families President and CEO Rick Schatz and similar individuals).

[14] Compl. App. E, Exh. 12. The documents also showed Commerce staff furnishing briefing points directly to advocacy groups like Concerned Women for America, Family Research Council, and American Family Association, some or all of which were responsible for the mass email campaigns. *Id.*, Exh. 8. Commerce staff also promised Family Research Council they would facilitate a meeting between the group and ICANN, and compiled names and contact information of ICANN staff and North American Board members. *Id.*, Exh. 14.

*1.  There followed month after month of ICANN's Board holding meetings for which approval of the .xxx contract initially appeared on the agenda but was deleted pre-meeting and/or in which it was discussed but not brought to vote – that is, until May 10, 2006, when the Board voted at its meeting 9-5 not to approve the contract as drafted. [15]  This vote, however, rejected only the contract but left intact ICANN's prior finding that the .xxx proposal satisfied all relevant sTLD criteria, and ICM accordingly timely availed itself of a reconsideration process provided in ICANN's Bylaws, Pl. SJ Opp. at 16, and later resumed negotiating the contract with ICANN to address remaining concerns. [16]  As with the once-scheduled then repeatedly put-off approval of the original contract, consideration of the revised contract and/or ICM's reconsideration request engendered a months-long on-again/off-again process as ICANN retrod old ground that had been decided as of mid-2005.

Meanwhile, ICM and the government briefed cross-motions for summary judgment in the instant FOIA litigation, and the matter was submitted to the Court as of October 26, 2006.  At issue were 243 agency records the Commerce Department withheld in full or in part under FOIA Exemption 5, and 37 State Department records withheld in full or part under FOIA Exemptions 4 and 5. [17]  Given the pendency of its reconsideration request before ICANN that raised, *inter alia*,

---

[15]  *Id*.  ICM filed its Complaint commencing the instant FOIA appeal on May 16, 2006, after several months of Commerce and State Department inaction on pending administrative appeals of their withholding and redacting responsive records.  Pl. SJ Opp. at 11-14.

[16]  *See*, *e.g.*, Plaintiff's Reply in Support of Cross-Motion for Summary Judgment ("Pl. SJ Reply") at 19 & n.25 (citing Pl. SJ Opp. at 16-17 and noting that, at time of Reply, the date for ICANN to decide reconsideration, which initially was extended through September 30, 2006, had been extended).  As noted in the Reply, ICM also reserved its right to require that ICANN submit to an arbitration process with respect to its actions on the .xxx domain.  *Id*.  ICM later withdrew its reconsideration request and resumed negotiations in an attempt to craft an acceptable version of the contract.  www.icann.org/minutes/resolutions-30mar07.htm#_Toc36876524.

[17]  *SJ Order* at *4, *8.  Another three dozen documents were disputed but not addressed other than collectively in the cross-motions, as the government moved to dismiss ICM's claim as

the effect of improper U.S. government influence over the ICANN processes for considering the .xxx application (as well as possible arbitration if reconsideration was denied), ICM sought an expedited decision on the records to which it had been denied full access.  Pl. SJ Reply at 19-20.

On March 29, 2007, the Court issued the *SJ Order* denying the government's motion to dismiss and granting in part and denying in part its motion for summary judgment.  *See SJ Order* at *1.  The Court commenced its analysis by establishing the legal standards for withholding or redacting records responsive to ICM's FOIA requests as requiring, for FOIA Exemption 4, that the material be commercial or financial, obtained from a person, and privileged or confidential, [18] and for the deliberative process privilege under Exemption 5, that the agencies show both that the material is pre-decisional or antecedent to adoption of agency policy, and that it is deliberative by identifying what deliberative process is involved and the role the documents played therein. [19]

The Court first held the State Department had failed to meet its burden under Exemption 5 for more than a quarter of the records for which it invoked the deliberative process privilege. *SJ Order* at *4-*6.  It held that in each case the government had failed to identify the deliberative process to which the documents contributed, failed in several cases to establish that they were

---

to the documents on the alleged ground of failure to exhaust administrative remedies, rather than substantively defending the claims of FOIA exemption and/or providing a Vaughn index explaining what was withheld.  *See id.* at *10-*12.

[18]  *Id.* (citing 5 U.S.C. § 552(b)(4); *Gulf & W. Indus. v. United States,* 615 F.2d 527, 529 (D.C. Cir. 1979)).

[19]  *SJ Order* at *4 (citing 5 U.S.C. § 552(b)(5) and quoting *Vaughn v. Rosen,* 523 F.2d 1136, 1143-44 (D.C. Cir. 1975); *Jordan v. DOJ,* 591 F.2d 753, 774 (D.C. Cir. 1978) (*en banc*); *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)). Though Commerce had also claimed some records it withheld or redacted fell under Exemption 5 pursuant to the attorney-client and/or work-product privileges, *see*, *e.g.*, Pl. SJ Opp. at 34-39, the *SJ Order* does not discuss the legal standard applicable to those privileges.  *But see infra* n.20.

predecisional, and in some cases "essentially provided no information for the court to consider in assessing the application of exemption (b)(5)."  *Id*. at *5-*6; *see also id*. at *6 ("what the government must show (in more than conclusory terms) is the deliberative process reflected in the documents").   In addition, it held that the government failed to meet its burden on all three documents withheld or redacted under Exemption 4, because "all of the government's submissions relevant to the confidential prong of the exemption (b)(4) test are conclusory" and/or were "but mere repetitions of the legal standard" or "legal boilerplate."  *Id*. at *7.

The Court also held the Commerce Department failed to meet its burden under Exemption 5 for more than two dozen documents as to which it invoked the deliberative process privilege. [20]   The Court held in most cases the government failed <u>both</u> to identify a deliberative process to which the documents contributed and to establish that they were predecisional (though in a few cases the failure was to meet only one of these requirements).  *SJ Order* at *8-*10.  For several of the documents the Court rejected Commerce's claims because they rested simply on unexplained assertions that the documents contained "opinions" and/or were "drafts." [21]  Finally, citing jurisprudential considerations and those of judicial efficiency, the Court rejected Commerce's attempt to avoid justifying its withholdings and redactions of records sought by ICM's

---

[20]   As indicated *supra* at note 19, Commerce also invoked the attorney-client and work-product privileges under Exemption 5, but these were addressed by the Court only insofar as it acknowledged ICM's acquiescence on the government's claim of work-product privilege.  *See SJ Order* at *8 (citing Pl. SJ Reply at 4).  ICM has not conceded that the Commerce Department has satisfied its burden with respect to the attorney-client privilege.  *See* Pl. SJ Reply at 11-13.

[21]  *See id*. at *8 ("the deliberative process privilege does not support withholding material simply because it contains … opinions; the fact that a document expresses its authors views is not dispositive if the agency has neither identified the deliberative process to which the document contributed nor explained how the materials are pre-decisional"); *id*. at *10 ("the words 'draft' and 'opinion,' without more, do not fulfill the … obligation to demonstrate how the material is covered by the deliberative process privilege").

FOIA request as to which the agency claimed ICM failed to exhaust is administrative remedies. *Id*. at *11-*12. Based on these findings, the Court gave the government 30 days to offer further justification for 38 documents on which it insufficiently supported its claims of FOIA exemption, and to provide a Vaughn index and otherwise support its withholdings in the first instance for the documents as to which the Court denied Commerce's motion to dismiss. *Id*. at *8, *10, *12.

