# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ICM REGISTRY, LLC, | ) |
| | ) |
| Plaintiff, | )    Civil Action No. 06-0949 (JR) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES DEPARTMENT OF | ) |
| COMMERCE and | ) |
| UNITED STATES DEPARTMENT OF | ) |
| STATE, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DEFENDANTS' REPLY TO PLAINTIFF'S CONSOLIDATED OPPOSITION AND DEFENDANTS' OPPOSITION TO PLAINTIFF'S RENEWED MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

In its Consolidated Opposition to Defendants' Second Motion for Summary Judgment, and Memorandum in Support of Renewed Motion for Summary Judgment ("Pl. Cons. Op."), plaintiff claims that, "[o]verall, the government's new submissions fail to meet the elemental threshold for Exemption (b)(5) claims in that they still do not identify the necessary deliberative process or explain how the documents were pre-decisional."  Pl. Cons. Opp., p. 2.  Plaintiff also argues that the Department of State "has not advanced much beyond "'mere repetitions of the legal standard' in invoking  . . . Exemption (b)(4) . . . ."  Id. at 32.  Plaintiff's arguments fail.

The Department of Commerce ("DOC") has demonstrated that the documents at issue meet the elemental threshold for Exemption (b)(5).  The documents are predecisional and deliberative, and concern decisions that are well within the authority of the DOC to consider, regardless of whether the DOC has authority to make policy concerning those deliberations.

In addition, the Department of State ("DOS") has demonstrated that the documents withheld under Exemption (b)(5) all played an identifiable role in particular deliberative processes, including the formulation of the United States Government's response to pressure on the international plane for particular changes to the structures and procedures of Internet governance. Furthermore, the record now leaves little room for doubt that the information DOS withheld under Exemption (b)(4) was submitted to the United States Government voluntarily and that it is not information that would customarily be disclosed. Accordingly, the DOS withholdings under Exemptions (b)(4) and (b)(5) were proper.

## ARGUMENT

### I. The Department of Commerce Properly Withheld Material Pursuant to FOIA Request Nos. CRRIF 06-068 and 06-127

Plaintiff argues that developing a response on how the DOC would respond if ICANN were to recommend the creation of a proposed new .xxx domain is not deliberative because "no conceivable response would have resulted in policy-making . . . under exemption 5." Pl. Cons. Opp., p. 20. Although the Government has demonstrated that the DOC has ample authority to deliberate on possible courses of action if ICANN were to recommend the creation of the proposed new .xxx domain and/or enter into a contract with ICM to operate the domain,[1] contrary to plaintiff's assertions, the Government's case for invoking the deliberative process privilege does not hinge on the DOC's policymaking authority regarding the deliberations at issue. A quotation from a case cited in the Defendants' Reply to Plaintiff's Consolidated Opposition to

---

[1] In addition to modifying the authoritative root zone file, the DOC is also responsible for monitoring ICANN's compliance with the 1998 MOU between ICANN and the DOC (the "MOU"), and participating in the Government Advisory Committee ("GAC"), which "provide[s] advice to ICANN on issues of public policy." Reply to Cross-MSJ, pp. 6-9.

2

Defendants' Motion to Dismiss and for Summary Judgment, and Cross-Motion for Summary

Judgment ("Reply to Cross-MSJ") bears repeating in full here, as it makes clear how expansively

courts interpret agencies' authority to conduct deliberations under the deliberative process

privilege:[2]

> Along the way to formulating a policy that is within its power to implement, an agency
> might legitimately identify and consider a host of alternatives, some within the agency's
> power to effectuate and some without . . . Deeming internal discussions unprotected by
> the deliberative process privilege because, in retrospect, it appears that the agency was
> considering proposals that were beyond the scope of its authority to implement might
> well discourage the kind of frank and appropriate policymaking discussions that the
> privilege was meant to protect and promote. Nonetheless, we may assume for the sake of
> argument that the scope of an agency's authority places some limits on the deliberate
> process privilege . . . Perhaps if . . . EPA staff members were to begin mapping out policy
> on something like school prayer, for example, then the privilege would not apply. We
> may likewise assume, looking to another line of cases that . . . [plaintiff-appellant] cites to
> us, that internal discussions about a course of agency action that would be nefarious, if
> not illegal, likewise would not be protected by the deliberative process privilege.

Reply to Cross-MSJ, p. 5, n.3 (citing Enviro Tech Int'l, Inc. v. U.S. Envtl. Prot. Agency, 371

F.3d 370, 376 (7th Cir. 2004)).

In this case, all predecisional deliberative information protected under the deliberative

process privilege is well within the scope of the deliberative process privilege as set forth in

Enviro Tech, regardless of the DOC's authority to effectuate any of the policies discussed in the

---

[2] An example of how broadly courts construe the kinds of deliberations which fall under
the deliberative process privilege is Maydak v. U.S. Dep't of Justice, 362 F. Supp. 2d 316, 326
(D.D.C. 2005), in which the court upheld protection under the deliberative process privilege of
information about the plaintiff, a prison inmate, which was "generated as part of [ ] a continuing
process . . . [in making] decisions regarding [plaintiff's] placement, security level and
classification."  Another example is Formaldehyde Inst. v. HHS, 889 F.2d 1118, 1123 (D.C. Cir.
1989), in which the court upheld protection of a review letter submitted by a review panel for a
scholarly journal which commented on an article written by employees of the Center for Disease
Control.

documents.[3]  Also, no evidence suggests that the protected material reveals any nefarious or illegal activity on the part of the DOC.

## II.  Application to Specific Documents Properly Withheld by the Department of Commerce[4]

A-     Documents Nos. EP7, EP46, EP59-EP69, EP98, EP102, EP116-117, EP125-26

Plaintiff argues that, with respect to EP59-EP61, no explanation is offered on how deliberations on the possible effects of creation of a .xxx domain on children's access to pornographic material, and on which websites would be in a .xxx domain, "factored into any deliberative process other than 'reactions' that could have involved only ministerial or *ultra vires* activity."  Pl. Opp., p. 21.  But, as Enviro Tech makes clear, whether the DOC had the authority to effectuate policy concerning the issues plaintiff mentions, or whether exercising such authority would be *ultra vires*[5] as plaintiff contends, does not lessen the protectibility of the DOC's predecisional deliberations on these matters.  The DOC's deliberating on these issues is hardly "nefarious" or "illegal," which the Enviro Tech court identifies as the limits of the deliberative process privilege.

Plaintiff makes the same mistake concerning the DOC's policymaking authority in

---

[3] Indeed, courts have made clear that the deliberative process privilege may apply even when the agency cannot identify a specific decision in connection with which a particular document is prepared, and when the deliberative process does not produce an actual decision by the agency.  See NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 151 n.18 (1975).

[4] Plaintiff indicates that it "does not dispute withholdings with respect to [D]ocument [Nos.] 000011-15, 000017, 000022-000024[,] 000027[ and] 000034-000037 . . . ."  Pl. Cons. Op., p. 2, n.1.

