**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
ICM REGISTRY, LLC,                )
                                  )
               Plaintiff,        )
                                  )
v.                                )
                                  )    Case No. 1:06CV00949 (JR)
UNITED STATES DEPARTMENTS         )
OF COMMERCE and STATE,            )
                                  )
               Defendants.       )
_____)

**PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO
PLAINTIFF'S RENEWED MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56 and Local Rules 7(d) and 56.1, Plaintiff ICM Registry, LLC ("ICM"), by its attorneys, hereby replies to Defendants' response (Doc. No. 25) ("Def. Sec. Opp.") to ICM's Cross-Motion for Summary Judgment. There continue to be no genuine issues of material fact bearing on ICM's Complaint seeking access to records sought through requests under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), that relate to ICM's pursuit of approval from the Internet Corporation for Assigned Names and Numbers ("ICANN") to operate a .xxx domain, and ICM is entitled to judgment as a matter of law except as its Memorandum in Support of its Cross-Motion (Doc. No. 21) ("Pl. Sec. Mem.") otherwise notes. *See* Pl. Sec. Mem. at 2 n.1 & internal references cited therein. Accordingly, the Court should grant ICM's Cross-Motion for Summary Judgment for reasons stated in its Cross-Motion and in this Reply. *Bennett v. DEA*, 55 F.Supp.2d 36, 38-39 (D.D.C. 1999).

**PRELIMINARY STATEMENT**

The government now has had four opportunities – the responses to ICM's requests, ICM's administrative appeals, the first set of summary judgment motions before this Court, and

now the current round of summary judgment motions – to connect the documents withheld under FOIA Exemption 5's deliberative process privilege to a legitimate policymaking action.[1] Indeed, in each of its multiple bites at the proverbial apple, the government primarily has continually shifted its theory on why it was permissible to withhold the records it has shielded from public view. Plaintiff's instant Cross-Motion demonstrated that the centerpiece of the government's FOIA defense – that it was developing "a position on how to respond if ICANN were to recommend the creation of a proposed new .xxx domain" – tied back to agency action that at best was either ministerial or *ultra vires*, and consequently insufficient to support an Exemption 5 claim. *See* Pl. Sec. Mem. at 14-31.

Not surprisingly, as in the past, the government's opposition trots out another theory, in which – remarkably – it simply and expressly denies outright that it has any duty to connect to any legitimate policymaking the agency actions that it claims allow it to withhold material responsive to ICM's requests. Under the government's new theory, Exemption 5 applies "[w]hether or not the DOC had actual policymaking authority" but rather the "pertinent question is whether or not the DOC conducted deliberations, which it did," such that "regardless of whether the DOC had authority to effectuate policy, [its] predecisional deliberations are protectible." Def. Sec. Opp. at 8. If we are to understand properly, according to the government, the deliberative process privilege applies even when the action under consideration is wholly illegitimate and bears no relation to the agency's policymaking authority. In other words, anything goes. But this clearly is not the state of the applicable law. *See infra* at 5-7. The

---

[1] *See Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). Nondisclosure is justified only for records that are both predecisional, *i.e.*, antecedent to the adoption of agency policy, and deliberative, *i.e.*, actually related to the process by which policies are formulated; *Jordan v. DOJ*, 591 F.2d 753, 773 (D.C. Cir. 1978); *Formaldehyde Inst. v. HHS*, 889 F.2d 1118, 1121 (D.C. Cir. 1989).

government's current position, that Exemption 5 demands no connection to policymaking, stands in stark contrast to its repeated (but unavailing) attempts to situate the disputed documents in the context of agency decisions.

Throughout this litigation, ICM has documented the fact that the U.S. government leaves to ICANN the policy decision whether to add new domains to the Internet root server system.[2] Pl. Sec. Mem. at 5-6; Opposition and Cross-Motion for Summary Judgment ("Pl. SJ Opp.") at 4-5. Similarly, under the *Memorandum of Understanding Between the U.S. Department of Commerce and Internet Corporation for Assigned Names and Numbers* ("MoU"), ICANN – not the Department of Commerce – plays the policymaking role in approving new domains; by contrast, the role of the Department of Commerce is ministerial. *See* Pl. Sec. Mem. at 6-7 & n.11.