The day after the Court issued the *SJ Order* holding that the government had failed to satisfy its burden under the FOIA with respect to several dozen documents involving Commerce and State Department communications on ICANN consideration of the .xxx application, ICANN adopted a resolution rejecting the .xxx sTLD. www.icann.org/announcements/announcement-30mar07.htm; www.icann.org/minutes/resolutions-30mar07.htm#_Toc36876524. However, as noted, ICM may now demand arbitration under provisions in ICANN's bylaws providing for independent review by an international provider charged with comparing contested actions of ICANN's Board to its articles of incorporation and bylaws, and declaring whether the Board acted consistently therewith. www.icann.org/general/archive-bylaws/bylaws-28feb06.htm, Art. IV, § 3. Any arbitration conducted under this procedure offers ICM an opportunity to show how ICANN violated its bylaws, core values, and request for proposals for new sTLDs, including the extent to which it did so as a result of impermissible interference by the U.S. government.

## ARGUMENT

Given an unearned "second chance" with respect to several dozen records where it simply "insufficiently supported its withholdings," *SJ Order* at *8, *10, the government in most cases still fails to justify its claims under the operative FOIA exemptions. In these instances where the prior defenses were too vague and/or conclusory and *Vaughn* indices "fail[ed] to

answer questions" that were decisional, *id*. at *9, the further explanations offered in the Second Motion for Summary Judgment, while more expansive, still fail satisfy the key elements of Exemptions 4 and 5 of the FOIA on which the Commerce and State Departments rely.  In addition, for records as to which Commerce is detailing its claim of exemption for the first time due to a futile attempt (now invalidated by the Court) to refuse to decide ICM's administrative appeal or produce a *Vaughn* index and/or supporting declaration,[22] the government once again offers predominantly conclusory statements that purport to satisfy the relevant legal standard. Now that the government has been given every reasonable opportunity to defend withholding and redacting records responsive to ICM's FOIA requests, the Court should expeditiously order the agencies to disclose the documents on which they have failed to carry their burden.  *See Judicial Watch, Inc. v. Department of Energy*, 310 F.Supp.2d 271, 317 (D.D.C. 2004); *In Defense of Animals v. HHS*, No. 99-3024, 2001 U.S. Dist. Lexis 24975, at *37 (D.D.C. Sept. 1, 2001).

## I.    THE GOVERNMENT STILL FAILS TO CARRY ITS BURDEN UNDER EXEMPTION 5 FOR MOST DOCUMENTS THAT REMAIN AT ISSUE

### A.    Overview

The Departments of Commerce and State in the vast majority of cases fail to remedy what the Court cited as either failures to identify the deliberative process to which the materials contributed, failure to explain how they are pre-decisional, or failures on both accounts.[23]  In

---

[22]  *See SJ Order* at *11-12; Ans. & Aff. Def. at 1 & Exh. 1; Def. Mot. at 7-8 & Exh. B, McCready Declaration at 2.  *See also* Def. Sec. Mot. at 33-40; Second Supplemental Declaration of Kathy Smith ("Smith Sec. Supp. Decl.") at 5-7 & Exh. C at 9-15.

[23]  *See SJ Order* at *8.  *See also id*. at *9 (citing failure to provide description how material withheld is pre-decisional or relates to deliberative process); *id*. ("Commerce Department has failed to explain how [withheld matter] is a pre-decisional component of a deliberative process").  In a few cases, of course, the government arguably has finally succeeded in meeting

virtually all these cases, the government defended its withholdings and redactions by making conclusory statements that alluded to alleged agency "deliberations" and "policies" that purportedly related to ICANN's process for evaluating and approving the .xxx domain, and in some cases by "withholding material simply because it contains … opinions" of agency personnel, which the Court rightly held to be improper.  *SJ Order* at *8-*10.  More specifically for most of the documents, the Court held that withholding simply on grounds that a document "reflected [ ] opinions … on ICANN's decision to negotiate a  .xxx contract" was insufficient. *SJ Order* at *8.

Despite being given a second opportunity to justify its decision to withhold information from the public, the government in most instances has merely dressed up its empty claims. It changes the phrase "ICANN's decision to negotiate a .xxx contract," *id.*, to the functional equivalents "recommend the creation of a … new .xxx domain" and/or "enter into a contract with ICM to operate [the] domain," [24] and merely adds the supposed explanation that the policy-making at issue was formulating how the U.S. government would "react" or "respond" to these ICANN actions.  Indeed, with respect to the vast majority of documents still at issue – *i.e.*, for which the Court held the agencies failed to meet their burden – the government claims its Exemption 5 claims tie back to "the larger deliberative process of 'how to respond if ICANN

_____

its burden and the documents at issue need no longer be considered in dispute.  *See infra* at 29 & nn.32, 49, 53.

[24]  Plainly, regardless whether ICANN's activity is characterized as successfully "nego-tiating" a .xxx contract or deciding to "enter" such a contract, the description refers to the same activity and, as noted, "ICANN's decision to negotiate a .xxx contract" also means it necessarily had found ICM satisfied the technical sTLD criteria for a new .xxx domain.  *See supra* at 9-10; Pl. SJ Opp. at 7 & nn.8-9.  Moreover, such semantic gamesmanship obscures the extent to which the U.S. government's behind-the-scenes efforts were the catalyst for preventing ICANN's process from reaching finality, and how the government now attempts to parlay its interference with ICANN's processes into a showing that the Commerce and State Department materials in dispute were part of pre-decisional activity.  *See infra* at 19-20.

were to recommend the creation of a proposed new .xxx domain and/or enter into a contract to operate [the] domain.'" [25]

The core – and fatal – problem with this further "explanation" that the policy on which the agencies were deliberating for Exemption 5 purposes was how to "react" or "respond" to possible ICANN approval of a contract with ICM to operate the .xxx domain, is that such reaction or response does not involve any policy-making protected by the deliberative process privilege.  As noted, *see supra* at 5-7, the *White Paper*, the MoU, and the IANA function contract the government entered with ICANN make clear the Commerce Department does not have an "oversight" or policymaking role with respect to approval of a new sTLD.  Accordingly, the government's Exemption 5 deliberative process claim must fail.