[5] But DOC's deliberations are not *ultra vires* because of its authority to deliberate on possible courses of action if ICANN were to recommend the creation of the proposed new .xxx domain and/or enter into a contract with ICM to operate the domain.  See supra at n.1.

4

indicating with respect to EP116-117 that the deliberations at issue, which concern opinions on the possible legal consequences of taking a certain course of action with respect to .xxx, are not protectible unless the legal consequences at issue "arise from" the DOC's authority to add an ICANN-approved sTLD to the root zone file. Pl. Opp., p. 22. Enviro Tech shows that such a narrow reading of the deliberative process is unwarranted. The Government, indeed, has argued that the discussions of legal consequences regarding .xxx were an integral part of the broader deliberation on what the Government's response should be to possible creation of a .xxx domain. Enviro Tech shows that this broad manner of conceptualizing how the individual Government deliberations at issue in these documents relate to a broader decision making process does not mean that the deliberative process privilege is applicable only if the Government shows that the legal consequences being discussed arise from the DOC's authority to add a sTLD to the root file.

Plaintiff repeats essentially the same arguments, in asserting why the deliberative process privilege is inapplicable to documents EP125-26, EP102, EP7, EP46, and EP98. As discussed supra, plaintiff is incorrect.

B-    Document Nos. EP90-92

Plaintiff also is incorrect in suggesting that the DOC protecting deliberations on "how to present to the public . . . Commerce's role in making changes to the authoritative root zone file" was somehow improper. Pl. Opp., p. 24. Predecisional deliberations on how to present policies to the public is an inherent part of the process of formulating those policies, and as such is protected by the deliberative process privilege. In Sierra Club v. U.S. Dep't of Interior, 384 F. Supp.2d 1, 22 (D.D.C. 2004), for instance, the court protected a "[d]raft compilation of arguments propounded by outside groups regarding ANWR [Alaska National Wildlife Refuge],

5

with preliminary responses from the Department [of Interior]." Id. at 22. The court agreed to

protect the material on the basis of the Department's assertion that the document

> shows the development of the Department's policy regarding how to present its
> positions on ANWR, and as a draft, is predecisional to the Department's final
> positions.

Id. Similarly, in another case, the court held that two documents

> fall within exemption 5 because they are pre-decisional, deliberative documents that in
> part discuss how the Department [of State] should respond to the reaction of some
> members of the public to the Article [an article published by the State Department in its
> Department of State Bulletin] and the Note [which was included in the foregoing Article].

Krikorian v. Dept. of State, 984 F.2d 461, 466 (D.C. Cir. 1993).

The broad scope given to the deliberative process privilege in Enviro Tech also fully

supports protection of predecisional deliberations on how to present policies to the public, and

the cases cited by plaintiff do not contradict this position. In Carter v. U.S. Dep't of Commerce,

186 F.Supp.2d 1147 (D. Oregon 2001), unlike the instant situation, the information at issue was

numbers (adjusted Census data). Numbers, unlike the information at issue here, "contain factual

information which reveals nothing about . . . subjective thought processes" involved, id. at 1157,

and are not customarily protected under the deliberative process privilege.[6] Alexander v. FBI,

186 F.R.D. 154 (1999), cited by plaintiff is also inapposite in which the court held that the

deliberative process privilege was inapplicable to protect specific evidence of Government

misconduct, in particular, "documents pertaining to an attempt to cover up political motivations

for or connections to the misuse of . . . [a] government file." Id. at 164. No such evidence is

---

[6] But see Fla. House of Representatives v. U.S. Dep't of Commerce, 961 F.2d 941 (11th
Cir.1992), in which the court protected such numerical data, viewing the census data as opinion
that was ultimately rejected by the decisionmaker and therefore withholdable under the
deliberative process privilege. Id. at 950.

present here.

C-    Documents Nos. EP33-34, MPW3, MPW14

Plaintiff again mistakenly argues, as it did for documents EP90-92, that the DOC

protecting deliberations on "how to present to the public . . . Commerce's role in making changes

to the authoritative root zone file" was somehow improper.  However, predecisional deliberations

on how to present policies to the public is an inherent part of the policymaking process itself, and

as such is protected by the deliberative process privilege.

D-    Document No. 000025[7]

Plaintiff argues that, with respect to this particular document and Vaughn entry, no

conceivable response by DOC would have resulted in policy-making or deliberation associated

with it under Exemption (b)(5).  Pl. Cons. Opp., p. 20.  The document is an e-mail consisting of

opinions and recommendations concerning potential questions that might arise with regard to

.xxx application at the ICANN/GAC meeting.  As discussed supra, contrary to plaintiff's

assertions, courts interpret agencies' authority to conduct deliberations broadly.  Enviro Tech at

376; see Reply, p. 5, n.3.  Pertinent to this particular document is the official role DOC plays

with respect to ICANN's creation of new domains, because the DOC accepted the open

invitation of ICANN to national Governments to serve on its Governmental Advisory

Committee, which is comprised of Government representatives from around the world and was

established by ICANN to "provide advice to ICANN on issues of public policy."[8]  Based on this

_____

[7] Plaintiff notes in its motion that Document 000026 does not appear in the Vaughn
Index.  Pl. Cons. Opp., p.30, n.49.  However, Document 000026 was released to Plaintiff by
letter dated April 30, 2007.

[8] See ICANN's website: www.icann.org/committees/gac/outreach-en-01oct01.htm.

advisory role, the DOC, in exercising its legitimate policymaking authority, is fully justified in deliberating on possible recommendations to make to the GAC related to ICANN's creation of a .xxx domain, particularly as they concern the process for creating new domains.

  E-  Document Nos. 000020 and 000021

  Plaintiff argues that no effort is made in the <u>Vaughn</u> entries for these two documents to identify the deliberative process to which the material relates, nor the role the document played. Pl. Cons. Opp., p. 29.  The <u>Vaughn</u> entries for these two documents state that "[t]he redacted portions of this document are predecisional and deliberative in that they consist of an employee's opinions concerning ICANN matters, given in advance of the ICANN meeting."  <u>See</u> Defendants' Second Motion for Summary Judgment, Department of Commerce Supplemental Vaughn Index ("DOC Supp. Vaughn"), p. 13.  Again, plaintiff argues that because, in its opinion, DOC did not have a policymaking role, the deliberations included in this document should not be protected by FOIA Exemption (b)(5).  This is simply not the case.  Whether or not the DOC had actual policymaking authority is not the pertinent question.  The pertinent question is whether or not the DOC conducted deliberations, which it did.  <u>Enviro Tech</u> makes clear that regardless of whether the DOC had authority to effectuate policy, predecisional deliberations are protectible under FOIA Exemption (b)(5).