Conversely, the government repeatedly has responded to ICM's detailed discussion of the precise scope of Commerce's role with only generalized claims about the agency's interest in ICANN's domain-name approval process. The government first tried to tie the relevant policymaking allegedly at issue to vague references to ICANN's consideration of the .xxx domain. Pl. SJ Opp. at 27-34. But when ICM pointed out that such assertions lack any explanation of how *ICANN* consideration of .xxx or possible entry into a contract with ICM has a nexus to legitimate exercises of *Commerce Department* policymaking, Pl. SJ Opp. at 3, 27-34, the government then changed course by asserting that Commerce exercises direct authority over whether new domains are added to the authoritative root zone file *even after ICANN approves such domains.*[3]

---

[2] *Management of Internet Names and Addresses*, 63 Fed. Reg. 31741 (1998) ("*White Paper*").

[3] Defendants' Reply to Plaintiff's Consolidated Opposition ("Def. SJ Opp.") at 6 ("DOC, through its National Telecommunications and Information Administration… has official responsibilities with respect to ICANN and the creation of new domains such as .xxx" including the extent to which "the United States government maintains policy control over and operational

However, this version of Commerce authority over the creation of new domains simply confused the respective roles of ICANN and Commerce because, as ICM explained in the current round of summary judgment motions, Commerce has no decision to make – and no policy role – once ICANN approves a domain. Indeed, the MoU and *White Paper* require that Commerce, as a ministerial act, add all ICANN-approved domains to the root.[4] Having tried and failed throughout this litigation to connect the documents withheld under the deliberative process privilege to some exercise of agency authority, the government, now backed into a corner, offers the radical view that "the Government s case for invoking the deliberative process privilege *does not hinge on the DOC s policymaking authority regarding the deliberations at issue*," Def. Sec. Opp. at 2 (emphasis added), a view squarely rejected by binding authority, as detailed below.

The State Department, meanwhile, fares no better than Commerce. Even at this late stage of litigation it fails to demonstrate with sufficient particularity that the documents it withholds

---

oversight responsibility for modifications to, and maintenance and dissemination of, the 'authoritative root zone file.'").

[4] Def. SJ Opp. at 6 ("Before any new domain can be established, the ICANN Board must not only approve its creation, but also must submit an official recommendation to NTIA to add the new domain to the authoritative root zone file. After the ICANN Board makes an official recommendation, NTIA must approve the recommendation and provide written direction to VeriSign, Inc. to modify the authoritative root zone file before the domain is live within the Internet domain name system.") (footnotes omitted). *Accord*, www.icann.org/general/white-paper-05jun98.htm (assigning ICANN role of overseeing "policy for determining the circumstances under which new TLDs are added to the root system" and to the government the duty to "recognize the role of [ICANN] to establish and implement DNS policy and to establish terms (including licensing terms) applicable to new and existing gTLDs and registries under which registries, registrars and gTLDs are permitted to operate"). Under the MoU in effect at all relevant times, the government's role was limited to maintaining "oversight of the technical management of the DNS functions currently performed either directly by, or subject to agreements with, the U.S. Government, until such time as further agreement(s) are arranged as necessary for ICANN to undertake management of specific DNS technical management functions." www.icann.org/general/amend6-jpamou-17sep03.htm.

4

qualify as predecisional and deliberative under Exemption 5. It also fails to demonstrate that the material it has withheld under FOIA Exemption 4 is commercial and confidential.

I.  **COMMERCE FAILS TO SATISFY ITS BURDEN UNDER EXEMPTION 5 BECAUSE THE FOIA DOES NOT PROTECT AGENCY DISCUSSION UNRELATED TO LEGITIMATE POLICYMAKING**