As set forth above, under the *White Paper* and the MoU, the government's continuing management of the root server does not include "policy" considerations that would entail a deliberative process of making recommendations, expressing opinions, or agency "give-and-

---

[25]     Def. Sec. Mot. at 20, 24, 26.  *See also* Smith. Sec. Supp. Decl. at 3 (discussing documents in terms of "laying the groundwork for the development of a final Government position on" responding to ICANN approval of a .xxx domain).  Remarkably, over a dozen times in its points and authorities providing "further briefing" on these documents, Def. Sec. Mot. at 19, the main additional information the government proffers to bolster its position is to combine some version of the verbs "respond" or "react" to various phrasings that translate into ICANN giving final approval to the .xxx domain.  *Id*. at 22, 26-32.  *See id*. at 22 ("ongoing deliberations concerning the Department of Commerce's response to the creation of a .xxx domain"); *id*. at 25 ("how to respond if the .xxx domain were created and operated."); *id*. at 26 ("opinions contributed to the larger deliberative process regarding the creation of the .xxx domain"); *id*. ("how to respond to the creation of the .xxx domain"); *id*. at 27 ("what the Government's response should be to possible creation of a .xxx domain"); *id*. ("antecedent to any final Government decision regarding the creation of the .xxx domain"); *id*. at 28 ("how to respond to an ICANN decision regarding the establishment of a .xxx domain"); *id*. at 29 ("what position DOC should adopt if a .xxx domain is approved"); *id*. ("final positions by the Government on the position it should react if the .xxx domain is approved."); *id*. at 30 ("how to respond if ICANN approved a .xxx domain"); *id*. at 31 ("reaction to possible ICANN approval of the .xxx domain"); *id*. at 32 ("developing a Government response to ICANN's possible recommendation to create a new .xxx domain").  This approach is mirrored 7 times in the Second Supplemental Smith Declaration and 23 times in the Supplemental Vaughn Index.  *See* Smith. Sec. Supp. Decl. at 2-4 & Exh. C at 1-8.

take."[26]   Indeed, contrary to the current claim that some of the records should be protected

because they include deliberation on how Commerce should "react" to ICANN's approval of the

.xxx contract that would allow the domain to become active, senior NTIA staff members

explained at the time that "DoC reviews ICANN's performance to ensure the completion of tasks

set forth by the MOU [but] does not exercise oversight in the traditional context of

regulation."[27]   Accordingly, on this first of two alternatives facing Commerce upon ICANN

approval of .xxx, *i.e.*, the administrative task of adding .xxx to the root, there can be no proper

invocation of Exemption 5, because "material sought to be protected [that] concerns primarily

legal and administrative tasks incident to implementation of … policies already formulated" or

that are "ministerial in character," are "not protected by the deliberative process privilege."

*Resident Advisory Bd. v. Rizzo*, 97 F.R.D. 749, 753 (E.D. Pa. 1983) (construing privilege under,

*inter alia*, *Coastal States Gas*, 617 F.2d at 866).

Alternatively, the other possible "response" Commerce could have had to final ICANN

approval of the ICM contract would be, as alluded to in the original summary judgment plead-

ings,[28] repudiating the duty to effectuate ICANN's decision by refusing to add .xxx to the root.

However, this not only would contravene the *White Paper's* goal of taking such decisions out of

---

[26]   *Vaughn v. Rosen*, 484 F.2d at 823-24; *Jordan v. DOJ*, 591 F.2d at 774.   Further, nothing about the ministerial task of providing direction to add .xxx (or any other sTLD) to the root involves anything that, if revealed, would discourage candid discussion on permissible agency functions.  *See Gutman v. DOJ*, 238 F.Supp.2d 284, (D.D.C. 2003) (one critical factor in determining whether document is deliberative is whether disclosure would discourage candid discussion within agency).

[27]   *See supra* at 7 (quoting Compl. App. E, Exh. 5).   At the time, the version of the MoU in effect required *ICANN* to "[d]efine and implement a predictable strategy for selecting new TLDs using straightforward, transparent, and objective procedures that preserve the stability of the Internet."  www.icann.org/general/amend6-jpamou-17sep03.htm.

[28]   *See*, *e.g.*, Pl. SJ Opp. at 26; Defendants' Reply to Plaintiff's Consolidated Opposition to Motion to Dismiss and for Summary Judgment ("Def. SJ Opp.) at 6-7.

government hands and privatizing them, as well as the objectives of openness and transparency that are so intrinsic to ICANN's core values the *government* cites them here, [29] it would violate the MoU and the IANA contract, and accordingly would constitute *ultra vires* action by the Department.  As ICM noted previously, actions that lie beyond limits of an agency's authority cannot "be construed as being part of any proper governmental process" under Exemption 5. *Tax Reform Research Group*, 419 F.Supp. 415.  *See also id.* at 418; *Alexander v. FBI*, 186 F.R.D. 154, 164 (D.D.C. 1999) ("the deliberative process privilege does not apply if there is a discrete factual basis for the belief that the deliberative information sought may shed light on government misconduct") (internal quote omitted).  Even courts that are lenient regarding how far an agency's deliberations might stray to consider (and, one hopes, reject) actions that are beyond its powers, recognize that "the scope of an agency's authority places some limits on the deliberate process privilege, and internal communications about something not even arguably within the agency's domain … might not be privileged."  *Enviro Tech Int'l, Inc. v. EPA*, 371 F.3d 370, 376 (7th Cir. 2004).  If the FOIA's "fundamental purpose" truly is to "assist citizens in discovering 'what their government is up to,'" *Center for Int'l Envtl. Law*, 237 F.Supp.2d at 22, then ferreting out *ultra vires* activity and other malfeasance <u>must</u> be a central reason for providing public access to government records, and such improper conduct was never intended to be activity that FOIA exemptions were intended to shield from public view. [30]

---

[29]  Def. Sec. Motion at 6-8; <u>www.icann.org/general/archive-bylaws/bylaws-06nov98.htm</u>, Art. III; <u>www.icann.org/general/archive-bylaws/bylaws-28feb06.htm</u>, Art. I, § 2.

[30]  *Pratt v. Webster*, 673 F.2d 408, 424 (D.C. Cir. 1982) ("a suit under the [FOIA] is an important mechanism for discovering the malfeasance of government agencies").  *See Carter v. Department of Commerce*, 186 F.Supp.2d 1147, 1157 (D. Ore. 2001) ("FOIA intends … robust political debate, agency accountability, and public disclosure rather than secrecy").  One might speculate that the "policy" formulation at issue was perhaps recommending changes in the law or legal documents that otherwise would have dictated the ministerial steps to have be taken upon ICANN approval of a domain.  However, it is incumbent that the government, not a FOIA

Even if the agencies' desire to withhold the materials remaining in issue under Exemption 5 stemmed from the somewhat less nefarious reasons postulated above – such as massaging public opinion and/or wanting to avoid revealing the extent to which NTIA was engaged in politicking rather than administering its contractual obligations – invoking the deliberative process privilege is improper.   As this Court has recognized, where such "activities … are not part of the normal and proper operations of the agency" but rather "are connected with … abuses of an essentially political nature," they are not a proper subject for nondisclosure under FOIA exemptions.  *Tax Reform Research Group*, 419 F.Supp. at 418.  *Cf., Dominion Cogen, D.C. v. District of Columbia*, 878 F.Supp. 258, 268 (D.D.C. 1996) (allegations of political motive "raise questions of governmental misconduct and place the deliberative process itself directly in issue").   As in other cases, though a "release of [disputed] data may subject the [Commerce] Department to some political controversy … or generate some additional departmental embarrassment," that does not make material protectible under Exemption 5. [31]   If the present matter is to surmount "difficulties [that] arise" in cases where political maneuvering rather than legitimate governing and deliberation associated with it is at issue, *Tax Reform Research Group*, 419 F.Supp. at 418, the government cannot be allowed to withhold under Exemption 5 material responsive to ICM's FOIA requests.

---

requestor/plaintiff or the Court, indicate as much.  *See Judicial Watch, Inc. v. Department of the Army*, 435 F.Supp.2d 81, 92 (D.D.C. 2006) ("FOIA places the burden of justifying nondisclosure on the agency" and this "cannot be shifted to the courts").