  F-  Document Nos. 000001-10, 000016, 000018-19, and 000028-33

  With respect to these documents, plaintiff admits that it is "inclined to concede" that DOC's withholding of these documents as drafts pursuant to FOIA Exemption (b)(5) is "acceptable;" however, it argues that DOC does not provide any substantiation for withholding the last draft version of these documents, other than to state that final versions of the documents

were never produced.  Pl. Cons. Opp., p. 30.  The <u>Vaughn</u> entry for these documents states that

they are <u>all</u> drafts and that <u>no</u> final versions were produced.  <u>See</u> DOC Supp. Vaughn, pp. 9-14.

FOIA does not distinguish between early drafts and late drafts, thus, the same analysis that

applies to the first draft version of a document also applies to the last draft version of a

document, whether or not a final version is ever created.

      With respect to the documents cited above, even though no document was ever created

that reflected a final agency position, the last draft, which plaintiff refers to as a "final version" or

"last iteration" is still a draft, and is therefore protected pursuant to FOIA Exemption (b)(5).

Plaintiff mischaracterizes it as a "final version" or "last iteration" because NTIA did not go

forward and make a final decision on the issue.  The last draft should be withheld for the same

reasons the first draft is withheld – because release of such a draft document could discourage

open, frank discussions on matters of policy between subordinates and superiors and lead to

public confusion by disclosing reasons and rationales that were not, in fact, ultimately the

grounds for an agency's action. <u>See, e.g.</u>, <u>Russell v. Dep't of the Air Force</u>, 682 F.2d 1045, 1048

(D.C. Cir. 1982); <u>Jordan v. United States Dep't of Justice</u>, 591 F.2d 753, 773 (D.C. Cir. 1978).

      Courts have also consistently held that the very process of the evolution of a draft can, in

and of itself, warrant protection.  <u>See</u>, <u>e.g.</u>, <u>Marzen v. HHS</u>, 825 F.2d 1148, 1155 (7th Cir. 1987)

("[E]xemption protects not only the opinion, comments and recommendations in the draft, but

also protects the process itself.").  Plaintiff argues that, at a minimum, *in camera*, review of what

they refer to as the "last iteration" of these documents is in order to determine if the version last

edited truly reveals anything deliberative with respect to determining what should go into the

final document.  <u>See</u> Pl. Cons. Opp., p. 13.  However, Plaintiff cannot convert a draft, even the

9

last draft in a series of drafts, into a final document by mischaracterizing it as a "final version."

Even if there were final versions of these documents, which there are not, courts have

consistently held that FOIA Exemption (b)(5) protection is available to a draft document

regardless of whether it differs from the final document.  See e.g., Exxon Corp. v. Dep't of

Energy, 585 F.Supp. 690, 698 (D.D.C. 1983) (rejecting argument that agency must show how

draft differs from final document, because such a requirement would "expose what occurred in

the deliberative process between the draft's creation and the final document's issuance.").

### III.  Plaintiff's Contention (unrelated to the FOIA) That ICANN's Board Had Determined That Plaintiffs Proposed .xxx Domain Satisfied All Criteria for New sTLDs is False

Plaintiff asserts the following with respect to an August 11, 2005 letter from NTIA

Assistant Secretary Gallagher to Dr. Vinton Cerf, a member of ICANN's Board:

> ICM described [in its Opposition to Plaintiff's Summary Judgment Motion and Cross-Motion for Summary Judgment] how an eleventh-hour letter from . . . [Mr.] Gallagher to a leading member of ICANN's Board succeeded in blocking the last step toward .xxx's inauguration, despite the fact that ICANN's Board had determined that .xxx satisfied all criteria for new sTLDs and announced it intent to enter a contract with ICM to operate the domain.

Pl. Cons. Opp., p. 8.

Plaintiff's assertion that ICANN's Board had determined that .xxx satisfied all criteria for

new sTLDs is false.  Plaintiff's assertion that Mr. Gallagher's letter blocked the "last step" in the

inauguration of .xxx is also incorrect.  The minutes of the June 1, 2005, meeting of ICANN's

Board reflect that it authorized its President and General Counsel "to **enter into negotiations**

relating to proposed commercial and technical terms for the .xxx . . . sTLD . . . with the

applicant."[9] (emphasis added).  During the same meeting, the Board made clear that it was *not*

authorizing the President and General Counsel to enter into an agreement with ICM:

> Resolved [05.33] **if** after entering into negotiations with the .XXX sTLD applicant the
> President and General Counsel are able to negotiate a set of proposed commercial and
> technical terms for a contractual arrangement, the President shall present such proposed
> terms to this board, for approval and authorization to enter into an agreement relating to
> the delegation of the sTLD.[10] (emphasis added)

At the May 10, 2006, Board meeting, a proposed agreement between ICANN and ICM

was introduced.  The Board voted 9-5 against the proposal, with members voting against

expressing various concerns about the proposed agreement.[11]  On February 12, 2007, the Board

considered a revised proposed agreement with ICM and resolved:

> Whereas, a majority of the Board has serious concerns about whether the proposed .xxx
> domain has the support of a clearly-defined sponsored community as per the criteria for
> sponsored TLDs.[12]

The Board further resolved that ICANN staff would

> consult with ICM and provide further information to the Board prior to its next meeting,
> so as to inform a decision by the Board whether sponsorship criteria is [sic] met for the
> creation of a new .xxx sTLD.[13]

---

[9] http://www.icann.org/minutes/minutes-01jun05.htm

[10] Id.

[11] http://www.icann.org/minutes/minutes-10may06.htm

[12] http://www.icann.org/minutes/minutes-12feb07.htm

[13] Id.  The sponsorship information that a sTLD applicant must provide to meet
ICANN's sponsorship selection criteria appears in ICANN's Request for Proposals for new
sTLDs at http://www.icann.org/tlds/new-stld-rfp/new-stld-application-parta-15dec03.htm.  The
RFP provides, in pertinent part:

A. Definition of Sponsored TLD Community
The proposed sTLD must address the needs and interests of a clearly defined community (the
Sponsored TLD Community), which can benefit from the establishment of a TLD operating in a

On March 30, 2007, the Board definitively rejected ICM's application and proposed agreement.

The Board's resolution which was adopted at that meeting provides:

———————————————

policy formulation environment in which the community would participate.

Applicants must demonstrate that the Sponsored TLD Community is:

Precisely defined, so it can readily be determined which persons or entities make up that community; and Comprised of persons that have needs and interests in common but which are differentiated from those of the general global Internet community.

B. Evidence of support from the Sponsoring Organization
Applicants must:

Provide evidence of support for your application from your sponsoring organization; and, Provide the name and contact information within the sponsoring organization

C. Appropriateness of the Sponsoring Organization and the policy formulation environment
Applicants must provide an explanation of the Sponsoring Organization's policy-formulation procedures demonstrating:

Operates primarily in the interests of the Sponsored TLD Community; Has a clearly defined delegated policy-formulation role and is appropriate to the needs of the Sponsored TLD Community; and Has defined mechanisms to ensure that approved policies are primarily in the interests of the Sponsored TLD Community and the public interest.

The scope of delegation of the policy formulation role need not be (and is not) uniform for all sTLDs, but is tailored to meet the particular needs of the defined Sponsored TLD Community and the characteristics of the policy formulation environment.