To support its newly minted position that Exemption 5 protects *any* agency discussion, even discussions unrelated to legitimate policymaking, Commerce relies almost exclusively on *Enviro Tech International, Inc. v. EPA*, 371 F.3d 370 (7th Cir. 2004), a case the government cites *nine times* in its latest brief. Leaving aside the fact that the Seventh Circuit issued the decision, which makes it non-binding on this Court, *Enviro Tech* by its own terms does not support the government's argument. In *Enviro Tech*, the Court held that EPA's consideration whether to set a workplace exposure limit for a chemical qualified as policymaking for purposes of Exemption 5 because "[i]t is, at the least, arguable that identifying the exposure limits … is a task subsumed within" the EPA's statutory mandate. *Id.* at 377. Thus, *Enviro Tech* held that Exemption 5 applies to policymaking that arguably lies beyond – "but not [ ] patently beyond" – the "scope of [the agency's] authority." [5] In this case, and as explained previously, Pl. Sec. Mem. at 16-18, any decision not to add the .xxx domain to the root after ICANN approval would exceed the role of the government contemplated in the *White Paper* and specified in the MoU, and therefore is disqualified for protection even under *Enviro Tech*. Tellingly, the government posits that "DOC has ample authority" to engage in whatever policymaking Commerce now claims it engaged in, Def. Sec. Opp. at 2, but fails even to mention ICM's detailed discussion of

---

[5] *Id.* at 377. The other cases the government cites in asserting that *ultra vires* activity qualifies for protection, Def. Sec. Opp. at 3 n.2, are wholly inapposite. *See Formaldehyde Inst.*, 889 F.2d at 1124 ("Congress … directed HHS to make precisely the kind of 'deliberative' decision" at issue, obviously foreclosing any contention regarding *ultra vires* agency action) (emphasis original); *Maydack v. DOJ*, 362 F.Supp. 2d 316 (D.D.C. 2005) (no mention of *ultra vires* action).

the relative roles of ICANN and the Commerce Department in the establishment of functioning new domains.

To the extent the government generically asserts that the relevant policy decision is Commerce's response to ICANN approval of the .xxx domain or its general opinion on .xxx (as distinguished from the more concrete formulation of the decision as whether to add the .xxx domain to the root), this Court has already held that such conclusory formulations cannot support an Exemption 5 claim. *ICM Registry, LLC v. Department of Commerce*, No. 06-0949, 2007 WL 1020748 (D.D.C. Mar. 29, 2007) ("*SJ Order*"), at *8 n.8 ("Descriptions of mere opinions regarding ICANN's consideration of .xxx – absent, for example, corresponding assertions that such opinions concern DOC's role in the ICANN process and contribute to an ongoing dialogue or debate regarding that role – do not enjoy deliberative process privilege."); *id.* at *8 (assertion that a document is "related to ICANN's decision about the .xxx domain" insufficient); *id.* at *9 ("opinions related to .xxx" insufficient); *see also id.* at *10.

Beyond the government's misreading of *Enviro Tech*, authority that *is* binding in this jurisdiction dictates that the documents in issue must be disclosed, because ICM has cited evidence that Commerce, facing pressure from well-connected lobbying groups, and only after the ICANN Board had approved the .xxx application, reversed its prior position, and instead worked behind the scenes – and not through any official or legitimate deliberative process – to pressure ICANN not to approve the .xxx contract with ICM. Pl. Sec. Mem. at 4-5; Pl. SJ Opp. at 7-9. In this regard, *this* Court has held that seeking mere political cover independent of any legitimate agency function is insufficient to trigger FOIA protection. *Tax Reform Research Group v. IRS*, 419 F.Supp. 415, 418 (D.D.C. 1976) ("[D]ifficulties arise where, as here, the activities involved are not part of the normal and proper operations of the agency … but are rather connected with

6

serious abuses of an essentially political nature"); *Alexander v. FBI*, 186 F.R.D. 154, 164 (D.D.C. 1999) ("[P]olitical motivations for or connections to the misuse [of a government file] fall under the misconduct exception to the deliberative process privilege."). Notably, while the government relies almost entirely on *Enviro Tech*, it fails to even mention *Tax Reform Research Group*, and wholly fails to refute that that case and *Alexander v. FBI* – both of which ICM discussed in its renewed summary judgment motion – preclude Commerce's Exemption 5 claims here.