[31]   *Carter v. DoC*, 186 F.Supp.2d at 1157.  *Cf.*, *Alexander v. FBI*, 186 F.R.D. at 164 ("documents pertaining to an attempt to cover up political motivations … fall under the misconduct exemption to the deliberative process privilege").  *See also id*. at 165 ("The law in this circuit clearly states that the deliberative process privilege disappears altogether when there is *any* reason to believe government misconduct has occurred …  and that where there is reason to believe the deliberative information sought may shed light on government misconduct, the privilege is routinely denied.") (emphasis original, internal quote and cites omitted).

In this connection, the government's argument that the documents withheld and redacted were "pre-decisional" because ICANN never entered a contract with ICM Registry is particularly disingenuous. *See*, *e.g.*, Def. Sec. Mot. at 23. It is the government's decisionmaking process that is relevant – not ICANN's – and it is too clever by half for the Commerce Department to exert *ultra vires*, behind-the-scenes pressure on a private-sector process required to be transparent, then attempt to cover up its involvement on grounds that it succeeded in blocking ICANN's decision. Essentially, the government is asking this Court to apply Exemption 5 based on the plaintive cry from the Wizard of Oz to "pay no attention to that man behind the curtain."

**B.    Application to Specific Documents**

Documents EP7, EP46, EP59-69, EP98, EP102, EP116-17, EP125-26, 000025. These records still in dispute are those for which the government is guiltiest of simply citing repetitively a putative "reaction" or "response" to ICANN's then-impending approval of the .xxx contract, even though no conceivable response would have resulted in policy-making (or deliberation associated with it) under Exemption 5. For example, with respect to EP59-61, Commerce's defense consists predominantly of repeating three times that the deliberative process to which the material contributed was development of a position on how to respond if ICANN were to recommend the creation of a proposed new .xxx domain and/or enter into a contract with ICM to operate it. Def. Sec. Mot. at 22-23 (also citing "alternatives the agency would have to address if the .xxx domain were created"). This is insufficient to satisfy Exemption 5 given that the only potential responses either would have been ministerial or *ultra vires* activity. *See supra* at 17-18. *See also The Wilderness Soc'y v. Department of the Interior*,

344 F.Supp.2d 1, 12 (D.D.C. 2004) ("the briefest of references to … subject matter … will not do" for an Exemption 5 claim that a specific deliberative process was implicated).

The only other manner in which Commerce describes the withheld material's substance (as opposed to sundry other "process" matters such as, who was involved, their job titles and/or responsibilities, how widely within Commerce information was shared, etc.), is a claim that some material reflects deliberation about "possible effects of creation of a .xxx domain on children's access to pornographic material" and/or about "which websites would be in a .xxx domain." [32] While these factual matters entered into the general (public) debate over creation of a .xxx domain, there is no discussion here of how the alleged opinions that Commerce staff internally offered on these points factored into any deliberative process other than "reactions" that could have involved only ministerial or *ultra vires* activity. *See* Def. Sec. Mot. at 22. Moreover, even if reacting to impending approval of the .xxx contract could engender a deliberative process protected by Exemption 5, the government says nothing about the crucial matter of how children's access to adult online content or potential .xxx websites played a "role … in the course of the deliberative process" at issue. *SJ Order* at *4 (quoting *Coastal States,* 617 F.2d at 868).

The government follows the same pattern for EP62-69 – *i.e.*, repeated references to "what the Department['s] position should be regarding the root zone file" as "integral" to the "larger" question of "develop[ing] a position on how to respond if ICANN were to recommend the creation of a proposed new .xxx domain," Def. Sec. Mot. at 24, 35 – which fails for the same reasons

---

[32]  Def. Sec. Mot. at 22.  To the extent – and only to the extent – the government claims some material redacted from EP60 involves a colloquy about the progress and timing of the document's preparation and review, *id.* at 22 n.15, ICM does not dispute the redactions.  ICM maintains its objections to the validity of the remaining redactions in this document, however.

it fails for EP59-61. [33]   The same is true for EP116-117, *id.* at 27, with the only difference being a reference to material consisting of "answers to unspecified questions regarding 'possible legal consequences of taking a certain course of action with respect to .xxx.'" [34]   Once again, the government is silent on how "legal consequences" arise from the administrative task of adding an ICANN-approved sTLD to the root.

The defense of redacting EP125-26 also follows the pattern of referring back to "the roles of ICANN and … Commerce in approving new domains such as .xxx," Def. Sec. Mot. at 27-28, only the twist here is repetition of references to "control of child pornography" and "possible types and names of domains related to .xxx."   These are divorced, once again, from any explanation of how such matters fit into the deliberative process claimed to be at issue (since the U.S. government has no policy role in "approving new domains"), and accordingly fail to carry Commerce's burden for the same reasons that raising these factual matters was ineffectual for EP59-61 as well. [35]   So, too, with respect to EP102, which involves an "opinion regarding outside support for the creation of a .xxx domain," insofar as the defense of redacting is tied solely to "what position DOC should adopt if a .xxx domain is approved."  Def. Sec. Mot. at 29;

---

[33]   That the government repeated its the same (flawed) approach on these documents as EP59-EP61 is hardly surprising given the Court's observation – repeated here by the government itself – "that 'these emails … have the same problem as the Court identified for EP59-EP61.'" Def. Sec. Mot. at 24 (quoting *SJ Order* at 21).

[34]   *Id.* (appearing to quote Commerce Supp. *Vaughn* at 5).  It bears noting that, with respect to its category-by-category discussion of documents EP62-69 and EP116-117, the government offers virtually no legal support for its positions, and where it does the citation relates solely to the kind of "legal boilerplate" the Court already has rejected.  *See, e.g.*, *SJ Order* at *7.  The same is true of its defenses relating to EP7, EP46, and EP98.  *See infra* at 22-23.

[35]   *Id.* at 27.  The distinction made in the *SJ Order* between instances where redacted materials pertained to "opinions of the DOC's role with respect to certain functions of ICANN" that satisfied Exemption 5, and "opinions … on ICANN's decision to negotiate a .xxx contract" that did not, applies fully here.  *SJ Order* at *8 n.8.  Simply claiming that the policy-making at issue was formulating a "reaction" or "response" to ICANN's approval of a .xxx domain clearly is insufficient.

Smith Sec. Supp. Decl., Exh. C at 6. With respect to EP7, EP46, and EP98, the same cardinal error exists of relying heavily on repeated citation to the "development of final Government positions on how to respond if ICANN approved a .xxx domain" and "reaction to possible ICANN approval of the .xxx domain." Def. Sec. Mot. at 30, 31. This fails for the reasons explained above for the other documents in this category. [36]

Finally, for 000025, the government's defense boils down to a scant two sentences stating the redacted material involves "opinions and recommendations concerning potential questions that might arise with regard to .xxx application" and that "surround" the application, "given in advance of any final decision regarding the application." Smith Sec. Supp. Decl., Exh. C at 14. *See also id.* at 7; Def. Sec. Mot. at 38. As with the failings ICM pointed out in its original summary judgment papers, this reference to activity "in advance of any final decision regarding the application" would appear to speak more to *ICANN*'s process rather than Commerce Department activity. [37] In any event, as this Court has observed, such general statements fail to "identify the deliberative process to which the document contributed." [38] Since

---

[36] With respect to EP46 and EP98, and for other documents remaining at issue as well, the government claims that to the extent the material redacted includes factual information, it is "inextricably intertwined with policymaking processes" and accordingly need not be extracted and released. *Id*. at 30. *See also id*. at 28 (EP125-26), 40 (000020-27). Notwithstanding the government's recognition of a duty to "to demonstrate that all reasonably segregable material has been released" by "provid[ing] a 'detailed justification' rather than 'conclusory statements,'" *id*. at 44, it provides little more than "legal boilerplate" that as noted the Court found insufficient in other contexts. *SJ Order* at *7. While the government may understandably be sensitive about saying too much in justifying that factual and protected information is "inextricably intertwined" out of concern for inadvertently disclosing the latter, it cannot satisfy its burden by rotely reciting black letter standards of law. *Id*. Consequently, if the Court does not simply order the records released in full, it should conduct *in camera* review of the government's "inextricably intertwined" claims to determine if there truly is no further factual matter that can be meaningfully extracted.