D. Level of support from the Community
A key requirement of a sTLD proposal is that it demonstrates broad-based support from the community it is intended to represent.

Applicants must demonstrate that there is:

Evidence of broad-based support from the Sponsored TLD Community for the sTLD, for the Sponsoring Organization, and for the proposed policy-formulation process; and An outreach program that illustrates the Sponsoring Organization's capacity to represent a wide range of interests within the community.

12

**ICM's Application and the Revised Agreement fail to meet, among other things, the Sponsored Community criteria of the RFP specification.**

Based on the extensive public comment and from the GAC's communiqués that this

agreement raises public policy issues.

Approval of the ICM Application and Revised Agreement is not appropriate as they do not resolve the issues raised in the GAC Communiqués, and ICM's response does not address the GAC's concern for offensive content, and similarly avoids the GAC's concern for the protection of vulnerable members of the community. The Board does not believe these public policy concerns can be credibly resolved with the mechanisms proposed by the applicant.

The ICM Application raises significant law enforcement compliance issues because of countries' varying laws relating to content and practices that define the nature of the application, therefore obligating ICANN to acquire a responsibility related to content and conduct.

The Board agrees with the reference in the GAC communiqué from Lisbon, that under the Revised Agreement, there are credible scenarios that lead to circumstances in which ICANN would be forced to assume an ongoing management and oversight role regarding Internet content, which is inconsistent with its technical mandate (emphasis added).[14]

**IV.  The Department of State's Withholding in Response to FOIA Request No. 04-606**

A-    The Department of State Properly Applied Exemption (b)(4)

The remaining issue relating to the Department of State's redaction of confidential

business information is whether the information withheld in documents E2 and E71 is

"privileged or confidential" as those terms are used in 5 U.S.C. § 552(b)(4).  See Court's

Memorandum ("Court's Memo."), pp. 17-19.  As the Court noted, "[i]f the commercial or

financial information was submitted voluntarily, it is confidential-and therefore protected under

exemption (b)(4)-so long as it is the type of information that is not customarily disclosed by the

submitter."  Id. at 16 (citing Critical Mass Energy Project v. Nuclear Regulatory Comm'n, 975

---

[14] http://www.icann.org/minutes/minutes/resolutions-30mar07.htm#_toc36876524.

13

F.2d 871, 879 (D.C. Cir. 1992) (en banc)).  To eliminate any doubt that may have remained about the confidential nature of the information at issue, defendants attach here two supplemental declarations and refers the Court to the Declaration of Richard C. Beaird ("Beaird Dec.") submitted with Defendants' Second Motion for Summary Judgment.  See Declaration of Marilyn S. Cade ("Cade Dec."), attached hereto as Exhibit A; Declaration of John O. Jeffrey ("Jeffrey Dec."), attached hereto as Exhibit B; Beaird Dec.[15]

_____    1-  Document No. E2.  With respect to the redactions in this document, which contains a series of emails from private telecommunications consultant Marilyn Cade to Ambassador David Gross, the Court requested further information addressing whether Ms. Cade's disclosure of this information was voluntary, whether the information redacted is customarily released to the public, and (in the event that submission was not voluntary, see Critical Mass, 975 F.2d at 879; Nat'l Parks & Conservation Ass'n v, Morton, 498 F.2d 765, 770 (D.C. Cir. 1974)) what harm would befall the Government or Ms. Cade if the redacted portions were released.

The record leaves little room for doubt that Ms. Cade's disclosure was voluntary.  She has occasionally "initiated contact with Ambassador Gross" and others in Government positions, but "[n]one of these interactions were ever invited by the Department of State or Ambassador Gross, or by any member of the U.S. government."  Cade Dec. at ¶ 4.  In particular, with regard to the

_____

[15]Plaintiff contends, without merit, that the information withheld under exemption 4 is not commercial, despite the Court's earlier determination to the contrary.  See Pltf's Cons. Opp., p. 36, n.55; Court's Memo., pp. 17-19.  Even if there had ever been any doubt, the Cade and Jeffrey declarations now make it plain that the submitters "have a commercial interest in the requested information."  Public Citizen Health Research Group. v. FDA, 704 F.2d 1280, 1290 (D.C. Cir. 1983).

material at issue in document E2, Ms. Cade asserts that she "provided the redacted information to the United States Government on my own initiative without any request, in indication of interest by Ambassador Gross or anyone else in government."  Id. at ¶ 9; see also id. ("I provided this information voluntarily; the United States government did not solicit the information I provided and I had no obligation to provide it.");  Critical Mass, 975 F.2d at 878-79.

      Furthermore, the information withheld in the document is of the sort that would not customarily be released, and has not here been released, to the public by the person from whom it was obtained.  Id. at 879; see Beaird Dec. at ¶ 27.  Public release of this information, which concerns Ms. Cade's "impressions of the July 2005 meeting in Geneva at which the WGIG report was presented to stakeholders," Beaird Dec. at ¶ 26, could have a potentially undesirable effect on the issues to which it pertained, including inhibiting candor among interested parties in issues of Internet governance.  See Cade Dec. at ¶¶ 8, 9.  Furthermore, the information is "particularly private," even in comparison with other (unredacted) personal impressions that Ms. Cade also labeled "private" in her email.  Id. at ¶ 9.  Disclosure of this information would breach the confidence of third parties with whom Ms. Cade has endeavored over the course of many years "to develop of very high degree of trust" and would run the risk of compromising that trust and irreparably harming Ms. Cade's professional and personal standing.  Id. at ¶¶ 3, 8.  For similar reasons, even if Ms. Cade had not shared this information with the Department of State voluntarily, it is clear that disclosing information would harm the submitter as well as the Government.  See also id. at ¶ 9 ("If the government could not withhold such private commercial information in response to a Freedom of Information Act request, I would not provide it to the government in the first place.");  Critical Mass, 975 F.2d at 878 (noting that "when . . .

15

information is volunteered, the Government's interest is in ensuring its continued availability").

       2 - <u>Document No. E71</u>.  This document contains the text of "two emails, one quoted within the other," which communicated impressions of meetings between ICANN personnel and European Union staff, and which an ICANN senior executive shared with the United States Government.  Jeffrey Dec. at ¶¶ 4, 5.  The United States Government did not solicit or require this information from ICANN; on the contrary, it was provided voluntarily with the aim of "assist[ing] the United States government in preparation for the politically controversial discussions surrounding the WSIS meeting in Tunisia" in November 2005.  <u>Id</u>. at ¶ 6; <u>see</u> <u>Critical Mass</u>, 975 F.2d at 878-79.  Moreover, it is not information that ICANN has made or would customarily make public, "as doing so could harm both ICANN's and the United States government's interests in the global debates on the structures and procedures of internet governance."  Jeffrey Dec. at ¶ 6; <u>see also</u> <u>id</u>. at ¶ 5 (noting that, "[d]espite ICANN's general policy of openness, . . . [i]f ICANN were required to report such private conversations to the public, it would make it very difficult for ICANN to obtain information to support ICANN's technical coordination role and the discussion of this role, particularly in dialogue of such an international nature.").  Finally, even if ICANN had had an obligation to share the information in these emails with the United States Government, it is clear that disclosure would both harm ICANN and inhibit the Government's ability to obtain such information in the future.  <u>Id</u>.  at ¶¶ 5, 6; <u>Nat'l Parks</u>, 498 F.2d at 770.