Where, as here, documents withheld under the deliberative process privilege "may shed light on government misconduct," *In re Sealed Case*, 121 F.3d 729, 736 (D.C. Cir. 1997), and/or "if there is 'any reason' to believe the information [ ] may shed light on government misconduct, public policy (as embodied by the law) demands that the misconduct not be shielded merely because it happens to be predecisional and deliberative." *Alexander v. FBI*, 186 F.R.D. at 164 (citation omitted). *See also id.* at 164-65 (party seeking disclosure need not "*prove*" misconduct and need only cite "some identifiable basis for relevant government misconduct"); *Sealed Case*, 121 F.3d at 746 (deliberative process privilege "disappears altogether when there is any reason to believe government misconduct occurred"). Even the Seventh Circuit decision in *Enviro Tech*, which the government so frequently cites, recognizes these limits on the deliberative process privilege. [6]

Apparently placing all its eggs in the basket of its new argument – that Exemption 5 applies so long as an agency discusses *some* policy – the government in its latest filing offers no new information that connects the withheld documents to any legitimate agency action. With

---

[6] *See* 371 F.3d at 376 (citing, *inter alia*, *Tax Reform Research Group*, 419 F.Supp. at 426; *Hearnes v. IRS*, No. 77-225C(3), 1979 WL 1428, at *6 (E.D. Mo. July 2, 1979); *Sealed Case*, 121 F.3d at 746).

7

regard to Documents EP7, EP46, EP 59-69, EP90-92, EP33-34, EP98, EP102, EP116-117, EP 125-126, MPW3, MPW14, 000020, 000021, and 000025, the government simply reiterates its theory that it need not connect the documents to any proper agency decision, positing that mere political cover and public relations spin trigger the deliberative process privilege, Def. Sec. Opp. at 5-6, and it thus fails to articulate how such decisions relate to any Commerce authority or affect any Commerce policy decision.[7] In the brief passages where the government actually discusses the topic of the supposed deliberations, it does so either by rehashing the same conclusory terms it has used throughout this litigation and which this Court has already dismissed as insufficient (*e.g.*, "opinions concerning ICANN matters," Def. Sec. Opp. at 8 (quoting Supplemental Vaughn Index at 13)) or by listing subjects but failing to connect them to Commerce Department authority or policymaking (*e.g.*, "the possible effects of creation of a .xxx domain on children's access to pornographic material," Def. Sec. Opp. at 4).

To the extent the government claims withheld documents involve recommendations to the Governmental Advisory Committee ("GAC"), its new assertions lack any credibility. Commerce was in most cases communicating directly with the *ICANN Board* in an attempt to delay and block its decision, and not with the GAC. *See* Pl. SJ Opp. at 8. The letter from Assistant Secretary Gallagher to Dr. Cerf, for example, urged the ICANN Board to delay finalizing the .xxx sTLD contract, and did not even refer to the GAC. *See id.* at 8; Compl. App. E at 21 ("Cerf

---

[7] The government cites *Sierra Club v. Department of the Interior*, 384 F.Supp.2d 1, 22 (D.D.C. 2004), and *Krikorian v. Department of State*, 984 F.2d 461, 466 (D.C. Cir. 1993), for the proposition that communications with the public regarding agency policy can qualify for Exemption 5 protection, Def. Sec. Opp. at 5-6, but these cases are inapposite because they did not involve potential misuse of agency authority due to political pressure, a consideration that defeats the deliberative process privilege in this case, as in *Tax Reform Research Group*, *Alexander*, and *Hearnes*. While disclosures of disputed documents might lead to "political controversy" or "departmental embarrassment," such are the very "consequences which the FOIA intends: robust political debate, agency accountability, and public disclosure rather than secrecy." *Carter v. Dep't of Commerce*, 186 F.Supp.2d 1147, 1157 (D. Ore. 2001).

8

Letter") ("I request that the *Board* will provide a proper process and adequate additional time") (emphasis added). Moreover, the government's new position is a shift, given that adding .xxx to the root is not a GAC function but rather a function Commerce must perform in its capacity as administrative manager of the root server system under the MoU.

Beyond these limited additional references to the supposed policymaking at issue, the government rests on its old and generic references to a putative "reaction" or "response" to ICANN's then-impending approval of a contract for operation of the .xxx domain. But ICM has already shown this to be irrelevant to any legitimate Commerce Department decision, given that ICANN and not the Commerce Department is responsible for developing and implementing policy for the addition of new domains. Thus, the only permissible response from the Commerce Department is to add the domain to the root on ICANN's recommendation.[8] Significantly, the government's only rejoinder to this showing (other than claiming that deliberative processes need not relate to policymaking within the agency's authority to claim Exemption 5 protection) was its continuing to make vague and generalized statements about Commerce's ICANN-related duties. *See* Def. Sec. Opp. at 2 & n.1 (noting alleged DOC "ample authority" with regard to "possible courses of action if ICANN were to recommend the creation of the proposed new .xxx domain and/or enter into a contract with ICM to operate the domain" and citing functions such as "monitoring ICANN's compliance with the 1998 MOU … and participating in the [GAC]").