[37] *See, e.g.*, Pl. SJ Opp. at 21-22 (Exemption 5 claims "generally refer to decisions that *ICANN* must make, not those the government must − or even can − make"); *id*. at 26-28.

[38] *SJ Order* at *8. While the government attempts (futilely in many cases) to bolster its showing on documents the Court has already once considered, for these newly considered

the government already has had the benefit of the Court's instruction in the *SJ Order*, the fact that its defense for this document (and others with "0000" prefixes) is a first cut rather than a second attempt should not result in the government receiving an opportunity to again supplement its claims – the Court should instead order the documents released in full. *See also infra* at 28-32.

Documents EP90-92, E54. The government defense of these documents involving emails and a memo by agency staff commenting on matters appearing in the press cannot overcome the shortcoming identified by the Court of failing to show how "mere commentary on a news report" is sufficiently both pre-decisional and deliberative to satisfy Exemption 5. *SJ Order* at *5, *9. In addition to tying its claims of exemption here to "deliberation[ ] on developing … how to respond if ICANN were to recommend creation of a proposed new .xxx domain," Smith Sec. Supp. Decl. Exh. C at 3-4, which is invalid for reasons outlined above, the government's further defense is that EP90-92 are deliberative with respect to "how to present to the public … Commerce's role in making changes to the authoritative root zone file." Def. Sec. Mot. at 26. But this seems very much like a matter of attempting to avoid "political controversy" and/or "departmental embarrassment," *Carter v. DoC*, 186 F.Supp.2d at 1157; *see also Alexander v. FBI*, 186 F.R.D. at 164, not deliberation on substantive agency policy, [39] and the government cites no precedent to support the notion that email exchanges on how to massage the agency's public image with the White House's conservative base falls within Exemption 5. [40]

---

documents, it appears the Commerce Department has learned no lessons from the Court's decision, since most of the defenses consist of the kind of conclusory and boilerplate statements the Court has found unpersuasive. *See infra* at 28-32.

[39] *SJ Order* at *4 (quoting *Vaughn v. Rosen,* 523 F.2d at 1143-44; *Jordan v. DOJ,* 591 at 774; *Coastal States Gas*, 617 F.2d at 866).

[40] *See* Def. Sec. Mot. at 26. To be sure, one could imagine a dynamic in which one agency staffer explains to another "the press claimed I said *x*, when I really said *y*" in a context where *x*

24

The further defense of withholding E54 also fails to escape the gravitational pull of the Court's skepticism regarding Exemption 5 claims about "mere commentary on a news report." *SJ Order* at *9.  As a threshold matter, the fact that the State Department "forwards assessments and analyses similar to Document 54" for use in policy deliberations, Beaird Decl. ¶ 12, cannot transform *this* document – which admittedly "was not … forwarded," Def. Sec. Mot. at 16 – into one that played a role in deliberative process.  *See SJ Order* at *4 (quoting *Coastal States,* 617 F.2d at 868).  Moreover, the government continues to defend its withholding under Exemption 5 with only a non-specific reference to the deliberative process of "developing United States government policy related to Internet governance."  Beaird Decl. ¶ 12.  This fails to explain how "commentary" on the *Wall Street Journal*'s characterization of "attempts by other countries to create alternatives to the … domain name system" ties into *State Department* deliberative processes. [41]  The lack of specificity in this regard is significant.  The government goes on to claim that the document is pre-decisional because "it was drafted antecedent to the adoption of U.S. Government policy on Internet governance."  Def. Sec. Mot. at 17.  However, this will always be true of regulatory and other initiatives of an ongoing nature such as in the non-specific

---

or *y* reflects deliberation on agency policy, but the government has not claimed that is the case here (other than to indicate the context, as for so many records still in dispute, was "reacting to" ICANN's final approval of the .xxx domain).  *Id*. at 25-26.  If the staff's conversation with the reporter did in fact involve information about a particular deliberative process on specific policy formulation, or the staff's recounting of this interaction with the reporter required discussion of such deliberative processes, the government must specifically identify that deliberative process (and, to the extent appropriate, explain or rebut why discussing it with a reporter did not waive the privilege).  *See SJ Order* at *5 (government must connect documents to exemption by explaining with specificity the role the document played in the process of agency deliberations).

[41]  Def. Sec. Mot. at 16.  In addition, the government's attempt here to defend withholding simply because a document is a "draft" continues to be unavailing.  *See SJ Order* at *5 (citing *Arthur Andersen v. IRS,* 679 F.2d 254, 257 (D.C. Cir. 1982)); *id*. at *10.  *Compare also* Def. Sec. Mot. at 16 ("plaintiff does not dispute that drafts are properly withheld"), *with infra* at 29-31 (distinguishing general proposition regarding drafts and specific applications thereof, including distinction between drafts withheld where final versions are released).

area of "Internet governance," which is why even though agencies need not identify a specific

decision to which a document relates,[42] they still must cite something less amorphous than

"Internet governance." *See Wilderness Soc'y*, 344 F.Supp.2d at 11 ("vaguely suggest[ing docu-

ments] ... relate to 'wilderness issues,' 'wilderness review,' 'wilderness policy,' and 'wilderness

matters'" held insufficient).

        <u>Documents E3, E36, E68, E69 and E70</u>.  These State Department documents that discuss

U.S. government interagency telecom and high-tech conference calls, Def. Sec. Mot. at 18, still

"fail to specify the deliberative process reflected in these documents." *SJ Order* at *6.  Granted,

the government's present showing is somewhat more robust than when it originally moved for

summary judgment – it would be hard not to be given the terseness of its prior showing [43] – but

even so it amounts to little more than a laundry list of issues on which the federal government

generally was active at the time.  For example, for E69, the government simply states that the

redacted passages "reflect" deliberations on "international meetings," "digital television

legislation" and "an upcoming Federal Communications Commission meeting."  Def. Sec. Mot.

at 19 (quoting Beaird Decl. ¶ 21).  As with E54's broad reference to "Internet governance," *see

supra* at 25-26, these general areas of policy-making are ongoing and non-specific, and provide

no basis for tying particular redacted materials to a deliberative process.  *Cf.*, *Coastal States Gas*,

617 F.2d at 868 ("Characterizing [ ] documents as 'predecisional' simply because they play into

an ongoing [ ] process would be a serious warping of the meaning of the word.").  *Compare* Def.