    B-    <u>The Department of State Properly Applied Exemption (b)(5)</u>

       1- <u>Document No. E54</u>.  The Department of State has withheld in full this "unsigned, undated three-page draft memorandum" from a staffer to the then-Assistant Secretary

for Economic and Business Affairs.  See Beaird Dec. at ¶ 10.  As the Court has already noted, "the application of exemption (b)(5) 'does not depend on the agency's ability to identify a specific decision to which the documents relate.'"  Court's Memo., p. 11 (quoting Balderrama v. Dep't of Homeland Security, 2006 U.S. Dist LEXIS 19421, *22 (D.D.C. 2006)); see also Hunt v. United States Marine Corps., 935 F.Supp. 46, 51 (D.D.C. 1996).  Instead, the agency need only show "what deliberative process is involved, and the role played by the documents in issue in the course of that process."  Coastal States Gas Corp., 617 F.2d at 868.  The Court should afford "considerable deference to the [agency's] judgment as to what constitutes . . . 'part of the agency give-and-take-of the deliberative process-by which the decision itself is made.'"  Chemical Mfrs. Ass'n v. Consumer Product Safety Comm'n., 600 F.Supp. 114, 118 (D.D.C. 1984) (quoting Vaughn v. Rosen, 523 F.2d 1136, 1144 (D.C. Cir. 1975)); see also Pfeiffer v. CIA, 721 F.Supp. 337, 340 (D.D.C. 1989) (same).

The record here makes clear the deliberative process at issue.  As discussed at length in the Beaird Declaration, at the time this document was created, the Department of State was thickly involved in (and had not completed) policymaking regarding Internet governance.  See Beaird Dec. at ¶¶ 5-9.  In particular, the Department had to address significant international pressure to change United States policy concerning how to structure the "relationship b[etween] the USG and ICANN," which was a "major topic" at WSIS.  Id. at ¶ 6.  Indeed, the WGIG report "criticized . . . the relationship between the United States Government and ICANN" and proposed "alternative 'models' for 'Internet governance,'" while the EU criticized the United States' alleged "control" over the Internet and its relationship with ICANN.  Id. at ¶ 7.  As conducting the foreign affairs of the United States is a core function of the Department of State,

see 22 U.S.C. §§ 2651, 2656, it is plainly a legitimate policymaking function of the Department to help decide "how the United States government should deal with and respond to" particular international pressure for alternative arrangements between the United States Government and other entities that might play a role in designing the structures and policies of the Internet.  Id. at ¶ 9.

The record likewise establishes the role of document E54 within these internal deliberations.  In the first place, this memorandum consists of "frank" views on an Internet governance issue attracting particular attention and international pressure - - that is, "attempts by other countries to create alternatives to the Internet's domain name system (which is managed by ICANN)."  Id.  at ¶ 12.  Analyses like the one contained in document E54 have been routinely prepared for the agency principals who "develop[] United States government policy related to Internet governance."  Id.; see also Coastal States, 617 F.2d at 868 (noting that "a document from a subordinate to a superior official is more likely to be predecisional"); Hunt, 935 F.Supp. at 51 (same); cf. Renegotiation Bd. v. Grumman Aircraft Eng'g Corp., 421 U.S. 168, 184-85 (1975) (linking the likelihood that a document is predecisional to the decision-making authority of the document's author).

That this particular document was never forwarded to the then-Assistant Secretary only strengthens the case for applying exemption (b)(5).  Cf. Hamilton Sec. Group. v. HUD, 106 F.Supp.2d 23, 30 (D.D.C. 2000) (upholding (b)(5) withholding of a draft report in part because it was never reviewed and approved by a senior official), aff'd, 2001 WL 238162, at *1 (D.C. Cir 2001); Greenberg v. Dep't of Treasury, 10 F.Supp.2d 3, 16 (D.D.C. 1998) (upholding (b)(5) withholding even though the agency never used the documents at issue).  Likewise, the

18

deliberative process privilege protected by exemption (b)(5) applies to documents, like E54, that have never been finalized. See, e.g., Dudman Commc'ns Corp. v. Dep't of the Air Force, 815 F.2d 1565, 1568-69 (D.C. Cir. 1987). Document E54 is not a draft of the type that has effectively been "used . . . as a finished product," Hansen v. Dep't of the Air Force, 817 F.Supp. 123, 125 (D.D.C. 1982), such that applying exemption (b)(5) would allow the agency to make "secret law" outside the view of the American public. Sterling Drug, Inc. v. FTC, 450 F.2d 698, 708 (D.C. Cir. 1971). On the contrary, this is a draft document that was never reviewed by its author's supervisor, approved, or forwarded. Beaird Dec. at ¶ 11. Disclosure of documents like E54 would deter frank deliberation within the Department of State and thereby undermine the heart of the protection intended by exemption (b)(5). See, e.g., Russell, 682 F.2d at 1048.

           2 - Document No. E59. This document, the two-page draft paper discussing a meeting between Department of State officials and a Japanese official, falls within the scope of the deliberative process privilege for similar reasons as Document E54, discussed supra. In its earlier Memorandum at 14, the Court already agreed that this document is predecisional. In addition, the record now shows in greater detail the deliberative nature of this document, demonstrating that it played a part in the same policymaking process described above concerning international negotiations and Internet governance. See supra; Beaird Dec. at ¶¶ 5-9. Furthermore, both the deliberative and the predecisional natures of the document are evident from the fact that it was drafted to assist the deliberations of United States policymakers in their preparations for a specific, imminent meeting of the WSIS. Id. at ¶ 15.[16] The only uncertainty

_____

[16]Accordingly, to the extent facts are recounted in this document, the purpose for their inclusion is to advance internal United States deliberations on policy and negotiating strategy in anticipation of the WSIS event. See Beaird Dec. at ¶ 15 ("Document E59 reflects the author's

surrounding this document is the precise identity of its drafter, but it was likely a former

employee in the Office of Multilateral Affairs, and in any event, the document is from the files of

the Office of Communications and Information Policy (EEB/CIP). Id. at ¶¶ 3, 14.

Moreover, this document is a draft, and even the process by which a draft is pushed (or

not) toward finalization can reflect predecisional deliberation as to the content of the document.

See, e.g., Dudman, 815 F.2d at 1568-69. Above all, this draft is of the sort that never served in a

finalized capacity, for it was "not finished," does not contain information about the author or the

intended recipients, contains "place-markers . . . to indicate which portions remain to be filled

in," and "does not necessarily reflect an accurate portrayal of the meeting" it discusses. Beaird

Dec. at ¶ 14; see also Defendants' Motion to Dismiss and for Summary Judgment, Declaration of

Margaret P. Grafeld ("Grafeld Dec.") at ¶ 28. In short, it is evident that this draft was not "used .