With respect to Documents 000001-10, 000016, 000018-19, and 000028-33, the government again recites that these documents are "drafts," Def. Sec. Opp. at 8-10, as if that label

---

[8] *See* Pl. Sec. Mem. at 20-24. *See also* Defendants' Second Motion for Summary Judgment ("Def. Sec. Mot.") at 23 (alluding in vague terms to "alternatives the agency would have to address if the .xxx domain were created"); *id.* at 22 (deliberation about "possible effects of creation of a .xxx domain on children's access to pornographic material" with no explanation of Commerce Department policymaking authority in this area); *id.* at 29 ("what position DOC should adopt if a .xxx domain is approved").

9

talismanicly confers Exemption 5 protection, ignoring this Court's statement in this litigation that "draft documents are not presumptively privileged." *SJ Order* at *5 (citing *Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 257 (D.C. Cir. 1982)). *See also Hansen v. Dep't of the Air Force*, 817 F.Supp. 123, 125 (D.D.C. 1992), *cited in* Pl. Sec. Mem. at 31 n.52. The government still does not assert that these documents contain any deliberative content tied to policymaking, nor provide any basis for withholding the last version of each document. Nor does it respond to ICM's argument that under the government's theory (which apparently holds that so long as a document is continuously edited and commented upon it eternally remains a "working draft"), an agency could avoid disclosure of a document used as a final statement of policy simply by inserting editing marks as window dressing. Pl. Sec. Mem. at 30-31. At a minimum, the Court should review these documents *in camera* to determine whether these last "drafts" in fact reveal *any* deliberation with regard to what the hypothetical and never-created "final" drafts would have contained.

## II. THE STATE DEPARTMENT AGAIN FAILS TO CARRY ITS BURDEN UNDER EXEMPTIONS 4 AND 5

The State Department also fails to demonstrate that <u>Documents E2 and E71</u> qualify as "commercial or financial" and "privileged or confidential" – both prerequisites to Exemption 4 protection. *SJ Order* at *6 (citing 5 U.S.C. § 552(b)(4) & *Gulf & W. Indus., Inc. v. United States*, 615 F.2d 527, 529 (D.C. Cir. 1979)). As for the "privileged and/or confidential" prong, this Court held that the government failed to make the required showing in its first summary judgment motion, *SJ Order* at *7-8, and the government waited until its latest (and final) brief to provide declarations from John O. Jeffrey and Marilyn S. Cade. These eleventh-hour declarations conveniently recite the relevant issues listed by this Court in the previous orders, but they

do so in boilerplate terms, ignoring this Court's admonition that "mere repetitions of the legal standard" do not suffice under the confidentiality prong of Exemption 4. [9]

ICM also continues to respectfully disagree with this Court's determination, *see SJ Order* at *7-8; Pl. Sec. Mem. at 34 n.55, that the withheld information is "commercial or financial," 5 U.S.C. § 552(b)(4). It is well-settled that "not every bit of information submitted to the government by a commercial entity qualifies for protection under Exemption 4," *Public Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983), and the government's latest declarations only confirm the non-commercial nature of the information at issue by stating, for example, that the redactions relate not to commercial information but to "conversations between ICANN staff and governmental officials." [10] With respect to the Cade Declaration, the statements therein serve only to confirm that the government has not met its burden of showing the material is not commercial or financial. In fact, the declaration says *nothing* about the substance of the material withheld but rather claims only that the redacted material comes from "third parties [who] interacted with [her] in private conversations." Cade Decl. ¶ 8. But the asserted confidentiality that may have existed between Ms. Cade and third parties, whatever potential commercial implications it raises, does not necessarily make the underlying information redacted from her email that has become a government record "commercial" or "financial" within the meaning of Exemption 4. *Washington Research Project, Inc. v. HEW*, 504 F.2d 238, 244-45

---

[9] *SJ Order* at *7. *See also* Def. Sec. Opp., Ex. A ("Cade Decl.") ¶ 9 ("If the government could not withhold such private commercial information in response to a [FOIA] request, I would not provide it to the government in the first place[.]"); *id.*, Ex. B ¶ 6 ("Jeffrey Decl.") ("If the government could not withhold such information in response to a Freedom of Information Act request, ICANN would seek to avoid providing it to the government in the first place …").