Sec. Mot. at 19 ("redacted passages … reflect … deliberations on telecommunications legislation

and discussions regarding holding another interagency meeting") (quoting Beaird Decl. ¶ 22)

---

    [42]  *SJ* Order at *4 (quoting *Balderrama v. Dep't of Homeland Security,* 2006 U.S. Dist. LEXIS 19421, *22 (D.D.C. 2006)).

    [43]  *See* Grafeld Decl. at 23-24; Def. Mot. at 41.  *Accord SJ Order* at *6.

(quotation omitted). Because the government still does not "show (in more than conclusory terms) ... the deliberative process reflected in the documents," they must be released in unredacted form. *SJ Order* at *6.

Document EP59. The State Department has expanded somewhat its explanation why this unfinished two-page paper is relevant to U.S. preparation of its position in advance of the November 2005 Tunisia WSIS meeting, but this tells only part of the story. [44] Given the uncertainty that appears to surround the document, *see supra* note 44, the fact that is was unfinished may suggest it was a draft to which Exemption 5 status might attach, *but see infra* at 29-31 (discussing "working drafts" that are actually last iteration of document), yet it also may suggest that document never played any meaningful role in any deliberative process. In addition, insofar as it seems the document included factual matter – *i.e.*, what views Japanese officials expressed – the government fails to provide more than its original conclusory statement that "no meaningful material ... may be segregated and released." Grafeld Decl. at 23. This does not explain why these facts, once separated from the author's recounting of them (or surrounding statements by the Japanese that the author declined to recount), reveals any State Department deliberations.

Documents EP33-34, MPW3, MPW14. The government's response to the Court's well-founded skepticism that this draft invitation and/or emails about it are "only pre-decisional and deliberative regarding the text of [the] invitation," and that "it is unclear how such a deliberation 'makes recommendations or expresses opinions on policy,'" *SJ Order* at *10 (citing *Vaughn*, 523

---

[44] Beaird Decl. at 8. It bears noting, though, that in elaborating, the State Department now reveals it is uncertain regarding who wrote the document, *id.* ¶ 14 (E59 "was *most likely* authored by a former member of my staff") (emphasis added), and to the extent authorship can be critical in evaluating Exemption 5 claims, *Wilderness Soc'y*, 344 F.Supp.2d at 15, the Court would be justified in holding this uncertainty suffices to prevent the government from meeting its burden.

F.2d at 1143-44), is to claim that Exemption 5 applies because the withheld material involves deciding how to describe the "public briefing" to which the document invited recipients. [45]  As a threshold matter, here, too, the government ties its defense back to public briefing on what would happen in the wake of "creation of a new .xxx domain," *id.*, and to the extent this implies the same type of alleged "deliberation" and "policy-making" involved in reacting or responding to ICANN approval of the .xxx contract, nondisclosure is inappropriate for the reasons provided above.   In addition, to the extent the briefing was to be public, it remains "unclear how … deliberation" on how to describe it "makes recommendations or expresses opinions on policy." *SJ Order* at *10 (internal quote omitted).  If there is anything particularly "deliberative" about how the agencies were planning on referring to ICANN's approval of the .xxx contract – *i.e.*, consideration of something other than building political cover, *see supra* at 19 – the government has yet to identify it. [46]  Given the government's repeated chances to justify its decision and its failure to do so, the documents must be disclosed in full.  *See*, *e.g.*, *Carter v. DoC*, 186 F.Supp.2d 1147 (summary judgment granted to plaintiff where Commerce had opportunity to file supplemental briefing and still failed to satisfy Exemption 5).

Documents 000020/21.  These two withholdings involve the same document, as to which the government redacted "opinions relating to issues that are likely to be raised at ICANN,"

---

[45]  Def. Sec. Mot. at 32.  Notwithstanding the Court's concerns, the government repeats the errors from its original motion for summary judgment of claiming that Exemption 5 applies because "the draft documents contributed to the deliberative process of preparing a final invitation to the briefing," and that "the documents are predecisional because none were in final form."  *Id.*  It is unclear how this differs from the approach the Court rejected.  *See SJ Order* at *10 (as quoted in text); *id.* at *5 ("mere recitation of the buzz words 'draft' and 'deliberative' is not enough") (citing *Arthur Andersen*, 679 F.2d at 257, and describing its holding in pertinent part as "draft documents are not presumptively privileged").

[46]  In addition, the government has not claimed that the redacted material has anything to do with anyone's consideration whether to *attend* the public briefing to which the invitation relates.  *Compare*, *e.g.*, *Judicial Watch, Inc. v. DOJ* , 306 F.Supp.2d 58, 70 (D.D.C. 2004).

based on the same type of conclusory and boilerplate Exemption 5 claims that were insufficient when raised for documents analyzed in the *SJ Order*. [47]  In fact, the whole of the Exemption 5 claim here is recitation of the (i) black-letter legal standard that the "information withheld … is internal predecisional deliberative material" that "does not represent final agency decisions," (ii) the reasons why the deliberative process exists, and (iii)  the above-quoted one-line "description" of the redacted material.  Smith Sec. Supp. Decl. at 13; Def. Sec. Mot. at 39-40.  No effort is made to identify the deliberative process to which the material relates, nor the role the document played in it.  For the same reasons identified in the *SJ Order*, such invocation of Exemption 5 "without any corresponding description of how [an] opinion is pre-decisional or relates to a deliberative process" fails to satisfy the government's burden. [48]

Documents 000001-19, 000022-24, 000027-33.  For the most part these are records withheld as "Draft Documents."  Where that is true and final versions were released, the government is correct as a general proposition that "plaintiff does not dispute that drafts are properly withheld."  *See* Def. Sec. Mot. at 16 (citing Pl. SJ Reply at nn.9 & 15).  However, in many cases Commerce withholds as well all or part of the last iteration of the record at issue, despite failing to satisfy Exemption 5.  Hence, documents 000022, 000023, 000024 and 000027 are not in dispute, as Commerce's *Vaughn* index for them explains that they are drafts and the final version

---

[47]  Def. Sec. Mot. at 38; Smith Sec. Supp. Decl. at 13.  As noted elsewhere, as to these records for which the present motion represents the government's first assertion of an Exemption 5 claim, it offers less robust explanations akin to those provided in its first summary judgment motion rather than the fuller explanations provided in supplementation here.  *See supra* at 14.

[48]  *SJ Order* at *9.  Here, too, the government claims withheld factual matter is inextricably connected with deliberative process material and thus was not released, without making a meaningful showing why that is so.  Consequently, here, too, the Court should conduct *in camera* review to confirm the government's position.  *See supra* note 36.

was released. [49]  Conversely, documents 000001-10, 000013-16, 000018-19, and 000028-33 also

are withheld as drafts, *id*. at 9-11, and while ICM is inclined to concede that is acceptable as far

as it goes, the government offers no substantiation for withholding the last version of each of the

documents, other than that they were "working documents and final versions were never

produced." *Id*.