. . as a finished product." Hansen v. Dep't of the Air Force, 817 F.Supp. at 125. Withholding

under (b)(5) was therefore proper.

_____ 3- Document Nos. E3, E36, E68, E69, and E70. These documents discuss

"periodic United States government interagency phone calls, chaired by the White House Office

of Science and Technology Policy." Beaird Dec. at ¶ 16. They were redacted in part and are

attached, in redacted form, as Exhibits 2 through 6 to the Beaird Declaration.

The record demonstrates that the documents themselves, and not merely the underlying

_____

frank impressions of a Japanese official's views concerning Internet governance and the proper
role for the United States in relation to that subject"); Jowett, Inc. v. Dep't of the Navy, 729 F.
Supp. 871, 874 (D.D.C. 1989) ("[E]ven factual segments of documents 'are protected from
disclosure as not being purely factual if the manner of selecting or presenting those facts would
reveal the deliberat[ive] process, or if the facts are "inextricably intertwined" with the policy-
making process.") (quoting Ryan v. Dep't of Justice, 617 F.2d 781, 790 (D.C. Cir. 1980)).

phone calls, contain deliberative and predecisional information. In the first place, the withheld material contains "judgments, analysis or anticipated actions," and not merely facts. Grafeld Dec. at ¶ 30; see also Beaird Dec. at ¶ 23 ("The factual portions of documents E3, E36, E68, E69, and E70 have been released to plaintiff."). Furthermore, the documents were "prepared by EEB/CIP staff members who participated in the calls to keep Ambassador Gross, the head of EEB/CIP, informed of the discussions that took place in those calls." Beaird Dec. at ¶ 17. Thus, the documents constitute communications "from a subordinate to a superior official" and are therefore more likely to fall within the scope of exemption (b)(5). Coastal States, 617 F.2d at 868; Hunt, 935 F.Supp. at 51. In particular, these communications directed to Ambassador Gross themselves further the goal of ensuring that the various federal actors "with telecommunications and technology responsibilities" - - including Ambassador Gross - - "coordinate responses and policy on matters of common interest." Beaird Dec. at ¶ 16. As such, the documents themselves "reflect interagency deliberations on . . . then-current telecommunications issues," id. at ¶ 17, and are no less deliberative than the phone calls out of which they arose.

Moreover, the various deliberative processes underlying the redactions in these documents are specific, delimited concerns pending at the times the documents were created. The redactions concerned deliberations about, among other things, particular matters at an upcoming ICANN board meeting; proposed legislation pending in Congress; the WGIG report of July 2005; FTC investigations; securing funding to remedy problems caused by Hurricane Katrina; support-building for the United States position in advance of a WSIS preparatory meeting; an upcoming FCC meeting; discussions on holding other meetings; and reactions to a pending ICANN/Verisign settlement. Beaird Dec. at ¶¶ 18-22. As the Department of State has

adequately identified both the "deliberative process . . . involved, and the role played by the documents in issue in the course of that process," <u>Coastal States</u>, 617 F.2d at 868, the redactions under exemption (b)(5) were proper.

## CONCLUSION

For the reasons explained herein, defendants respectfully request that the Court grant the Government's Second Motion for Summary Judgment and deny plaintiff's Renewed Motion for Summary Judgment.

Respectfully submitted,


_____/s/_____

JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney


_____/s/_____

RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney


_____/s/_____

MARIAN L. BORUM, D.C. Bar # 435409
Assistant United States Attorney
501 Third Street, N.W., Fourth Floor
Washington, D.C.  20530
(202) 514-6531


Of Counsel:

Oliver M. Lewis
Attorney Adviser
United States Department of State
Office of the Legal Adviser
2201 C Street, N.W.
Washington, D.C.  20520

Andrew W. McCready
Senior Counsel
Office of the General Counsel
United States Department of Commerce
14th Street and Constitution Avenue, N.W.
Washington, D.C.  20230

Sarah Coe
Senior Counsel
Office of the General Counsel
United States Department of Commerce
14th Street and Constitution Avenue, N.W.
Washington, D.C.  20230

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ICM REGISTRY, LLC, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 06-0949 (JR) |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES DEPARTMENT OF ) | |
| COMMERCE and ) | |
| UNITED STATES DEPARTMENT OF ) | |
| STATE, ) | |
| ) | |
| Defendants. ) | |

## DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS NOT IN GENUINE DISPUTE

Pursuant to Local Rules 7(h) and 56.1, Defendants submit the following Response to Plaintiff's Statement of Additional Material Facts Not in Genuine Dispute.

1. Admitted that Plaintiff was an applicant to the Internet Corporation for Assigned Names and Numbers ("ICANN") as of the date that this suit was filed. ICANN, however, denied Plaintiff's application for a delegation of the .xxx sponsored top level domain ("sTLD") on March 30, 2007. Defendants refer the Court to the "Adopted Resolutions for ICANN Board Meeting," 30 March 2007, at http://www.icann.org/minutes/resolutions-30mar07.htm.

2. This paragraph constitutes the Plaintiff's characterization of action by the ICANN Board, a non-party, on June 1, 2005, and is inconsistent with the Minutes of the Special Meeting of the ICANN Board. Defendants refer the Court to the "Special Meeting of the Board Minutes," 1 June 2005, at http://www.icann.org/minutes/minutes-01jun05.htm. The Minutes do not indicate that the Board found Plaintiff's application to meet all eligibility criteria, but rather

provide that "[t]he topics of discussion among board members, liaisons and staff surrounded the adequacy of the application with particular focus on the 'sponsored community' issues among others." Moreover, the Minutes indicate that the Board merely authorized the President and General Counsel to enter into negotiations relating to proposed terms for a contractual agreement, and if after entering into such negotiations, the President and General Counsel were able to negotiate a set of proposed terms, then the President was to present the proposed terms to the Board for its approval and authorization to enter into an agreement. Admitted that the ICANN Board scheduled consideration of an agreement for the .xxx sTLD for August 16, 2005.

3. This paragraph constitutes Plaintiff's description of a letter from Assistant Secretary Michael D. Gallagher to Dr. Vinton Cerf, Chairman of the ICANN Board, on August 11, 2005 ("August 11 Letter"). Admitted that Mr. Gallagher did send a letter to Dr. Cerf on that date. Defendants refer the Court to the text of the August 11 Letter at http://www.icann.org/correspondence/gallagher-to-cerf-15aug05.pdf.