[10] Def. Sec. Opp., Ex. B at 3; *see also id.*, Ex. A at 4 (no mention of the supposed commercial nature of the information). Given such indications that the material at issue is not commercial or financial in nature, the Court should at minimum review Documents E2 and E71 *in camera* to determine whether they in fact contain any protected information.

11

(D.C. Cir. 1974) (scientist's research designs submitted with grant applications do not qualify as commercial information despite harm that disclosure could cause him). Because the government continues to be silent on this point, it has not met its burden. *Id.* at 244 n.6 ("burden of showing the trade or commercial character of the … information was on the agency").

While the State Department at least attempted to provide new evidence in support of its Exemption 4 claims, it continues to rely solely on the Beaird Declaration – which discusses supposed policymaking in extremely vague terms such as deliberation on "international meetings," "proposed telecommunications legislation," "other telecommunications legislation" and "other similar deliberations" – to support its Exemption 5 claims regarding Documents E3, E36, E68, E69, and E70. Def. Sec. Mot., Ex. A at 10-11; Pl. Sec Mem. at 26-27. The government still fails to meet its Exemption 5 burden because such assertions still do not "specify the deliberative process reflected in these documents."[11] Similarly, with regard to Document E54, the government still offers nothing to overcome this Court's justified skepticism that "mere commentary on a news report" can trigger Exemption 5 protection. *SJ Order* at *9. Instead, the government refers vaguely to "Internet governance" and "the relationship between the United States Government and ICANN," as the supposed policy decision at issue. Def. Sec. Opp. at 17. Finally, as for Document E59, the government refers generally to a "policymaking process" involving "Internet governance," and is reduced to speculation even about such a basic question as the author of the supposedly deliberative document. Def. Sec. Opp. at 19-20.

---

[11] *SJ Order* at *6; Pl. Sec. Mem. at 26-27. The government observation, based on *Coastal States Gas*, that the documents involve communications from a superior to a subordinate, *see* Def. Sec. Opp. at 21 (citing 617 F.2d at 868), is irrelevant because the government still "has the burden of establishing what deliberative process is involved, and the role played by the documents in issue in the course of that process," a burden it does not meet. *Coastal States*, 617 F.2d at 868.

### III. THE GOVERNMENT'S NEW CLAIM THAT ICANN DID NOT FIND THAT ICM MET ALL ELIGIBILITY CRITERIA FOR A .xxx DOMAIN IS MISGUIDED AND CONTRADICTS THE FINDING OF THIS COURT

Despite failing to mention the issue in all of its prior filings – and only now that this Court has made a finding directly to the contrary – the government contends "ICANN's Board [did not] determine[ ] that .xxx satisfied all criteria for new sTLDs." Def. Sec. Opp. at 10. The Court's order on summary judgment directly forecloses this position:

> On June 1, 2005, the ICANN Board determined that the .xxx application met all eligibility criteria for sponsored domains and authorized ICANN staff to initiate contractual negotiations with ICM.

*SJ Order* at *1. It is notable in this regard that the Statement of Material Facts Not in Genuine Dispute attached to ICM's original cross-motion for summary judgment stated "[o]n June 1, 2005, ICANN found that ICM's .xxx sTLD application met all eligibility criteria and voted to negotiate with ICM a contract to operate the domain[.]"[12] As ICM pointed out in its summary judgment reply on the prior round of pleadings, under Local Rule 7(h), "Defendants did not respond to Plaintiff's Statement of Material Facts Not in Dispute" so "the facts therein may be deemed admitted (as may those not contested in Plaintiff's Response to Defendants' Statement of Material Facts Not in Dispute)." Pl. Reply in Support of Cross-Motion for Sum. J. ("Pl. SJ Reply") at 1 n.1. Accordingly, any dispute Defendants wish to raise on this point has been waived.[13]

---

[12] Plaintiff's Statement of Material Facts Not in Dispute ("Pl. Material Facts") ¶ 2.