As to the last iterations of all these documents other than 000013-15, *see infra* note 53,

the *Vaughn* index states only that they were never finalized or produced but does not explain on

what grounds, exemption, or claim of privilege they were withheld.  The supporting declaration

is silent on this point, Smith Sec. Supp. Decl. at 6, and the government's points and authorities

justify withholding "working documents" solely because they allegedly "satisfy the three policy

bases for the deliberative process privilege."  Def. Sec. Mot. at 35.  Whatever validity there may

be to that claim, the issue is not whether withholding satisfies the "policy bases" underlying

Exemption 5, but rather, whether it satisfies the *legal standard* for invoking the exemption,

specifically, that the material is pre-decisional or antecedent to adoption of an agency policy, and

is deliberative. [50]

---

[49]    Smith Sec. Supp. Decl., Exh. C at 13-14.  Plaintiff also concedes that Commerce satisfies its burden under Exemption 5 of withholding Document 000017, which is a cable from agency headquarters to the U.S. Embassy in Sweden regarding development of a U.S. position on pending EU proposals to be discussed at the WSIS.  *Id*. at 12.  In addition, no document numbered 000026 appears in the *Vaughn* index.

[50]    *SJ Order* at *4 (quoting *Jordan v. DOJ,* 591 F.2d at 774; *Vaughn,* 523 F.2d at 1143-44). *Cf.*, *id*. at *10 ("the words 'draft' and 'opinion,' without more, do not fulfill the agency's obliga-tion to demonstrate how the material is covered by the deliberative process privilege").

On this point, as with its first attempt regarding many of the records at issue during the initial summary judgment briefing,[51] the government falls short. As a threshold matter, its position seems to be that so long as a document is continuously edited and commented upon, so long as a clean, "final version" is never created, it retains "working draft" status in perpetuity, sheltered by Exemption 5, no matter how the government uses whatever happens to be the last iteration. *See* Def. Sec. Mot. at 34-36. But precedent indicates otherwise.[52] Indeed, if this were the case, all any agency ever would have to do to ensure Exemption 5 precludes release of documents created by it would be to simply insert editing, redaction, or other marks to create a withholdable "working draft." At minimum *in camera* review of the last iteration of each of these "working documents" is in order to determine if the version last edited truly reveals anything deliberative with respect to determining what should go into the (never produced) "final" document, and if not, whether there is any basis under Exemption 5 for the government to go back (yet again) to explain how the document's substance (as opposed to edits on it) reveals a deliberative process tied to discernible policy-making. *See Hansen v. Air Force*, 817 F.Supp. at 125 (construing *Russell v. Department of the Air Force,* 682 F.2d 1045, 1049 (D.C. Cir. 1982)).

Finally, to the extent an Exemption 5 defense of the substance of the last iterations of these "working drafts" (as opposed to the edits on them) can be inferred on the record thus far, at most what the government offers is the opaque explanation that the documents reflect "policies concerning positions on various matters surrounding the .xxx issue." Def. Sec. Mot. at 35. This

---

[51]  These records are part of the FOIA request for which Commerce never decided ICM's administrative appeal nor previously prepared a *Vaughn* index. *See supra* at 12-13 & n.38.

[52]  *Cf.*, *Hansen v. Department of the Air Force*, 817 F.Supp. 123, 125 (D.D.C. 1982) (record left unchanged by agency as an interim assertedly "draft" version and "used [by it] as a finished product," and which allowed "no possibility of comparisons with previous versions," obtained over Exemption 5 claim). Here, too, the government's defense also seems to ignore the

is insufficient for reasons that the *SJ Order* held an agency cannot satisfy its burden if it neither identifies the deliberative process to which a record contributes nor explains how it is pre-decisional or, in short, "is a pre-decisional component of a deliberative process." [53]  The government should be required to release the last version each of these documents, or to justify its withholding under an applicable FOIA exemption.

## II.    THE GOVERNMENT STILL FAILS TO SATISFY EXEMPTION 4

Given another bite at the proverbial apple, the State Department has not advanced much beyond "mere repetitions of the legal standard" in invoking FOIA Exemption 4 to withhold in full or part two documents that remain at issue, Slip. Op. at *7, and to the limited extent it has bolstered its defense, it still fails to satisfy its burden.  *See Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 146 (D.C. Cir. 2006) (FOIA places burden of proving exemption on agency).  With respect to the two out of three areas where "the court lack[ed] sufficient details to evaluate" the State Department's claims – specifically, "whether (1) disclosure was voluntary … and (3) harm would befall the government or the submitter," *SJ Order* *7 – the government still offers only "conclusory" statements regarding the former, while remaining silent on the latter. [54]  Moreover,

---

Court's admonition that precedent holds that "draft documents are not presumptively privileged."  *SJ Order* at *5 (*Arthur Andersen v. IRS,* 679 F.2d at 257).

[53]  *See*, *e.g.*, *SJ Order* at *8-*10.  Conversely, with respect to documents 000011-000012, which are identical copies of the final version of documents 000013-000015 withheld as "drafts," the government defends its withholding on grounds that "it is part of the larger decisional process of what potential issues might be key issues for DOC at the GAC meeting" and "represents opinions and recommendations … concerning what [DOC] employees believed were key issues for the GAC meeting."  Smith Sec. Supp. Decl., Exh. C at 13-14.  ICM has no basis on which to dispute this characterization of the document.  However, this contrasts with most of the government's other claims regarding purported possible "responses" to ICANN's expected approval of .xxx, which could give rise only to ministerial activity by Commerce to put the domain in the root, or to an *ultra vires* refusal to do so.  *See supra* at 16-18.

[54]  *SJ Order* *7.  *See* Def. Sec. Mot. at 13 & Beaird Decl. ¶ 26, Def. Sec. Mot. at 14 & Beaird Decl. ¶ 30.  The government previously made no showing on how disclosure of the with-held material would "cause substantial harm to the competitive position" of the submitter, *SJ*

as discussed below, its showing on the allegedly confidential nature of the withheld information remains insufficient. *Compare*, *Physicians Comm. for Responsible Med. v. NIH*, 326 F.Supp.2d 19, 25-26 (D.D.C. 2004) (quoted in Pl. SJ Reply at 15 n.18).

Document E2:  Though the State Department uses more words to state its position, there is in reality little that is new or supplemental to its defense for redaction compared to its original statements about this five-page series of emails from consultant Marilyn Cade to Ambassador Gross.  *Compare* Grafeld Del. at 17-18 *with* Beaird Decl. at 11-12.  Most of the additional verbiage relates not to what makes redaction permissible, but rather to describing the quantum of what was redacted and the intent to release the maximum amount of information the government deemed appropriate, and to stating that the redacted document is attached to the supporting declaration. *See id*.  The only new information that goes to the merits of the Exemption 4 claim are statements that the redacted material reflects Ms. Cade's impressions of a meeting in Geneva at which a non-confidential report by the WGIG was presented, and that she considered "the rest of [her] email" – most of which State has released – to be "private."  Def. Sec. Mot. at 13 (citing Beaird Decl. ¶¶ 26-27 & Exh. 7 at p.2 fourth paragraph).