4. This paragraph constitutes Plaintiff's description of what was not contained in the August 11 Letter as if to suggest that there is some significance that the Department of Commerce ("DOC") did not take issue with any specific step that ICANN may have taken in evaluating proposals for new sTLDs or the .xxx sTLD application. As of the date of the August 11 Letter, ICANN had not, however, provided any information to the public on the steps it had taken to evaluate new sTLD proposals. Only after urging from an official of the European Commission, among others, did ICANN make independent evaluation reports and other documents available for review. Defendants refer the Court to the Letter from Peter Zangl, Deputy Director General, Information Society and Media Directorate General, European

2

Commission, to Vinton Cerf, ICANN Board Chairman, on September 16, 2006, at

http://www.icann.org/correspondence/zangl-to-cerf-16sep05.pdf.  In response, ICANN posted on

its website sTLD Evaluation Reports and supporting documentation generated by the sTLD

application process.  Defendants refer the Court to "Information Page for Sponsored Top Level

Domains," at http://www.icann.org/tlds/stld-apps-19mar04/ and the Evaluation Reports, at

http://www.icann.org/tlds/stld-apps-19mar04/PostAppD.pdf, which concludes that the .xxx

application does not meet the sponsorship criteria.

     5.  This paragraph constitutes Plaintiff's description of a letter from Mohamed Sharil

Tarizi, Chairman of ICANN's Governmental Advisory Committee ("GAC"), to the ICANN

Board of Directors, on August 12, 2005.  The text of the letter indicates that Mr. Tarizi did not

request "further debate" as Plaintiff contends, but rather asks that the Board keep in mind

previous expressions of governmental views on the potential introduction of the .xxx domain "in

any further debate that we may have with regard to this TLD."  Defendants refer the Court to the

text of the letter at http://www.icann.org/correspondence/tarmizi-to-board-12aug05.htm.

     6.  This paragraph constitutes Plaintiff's description of ICANN Board action on August

16, 2005.  The ICANN Board minutes indicate, however, that the Board "deferred consideration"

of the .xxx sTLD request in response to requests from the "applicant ICM, the Chairman of

ICANN's Governmental Advisory Committee, and the US Department of Commerce to allow for

additional time for comments from interested parties."  Defendants refer the Court to the

"Special Meeting of the Board Minutes" August 16, 2005, at

http://www.icann.org/minutes/minutes-16aug05.htm as well as Letter from ICM Registry's

Chairman Stuart Lawley to ICANN CEO Paul Twomey, on August 15, 2005, at

http://www.icann.org/correspondence/lawley-to-twomey-15aug05.pdf.

7.  Admitted that Plaintiff submitted requests, dated October 18, 2005, under the FOIA to the DOC's Freedom of Information Officer, a copy of which is attached as Appendix A to Plaintiff's Complaint, and to the Department of State ("State"), Office of Information Programs and Services, a copy of which is attached as Appendix B to Plaintiff's Complaint, requesting records.  Defendants refer the Court to that request for a description of the documents Plaintiff sought from Commerce.

8.  This paragraph constitutes Plaintiff's description of how Plaintiff asked Commerce and State to account for any records withheld pursuant to the request cited in the paragraph 7 above.  Defendants refer the Court to these requests for a description of how Plaintiff asked Commerce and State to account for any records withheld.

9.  Admitted.

10.  Admitted.

11.  This paragraph constitutes a legal conclusion regarding the statutory deadline for response, to which no response is required.  To the extent a response is required, denied. Pursuant to Commerce's FOIA regulations at 15 C.F.R. § 4.5(a), Commerce's Freedom of Information Officer assigned lead responsibility for responding to Plaintiff's request to the National Telecommunications and Information Administration (NTIA).  NTIA received the request on October 20, 2005.  Thus, NTIA had twenty working days from that date, November 18, 2005, to provide an initial response to Plaintiff.  See 15 C.F.R. § 4.6(b).

12.  Admitted.

13. Admitted that ICM submitted a second FOIA request, dated December 2, 2005, to

4

Commerce's Freedom of Information Officer, a copy of which is attached at Appendix C to

Plaintiff's Complaint.  Defendants refer the Court to that request for a description of the

documents Plaintiff sought from Commerce.

14.  This paragraph constitutes Plaintiff's further description of how Plaintiff asked that

Commerce account for any records withheld.  Defendants refer the Court to the request

referenced in paragraph 13 for a description of how Plaintiff asked Commerce to account for any

records withheld.

15.  Admitted.

16.  The first sentence of this paragraph states a legal conclusion, to which no response is

required.  To the extent a response is required, denied.  As for the deadline for Commerce to

respond to request 06-127, under Commerce's FOIA regulations at 15 C.F.R. § 4.5(a),

Commerce's Freedom of Information Officer assigned lead responsibility for responding to

Plaintiff's request to NTIA.  NTIA received the request on December 6, 2005.  Thus, NTIA had

twenty working days from that date, or January 5, 2006,  to provide an initial response to

Plaintiff. 15 C.F.R. § 4.6(b).  Under "unusual circumstances" as provided for in 15 C.F.R. § 4.6

(c), NTIA had an additional ten working days to respond upon written notice to the requester or

an alternate time frame could have been arranged.  Pursuant to Commerce's FOIA regulations,

NTIA notified the requester in writing on January 5, 2006, that NTIA would be exercising a ten-

day extension, and would provide responsive documents by January 19, 2006.  The Plaintiff

acknowledged receipt of that notice in writing on that same day.

17.  Admitted.

18.  Admitted that, by facsimile sent on November 29, 2005, Plaintiff provided the

Department of State with materials indicating that the Department of Commerce may have coordinated on the subject matter of Plaintiff's FOIA request with individuals at the Department of State.

19. Admitted.

20. Admitted.

21. Admitted that certain of the transmitted documents included redacted portions, which in some cases included entire pages, and that the redacted portions included notations that 5 U.S.C. § 552 (b)(5) was the basis for redaction.

22. Admitted that the only explanation NTIA provided Plaintiff for withholding records pursuant to its FOIA response were contained in the FOIA response and in notations on the released documents themselves.

23. Admitted that NTIA did provide the plaintiff with additional records on December 19, 2005, and December 21, 2005. Defendants refers the Court to the transmittal letters for their texts.

24. Admitted that the supplemental responses included documents with notations indicating that portions of the documents were withheld in part or in full based on 5 U.S.C. § 552(b)(5).

25. Admitted.

26. Admitted.

27. This paragraph constitutes Plaintiff's description of statements it made in its appeal with respect to CRRIF 06-068. Defendants refer the Court to the appeal for the text of the Plaintiff's statements. Plaintiff's assertions are conclusions and inferences about released

6

records, to which no response is required, but insofar as a response is required, the assertions are denied.

28.   This paragraph constitutes Plaintiff's explanation of its grounds for appealing CRRIF 06-068.  Defendants refer the Court to the appeal for the text of Plaintiff's explanation. Plaintiff's assertions are conclusions and inferences, to which no response is required, but insofar as a response is required, the assertions are denied.

29.   This paragraph constitutes Plaintiff's description of the grounds for its expanded appeal. Defendants refer the Court to the Plaintiff's January 3, 2006, letter for the text of its assertions.