[13] *Ouzts v. Hantman*, No. 03-1275, 2005 WL 3508655, at *2 (D.D.C. Dec. 22, 2005). Defendants' attempt to now dispute in their second round of summary judgment pleadings this paragraph of ICM's Statement of Material Facts is to no avail. For all intents and purposes, this fact is not even "stated" at this stage of the proceedings, and the government may not exploit ICM's inclusion of its previously stated – and undisputed – material facts as part of its current statement as a matter of convenience for the Court. *See* Plaintiff's Statement of Additional Material Facts Not in Dispute ("Pl. Add'l Material Facts") at 1 ("Statement includes each of the

In any case, the government's position is plainly at odds with the facts. ICANN's request for proposals ("RFP") for new sponsored top level domains ("sTLDs") to which ICM's .xxx application responded set out an explicit process for consideration and approval new domains. The RFP clearly stated that the two-step process required that after – and only after – ICANN's Board found that an sTLD satisfied the RFP criteria, would it proceed to commercial and technical negotiation of a contract for operation of the domain.[14] The record with respect to .xxx amply reflects that prior to June 1, 2005, the Board extensively considered *and disposed of* any questions concerning the RFP criteria. According to the official minutes of a meeting between the ICANN Board and the GAC in July of 2005, Dr. Cerf affirmatively informed the GAC that .xxx met the RFP Criteria.[15]

That ICM's .xxx proposal was found to meet all the RFP criteria also is evident in the fact that, once the Board approved commercial negotiations on June 1, 2005, its focus shifted

---

items from Plaintiff's Statement of Material Facts submitted with its original motion for summary judgment in this case, and those are reproduced here, without alteration and in italics").

[14] *See* www.icann.org/tlds/new-stld-rfp/new-stld-application-parta-15dec03.htm; www.icann.org/announcements/advisory-31oct03.htm ("Upon the successful completion of the sTLD … process, an agreement reflecting the commercial and technical terms shall be negotiated."). *See also* www.icann.org/meetings/kualalumpur/captioning-public-forum-23jul04.htm (transcript of live captioned ICANN meeting stating that only sTLD applications "that meet the requirements of the RFP" progress to contract negotiations); www.icann.org/meetings/rome/captioning-forum1-04mar04.htm (same). Letter from Vint Cerf to Peter Zangl (Jan. 17, 2006) ("Cerf Letter"), *available at* www.icann.org/correspondence/cerf-to-zangl-30jan06.pdf ("Where an applicant passed all three sets of criteria and there were no other issues associated with the application, the Board was briefed and the application was allowed to move on to the state of technical and commercial negotiations designed to establish a new sTLD.")

[15] *See* gac.icann.org/web/meetings/mtg22/LUX_MINUTES.doc ("The proposal … met the three main criteria, financial, technical, sponsorship."). *See also, e.g.*, www.icann.org/meetings/luxembourg/captioning-pf2-14jul05.htm (transcript of live captioned meeting) (noting that .xxx was one of "[f]our … applicants" who was finally "found to *satisfy the baseline criteria*" in the RFP) (emphasis added); Cerf Letter ("the Board authorized the President and General Counsel to enter into negotiations relating to proposed commercial and technical terms with ICM").

14

exclusively to contract issues. [16] Likewise, staff negotiations beginning in June of 2005 were limited to the discrete contractual issues appropriate in the second stage of the sTLD application process. Simply put, and consistent with ICANN's "Core Values" and Bylaws, after June 1, 2005, nothing other than the terms and conditions of the registry agreement were properly on the table, because the .xxx proposal already had satisfied the RFP criteria. [17]

## IV.  REQUEST FOR EXPEDITION AND OTHER PROCEDURAL MATTERS

ICM respectfully repeats and renews its request, first expressed in its original reply on summary judgment, that the Court schedule the summary judgment motions for hearing at the earliest possible date, or even issue an expedited ruling on the pleadings without holding a hearing. *See* Pl. SJ Reply at 19. It is now going on 20 months since ICM filed the first of the FOIA requests at the heart of this case, which is itself over a year old and commenced only after several months of inaction following expiration of the statutory deadlines for agency action. *See* Pl. SJ Reply at 19-20; Pl. SJ Opp. at 9-14. *Cf. Electronic Privacy Information Ctr. v. DOJ,* 416 F.Supp.2d 30, 37-38 (D.D.C. 2006). And while the suit has succeeded in forcing the Commerce and State Departments to attempt to explain their withholdings, and in shaking loose a few of the documents, [18] the status of the documents still at issue, constituting nearly a quarter of those in dispute, remains unsettled. As stated previously, ICANN's decision not to enter the contract with ICM to operate the .xxx domain is yet subject to arbitration under provisions in ICANN's

---

[16] *See*, *e.g.*, www.icann.org/minutes/minutes-18apr06.htm.