However, this provides no insight whatsoever into what about the redacted content is commercially sensitive so as to make it confidential, or why Ms. Cade declared it be "private." In fact, it could just as easily be the case that Ms. Cade intended the parts of the balance of her email that she labeled "private" but that State disclosed to be kept confidential.  These portions of the email discuss her insights on an ICANN meeting (including assessments about procedural "breakdowns" and "BIG failures" that occurred), audience participation at the WGIG meeting, and the fact that she would be participating on a call "at AT&T's request."  Beaird Decl. Exh. 7

---

*Order* *6, and continues here to decline making a case on this point.  Def. Sec. Mot. at 13-14; Beaird Decl. at 11-13.

at 2.  There is no explanation why these thoughts, also labeled by the author as "private," differ in any material way from the observations that were redacted.  The government accordingly perpetuates its failure to explain what it is about this information that makes it "confidential" under Exemption 4, and it accordingly must be disclosed. [55]

Document E71:  The State Department also still has failed to demonstrate that these two emails from ICANN personnel involving "impressions and observations" of meetings between ICANN and European Union (EU) personnel relating to "Internet governance" satisfies Exemption 4's confidentiality requirement.  Beaird Decl. at 12-13.  As noted above, ICANN was founded on, among other things, "operat[ing] to the maximum extent feasible in an open and transparent manner" that makes it "accountable to the Internet community."  *See also* www.icann.org/general/bylaws.htm, Art. I, § II, Art. III, § 1.  Its work primarily involves the "management of … technical elements" to ensure universal Internet functionality.  *See* www.icann.org/new.html.  Yet the government says next to nothing that explains why or how the substance of the statements by ICANN personnel in the emails at issue are of a sufficiently

---

[55]  ICM respectfully objects to the Court's observation that it has "confuse[d] the first and last prong of the exemption (b)(4) test" because "[i]nformation reflecting the professional insights of a telecommunications consultant is … obviously commercial."  Slip. Op. at *7 (citing, *inter alia*, *Public Citizen Health Research Group v. FDA,* 704 F.2d 1280, 1290 (D.C.Cir.1983)).  Not all "professional insight" is necessarily commercial, *see Public Citizen*, 704 F.2d at 1290 ("not every bit of information submitted to the government by a commercial entity qualifies for protection under Exemption 4"), and nothing in the government's defense of its redactions show the redacted material is "commercial" in the sense Exemption 4 protects.  Consequently, the slight explanation the government has offered not only fails, despite the Court's direction, to reveal enough about the redacted material to show why it is "confidential" (other than the author's bare assertion that it is so), it also has not revealed enough to confirm that the material is, in fact, commercial in nature.

sensitive nature that they should be deemed exceptions to ICANN's general policies of openness and accountability. [56]

There is nothing inherently confidential about possible "EU[ ] proposals for changing the existing governance structure of the Internet."  Nor is there any reason, given ICANN's "core values" of "open and transparent policy development," www.icann.org/general/bylaws.htm, Art. I, § II, ¶ 7, that observations of ICANN's personnel about Internet governance proposals should be expected to be withheld from public view.  Indeed, the government acknowledges the views of ICANN in this regard would be "useful" for stakeholders in Internet governance to know when debating the issues.  Beaird Decl. at 13 (ICANN personnel who authored E71 likely provided it to State "because they thought [it] would be useful" in "prepar[ing] for the second-phase WSIS meeting").  The only real ground for claiming confidentiality, therefore, is State's elaboration on its prior statement that the information in E71 "was provided with the expectation that it would be held in confidence," Grafeld Decl. at 19, by adding that the agency, after apparently having failed to do so in advance of withholding the document, now "has confirmed with officials at ICANN that they have not made the information … public, and … oppose making it public."  Beaird Decl. at 13.  The government claims it has "confirmed" this position with ICANN, but the ICANN officials are unnamed, the asserted confirmation seeks to rely on (also unnamed) ICANN "officials" (rather than the ICANN personnel who made the original statements), and the confidentiality request is unsupported by declaration or other extrinsic

---

[56] In addition, and again with all due respect to the Court's conclusion it has seen "enough … to determine that the material is commercial," *SJ Order* *8; *see also supra* n.55, it also is difficult to understand how any information passing between EU government bodies and a non-profit corporation charged with "management of the technical elements of the DNS to ensure universal resolvability [for] all users of the Internet," www.icann.org/new.html, is necessarily "commercial" even within a "broad definition" of that term.  *SJ Order* *7 (citing *Public Citizen,* 704 F.2d at 1290).

evidence. [57]   The government thus fails in its second opportunity to satisfy its burden and the document should be ordered released in full.  *Delta Ltd. v. Customs & Border Prot. Bur.*, 393 F.Supp.2d 15, 19 (D.D.C. 2005).

### III.    THERE IS NO DISPUTE REGARDING THE GOVERNMENT'S CLAIMS UNDER FOIA EXEMPTIONS 2 AND 6

Plaintiff does not contest the government's invocation of Exemptions 2 and 6 under the FOIA to redact documents 000034-37.  *See* Def. Sec. Mot. at 41-43.  *See also* Smith Sec. Supp. Decl., Exh. C at 15-16.  This is the same approach ICM took under Exemption 6 with respect to records at issue in the parties' original cross-motions for summary judgment, Pl. SJ Opp. at 15-16 n.9, and had Commerce revealed the basis for its Exemption 2 and 6 redactions for these documents by deciding ICM's administrative appeal with respect to the FOIA request to which they relate, ICM would have been able to head off any need to brief the efficacy of these with-holdings.  Unfortunately, the government's instant motion and supporting documents represent the first opportunity for ICM ascertain the scope and substance of Commerce's Exemption 2 and 6 claims for these records.  *See* Compl. Exh. L at 1 (bare recitation of FOIA exemptions claimed, including 5 U.S.C. § 552(b)(2) & (6)).  In any event, the Court should consider these documents removed from dispute.

### CONCLUSION

For the foregoing reasons, Plaintiff ICM respectfully requests that the Court grant Plaintiff's renewed motion for summary judgment on its Complaint in this matter with respect to documents discussed in the *SJ Order*.

---

[57]   *See id*.  This contrasts with the emails from Ms. Cade that, whatever other failings exist in State's Exemption 4 defense, at least reflect on the face of the disclosed portions Ms. Cade's intentions regarding confidentiality.  Beaird Decl. ¶¶ 26-27 & Exh. 7 at 2.

Dated this 24th day of May, 2007.

Respectfully submitted,

DAVIS WRIGHT TREMAINE L.L.P.


_____/s/ Robert Corn-Revere_____
Robert Corn-Revere – Bar No. 375415
Ronald G. London – Bar No. 456284
Davis Wright Tremaine LLP
1919 Pennsylvania Ave, N.W., Suite 200
Washington, D.C.  20006
(202) 973-4200

ATTORNEYS FOR PLAINTIFF
ICM REGISTRY, LLC

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

ICM REGISTRY, LLC,           )
                                   )
                 Plaintiff,    )
                                   )
   v.                               )
                                   )    Case No. 1:06CV00949 (JR)
UNITED STATES             )
DEPARTMENT OF COMMERCE and  )
DEPARTMENT OF STATE,      )
                                   )
               Defendants.  )
_____)

**PLAINTIFF'S RESPONSE TO DEFENDANTS**
**STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE**

Pursuant to Local Rule 7(h), Plaintiff ICM Registry, LLC ("ICM"), submits this Response to state that it does not contest any of the assertions in Defendants' Statement of Material Facts Not in Genuine Dispute submitted with Defendants' Second Motion for Summary Judgment.

Dated this 24th day of May, 2007.

Respectfully submitted,

DAVIS WRIGHT TREMAINE L.L.P.

_____/s/ Robert Corn-Revere_____

Robert Corn-Revere – Bar No. 375415
Ronald G. London – Bar No. 456284
Davis Wright Tremaine LLP
1919 Pennsylvania Ave, N.W., Suite 200
Washington, D.C.  20006
(202) 973-4200

ATTORNEYS FOR PLAINTIFF