30.   Admitted that the deadline pursuant to 5 U.S.C. § 552(a)(6)(A)(ii) for Commerce to respond to ICM's appeal on request 06-068 was January 3, 2006.  Commerce avers that on January 4, 2006, counsel for Plaintiff agreed to a two-week extension to answer the appeal (see Appendix K of Plaintiff's Complaint), and that by virtue of this agreement, the deadline for answering the appeal was January 18, 2006.

31.   Admitted that by letter dated January 19, 2006, NTIA responded to Plaintiff's request 06-127, and that it transmitted responsive records.

32.   Admitted that NTIA's letter referenced in paragraph 31 cited as a basis for withholding documents or portions thereof "5 U.S.C. § 552(b)(5), as it contains predecisional, deliberative process and/or attorney client privileged information," as well as exemptions (b)(2) and (b)(6) of the FOIA.

33. Admitted that ICM filed an administrative appeal dated February 21, 2006, with Commerce by fax, and email transmitted February 21, 2006, to challenge NTIA's January 19

response to  Request No. 06-127.  Defendants refer the Court to the appeal at Appendix F of

Plaintiff's Complaint for the grounds of Plaintiff's appeal.

34.  Admitted that on March 2, 2006, Commerce sent Plaintiff a letter informing the

requester that its appeal would not be considered.  Defendants refer the Court to the text of the

letter for an explanation of Commerce's grounds for declining to consider Plaintiff's appeal.

35.  This paragraph constitutes the Plaintiff's description of ICANN Board action of May

10, 2006.  Defendants refer the Court to "Special Meeting of the Board Minutes," 10 May 2006,

at http://www.icann.org/minutes/minutes-10may06.htm.

36.  Upon information and belief, Defendants aver that Plaintiff filed a reconsideration

request with ICANN on May 19, 2006, and withdrew such request on October 20, 2006, to

permit further negotations with ICANN.  Defendants direct the Court to "Adopted Resolutions

from the ICANN Board Meeting," 20 March 2007, at

http://www.icann.org/minutes/resolutions-30mar07.htm.

37. Admitted.

38. Admitted.

39. Admitted.

40. Admitted.

41. Admitted.

42. Admitted.

43. Admitted that with a cover letter dated July 5, 2006, and in accordance with a series

of telephone calls and emails with counsel for Plaintiff, the Department of State released 1,155

pages of material that were potentially responsive to the request, but that had not been reviewed

8

document-by-document for responsiveness.

44. Admitted that by letter dated July 14, 2006, the Department of State released records to Plaintiff and informed Plaintiff that searches had yielded 74 documents responsive to the request.

45. Admitted that the Department of State's letter referenced in paragraph 44 referenced 5 U.S.C. § 552(b)(5), noted the "inter-agency or intra-agency" scope of that provision, and stated that the material withheld under this provision was exempt from release "because it consists of pre-decisional deliberative process material." Defendants admit that the letter informed Plaintiff that a limited amount of material was withheld under 5 U.S.C. § 551(b)(4) because it "constitutes trade secrets or commercial or financial information obtained from a person and is privileged or confidential."

46. Denied. Of the 74 documents that the Department of State identified as responsive to Plaintiff's request, it has released 34 in full and 9 in part, and it has withheld 25 in full and referred 6 to other agencies. These numbers reflect the actions communicated to Plaintiffs by letters dated August 17, 2006 (Grafeld Dec., Ex. 8) and April 27, 2007 (Beaird Dec., Ex. 1).

47. Admitted that a number of documents released to Plaintiff by the Department of State contained "B4" or "B5" annotations in the margin next to redactions. The precise number of pages containing such annotations will have changed given actions communicated by the letters cited in paragraph 46, supra.

48. Denied. In addition to noting the exemption in the margin next to each redaction and sending letters dated July 14, 2006 and August 17, 2006 to Plaintiff that cited the statutory bases for its redactions and withholdings (including noting, as discussed above in paragraph 45, that

9

the exemption 5 withholdings were on deliberative process grounds), the Department of State has

now prepared multiple declarations indexing its withholdings and redactions.

49. Admitted.

50. Admitted, except that to clarify Plaintiff's statement, some of the 55 documents

released in part and 10 released in full had already been released by Commerce in its initial

response to request 06-068.

51. Admitted.

52. Admitted that Commerce's appeal decision invoked the deliberative process privilege,

and that the quoted language in paragraph 52 is correct.  Defendants refer to Court to the text of

the decision for a further explanation of the deliberative processes at issue in the decision.

53.  Admitted that Commerce's appeal decision invoked the attorney-client privilege, and

that the quoted language in paragraph 53 is correct.  Defendants refer to Court to the text of the

decision for a further explanation of the application of the attorney-client privilege to the

documents at issue in the decision.

54.  Admitted that from June 14 through August 22, 2006, ICM and Defendants engaged

in motions practice related to timing and other procedural issues regarding the DOC and State

FOIA actions.

55.  Admitted.

56.  Upon information and belief, Defendants aver that ICM withdrew its reconsideration

request on October 20, 2006, to permit further negotiations with ICANN.  Defendants direct the

Court to "Adopted Resolutions from the ICANN Board Meeting," 20 March 2007, at

http://www.icann.org/minutes/resolutions-30mar07.htm.

57.  Admitted that on March 29, 2007, the Court issued and Order and Memorandum & Opinion.  Defendants refer to the Court to that document for its contents.

58.  Admitted that on March 30, 2007, the ICANN Board resolved that the proposed agreement with Plaintiff concerning the .xxx sTLD was rejected and its application request for a delegation of the .xxx sTLD was denied.  For the text of the resolutions, the Defendants refer the Court to the "Adopted Resolutions for ICANN Board Meeting," 30 March 2007, at http://www.icann.org/minutes/resolutions-30mar07.htm.

59.  Admitted, except insofar as this paragraph omits mention of the August 17, 2006 letter from the Department of State to Plaintiff (Grafeld Dec., Ex. 8).

60. Admitted.

61.  Defendants lack sufficient knowledge or information to form a belief as to the truth of Plaintiff's statement, and thus deny it.

Respectfully submitted,


_____/s/_____

JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney


_____/s/_____

RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney


_____/s/_____

MARIAN L. BORUM, D.C. Bar # 435409
Assistant United States Attorney
501 Third Street, N.W., Fourth Floor
Washington, D.C.  20530
(202) 514-6531


Of Counsel:

Oliver M. Lewis
Attorney Adviser
United States Department of State
Office of the Legal Adviser
2201 C Street, N.W.
Washington, D.C.  20520

Andrew W. McCready
Senior Counsel
Office of the General Counsel
United States Department of Commerce
14th Street and Constitution Avenue, N.W.
Washington, D.C.  20230

Sarah Coe
Senior Counsel
Office of the General Counsel
United States Department of Commerce
14th Street and Constitution Avenue, N.W.
Washington, D.C.  20230

12

**CERTIFICATE OF SERVICE**

I hereby certify that on this 27th day of June, 2007, the foregoing was served upon counsel

for plaintiff via the Court's ECF e-mail.

/s/

MARIAN L. BORUM
ASSISTANT UNITED STATES ATTORNEY