[17] It also is significant that insofar as the government's most recent (and fourth) pleading is the first to which it appended a Declaration or any other statement from an ICANN official as noted above, *see supra* n.9, the Jeffrey Declaration would have been the ideal place for ICANN to confirm the government's take on the meaning of the Board moving .xxx to contract negotiations. However, just as the dog's failure to bark revealed to Sherlock Holmes there had never been a midnight intruder in *The Silver Blaze*, Sir Arthur Conan Doyle, THE COMPLETE SHERLOCK HOLMES 383, 400 (1953), ICANN's silence here is particularly telling.

[18] *SJ Order* at *11-15, 16-19, 20-25; Def. Sec. Mot. at 11.

bylaws providing for independent review by an international arbitration provider.  Pl. Add'l Material Facts ¶ 61.  It is extremely likely that, only if the Court expedites review, will any documents it orders disclosed have any utility in the remaining process to which ICM is entitled under ICANN's rules.  As noted, a case such as this, where information may lose its value unless the Court acts quickly, is a "paradigmatic example[] of 'good cause'" that justifies expedited treatment. [19]

ICM also respectfully requests that any order on the instant cross-motions for summary judgment include analysis of the records in dispute in this case that the Court held *sub silentio* in the *SJ Order* to be properly withheld.  *See SJ Order* at *11-20.  The D.C. Circuit is clear that:

> [T]o promote efficacious appellate oversight … [such] "decisions in FOIA cases must provide statements of law that are both accurate and sufficiently detailed to establish that the careful *de novo* review prescribed by Congress has in fact taken place."  This important appellate function is frustrated where … the order under scrutiny merely declares … that withholdings of FOIA-requested materials were proper, and does not elucidate why.

*Truitt v. Department of State*, 897 F.2d 540, 547-548 (D.C. Cir. 1990) (citations omitted).  *See also Founding Church of Scientology v. Bell*, 603 F.2d 945, 950 (D.C. Cir. 1979); *Summers v. DOJ*, 140 F. 3d 1077 (D.C. Cir. 1998); *Schwartz v. IRS*, 511 F.2d 1303, 1307 (D.C. Cir. 1975).  Should the instant case give rise to an appeal, a sufficiently detailed rationale of why the government has met its burden as to any documents not ordered released will be necessary.

---

[19] *See* Pl. Reply at 20 (citing *Ontario Forest Indus. Ass'n v. United States*, 444 F.Supp. 2d 1309, 1319 (Ct. Int'l Trade 2006)).  *See also Natural Resources Defense Council v. Department of Energy*, 191 F.Supp.2d 41, 43 (D.D.C. 2002); *Washington Legal Found. v. United States Sentencing Comm'n*, 17 F.3d 1446, 1448 (D.C. Cir. 1994); *Ryan v. DOJ*, 617 F.2d 781, 784 (D.C. Cir. 1980); *Ferguson v. FBI*, 722 F.Supp. 1137, 1143-46 (S.D.N.Y. 1989)).

## CONCLUSION

For the foregoing reasons, Plaintiff ICM respectfully requests that the Court grant its renewed motion for summary judgment on its Complaint in this matter with respect to documents discussed in the *SJ Order*.

Dated this 5th day of July, 2007.

        Respectfully submitted,

        DAVIS WRIGHT TREMAINE LLP


            /s/ Robert Corn-Revere
        Robert Corn-Revere – Bar No. 375415
        Ronald G. London – Bar No. 456284
        Davis Wright Tremaine LLP
        1919 Pennsylvania Ave, N.W., Suite 200
        Washington, D.C.  20006
        (202) 973-4200

        ATTORNEYS FOR PLAINTIFF
        ICM REGISTRY, LLC